Mark D. Bloom, Esq. (*pro hac vice* pending)
**BAKER & MCKENZIE LLP**
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131
Telephone: (305) 789-8900
Facsimile: (305) 789-8953
Email: mark.bloom@bakermckenzie.com

Frank Grese, Esq.
Richard Solow, Esq.
**BAKER & MCKENZIE LLP**
452 Fifth Avenue
New York, New York 10018
Telephone: (212) 626-4100
Facsimile: (212) 310-1600
Email: frank.grese@bakermckenzie.com
richard.solow@bakermckenzie.com

*Counsel for the Foreign Representative*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |  |
|---|---|---|
| | x | |
| In re: | : | Chapter 15 |
| | : | |
| PT Pan Brothers Tbk,[1] | : | Case No. 22-10136-mg |
| | : | |
| Debtor in a Foreign Proceeding. | : | |
| | x | |

**DECLARATION OF GEOFFREY DAVID SIMMS IN SUPPORT OF MOTION FOR
(I) RECOGNITION OF FOREIGN NONMAIN  PROCEEDING, (II) RECOGNITION OF
FOREIGN REPRESENTATIVE, (III) RECOGNITION OF SANCTION ORDER AND
RELATED SCHEME, AND (IV) RELATED RELIEF AND ADDITIONAL ASSISTANCE
UNDER CHAPTER 15 OF THE BANKRUPTCY CODE**

---

[1] The Debtor in this chapter 15 case (the "**Chapter 15 Case**") is PT Pan Brothers Tbk, which is incorporated and registered in Indonesia with Indonesia Registration No. 8120214123901 and has its registered office at Jalan Raya Prabu Siliwangi No 178, Kelurahan Alam Jaya, Kecamatan Jatiuwung, Kota Tangerang, Provinsi Banten.

GEOFFREY DAVID SIMMS, hereby declares as follows:

1.      I am a Partner and President Director of PT AJ Capital Advisory ("**AJ Capital**"), a financial advisory firm with expertise in restructuring, insolvency and forensic accounting with offices in Singapore and Indonesia. I also am the duly authorized foreign representative (the "**Foreign Representative**") of the Debtor in connection with its foreign proceeding (the "**Singapore Scheme Proceeding**") that was commenced in and filed before the General Division of the High Court of the Republic of Singapore (the "**Singapore Court**"), pursuant to Section 71 of the Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018) (the "**IRDA**").[2]

2.      In the foregoing capacities, I submit this declaration (this "**Declaration**") in support of (a) the *Motion for (I) Recognition of Foreign Nonmain Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief and Additional Assistance Under Chapter 15 of the Bankruptcy Code* (the "**Motion**"), filed contemporaneously herewith, and (b) the Official Form 401 Petitions and the statements and lists attached thereto filed contemporaneously herewith for PT Pan Brothers Tbk ("**Pan Brothers**" or the "**Debtor**") (together with the Motion, the "**Chapter 15 Petition**").

3.      AJ Capital is the independent financial advisor to the "**Pan Brothers Group**" which consists of Pan Brothers and its "**Related Companies**," namely:

     a.     PB International B.V. ("**PBI**" or the "**Issuer**");

     b.     Continent 8 Pte. Ltd., a Singapore Limited Liability Company ("**Continent 8**");

     c.     PB Apparel(s) Pte. Ltd., a Singapore Limited Liability Company ("**PBA**");

     d.     PB Island Pte. Ltd., a Singapore Limited Liability Company ("**PBL**");

---

[2] Relevant provisions of IRDA are attached as Exhibit A to the Chua Declaration (defined below).

e.        PT Pancaprima Ekabrothers ("**PPEB**");

f.        PT Hollit International ("**Hollit**");

g.        PT Ocean Asia Industry ("**OAI**");

h.        PT Prima Sejati Sejahtera ("**PSS**");

i.        PT Eco Laundry Hijau Indonesia ("**ELHI**");

j.        PT Eco Smart Garment Indonesia ("**ESGI**");

k.        PT Berkah Indo Garment ("**BIG**");

l.        PT Victory Pan Multitex ("**VPM**");

m.        PT Teodore Pan Garmindo ("**TPG**");

n.        Cosmic Gear Limited ("**CGL**");

o.        PT Apparelindo Prima Sentosa ("**APS**");

p.        PT Prima Kreasi Gemilang ("**PKG**");

q.        PT Prima Cosmic Screen Graphics ("**PCSG**");

r.        PT Mitra Busana Sentosa ("**MBS**");

s.        PT Apparelindo Mitra Andalan ("**AMA**"); and

t.        PB Fashion B.V. ("**PBF**").

4.        I am authorized to act as the Foreign Representative of the Debtor and commence this Chapter 15 Case on the Debtor's behalf pursuant to the Order of the Singapore Court dated January 17, 2022 (the "**Sanction Order**"). Furthermore, as described more fully below, the Sanction Order approved the Scheme between PT Pan Brothers TBK and the Scheme Creditors, dated November 12, 2021 (the "**Scheme**").[3]  A certified copy of the Sanction Order from the

_____

[3] Unless otherwise noted, capitalized terms used but not otherwise defined herein, shall the meanings ascribed to them in the Scheme.

Singapore Court, accompanied by a true and correct copy of the Scheme attached to that Order as "Schedule 1," is attached as composite to Debtor's Official Form 401 Petition as Exhibit A. I have reviewed and am aware of the Sanction Order and the Scheme attached thereto.

5.      In my capacity as Foreign Representative and as Chairman of the Scheme process as explained more fully hereinafter, I have direct personal knowledge of the Debtor's financial position, business, and reorganization plan adopted and approved through the Scheme, as described more fully below. I also have prior experience acting as foreign representative in other cases commenced under Chapter 15 of the United States Bankruptcy Code (the "**Bankruptcy Code**") in the Southern District of New York (the "**District**"), including *In re PT Sri Rejeki Isman Tbk et al.*, jointly administered as Case No. 1:21-bk-11072 (JLG); *In re PT Delta Merlin Dunia Textile etr al.,* jointly administered as Case No. 1:19-bk-13214 (SHL).

6.      Each of the facts set forth in this Declaration is true to the best of my knowledge, information, and/or belief, as formed after reasonable diligence and investigation, and is based on information known by me or provided to me by other professionals and staff at AJ Capital acting in this matter at my direction and under my supervision.

**Eligibility, Purpose and Filing of the Chapter 15 Petition**

7.      The Debtor has property in the United States in the form of: (i) a retainer with the law firm of Baker & McKenzie, which funds are held in a trust account at a financial institution located in New York, New York, and (ii) certain property rights arising under the Existing Notes Indenture (defined below) that are governed by New York law.

8.      Because the Existing Notes (defined below) are governed by New York law and the Existing Notes Indenture (defined below) contains exclusive New York choice of forum provisions, as was set forth in the Scheme Documents (defined below), the Debtor is seeking recognition and enforcement under Chapter 15 in order to give effect to the Scheme in the United

States, so as to: (1) satisfy a condition precedent to the effectiveness and enforceability of the

Scheme, and ensure its orderly and consistent implementation, (2) ensure that all of the Scheme

Creditors are treated consistently in accordance with the terms and provisions of the Scheme,

regardless of where they are located, (3) protect the Debtor and the Pan Brothers Group from any

lawsuits in the United States from those parties who are bound by the terms of the Scheme, and

(4) ensure that the amendments to the Existing Notes and Deed of Release (Existing Notes) (as

defined below) approved by the Singapore Court through the Scheme will be enforceable within

the United States.

9.      Accordingly, on the date of filing this Declaration, in my capacity as the Foreign

Representative I caused to be filed the Chapter 15 Petition pursuant to sections 1504 and 1515 of

the Bankruptcy Code commencing this Chapter 15 Case in the Southern District of New York,

seeking recognition of the Singapore Scheme Proceeding as a "foreign nonmain proceeding" as

defined in section 1502(5) of the Bankruptcy Code, and seeking other necessary or appropriate

relief and additional assistance in aid and implementation of that proceeding.

10.      I believe that recognition of myself as a "foreign representative" as defined in

section 101(24) of the Bankruptcy Code, recognition of the Singapore Scheme Proceeding as a

"foreign nonmain proceeding," and recognition and enforcement of the Scheme, including the

amendments to the Existing Notes and Deeds of Release[4] contained therein, are consistent with

the purpose of Chapter 15 and will allow the Debtor and the other members of the Pan Brothers

Group to restructure their debts under the Existing Notes (along with the other Existing Facilities

(defined below)) and implement the Scheme.

---

[4] The term "Deeds of Release" means the "Deed of Release (Existing Bilateral Facility)," the "Deed of Release (Existing Syndicated Facility Agreement)," and the "Deed of Release (Existing Notes)," each as defined in either the Scheme Documents or herein.  Forms of the Deeds of Release are attached hereto as **Exhibit A**.

## **Statement Pursuant to Section 1515 of the Bankruptcy Code**

11.     I am informed and understand that section 1515 of the Bankruptcy Code provides, in pertinent part, as follows:

a.      A foreign representative applies to the court for recognition of a foreign proceeding in which the foreign representative has been appointed by filing a petition for recognition.

b.      A petition for recognition shall be accompanied by—

(1)     a certified copy of the decision commencing such foreign proceeding and appointing the foreign representative;

(2)     a certificate from the foreign court affirming the existence of such foreign proceeding and of the appointment of the foreign representative; or

(3)     in the absence of evidence referred to in paragraphs (1) and (2), any other evidence acceptable to the court of the existence of such foreign proceeding and of the appointment of the foreign representative.

c.      A petition for recognition shall also be accompanied by a statement identifying all foreign proceedings with respect to the debtor that are known to the foreign representative.

12.     The Sanction Order constitutes the decision of the Singapore Court sanctioning the Scheme and recognizing and approving my appointment as the Debtor's foreign representative "for the purposes of seeking recognition of these Singapore proceedings overseas, including in the United States of America pursuant to Chapter 15 of Title 11 of the United States Code." *See* Sanction Order ¶¶ 1, 2.

13.     Pursuant to section 1515(c) of the Bankruptcy Code, I am aware of the definition of a "foreign proceeding" under section 101(23) of the Bankruptcy Code, and I believe the Singapore Scheme Proceeding is a "foreign proceeding" as defined therein.  I am aware of no other foreign proceedings with respect to the Debtor pending as of the date of this Declaration. I also am aware of the requirements of section 1518 of the Bankruptcy Code, and will promptly advise this Court should any other foreign proceeding become known to me.

<p align="center">**Background of the Pan Brothers Group and Scheme**</p>

**I.      Business Operations of the Pan Brothers Group**

14.     Pan Brothers is Indonesia's largest listed garment manufacturer, conducting business operations in Indonesia, Singapore and other countries under the vertically integrated business model described more fully below.  The Debtor is incorporated in Indonesia, having been founded in 1980 and listed on the Indonesian stock exchange since 1990.  The corporate members of the Pan Brothers Group specialize in the manufacturing of outdoor functional and performance apparel, as well as sport-inspired and premium lifestyle apparel from woven, knit, technical nylon, natural-down, and GORE-TEX materials.   In response to COVID-19, Pan Brothers ventured to produce personal protective equipment ("**PPEs**") such as masks and hazmat suits.  Strategically, Pan Brothers focuses on exports to markets including US, Europe, Asia, Canada, Australia and New Zealand, and counts amongst its key customers top global fashion and apparel brands including Adidas, Uniqlo, The North Face, Amer Group, Columbia, Kathmandu, and Polo Ralph Lauren.

15.     The shares of Pan Brothers are held by: (a) PT Trisetijo Manunggal Utama (27.99% ownership); (b) PT Ganda Sawit Utama, which is owned by Ganda Sitorus, the brother of Martua Sitorus who co-founded SGX-listed commodities giant Wilmar International (16.00% ownership);

<p align="center">7</p>

(c) UBS AG Singapore S/A Burlingham International Ltd. (6.95% ownership); and (d) the public (49.06% ownership). A chart reflecting the organizational structure of the Pan Brothers Group is attached hereto as **Exhibit B**.

16.       Over the years, Pan Brothers has established a vertically integrated business model through the Pan Brothers Group, incorporating (amongst other things) supply, manufacturing, product development, sourcing and retail activities. Through these operations, the Pan Brothers Group has managed to achieve a global presence, with the US market constituting 25%-28% of global sales from 2016 to 2020, and the European market constituting 14%-18% of the global sales for the same period.

17.       The Pan Brothers Group has also achieved various accreditations, including ISO 9001, ISO 14001 and SA 8000 for the "Social Accountability Management System," along with other accolades including the Indonesia Export Award 2019, the Green Industry Award (every year since 2015 to date) and the Top GRC (Governance, Risk, Compliance) Award 2021. Additionally, the Pan Brothers Group has engaged intensively in corporate social responsibility efforts, including providing scholarship programs to high performing students in Central Java, making significant donations to victims of natural disasters, donating PPE equipment during the COVID-19 pandemic and organizing regular blood donor camps. In 2021, Pan Brothers has also focused on resource conservation and waste reduction; key projects include an initiative to repurpose used fabrics, and a project to install solar panels for each of Pan Brothers' facilities. These projects are expected to reduce up to 2.1 million carbon emissions annually.

18.       The corporate headquarters, business and principal operations of the Debtor, are located in Indonesia. The products manufactured by Pan Brothers and its affiliates are sold and

distributed in more than 50 countries worldwide, and sourcing and sales activities conducted through the representative offices in Singapore are central to its global business strategy.

**II.      Establishment in Singapore**

19.      I am informed and understand that section 1502(5) of the Bankruptcy Code defines "foreign nonmain proceeding" as "a foreign proceeding, other than a foreign main proceeding, pending in a country where the debtor has an establishment." I am further informed and understand that section 1502(2) of the Bankruptcy Code defines "establishment" as "any place of operations where the debtor carries out a nontransitory economic activity."

20.      The Debtor, through the Singapore Entities, engages in significant economic activities in Singapore that constitute an "establishment" in Singapore for purposes of recognizing the Singapore Scheme Proceeding as a foreign nonmain proceeding. As discussed below, the activities conducted in and through Singapore over a period of more than 5 years have a clear effect on the marketplace in Singapore, which supports a finding that the Debtor carries out nontransitory economic activity in that country.

21.      The Debtor holds three majority-owned and controlled subsidiaries—Continent 8, PBA and PBL—that are incorporated and registered as domestic companies in Singapore (the "**Singapore Entities**"). Pursuant to the requirements of Singapore corporate law, each of the Singapore Entities has a director residing in Singapore.

22.      The Debtor, through the Singapore Entities, is engaged in extensive business activities and has significant interests in Singapore that were deemed sufficient by the Singapore Court to establish a "substantial connection" to that country as a necessary predicate to the Scheme Proceeding, as described more fully below. In particular, Pan Brothers Group conducts key operations and management decisions from Singapore, and the representative offices that primarily

support the Pan Brothers Group's sourcing and export sales (which account for 85% of the Pan Brothers Group's sales from 2017 to 2020) are incorporated and based in Singapore (*i.e.*, Singapore Entities). The Debtor directly manages the Singapore Entities and the substantial business operations based and conducted in Singapore, which include the receipt and processing of payments from many of the Company's largest customers. Additionally, funds are transferred between the Debtor and the Singapore Entities to settle inter-company balances.

23.    Specifically, the Singapore Entities are primarily engaged in product and sourcing services. In that regard, the Singapore Entities assist third-party patrons by acting as an intermediary between such customers and suppliers. Further, the Singapore Entities assist customers in the end-to-end process, including through product development and design, and accepting payments and distribution of payments to suppliers. Importantly, the Singapore Entities' services, in part, are specifically related to Singapore exports.

24.    The Singapore Entities conduct their product and sourcing business through three different offices located in Singapore. In each of these offices, the Singapore Entities have employed citizens of Singapore to assist with their business activities. By employing those workers the Debtor is mandated to ensure that the Singapore Entities: (1) comply with labor and employment laws in Singapore, (2) file reports related to payroll taxes in Singapore, and (3) file certain other reports with governmental agencies that are mandated for businesses that operate in Singapore.

25.    In order to maintain operations for their product and sourcing business, the Singapore Entities hold various bank accounts in Singapore. Specifically, Continent 8 holds two accounts, PBA holds one account, and PBL holds one account (collectively, the "**Singapore Bank Accounts**"). The Singapore Bank Accounts include payroll accounts that are used to: (1)

compensate Singapore-based employees, and (2) pay certain payroll taxes that are mandated in Singapore.

26.    Due to the aforementioned business activities, the Singapore Entities are required to pay certain taxes in Singapore. Furthermore, the Noteholders (defined below) that are located in Singapore are subject to applicable taxes as set forth in the Singapore Income Tax Act (Chapter 134).

27.    Continent 8 and PBA are Subsidiary Guarantors of the Existing Notes and obligors under the Existing Facilities (defined below), and will continue to be guarantors of the Amended Notes. The Existing Notes are listed on the Singapore Stock Exchange ("**SGX**") and will continue to be so listed after the terms are amended to reflect the terms of the restructuring under the Scheme. The listing of the Existing Notes (and the Amended Notes as contemplated in under the Scheme) requires the payment of a listing fee in Singapore, as well as compliance with other listing requirements established and enforced by SGX and Singapore regulators.

28.    Pursuant to the Existing Syndicated Facility Agreement and Amended Syndicated Facility Agreement, certain disputes pertaining to the Syndicated Facility are to be resolved in arbitration proceedings conducted before the Singapore International Arbitration Centre ("**SIAC**").

29.    The Debtor and other members of the Pan Brothers Group have submitted to the non-exclusive jurisdiction of the Singapore courts by virtue of the non-exclusive jurisdiction clause set out in the Syndicated Facility.

30.    One of the lenders under the Syndicated Facility (*i.e.*, BRI Singapore) is a branch of a foreign company which is registered in Singapore, while one of the lenders under the Non-

Active Bilateral Facilities (*i.e.*, Strait Merchants Pte. Ltd.) is incorporated in Singapore. Additionally, many of the lenders under the Syndicated Facility have a presence in Singapore.

31.     On the basis of the foregoing facts and circumstances, the Debtor has a significant economic presence and conducts nontransitory economic activity in Singapore that supports a finding that the Singapore Scheme Proceeding should be recognized by this Court as a foreign nonmain proceeding.

### III.     Summary of the Pan Brothers Group's Pre-Scheme Capital Structures

32.     The Pan Brothers Group has a capital structure that interconnects the various Pan Brothers Group entities, chiefly characterized by:

    a.      USD 200,000,000 7.625% guaranteed senior notes due 2022 with a maturity date of January 26, 2022 (the "**Existing Notes**");

    b.      a revolving credit facility of up to USD 150,000,000 (the "**Syndicated Facility**"); and

    c.      bilateral facilities with various banks (the "**Bilateral Facilities,**" and together with the Syndicated Facility, the "**Existing Facilities**").

33.     Pan Brothers Group had US $375,159,539 in total borrowings as of December 7, 2021. The table below provides a broad breakdown of the capital structure of the Pan Brothers Group on a borrower/guarantor level, and also sets out aggregate amounts outstanding as of December 7, 2021:

| Instrument | Borrower(s) / Guarantor(s) | Amount outstanding (USD) |
|---|---|---|
| Syndicated Facility | Pan Brothers, PPEB, Hollit, OAI, PSS, ELHI, ESGI, BIG, VPM, TPG, Continent 8, PBA and CGL | 138,400,000 |

| Instrument | Borrower(s) / Guarantor(s) | Amount outstanding (USD) |
|---|---|---|
| Existing Notes | Pan Brothers, PPEB, Hollit, OAI, PSS, ELHI, ESGI, BIG, VPM, TPG, Continent 8, PBA, CGL, APS, PBI, PKG, PCSG, MBS and AMA (collectively, the "**Existing Note Obligors**") | 171,078,000 |
| Bilateral Facilities | Pan Brothers, PPEB, Hollit, OAI, PSS, ELHI, ESGI, BIG, VPM, TPG and APS | 65,681,539 |

34.     The Existing Notes are represented by a Global Note, in fully registered form without interest coupons. The Existing Notes were deposited with and registered in the name of a nominee of the common depositary for the Clearing Systems. The Clearing Systems each hold securities for their customers and facilitate the clearance and settlement of securities transactions by electronic book-entry transfer between their respective Account Holders. So long as the Existing Notes Depositary (or its nominee) is the registered owner of the Global Notes, it shall be considered the registered holder of the Existing Notes.  Under certain circumstances, the Issuer may be obliged to issue individual Certificated Notes (as defined in the Existing Notes Indenture) in fully registered form in exchange for the Global Note, in which case the holders of those Certificated Notes shall be considered the registered holders of the Existing Notes.

35.     While the Scheme approved by the Singapore Court in the Singapore Scheme Proceeding restructures and affects each of the Syndicated Facility, the Existing Notes and the Bilateral Facilities, this Chapter 15 Case is being commenced to recognize the Singapore Scheme Proceeding and to implement and enforce the Scheme as it relates to Existing Notes and a certain deed of release (the "**Deed of Release (Existing Notes)**") granted by the Noteholders for the benefit of the Debtor and the Existing Note Obligors. The Existing Notes and the Existing Notes

Indenture (as defined below) each are governed by New York law and subject the Debtor and Existing Note Obligors to the jurisdiction of the New York courts.  Similarly, the Deed of Release (Existing Notes) is governed by New York law and submits the Scheme Creditors to the nonexclusive jurisdiction of the state and federal courts of New York, thus enabling the Debtor to seek enforcement of the Deed of Release (Existing Notes) in the New York courts.  Accordingly, the description of the Existing Notes provided below is considerably more detailed than that of the Syndicated Facility and Bilateral Facilities, which are governed by foreign law and do not bear any direct relationship to the United States or New York.

## The Existing Notes

36.    The Existing Notes, which are listed on SGX, were issued pursuant to an Indenture dated as of January 26, 2017 (the "**Existing Notes Indenture**") by and between PBI, as issuer, The Bank of New York Mellon as trustee, the Existing Notes Collateral Agent, Pan Brothers, as Parent Guarantor, and PPEB, Hollit, OAI, PSS, ELHI, BIG, VPM, TPG, Continent 8, PBA, CGL, APS, PKG, PCSG, MBS and AMA, as the Subsidiary Guarantors.  The only security issued to the noteholders on account of the Existing Notes is security over a certain interest reserve account (the "**Interest Reserve Account**")

37.    The net proceeds from the issuance of the Existing Notes were used for the repayment of the Pan Brothers Group's indebtedness under various facilities, as well as for general corporate purposes such as to finance business expansion plans in the future and to support the financing needs of the Pan Brothers Group.

38.    The Issuer defaulted under the Existing Notes Indenture when funds in the Interest Reserve Account were used for the payment of the semi-annual interest that was due on January 26, 2021 under the Existing Notes, resulting in a failure to at all times maintain a certain specified minimum amount (the "**Minimum Amount**") in the Interest Reserve Account. The Issuer

subsequently topped up the Interest Reserve Account to ensure the Minimum Amount is held in the Interest Reserve Account as required in accordance with the terms of the Existing Notes Indenture.

39.     The Debtor, the Issuer and the Existing Note Obligors also have defaulted under the Existing Notes Indenture as a result of cross-defaults in respect of the Existing Facilities.

## IV.    Events Preceding Commencement of the Singapore Scheme Proceeding

40.     The financial difficulties of the Pan Brothers Group primarily stem from cash flow constraints and working capital consumption demands brought about by the ongoing worldwide COVID-19 pandemic. As evident from the Pan Brothers Group's audited financial statements as of December 31, 2020, the bulk of the Pan Brothers Group's assets are locked in working capital, accounts receivable, inventory and advanced payments.

41.     Specifically, the Pan Brothers Group's business has a long cash conversion cycle (*i.e.*, the time it takes for the company to convert its investments in inventory and other resources into cash flow from sales), which is typical of the apparel manufacturing industry. For the four-year period from 2016 to 2019 the average cash conversion cycle was 206 days.  As a direct result of the pandemic, however, the cash conversion cycle increased by 47 days compared to 2019, to 273 days.  Indeed, the Pan Brothers Group's overall cash conversion cycle in 2020 has been partially offset by a shorter cash conversion cycle from PPE products, which was approximately 90 – 120 days during 2020.  Without PPE sales, the cash conversion cycle in 2020 would have been significantly higher.

|  | **2016** | **2017** | **2018** | **2019** | **2020** |
|---|---|---|---|---|---|
| Consolidated Sales (USD)[5] | 482,204,159 | 549,355,786 | 611,371,311 | 665,049,043 | 684,892,301 |
| *Sales growth year on year* | *NA* | *13.9%* | *11.3%* | *8.8%* | *3.0%* |
| Cash Conversion Cycle (days)[6] | 188 | 202 | 206 | 226 | 273 |
| *Increment in days year on year* | *NA* | *14* | *4* | *20* | *47* |

42.    The comparatively lengthy cash conversion cycle is mainly attributable to the following factors:

a.    **Higher lead times needed for procurement of raw material.**  In particular, as the COVID-19 pandemic and its economic impact worsened, more suppliers began to request partial or full advance payments for material purchases.  Some suppliers also requested shorter terms of payment, creating additional demands on the Pan Brothers Group's cash flow.

b.    **A lengthy production and export process.**  During 2020 as the COVID-19 pandemic worsened, some customers requested delays in delivery of up to 10-20% of their total orders. This caused a build-up in inventory and lengthened production lead time by approximately 14 – 21 days.

_____

[5] All amounts are for the year ending December 31 and are from the annual audited accounts of Pan Brothers Group.

[6] Calculated based upon annual Cost of Goods Sold and year-end working capital balances.

    c.    **Collections terms for sales**. Again as a result of the COVID-19 pandemic in 2020, numerous customers requested an extension in terms of payments, again causing a build-up in receivables and lengthening receivable turnover days.

43.    The Pan Brothers Group's working capital needs have increased over the past five years in line with the growth in its sales and cash conversion cycle.  Between 2018 to 2022, net working capital (including unrestricted cash) has grown from USD 373.4 million as of  December 31, 2018 to USD 504.7 million as of December 31, 2020, an increase of USD 131.4 million. This increase has been primarily funded by the Existing Notes and retained earnings. While there have been fluctuations in the facilities under the Existing Syndicated Facility and its predecessor facilities over this period, as to be expected with revolving credit facilities, the net position has been marginal.

44.    Another critical element of the Pan Brothers Group's raw material ordering and working capital management has been the use of letter of credit trade lines provided under the Bilateral Facilities. These facilities are generally used by the Pan Brothers Group to issue letters of credit, with payment terms of 30 to 180 days from issuance date, to its suppliers in order to secure raw material.

45.    In 2020, however, as a reaction to the ongoing pandemic and a consequent negative view of the textile industry and subsequent credit downgrade of the Pan Brothers Group by Moody's Investor Service and Fitch Ratings, lenders either froze or reduced credit lines under the respective Bilateral Facilities. In April 2021, an additional lender froze its facility.

46.    With insufficient operating bilateral facilities, a number of overseas suppliers requested partial or full advance cash payments, accelerating cash consumption and putting further

pressure on working capital. This development ultimately led to the default in payment of maturing letters of credit under the Bilateral Facilities.

47.     The net effect of the foregoing circumstances is that the Pan Brothers Group, prior to acceptance of the Scheme by Scheme Creditors and entry of the Sanction Order, was in default on each of the Bilateral Facilities, the Existing Syndicated Facility Agreement, and the Existing Notes.

48.     Given their financial difficulties as described above, the Pan Brothers Group sought to engage its creditors at the earliest opportunity. Negotiations were initiated in late 2020, and preliminary term sheets were circulated in May 2020, setting out key restructuring terms proposed by the Pan Brothers Group to the Syndicated and Bilateral Lenders (collectively, the "**Lenders**").

49.     A draft term sheet was circulated to the Holders of the Existing Notes (the "**Noteholders**") in early June 2021. The engagements and discussions with the Noteholders on the Restructuring Term Sheet (Existing Notes)[7] continued thereafter. Pursuant to these engagements and discussions, the Pan Brothers Group made concessions on certain points, including bringing forward the deadline in respect of the Rights Issue Event of Default from December 30, 2022 to September 30, 2022,[8] notwithstanding the additional commercial pressure that the Pan Brothers Group will face in making this accommodation.

**V.     Moratoria Relief**

50.     In light of the good prospects of rehabilitation and broad levels of support for a restructuring and the implementation of a moratorium, Pan Brothers and its Related Companies

_____

[7] The Restructuring Term Sheet (Existing Notes) can be found at Appendix 6 to the Explanatory Statement (defined below).

[8] *See* Restructuring Term Sheet (Existing Notes), at Appendix 3 of the Restructuring Term Sheet (Existing Notes), paragraph (q).  Appendix 3 of the Restructuring Term Sheet (Existing Notes) is attached to the Explanatory Statement.

proceeded to file Moratoria Applications in the Singapore Court on June 1, 2021 (the "**Moratoria Applications**"). The Moratoria Applications were filed in contemplation of and as a prelude to the Singapore Scheme Proceeding, and consisted of, *inter alia*, a prayer for moratoria relief on the terms set out in Section 64 (Section 65 for the Related Companies) of the IRDA to secure time to propose the Scheme and prevent any legal and/or enforcement action from being taken against them or their property.

51.    On June 4, 2021, the Singapore Court granted Pan Brothers and its Related Companies the moratoria relief as sought, on an interim basis for the period of 30 days from the date of the Moratoria Applications or the date on which the application is decided by the Court, whichever is earlier.

52.    On June 28, 2021, the Singapore Court heard the Moratoria Applications. That same day, the Singapore Court made an order granting moratoria relief effective 6 months from the date of the order, *i.e.* up until December 28, 2021, which applies to any person in Singapore or within the jurisdiction of the Singapore Court, whether the act takes place in Singapore or elsewhere (the "**Moratoria Relief**"). On December 22, 2021, the constituent members of the Pan Brothers Group filed its respective applications to extend the period of the Moratoria Relief until the Debtor's application for the Court's sanction of the Scheme was determined. The application to further extend the period of Moratoria Relief was granted on January 5, 2022.

## VI.    Description of the Scheme[9]

### A.    The Scheme Documents

53.    As stated above, the Scheme document (the "**SOA Document**") is attached to Official Form 401 Petition. Further, the Scheme Explanatory Statement containing an explanation

_____

[9] The below description is a high-level summary only, and is qualified in its entirety by the full terms of the Scheme.

of the terms of the Scheme and additional background with respect to the Debtor and the Singapore Scheme Proceeding (the "**Explanatory Statement**") is attached hereto as **Exhibit C** [10] (the "**Explanatory Statement,**" and together with the SOA Document, the "**Scheme Documents**").

### B.    Key Objectives of the Scheme

54.    The key objectives of the Scheme are to:

    a.    adjust the ongoing interest payments under the Existing Facilities to a more manageable level to align with the latest forecast cash flows of the Debtor and the Pan Brothers Group which have been prepared in light of the latest market circumstances (and the adjustments to the Pan Brothers Group's detailed business and development plans in light of those market circumstances);

    b.    extend the maturity date of the Existing Notes and the Existing Facilities to allow the Debtor more time (including to execute its business plans) to repay the Holders (and in turn strengthen the capital structure of the Pan Brothers Group and improve working capital sustainability of the Debtor and the Pan Brothers Group), which presents the Debtor with better recovery prospects compared to potential recovery through enforcement of their rights under the Existing Notes and the Existing Facilities; and

    c.    allow Pan Brothers Group to continue carrying on its business as a going concern.

---

[10] The Explanatory Statement includes hundreds of pages of financial statements attached as Appendix 2 thereto. For purposes of brevity, the financial statements attached to the Explanatory Statement are not attached hereto but can be found at https://bonds.morrowsodali.com/PanBrothers.

C.        **Conditions to the Restructuring and the Restructuring Effective Date**

55.        The implementation of the Scheme and the Restructuring shall be deemed to be completed on the Restructuring Effective Date.

56.        The Restructuring Effective Date shall only occur on the date of satisfaction of all of the following conditions to the Restructuring Effective Date (the "**Restructuring Conditions**") and shall occur in accordance with the terms and conditions of clause 3 (Entry into the Restructuring Documents and fulfilment of Restructuring Conditions) and clause 4 (Restructuring Steps) of the Scheme:

a.        each of the Scheme Conditions has been satisfied and the Scheme Effective Date has occurred;

b.        an order or orders of the U.S. Bankruptcy Court which recognizes the Scheme as a foreign main or non-main proceeding under Chapter 15 of the Bankruptcy Code and grants other related relief and additional assistance as may be necessary to effectuate the Scheme (the "**Chapter 15 Order**") has been entered by the U.S. Bankruptcy Court, and such Chapter 15 Order is final and no longer subject to rehearing or appeal;[11]

c.        any other Application(s) for Cross-Border Recognition have been completed and the applicable recognition order(s) have been obtained and are in full effect;

d.        all corporate (including approval by shareholders, board of commissioners and/or board of directors), legal and regulatory approvals deemed

---

[11] Both the Scheme and Explanatory Statement expressly state that the entry of a final Chapter 15 Order by the US Bankruptcy Court is a condition precedent to the occurrence of the Restructuring Effective Date.

necessary by the Debtor (acting reasonably) to implement the Restructuring Effective Date, including, but not limited to, shareholder, director and/or commissioner approvals (as applicable) from the Debtor, the Guarantors or any other member of the Group and any approvals required from the OJK, IDX, KSEI or SGX-ST or under the laws of Indonesia or Singapore have been obtained; and

e.    all Restructuring Documents are in the agreed form and have been executed by or on behalf of the relevant parties to them in accordance with the terms of the Scheme.

57.    Thus, it is a condition precedent to the occurrence of the Restructuring Effective Date that this Court enter a final Chapter 15 Order granting recognition, relief, and additional assistance as necessary to approve and implement the provisions of the Scheme regarding the treatment of the Existing Notes Indenture and related obligations.[12]

### D.    Scheme Creditor Undertakings and Releases

58.    In consideration for its rights and entitlements under the Scheme, each Scheme Creditor bound by the Scheme is deemed to have given the undertakings, releases, and waivers in clause 11 (Scheme Creditor Undertakings and Releases) of the Scheme.

59.    Under the Cross-Border Recognition provisions of the Scheme, a duly appointed person or body appointed in the course or context of the Singapore Scheme Proceedings shall make an application to the U.S. Bankruptcy Court for a suitable Chapter 15 Order. The Debtor, or such person or body acting on its behalf, may also (acting reasonably) make an application for a suitable

---

[12] I am also informed and am aware that section 1518(b) of the Bankruptcy Code requires me to notify this Court of any subsequent foreign proceeding regarding the Debtor.

order under any other applicable law, legal doctrine or proceeding concerning Cross-Border Recognition (including any other applicable law, legal doctrine or proceeding in Indonesia, the United States or England and Wales), and for such other additional relief and/or assistance as the Debtor may require.

60.    The Debtor considers the entry of a Chapter 15 Order to be a prudent course of action given that the Existing Notes, Existing Notes Indenture, and the related Parent Guarantee and Subsidiary Guarantees, are governed by New York law and subject to the jurisdiction of New York courts. In order to mitigate the risk of enforcement in the United States and to give effect to the Scheme (conditional upon satisfaction of the other Scheme Conditions) in the United States, the Debtor has appointed, and the Singapore Court has confirmed the appointment of the Foreign Representative to commence the filing with the U.S. Bankruptcy Court for the grant of the Chapter 15 Order on or around the Scheme Effective Date.

61.    The Chapter 15 Petition requests that the U.S. Bankruptcy Court grant recognition of the Scheme as a foreign nonmain proceeding under Chapter 15 of the U.S. Bankruptcy Code, and grant other related relief and additional assistance. I am advised and understand that upon recognition of the Scheme under Chapter 15, a U.S. Bankruptcy Court has the discretion to grant "appropriate relief" and provide "additional assistance" to a foreign representative under sections 1521 and 1507 of the U.S. Bankruptcy Code, respectively. I further understand that in determining whether to provide additional assistance, and the scope of any such assistance, federal law directs the court to do so "consistent with the principles of comity." 11 U.S.C. §1507(b).

**E.    Scheme Timelines**

62.    The following summarizes the key timelines for the Scheme:

| Event | Date |
|---|---|
| Announcement of the Scheme through email, the Scheme Website, the Clearing Systems, and SGXNet and filing of Proofs of Debt. | November 12, 2021 |
| Information Meetings and Deadline for filing of Proofs of Debt | Information Meeting for the Noteholders<br><br>7.30 a.m. on November 19, 2021 (London time) /<br><br>3.30 p.m. on November 19, 2021 (Singapore time)<br><br>Information Meeting for the Holders of the Existing Facilities<br><br>6.00 a.m. on November 19, 2021 (London time) /<br><br>2.00 p.m. on November 19, 2021 (Singapore time) |
| Deadline to complete adjudication on Proofs of Debt | November 23, 2021 |
| Deadline to submit objections (if any) to the results of the adjudication of Proofs of Debt | November 26, 2021 |
| Deadline for Independent Assessor to make a decision on the objections (if any) | December 3, 2021 |
| Record Time | 2.00 p.m. on December 7, 2021 (London time) /<br><br>10.00 p.m. on December 7, 2021 (Singapore time) |
| Voting Results Announcement | December 8, 2021 |
| Sanction Hearing | January 17, 2022 |
| Scheme Effective Date | As soon as practicable after the Sanction Hearing |
| Restructuring Effective Date | By the Long Stop Date |
| Long Stop Date | March 31, 2022, subject to any extension under the terms of the Scheme. |

63.    All Scheme Creditors were entitled to attend the Sanction Hearing before the

Singapore Court in person or through legal counsel, to support or oppose the sanction of the Scheme. The Debtor notified the Scheme Creditors of the precise date and location of the Sanction Hearing by circulating a notice via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website (defined below).

64.    Among other assumptions, the dates in the aforementioned timetable to approve the Scheme assumed no additional court hearings or creditor meetings and that no court hearing or creditor meeting was adjourned or delayed, and that the Requisite Majority in respect of each class of Scheme Creditors provided their Blocking and Voting Instruction (in respect of the Existing Notes) or submitted their Voting Instruction Form (in respect of the Existing Facilities) (and take all other steps to submit a valid vote) in favor of the Scheme before the Record Time.

65.    The amount of the Accepted[13] Scheme Claims that are attributed for voting purposes to each Scheme Creditor, was calculated as at the Record Time. Only Scheme Creditors which were Holders at the Record Time were entitled to vote on the Scheme.  Specifically, votes of Scheme Creditors were Accepted for voting purposes at a value equal to the sum of:

a.    the outstanding principal amount of the Existing Notes or the Existing Facilities held by each Scheme Creditor at the Record Time (without double counting); and

b.    all accrued and unpaid interest on such Existing Notes or such Existing Facilities up to but excluding the Record Date. Every Scheme Creditor shall have one vote for every US $1 of its Accepted Scheme Claims (rounded down to the nearest US $1) as calculated for voting purposes.

66.    The Debtor or the Information Agent (defined below) provided notice of the

_____

[13] The term "Accepted" is defined in the Scheme.

Restructuring Effective Date (or any postponement thereof) to the Scheme Creditors (Conditions to the Restructuring and the Restructuring Effective Date). The Debtor may defer the Long Stop Date. In the event that the Long Stop Date is deferred, the Debtor or the Information Agent shall promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of the deferred Long Stop Date.

      **F.**    **Voting Classes**

      67.    The Scheme classifies the Scheme Creditors into four classes for purposes of voting on the Scheme.

      a.    Noteholders: The Noteholders rank *pari passu* as between themselves as (effectively) unsecured creditors of the Debtor, and have the benefit of the Existing Notes Guarantees and the Existing Notes Security Documents. Under the Restructuring Term Sheet (Existing Notes), the Noteholders would have materially the same rights against the Debtor under the Amended Notes Guarantees and the Amended Notes Collateral. There is no change in the Noteholders' principal economic and legal rights against the Debtor.

      b.    Syndicated Facility: The Holders of the Existing Syndicated Facility Agreement are secured creditors of the Debtor and have the benefit of the Existing Syndicated Facility Guarantees and Existing Syndicated Facility Security.

      c.    Active Bilaterals: The Holders of the Existing Facility (HSBC), the Existing Facility (UOB), the Existing Facility (Permata) and the Existing Facility (Maybank) are individual, unsecured creditors of the Debtor and do not

have the benefit of any security or guarantee.

d.     Non-Active Bilaterals: The Holders of the Existing Non-Active Bilateral Facilities are individual, unsecured creditors of the Debtor and do not have the benefit of any security or guarantee.

### G.     Releases

68.     Upon the occurrence of the Restructuring Effective Date, the Existing Notes Transaction Documents and the Existing Facilities Transaction Documents will be amended, restated, supplemented or otherwise modified as set out in the Scheme, the Restructuring Documents will be entered into and the Scheme Creditors will provide certain releases in respect of their Scheme Claims.

69.     A more detailed explanation of the releases set forth in the Scheme can be found in the *Declaration of Emmanuel Duncan Chua in Support of the Motion for (I) Recognition of Foreign Nonmain Proceeding, (II) Recognition of Foreign Representative, (III) Recognition of Sanction Order and Related Scheme, and (IV) Related Relief and Additional Assistance Under Chapter 15 of the Bankruptcy Code* (the "**Chua Declaration**") in paragraphs 65-71.

### VII.     Launch of Proposed Scheme

70.     The proposed Scheme was formally announced on November 12, 2021.   The Scheme Documents were circulated to the Scheme Creditors through the Clearing Systems, via email, and announced on SGXNet. An information agent, Morrow Sodali Limited (the "**Information     Agent**"),     also     was     appointed     to     host     a     scheme     website (https://bonds.morrowsodali.com/PanBrothers) (the "**Scheme Website**") to disseminate updates and information on the proposed Scheme to the Scheme Creditors.

71.    The SOA Document and Explanatory Statement set out relevant and substantive information around the Pan Brothers Group and the proposed Scheme, including:

a.    information on Pan Brothers and the Pan Brothers Group, and its business (pages 16 to 23 of the Explanatory Statement);

b.    the financial position and latest available financial statements of the Pan Brothers Group (pages 204 to 580 of the Explanatory Statement);

c.    background to, and the necessity for, the proposed Scheme (pages 24 to 35 of the Explanatory Statement);

d.    an overview of the proposed Scheme and the Scheme terms (pages 35 to 45 of the Explanatory Statement);

e.    timelines of the proposed Scheme (pages 45 to 47 of the Explanatory Statement);

f.    Scheme voting instructions (pages 47 to 54 of the Explanatory Statement);

g.    the four voting classes of Scheme Creditors, and the rationale behind the voting classification (pages 49 to 50 of the Explanatory Statement);

h.    risks associated with participation in the proposed Scheme (pages 54 to 78 of the Explanatory Statement);

i.    material interests disclosure of the directors (page 78 of the Explanatory Statement); and

j.    a segment on the frequently asked questions with respect to the proposed Scheme (pages 79 to 87 of the Explanatory Statement).

72.     AJ Capital, in its capacity as financial advisor to the Pan Brothers Group, has also issued a scenario-based recovery analysis report for the proposed Scheme (the "**Scenario Analysis**").  The Scenario Analysis was made available to all Scheme Creditors upon request.

73.     The Scenario Analysis essentially compares the likely outcomes in terms of the recovery that Scheme Creditors can expect: (1) under the proposed Scheme, and (2) in a liquidation scenario (being the likely outcome should the proposed Scheme fail to proceed).  In respect of the latter, the estimated recovery assumptions are presented as the: (1) high case scenario, which is based on the estimated realizable value ("**ERV**") of the Pan Brothers Group's assets upon enforcement under liquidation, and (2) low-case scenario, which assumes that a liquidator will not be able to realize the ERV for various reasons.

74.     It is noteworthy that the terms of the Scheme does not envisage any of the Scheme Creditors taking a haircut on the principal amounts of their debt, which is a feature rarely seen in other restructurings.  Needless to say, the Scheme is poised to provide a far higher rate of recovery than in the next most likely scenario (*i.e.* liquidation).  This is illustrated in the Scenario Analysis:

| Scenarios | High Case | Low Case |
|---|---|---|
| **Restructuring Scenario** | **100%** | **N/A** |
| **Liquidation Scenario** | | |
| Existing Syndicated Lenders | 43.8% | 19.3% |
| Noteholders | 33.0% | 14.1% |
| Existing Bilateral Lenders | 30.3% | 10.7% |
| Trade creditors | 30.3% | 10.7% |
| **Overall recovery under Liquidation Scenario** | **36.0%** | **15.1%** |

75.     As highlighted in the Scenario Analysis, it is my view that the Scheme offers the Scheme Creditors the best prospects of maximizing their recovery whilst also allowing the Pan Brothers Group to continue to carry on its business as a going concern.

## VIII.    Information Meetings

76.     Following the Scheme launch date, on November 19, 2021, the Pan Brothers Group and its advisors convened two videoconference meetings on November 19, 2021 (the

"**Information Meetings**"), one for the Lenders and the other for the Noteholders. The purpose of the Information Meetings was to outline the proposed Scheme and voting mechanics, as well as to address any queries which the Scheme Creditors may have in relation to the Scheme.

77.     Invitations to the Information Meetings were provided to the Scheme Creditors on November 12, 2021 through the announcement of the Scheme launch. The Information Agent thereafter also circulated separate emails to each Lender and identified Noteholder informing them of the Scheme launch and Information Meetings scheduled for November 19, 2021. Dial-in details to attend the Information Meetings (conducted over videoconference) were provided to each Lender following submission of their Proof of Debt, and to the Noteholders following completion of their registration with the Information Agent via submission of required information (e.g. comprising of name, contact details, and relevant documentary evidence).

78.     The Information Meetings were attended by all the Lenders, and 20 Noteholders representing USD 132,064,000 of the debt under the Existing Notes (*i.e.*, 77.2% of the outstanding principal amount of the Existing Notes).  During the Information Meetings, some questions were raised including queries around the calculation of voting for the purposes of determining whether the requisite majorities for each class of Scheme Creditors had been obtained. Other points discussed during the Information Meetings included clarification on the documentation for the Scheme, the Pan Brothers Group's plans after the Syndicated Facility matures, and what happens to the Scheme if the voting threshold is not achieved for a specific class of Scheme Creditors.

## IX.    The Scheme Vote

79.     With respect to the Noteholders, the voting procedure for the Noteholders is set out in full at paragraphs 6.1 to 6.13 of the SOA Document.  I set out an overview of the process below.

80.     Each Scheme Creditor that is a Noteholder at December 7, 2021, at 10:00 pm (SGT) (the "**Record Time**") was entitled to vote on the Scheme in respect of its economic or beneficial interest in the Existing Notes.  The amount of each Noteholder's Scheme Claims for voting purposes was determined by me as Chairman of the Scheme process (the "**Chairman**"), by verifying the same against the relevant information provided to the Information Agent as of the Record Time.

81.     To vote on the Scheme, each Noteholder had to submit (or procure the submission of) an electronic Blocking and Voting Instruction through the applicable Clearing System to block its interests in the Existing Notes from being traded and specify its voting instruction in respect of its blocked position.  Any Blocking and Voting Instruction submitted after the Record Time was to be disregarded for voting purposes, subject to specified exceptions in the Scheme.

## X.     Results of the Vote

82.     On December 8, 2021, one day after the Record Time, the Pan Brothers Group announced that the Scheme had been approved by the requisite majorities of Scheme Creditors in accordance with the terms of the Scheme.

83.     With respect to the Noteholders in particular, of those Noteholders that participated in the voting process, thirty-six (36) Noteholders holding debt of USD 143,417,898 of Scheme Claims (representing 95.75% of the value of votes cast by the Noteholders) voted in favor of the Scheme. Two (2) Noteholders holding USD 6,372,027 (4.25% of the value of votes cast by the Noteholders) of the Existing Notes voted against the Scheme. Accordingly, the Scheme has the overwhelming support of the Noteholders. Further, the Scheme has the unanimous support of the Syndicated Facility, Active Bilateral and Non-Active Bilateral lenders who participated in the voting process.

XI.    **The Sanction Order**

84.    A hearing to approve the Scheme was held before the Singapore Court on January

17, 2022.

85.    No objections to the Scheme were raised.

86.    On January 17, 2022, the Sanction Order was entered by the Singapore Court

approving the Scheme. *See* Sanction Order.

XII.    **Implementation of the Scheme**

87.    As set out above and in the Explanatory Statement, on the Restructuring Effective

Date, the arrangement and compromise contemplated for under the Scheme (including, but not

limited to, the amendment and restatement of the Existing Notes and the Existing Facilities) will

be implemented - subject to the fulfilment of the necessary conditions under paragraph 2.7 of the

SOA Document.  These include (i) all Restructuring Documents being in agreed form and duly

executed by the relevant Scheme Creditors and Pan Brothers, and (ii) the issuance of an order or

orders by this Court recognizing the Scheme as a foreign main or foreign non-main proceeding

and granting other related relief and additional assistance as necessary to effectuate the Scheme

under Chapter 15 of the Bankruptcy Code.

88.    With respect to the Existing Notes, the Scheme and the issuance of the Amended

Notes will be implemented ratably in proportion to the amount of the Existing Notes that each

Scheme Creditor holds.

89.    Pan Brothers will have until the Long Stop Date to implement the Restructuring

Effective Date. Under the Scheme, that date is March 31, 2022, unless the conditions under

paragraph 2.10 of the SOA Document are fulfilled, provided that the Long Stop Date may not be

deferred in any event beyond June 30, 2022.  Entry of the Chapter 15 Order is a condition precedent to occurrence of the Restructuring Effective Date.

90.     I am advised and believe that, insofar as the Existing Notes and Existing Notes Indenture are governed by New York law and the Existing Note Obligors are subject to the jurisdiction of the New York courts, entry of the Chapter 15 Order will mitigate the risk of enforcement in the United States (and elsewhere, given the risk of being in contempt of a U.S. court order), and also give effect to the Scheme in the United States (conditional upon the relevant orders being granted).

91.     As noted in paragraph 4 above, by way of the Sanction Order, I have been authorized by the Singapore Court to act as the Debtor's foreign representative and to make the necessary applications to initiate the Chapter 15 Case and seek entry of the Chapter 15 Order from this Court.

*[Remainder of Page Intentionally Left Blank]*

Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury under the laws of the United States of America that the foregoing statements are true and correct to the best of my knowledge, information, and belief.

Dated:  2 February, 2022

/s/_____

GEOFFREY DAVID SIMMS
Foreign Representative of
Debtor, PT Pan Brothers Tbk

**EXHIBIT A**

Deeds of Release

## APPENDIX 3

## (DEEDS OF RELEASE)

The Deeds of Release are appended on the next following pages.

**A. DEED OF RELEASE (EXISTING BILATERAL FACILITIES AGREEMENTS)**

**DEED OF RELEASE**

**Dated _____**

**by**

**THE HOLDERS OF THE EXISTING BILATERAL FACILITIES AGREEMENTS**

**in favour of**

**THE RELEASE DEED BENEFICIARIES**

**THIS DEED OF RELEASE** is dated _____ and is made by:

**THE HOLDERS OF THE EXISTING BILATERAL FACILITIES AGREEMENTS** under and as defined in the Scheme (as defined below) (the "**Scheme Creditors**"), acting by PT Pan Brothers Tbk. (the "**Company**") pursuant to the authority conferred upon the Company by the Scheme Creditors pursuant to clauses 3 (*Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions*), 4 (*Restructuring Steps*) and 9 (*Authorisation to Execute any Document to give Effect to the Scheme)* of the Scheme,

in favour of:

**THE RELEASE DEED BENEFICIARIES** (as defined below).

**WHEREAS:**

(A)     The Company has entered into a scheme of arrangement under Section 71 of the Insolvency, Restructuring and Dissolution Act of Singapore (the "**Scheme**") with the Scheme Creditors.

(B)     Pursuant to and on the terms of the Scheme, the Scheme Claims and certain other Claims of the Scheme Creditors are being released as set out more fully in the Scheme.

(C)     Under the authority conferred by the Scheme, the Company has been authorised under clauses 3 (*Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions*), 4 (*Restructuring Steps*) and 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) of the Scheme and instructed to execute and deliver this Deed on behalf of the Scheme Creditors in order to facilitate the transactions contemplated by the Scheme.

(D)     It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document by hand.

**IT IS AGREED as follows:**

**1.     INTERPRETATION**

1.1     Definitions

Terms defined in the Scheme shall, unless otherwise defined in this Deed or unless a contrary intention appears, bear the same meaning when used in this Deed, and the following terms shall have the following meanings:

"**Release Deed Beneficiaries**" means the Released Parties and their respective agents, advisors, representatives, directors, officers and employees, and "**Release Deed Beneficiary**" shall mean any one of them.

"**Released Claims**" means all Scheme Claims and all past, present and future claims arising out of, relating to and in respect of (a) any breach or default under the Existing Bilateral Facilities and (b) the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents, including any acts of an Authorised Person or otherwise in carrying out the steps and transactions contemplated in the Scheme or the Restructuring Documents in accordance with their terms; and "**Released Claim**" shall be construed accordingly.

"**Released Parties**" means (a) the Company, the Issuer, the Guarantors, the Security Providers and their respective affiliates; (b) the Advisors and the Chairman; (c) each agent, advisor, representative, director, officer and employee of each of the parties set out in (a) and (b) above;

v

and (d) each predecessor, successor and assign of each of the parties set out in (a), (b) and (c) above, and "**Released Party**" shall mean any one of them.

"**Releasing Parties**" means the Scheme Creditors and their predecessors, successors and assigns as well as any current, prior or future holder of any legal, beneficial or economic interest in the Existing Bilateral Facilities and their respective directors, officers and employees.

1.2    Construction

In this Deed, save where the context otherwise requires:

(a)    references to Clauses are references to clauses of this Deed;

(b)    references to a person include a reference to any individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)    references to a person include their respective successors and predecessors, and lawful assignees;

(d)    references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(e)    references to an agreement, deed or document include references to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(f)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(g)    headings to Clauses are for ease of reference only and shall not affect the interpretation of this Deed;

(h)    the words "include" and "including" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

(i)    references to days shall include Saturdays, Sundays and public holidays and any date or end of a period not falling on a Business Day shall be amended to fall on the immediately following Business Day; and

(j)    references to time shall be to Singapore time.

## 2.    RELEASES, WAIVERS AND UNDERTAKINGS

2.1    With immediate effect on and from the Restructuring Effective Date and conditional upon completion of each of the steps outlined in clause 4 (*Restructuring Steps*) of the Scheme (and subject to clause 16 (*Termination of the Scheme*) of the Scheme), each Scheme Creditor (for and on behalf of itself and its Releasing Parties) conclusively, irrevocably, unconditionally, fully and absolutely:

(a)    waives, discharges and releases all of its rights, title and interest in and to its Scheme Claims in consideration for its rights and entitlements under the Scheme;

(b)  waives, discharges and releases the Released Parties from the Released Claims;

(c)  ratifies and confirms everything which any Released Party may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge: (a) the validity of any act done or omitted to be done; or (b) the exercise or omission to exercise any power conferred in accordance with the provisions of the Scheme in good faith by any Released Party;

(d)  undertakes to the Released Parties that it will not (and shall use all reasonable endeavours to procure that its Releasing Parties will not) commence or continue, or instruct, direct or authorise any other Person to commence or continue, any Proceedings in respect of or arising from any Released Claim; and

(e)  acknowledges and agrees that it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and any of the Released Parties in respect of the Released Claims on the terms set out in the Scheme.

2.2  Each Scheme Creditor hereby further agrees and covenants not to, and shall not, on or following the Restructuring Effective Date, commence, prosecute or continue, or assist or otherwise aid any other entity in the commencement, prosecution or continuation (whether directly, derivatively or otherwise) of any (i) Released Claim or (ii) Proceeding against any of the Released Parties (or any property of any of the Released Parties), in respect of any Scheme Claim or any Released Claim.

2.3  The releases, waivers and undertakings under this Clause 2 shall:

(a)  not prejudice or impair any rights of any Scheme Creditor created under the Scheme or any other Restructuring Document and/or which arise as a result of a failure by the Company or any party to the Scheme to comply with any terms of the Scheme or any other Restructuring Document, and all such rights shall remain in full force and effect; and

(b)  not prejudice or impair any Claims or causes of action of any Scheme Creditor, arising from or relating to the gross negligence, breach of fiduciary duty, fraud, dishonesty, wilful default or wilful misconduct of any other party (other than any Administrative Party) or any gross negligence, fraud or wilful default of any Administrative Party, in each case which is seeking to rely on such releases, waivers or undertakings.

2.4  For the avoidance of doubt notwithstanding the terms of Clause 2.1 any outstanding indebtedness under Existing Bilateral Facilities shall continue pursuant to the terms of the applicable Existing Bilateral Facilities in accordance with and to the extent set out therein and in Clause 4.4(b) of the Scheme.

2.5  Each Scheme Creditor hereby also irrevocably confirms that (without in any way limiting the terms of Clause 9.1 and 9.2 of the Scheme and any authorisation granted thereunder) each applicable Administrative Party is authorised to enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor each document that is necessary or appropriate to give effect to or implement the Scheme, which includes the Restructuring Documents and any other document referred to, contemplated by or ancillary to any of the foregoing and to date, complete and release the Restructuring Documents to which that Scheme Creditor is a party and to accept delivery or service on their behalf of any Restructuring Documents (and any other documents, notices or evidence expressly referred to in the Scheme or in connection with the Restructuring Documents) required to be delivered to it, without being

required to obtain any further authorisations, provided that any steps so taken by the applicable Administrative Person shall be in accordance with the process set out in Clause 4 of the Scheme.

**3.      FURTHER ASSURANCE**

3.1      At the reasonable request and cost of any Released Party, each Scheme Creditor shall, and shall use reasonable endeavours to procure that their respective Releasing Parties shall, execute and deliver such documents, and do such things, as may reasonably be required to give full effect to this Deed, including without limitation, to perfect or evidence any release, waiver or discharge referred to in this Deed.

3.2      In addition, where this Deed requires a Scheme Creditor to take any action at the cost of any Released Party, the relevant Scheme Creditor shall not be required to take such action unless that Scheme Creditor is prefunded by the Company (on demand by that Scheme Creditor) in an amount that reflects that Scheme Creditor's reasonable estimate of the out-of-pocket costs likely to be incurred by that Scheme Creditor in undertaking the relevant action. The Scheme Creditor shall refund to the Company any part of the prefunding that it does not actually expend in undertaking the relevant action.

**4.      SEVERABILITY**

If any provision or part-provision of this Deed is invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision shall not affect the validity and enforceability of the rest of this Deed.

**5.      LANGUAGE**

In compliance with Indonesian Law No. 24 of 2009 on Flag, Language, National Emblem, and National Anthem Presidential Regulation No. 63 of 2019 on Use of Bahasa Indonesia, this Deed shall be executed in both Indonesian language and the English language version which shall both be effective. In the event of any inconsistency between the Indonesian language and English language texts or should there be any dispute on the meaning or interpretation of certain provisions, the Indonesian language text shall prevail and the English language text will be deemed to be amended to conform with and to make the relevant English language text consistent with the relevant Indonesian language text.

**6.      THIRD PARTIES**

6.1      Each Release Deed Beneficiary and any of its respective current, future and former direct and indirect affiliates, equity holders, members, managing members, officers, directors, partners, employees, advisors, principals, attorneys, professional advisors, accountants, investment bankers, consultants, agents, and representatives (including their affiliates) may rely on this Deed and enforce any of its terms as if it were a party to this Deed.

6.2      Subject to Clause 6.1, a person who is not a party to this Deed has no rights under this Deed to enforce and enjoy the benefit of any terms of this Deed.

6.3      Notwithstanding any term of this Deed, the consent of any person who is not a Party is not required to rescind or vary this Deed at any time.

**7.      AMENDMENT AND WAIVERS**

No variation of this Deed shall be effective unless such variation is in accordance with clause 14 (*Amendments to the Scheme*) of the Scheme.

**8.    GOVERNING LAW AND JURISDICTION**

8.1    This Deed and any rights and obligations arising out of and in connection with it are governed by the laws of the Republic of Indonesia.

8.2    Each Scheme Creditor hereby irrevocably and unconditionally submits itself to the non-exclusive jurisdiction of The District Court of Central Jakarta over any suit, action or proceeding arising out of or relating to this Deed.

## EXECUTION PAGE

**IN WITNESS** whereof this Deed has been executed as a deed and is intended to be and is hereby delivered by **PT Pan Brothers Tbk.** by its duly authorised officers on behalf of the Scheme Creditors on the date above first written.

**SCHEME CREDITORS**[4]

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **THE SCHEME CREDITORS** | ) |
| acting by | ) |
| **PT PAN BROTHERS TBK.** | ) |
| appointed by each of them as their attorney and agent | ) |
| pursuant to the authority conferred upon the Company | ) |
| by the Scheme Creditors under the Scheme | ) |

_____
Authorised Signatory
Name:
Title:


In the presence of:



_____
Witness
Witness name:
Witness address:

---

[4]Execution block and parties clause to be updated as applicable to reflect Clause 3.3 and 4.4(d) of the Scheme. Consequential technical or administrative changes may be made to this document solely to the extent required to reflect the parties to this Deed of Release.

x

**B. DEED OF RELEASE (EXISTING SYNDICATED FACILITY AGREEMENT)**

**DEED OF RELEASE**

**Dated _____**

**by**

**THE HOLDERS OF THE EXISTING SYNDICATED FACILITY AGREEMENT**

**in favour of**

**THE RELEASE DEED BENEFICIARIES**

**THIS DEED OF RELEASE** is dated _____ and is made by:

**THE HOLDERS OF THE EXISTING SYNDICATED FACILITY AGREEMENT** under and as defined in the Scheme (as defined below) (the "**Scheme Creditors**"), acting by PT Pan Brothers Tbk. (the "**Company**") pursuant to the authority conferred upon the Company by the Scheme Creditors pursuant to clauses 3 (*Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions*), 4 (*Restructuring Steps*) and 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) of the Scheme,

in favour of:

**THE RELEASE DEED BENEFICIARIES** (as defined below).

**WHEREAS:**

(A)     The Company has entered into a scheme of arrangement under Section 71 of the Insolvency, Restructuring and Dissolution Act of Singapore (the "**Scheme**") with the Scheme Creditors.

(B)     Pursuant to and on the terms of the Scheme, the Scheme Claims and certain other Claims of the Scheme Creditors are being released as set out more fully in the Scheme.

(C)     Under the authority conferred by the Scheme, the Company has been authorised under clauses 3 (*Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions*), 4 (*Restructuring Steps*) and 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) and instructed to execute and deliver this Deed on behalf of the Scheme Creditors in order to facilitate the transactions contemplated by the Scheme.

(D)     It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document by hand.

**IT IS AGREED as follows:**

**1.     INTERPRETATION**

1.1     Definitions

Terms defined in the Scheme shall, unless otherwise defined in this Deed or unless a contrary intention appears, bear the same meaning when used in this Deed, and the following terms shall have the following meanings:

"**Release Deed Beneficiaries**" means: (a) the Released Parties and (b) each Administrative Party and their respective agents, advisors, representatives, directors, officers, affiliates and employees, and "**Release Deed Beneficiary**" shall mean any one of them.

"**Released Claims**" means all Scheme Claims and all past, present and future claims arising out of, relating to and in respect of (a) any breach or default under the Existing Syndicated Facility and/or the Existing Syndicated Facility Agreement and (b) the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents, including any acts of an Authorised Person or otherwise in carrying out the steps and transactions contemplated in the Scheme or the Restructuring Documents in accordance with their terms; and "**Released Claim**" shall be construed accordingly.

"**Released Parties**" means (a) the Company, the Issuer, the Guarantors, the Security Providers and their respective affiliates; (b) the Advisors and the Chairman; (c) each agent, advisor, representative, director, officer and employee of each of the parties set out in (a) and (b) above;

and (d) each predecessor, successor and assign of each of the parties set out in (a), (b) and (c) above, and "**Released Party**" shall mean any one of them.

"**Releasing Parties**" means the Scheme Creditors and their predecessors, successors and assigns as well as any current, prior or future holder of any legal, beneficial or economic interest in the Existing Syndicated Facility and/or the Existing Syndicated Facility Agreement, and their respective directors, officers and employees.

1.2     Construction

In this Deed, save where the context otherwise requires:

(a)     references to Clauses are references to clauses of this Deed;

(b)     references to a person include a reference to any individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)     references to a person include their respective successors and predecessors, and lawful assignees;

(d)     references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(e)     references to an agreement, deed or document include references to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(f)     the singular includes the plural and vice versa and words importing one gender shall include all genders;

(g)     headings to Clauses are for ease of reference only and shall not affect the interpretation of this Deed;

(h)     the words "include" and "including" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

(i)     references to days shall include Saturdays, Sundays and public holidays and any date or end of a period not falling on a Business Day shall be amended to fall on the immediately following Business Day; and

(j)     references to time shall be to Singapore time.

## 2.     RELEASES, WAIVERS AND UNDERTAKINGS

2.1     With immediate effect on and from the Restructuring Effective Date and conditional upon completion of each of the steps outlined in clause 4 (*Restructuring Steps*) of the Scheme (and subject to clause 16 (*Termination of the Scheme*) of the Scheme), each Scheme Creditor (for and on behalf of itself and its Releasing Parties) conclusively, irrevocably, unconditionally, fully and absolutely:

(a)     waives, discharges and releases all of its rights, title and interest in and to its Scheme Claims in consideration for its rights and entitlements under the Scheme;

(b)     waives, discharges and releases the Released Parties and the Administrative Parties from the Released Claims;

(c)     waives, discharges and releases the Administrative Parties from any Claims arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents;

(d)     ratifies and confirms everything which any Released Party or Administrative Party may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge: (a) the validity of any act done or omitted to be done; or (b) the exercise or omission to exercise any power conferred in accordance with the provisions of the Scheme in good faith by any Released Party or Administrative Party;

(e)     undertakes to the Released Parties and Administrative Parties that it will not (and shall use all reasonable endeavours to procure that its Releasing Parties will not) commence or continue, or instruct, direct or authorise any other Person to commence or continue, any Proceedings in respect of or arising from any Released Claim; and

(f)     acknowledges and agrees that it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and any of the Released Parties and Administrative Parties in respect of the Released Claims on the terms set out in the Scheme.

2.2     Each Scheme Creditor hereby further agrees and covenants not to, and shall not, on or following the Restructuring Effective Date, commence, prosecute or continue, or assist or otherwise aid any other entity in the commencement, prosecution or continuation (whether directly, derivatively or otherwise) of:

(a)     any (i) Released Claim or (ii) Proceeding against any of the Released Parties and/or the Administrative Parties (or any property of any of the Released Parties and/or the Administrative Parties), in respect of any Scheme Claim or any Released Claim; and

(b)     any Claims or Proceedings against any of the Administrative Parties (or any property of any of the Administrative Parties) arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents.

2.3     The releases, waivers and undertakings under this Clause 2 shall:

(a)     not prejudice or impair any rights of any Scheme Creditor created under the Scheme or any other Restructuring Document and/or which arise as a result of a failure by the Company or any party to the Scheme to comply with any terms of the Scheme or any other Restructuring Document, and all such rights shall remain in full force and effect; and

(b)     not prejudice or impair any Claims or causes of action of any Scheme Creditor, arising from or relating to the gross negligence, breach of fiduciary duty, fraud, dishonesty, wilful default or wilful misconduct of any other party (other than any Administrative Party) or any gross negligence, fraud or wilful default of any Administrative Party, in each case which is seeking to rely on such releases, waivers or undertakings.

2.4    For the avoidance of doubt notwithstanding the terms of Clause 2.1:

    (a)    any outstanding indebtedness under Existing Syndicated Facility shall continue pursuant to the terms of the Amended Syndicated Facility Agreements in accordance with and to the extent set out therein and in Clause 4.4(b) of the Scheme;

    (b)    the security and guarantees created under the Existing Syndicated Facility Security Documents and the Existing Syndicated Facility Guarantees shall be confirmed by the relevant security providers or guarantors and shall continue and extend to cover the obligations of the Company and the relevant members of the Group under the Amended Syndicated Facility Agreement (in each case, other than any guarantees and/or security contemplated as being released in the Restructuring Term Sheet (Syndicated Facility)).

2.5    Each Scheme Creditor hereby also irrevocably confirms that (without in any way limiting the terms of Clause 9.1 and 9.2 of the Scheme and any authorisation granted thereunder) each applicable Administrative Party is  and was from the Scheme Effective Date authorised to complete, enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor each document that is necessary or appropriate to give effect to or implement the Scheme, which includes the Restructuring Documents and any other document referred to, contemplated by or ancillary to any of the foregoing and to date, complete and release the Restructuring Documents to which that Scheme Creditor is a party and to accept delivery or service on their behalf of any Restructuring Documents (and any other documents, notices or evidence expressly referred to in the Scheme or in connection with the Restructuring Documents) required to be delivered to it, without being required to obtain any further authorisations, provided that any steps so taken by the applicable Administrative Person shall be in accordance with the process set out in Clause 4 of the Scheme.

3.    **THE ADMINISTRATIVE PARTIES**

3.1    Each Scheme Creditor (on behalf of itself and its Releasing Parties) to the fullest extent permitted by law (and without prejudice to any rights, privileges, immunities, indemnities and limitations of liability of the Administrative Parties under the Existing Syndicated Facility Agreement and the Restructuring Documents):

    (a)    releases, discharges and exonerates each of the Administrative Parties, and any of their respective directors, officers, employers, advisors, affiliates or agents duly appointed, from any and all liabilities, losses, damages or consequences to the Scheme Creditors:

        (i)    for any of the Administrative Parties' acts or omissions in furtherance of or in connection with the Scheme and implementation of the same;

        (ii)    by reason of any of the Administrative Parties acting in accordance with the authorisation and instruction in clause 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) of the Scheme;

        (iii)    for the manner of performance of all acts carried out by the Administrative Parties on the authorisation and instruction in clause 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) of the Scheme; and

        (iv)    under the Existing Syndicated Facility Agreement with effect from the Restructuring Effective Date;

    (b)    hereby declares, confirms and acknowledges that each of the Administrative Parties (including, for the avoidance of doubts, their respective directors, officers, employers, advisors, affiliates or agents duly appointed) will not be held responsible for any liabilities, losses, damages or consequences arising directly or indirectly in connection

with the Scheme and it further declares that none of the Administrative Parties has responsibility for the terms of the Scheme or the transactions contemplated thereby;

(c)     shall and shall be deemed to completely and forever release, waive, void, acquit, forgive, extinguish and discharge unconditionally the Administrative Parties, and any of their respective directors, officers, employers, advisors, affiliates or agents duly appointed, from any Claim (whether asserted by any Scheme Creditor or any other Person) or liabilities, losses, damages or consequences in connection with the exercise or performance of any of their respective powers or duties under the Existing Syndicated Facility Agreement and the Scheme; and

(d)     hereby declares, confirms and acknowledges that it will not take any action or commence or pursue any Proceeding or Claim against any of the Administrative Parties in relation to the Scheme or the transactions contemplated thereby and it hereby expressly and unreservedly waives its rights to take any such actions or commence or pursue any such Proceedings or Claims,

in each case: (i) save to the extent of gross negligence, fraud,  or wilful default solely attributable to the Administrative Parties and (ii) irrespective of whether the Company obtains any order pursuant to any applicable law, legal doctrine or Proceeding concerning Cross-Border Recognition.

## 4.     FURTHER ASSURANCE

4.1     At the reasonable request and cost of any Released Party, each Scheme Creditor shall, and shall use reasonable endeavours to procure that their respective Releasing Parties shall, execute and deliver such documents, and do such things, as may reasonably be required to give full effect to this Deed, including without limitation, to perfect or evidence any release, waiver or discharge referred to in this Deed.

4.2     In addition, where this Deed requires a Scheme Creditor to take any action at the cost of any Released Party, the relevant Scheme Creditor shall not be required to take such action unless that Scheme Creditor is prefunded by the Company (on demand by that Scheme Creditor) in an amount that reflects that Scheme Creditor's reasonable estimate of the out-of-pocket costs likely to be incurred by that Scheme Creditor in undertaking the relevant action. The Scheme Creditor shall refund to the Company any part of the prefunding that it does not actually expend in undertaking the relevant action.

## 5.     SEVERABILITY

If any provision or part-provision of this Deed is invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision shall not affect the validity and enforceability of the rest of this Deed.

## 6.     LANGUAGE

In compliance with Indonesian Law No. 24 of 2009 on Flag, Language, National Emblem, and National Anthem Presidential Regulation No. 63 of 2019 on Use of Bahasa Indonesia, this Deed shall be executed in both Indonesian language and the English language version which shall both be effective. In the event of any inconsistency between the Indonesian language and English language texts or should there be any dispute on the meaning or interpretation of certain provisions, the English language text shall prevail and the Indonesian language text will be deemed to be amended to conform with and to make the relevant Indonesian language text consistent with the relevant English language text.

**7.      THIRD PARTIES**

7.1      Each Release Deed Beneficiary and any of its respective current, future and former direct and indirect affiliates, equity holders, members, managing members, officers, directors, partners, employees, advisors, principals, attorneys, professional advisors, accountants, investment bankers, consultants, agents, and representatives (including their affiliates) may rely on this Deed and enforce any of its terms as if it were a party to this Deed.

7.2      Subject to Clause 7.1, a person who is not a party to this Deed has no rights under this Deed to enforce and enjoy the benefit of any terms of this Deed.

7.3      Notwithstanding any term of this Deed, the consent of any person who is not a Party is not required to rescind or vary this Deed at any time.

**8.      AMENDMENT AND WAIVERS**

No variation of this Deed shall be effective unless such variation is in accordance with clause 14 (Amendments to the Scheme) of the Scheme.

**9.      GOVERNING LAW AND JURISDICTION**

9.1      This Deed and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, English law.

9.2      Each Scheme Creditor hereby irrevocably and unconditionally submits to the nonexclusive jurisdiction of any English courts over any suit, action or proceeding arising out of or relating to this Deed.

## EXECUTION PAGE

**IN WITNESS** whereof this Deed has been executed as a deed and is intended to be and is hereby delivered by **PT Pan Brothers Tbk.** by its duly authorised officers on behalf of the Scheme Creditors on the date above first written.

**SCHEME CREDITORS**[5]

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **THE SCHEME CREDITORS** | ) |
| acting by | ) |
| **PT PAN BROTHERS TBK.** | ) |
| appointed by each of them as their attorney and agent | ) |
| pursuant to the authority conferred upon the Company | ) |
| by the Scheme Creditors under the Scheme | ) |

_____
Authorised Signatory
Name:
Title:


In the presence of:


_____
Witness
Witness name:
Witness address:

---

[5]Execution block and parties clause to be updated as applicable to reflect Clause 3.3 and 4.4(d) of the Scheme. Consequential technical or administrative changes may be made to this document solely to the extent required to reflect the parties to this Deed of Release.

**C. DEED OF RELEASE (EXISTING NOTES)**

**DEED OF RELEASE**

**Dated _____**

**by**

**THE NOTEHOLDERS**

**in favor of**

**THE RELEASE DEED BENEFICIARIES**

**THIS DEED OF RELEASE** is dated _____ and is made by:

**THE NOTEHOLDERS** under and as defined in the Scheme (as defined below) (the "**Scheme Creditors**"), acting by PT Pan Brothers Tbk. (the "**Company**") pursuant to the authority conferred upon the Company by the Scheme Creditors pursuant to clauses 3 (*Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions)*, 4 (*Restructuring Steps)* and 9 (*Authorisation to Execute any Document to give Effect to the Scheme)* of the Scheme,

in favour of:

**THE RELEASE DEED BENEFICIARIES** (as defined below).

**WHEREAS:**

(A)     The Company has entered into a scheme of arrangement under Section 71 of the Insolvency, Restructuring and Dissolution Act of Singapore (the "**Scheme**") with the Scheme Creditors.

(B)     Pursuant to and on the terms of the Scheme, the Scheme Claims and certain other Claims of the Scheme Creditors are being released as set out more fully in the Scheme.

(C)     Under the authority conferred by the Scheme, the Company has been authorised under clauses 3 (*Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions)*, 4 (*Restructuring Steps)* and 9 (*Authorisation to Execute any Document to give Effect to the Scheme)* of the Scheme and instructed to execute and deliver this Deed on behalf of the Scheme Creditors in order to facilitate the transactions contemplated by the Scheme.

(D)     It is intended that this document takes effect as a deed notwithstanding the fact that a party may only execute this document by hand.

**IT IS AGREED as follows:**

**1.     INTERPRETATION**

1.1     Definitions

Terms defined in the Scheme shall, unless otherwise defined in this Deed or unless a contrary intention appears, bear the same meaning when used in this Deed, and the following terms shall have the following meanings:

"**Committee Party**" means each Noteholder that is a member of the Committee and its predecessors, successors, assigns and affiliates, as well as their respective agents, advisors, representatives, directors, officers and employees.

"**Release Deed Beneficiaries**" means: (a) the Released Parties; (b) each Committee Party and their respective agents, advisors, representatives, directors, officers and employees; and (c) each Administrative Party and their respective agents, advisors, representatives, directors, officers, affiliates and employees, and "**Release Deed Beneficiary**" shall mean any one of them.

"**Released Claims**" means all Scheme Claims and all past, present and future claims arising out of, relating to and in respect of (a) any breach or default under the Existing Notes and/or the Existing Notes Transaction Documents and (b) the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents, including any acts of an Authorised Person or otherwise in carrying out the steps and transactions contemplated in the Scheme or the Restructuring Documents in accordance with their terms; and "**Released Claim**" shall be construed accordingly.

"**Released Parties**" means (a) the Company, the Issuer, the Guarantors, the Security Providers and their respective affiliates; (b) the Advisors and the Chairman; (c) each agent, advisor, representative, director, officer and employee of each of the parties set out in (a) and (b) above; and (d) each predecessor, successor and assign of each of the parties set out in (a), (b) and (c) above, and "**Released Party**" shall mean any one of them.

"**Releasing Parties**" means the Scheme Creditors and their predecessors, successors and assigns as well as any current, prior or future holder of any legal, beneficial or economic interest in the Existing Notes, and their respective directors, officers and employees.

1.2    Construction

In this Deed, save where the context otherwise requires:

(a)    references to Clauses are references to clauses of this Deed;

(b)    references to a person include a reference to any individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)    references to a person include their respective successors and predecessors, and lawful assignees;

(d)    references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(e)    references to an agreement, deed or document include references to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(f)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(g)    headings to Clauses are for ease of reference only and shall not affect the interpretation of this Deed;

(h)    the words "include" and "including" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

(i)    references to days shall include Saturdays, Sundays and public holidays and any date or end of a period not falling on a Business Day shall be amended to fall on the immediately following Business Day; and

(j)    references to time shall be to Singapore time.

## 2.    RELEASES, WAIVERS AND UNDERTAKINGS

2.1    With immediate effect on and from the Restructuring Effective Date and conditional upon completion of each of the steps outlined in clause 4 (*Restructuring Steps*) of the Scheme (and subject to clause 16 (*Termination of the Scheme*) of the Scheme), each Scheme Creditor (for

and on behalf of itself and its Releasing Parties) conclusively, irrevocably, unconditionally, fully and absolutely:

(a)    waives, discharges and releases all of its rights, title and interest in and to its Scheme Claims in consideration for its rights and entitlements under the Scheme;

(b)    waives, discharges and releases the Released Parties and the Administrative Parties from the Released Claims;

(c)    waives, discharges and releases the Committee Parties and Administrative Parties from any Claims arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents;

(d)    ratifies and confirms everything which any Released Party or Administrative Party may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge: (a) the validity of any act done or omitted to be done; or (b) the exercise or omission to exercise any power conferred in accordance with the provisions of the Scheme in good faith by any Released Party or Administrative Party;

(e)    undertakes to the Released Parties and Administrative Parties that it will not (and shall use all reasonable endeavours to procure that its Releasing Parties will not) commence or continue, or instruct, direct or authorise any other Person to commence or continue, any Proceedings in respect of or arising from any Released Claim; and

(f)    acknowledges and agrees that it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and any of the Released Parties and Administrative Parties in respect of the Released Claims on the terms set out in the Scheme.

2.2    Each Scheme Creditor hereby further agrees and covenants not to, and shall not, on or following the Restructuring Effective Date, commence, prosecute or continue, or assist or otherwise aid any other entity in the commencement, prosecution or continuation (whether directly, derivatively or otherwise) of:

(a)    any (i) Released Claim or (ii) Proceeding against any of the Released Parties and/or the Administrative Parties (or any property of any of the Released Parties and/or the Administrative Parties), in respect of any Scheme Claim or any Released Claim; and

(b)    any Claims or Proceedings against any of the Committee Parties or Administrative Parties (or any property of any of the Committee Parties or Administrative Parties) arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents.

2.3    The releases, waivers and undertakings under this Clause 2 shall:

(a)    not prejudice or impair any rights of any Scheme Creditor created under the Scheme or any other Restructuring Document and/or which arise as a result of a failure by the Company or any party to the Scheme to comply with any terms of the Scheme or any other Restructuring Document, and all such rights shall remain in full force and effect; and

(b)    not prejudice or impair any Claims or causes of action of any Scheme Creditor, arising from or relating to the gross negligence, breach of fiduciary duty, fraud, dishonesty, wilful default or wilful misconduct of any other party (other than any Administrative

Party) or any gross negligence, fraud or wilful default of any Administrative Party, in each case which is seeking to rely on such releases, waivers or undertakings.

2.4    For the avoidance of doubt notwithstanding the terms of Clause 2.1:

(a)    any outstanding indebtedness under Existing Notes shall continue pursuant to the terms of the Amended Notes in accordance with and to the extent set out therein and in Clause 4.4(b) of the Scheme; and

(b)    the security and guarantees created under the Existing Notes Security Documents and the Existing Notes Guarantees shall be confirmed by the relevant security providers or guarantors and shall continue and extend to cover the obligations of the Company and the relevant members of the Group under the Amended Notes (in each case, other than any guarantees contemplated as being released in the Restructuring Term Sheet (Existing Notes)).

2.5    Each Scheme Creditor hereby also irrevocably confirms that (without in any way limiting the terms of Clause 9.1 and 9.2 of the Scheme and any authorisation granted thereunder) each applicable Administrative Party is and was from the Scheme Effective Date authorised to complete, enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor each document that is necessary or appropriate to give effect to or implement the Scheme, which includes the Restructuring Documents and any other document referred to, contemplated by or ancillary to any of the foregoing and to date, complete and release the Restructuring Documents to which that Scheme Creditor is a party and to accept delivery or service on their behalf of any Restructuring Documents (and any other documents, notices or evidence expressly referred to in the Scheme or in connection with the Restructuring Documents) required to be delivered to it, without being required to obtain any further authorisations, provided that any steps so taken by the applicable Administrative Person shall be in accordance with the process set out in Clause 4 of the Scheme.

## 3.    THE ADMINISTRATIVE PARTIES

3.1    Each Scheme Creditor (on behalf of itself and its Releasing Parties) to the fullest extent permitted by law (and without prejudice to any rights, privileges, immunities, indemnities and limitations of liability of the Administrative Parties under the Existing Notes Transaction Documents and the Restructuring Documents):

(a)    releases, discharges and exonerates each of the Administrative Parties, and any of their respective directors, officers, employers, advisors, affiliates or agents duly appointed, from any and all liabilities, losses, damages or consequences to the Scheme Creditors:

(i)    for any of the Administrative Parties' acts or omissions in furtherance of or in connection with the Scheme and implementation of the same;

(ii)    by reason of any of the Administrative Parties acting in accordance with the authorisation and instruction in clause 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) of the Scheme;

(iii)    for the manner of performance of all acts carried out by the Administrative Parties on the authorisation and instruction in clause 9 (*Authorisation to Execute any Document to give Effect to the Scheme*) of the Scheme; and

(iv)    under the Existing Notes Transaction Documents with effect from the Restructuring Effective Date;

(b)    hereby declares, confirms and acknowledges that each of the Administrative Parties (including, for the avoidance of doubts, their respective directors, officers, employers,

advisors, affiliates or agents duly appointed)  will not be held responsible for any liabilities, losses, damages or consequences arising directly or indirectly in connection with the Scheme and it further declares that none of the Administrative Parties has responsibility for the terms of the Scheme or the transactions contemplated thereby;

(c)     shall and shall be deemed to completely and forever release, waive, void, acquit, forgive, extinguish and discharge unconditionally the Administrative Parties, and any of their respective directors, officers, employers, advisors, affiliates or agents duly appointed, from any Claim (whether asserted by any Scheme Creditor or any other Person) or liabilities, losses, damages or consequences in connection with the exercise or performance of any of their respective powers or duties under the Existing Notes Transaction Documents and the Scheme; and

(d)     hereby declares, confirms and acknowledges that it will not take any action or commence or pursue any Proceeding or Claim against any of the Administrative Parties in relation to the Scheme or the transactions contemplated thereby and it hereby expressly and unreservedly waives its rights to take any such actions or commence or pursue any such Proceedings or Claims,

in each case: (i) save to the extent of gross negligence, fraud,  or wilful default solely attributable to the Administrative Parties and (ii) irrespective of whether the Company obtains any order pursuant to any applicable law, legal doctrine or Proceeding concerning Cross-Border Recognition.

## 4.    FURTHER ASSURANCE

4.1     At the reasonable request and cost of any Released Party, each Scheme Creditor shall, and shall use reasonable endeavours to procure that their respective Releasing Parties shall, execute and deliver such documents, and do such things, as may reasonably be required to give full effect to this Deed, including without limitation, to perfect or evidence any release, waiver or discharge referred to in this Deed.

4.2     In addition, where this Deed requires a Scheme Creditor to take any action at the cost of any Released Party, the relevant Scheme Creditor shall not be required to take such action unless that Scheme Creditor is prefunded by the Company (on demand by that Scheme Creditor) in an amount that reflects that Scheme Creditor's reasonable estimate of the out-of-pocket costs likely to be incurred by that Scheme Creditor in undertaking the relevant action. The Scheme Creditor shall refund to the Company any part of the prefunding that it does not actually expend in undertaking the relevant action.

## 5.    SEVERABILITY

If any provision or part-provision of this Deed is invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision shall not affect the validity and enforceability of the rest of this Deed.

## 6.    LANGUAGE

In compliance with Indonesian Law No. 24 of 2009 on Flag, Language, National Emblem, and National Anthem Presidential Regulation No. 63 of 2019 on Use of Bahasa Indonesia, this Deed shall be executed in both Indonesian language and the English language version which shall both be effective. In the event of any inconsistency between the Indonesian language and English language texts or should there be any dispute on the meaning or interpretation of certain provisions, the English language text shall prevail and the Indonesian language text will be

deemed to be amended to conform with and to make the relevant Indonesian language text consistent with the relevant English language text.

**7.     THIRD PARTIES**

7.1     Each Release Deed Beneficiary and any of its respective current, future and former direct and indirect affiliates, equity holders, members, managing members, officers, directors, partners, employees, advisors, principals, attorneys, professional advisors, accountants, investment bankers, consultants, agents, and representatives (including their affiliates) may rely on this Deed and enforce any of its terms as if it were a party to this Deed.

7.2     Subject to Clause 7.1, a person who is not a party to this Deed has no rights under this Deed to enforce and enjoy the benefit of any terms of this Deed.

7.3     Notwithstanding any term of this Deed, the consent of any person who is not a Party is not required to rescind or vary this Deed at any time.

**8.     AMENDMENT AND WAIVERS**

No variation of this Deed shall be effective unless such variation is in accordance with clause 14 (Amendments to the Scheme) of the Scheme.

**9.     GOVERNING LAW AND JURISDICTION**

9.1     This Deed and any non-contractual obligations arising out of or in connection with it shall be governed by, and construed in accordance with, the laws of the State of New York.

9.2     Each Scheme Creditor hereby irrevocably and unconditionally submits to the nonexclusive jurisdiction of any New York State or United States Federal court sitting in the Borough of Manhattan, New York City, New York over any suit, action or proceeding arising out of or relating to this Deed.

## EXECUTION PAGE

**IN WITNESS** whereof this Deed has been executed as a deed and is intended to be and is hereby delivered by **PT Pan Brothers Tbk.** by its duly authorised officers on behalf of the Scheme Creditors on the date above first written.

**SCHEME CREDITORS**[6]

| | |
|---|---|
| **EXECUTED** as a **DEED** by | ) |
| **THE SCHEME CREDITORS** | ) |
| acting by | ) |
| **PT PAN BROTHERS TBK.** | ) |
| appointed by each of them as their attorney and agent | ) |
| pursuant to the authority conferred upon the Company | ) |
| by the Scheme Creditors under the Scheme | ) |

_____
Authorised Signatory
Name:
Title:


In the presence of:


_____
Witness
Witness name:
Witness address:

---

[6] Execution block and parties clause to be updated as applicable to reflect Clause 3.3 and 4.4(d) of the Scheme. Consequential technical or administrative changes may be made to this document solely to the extent required to reflect the parties to this Deed of Release.

**EXHIBIT B**

Organizational Chart

3.11    The corporate structure of the Group as at the date of this Explanatory Statement is set out below:



*15% owned by Mitsubishi Corporation
**Joint ventures with same partner – PT Selaras Dua Tiga
***Partners include member of BOD or family of shareholder

**EXHIBIT C**

Explanatory Statement

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. FAILURE TO RESPOND MAY SIGNIFICANTLY AFFECT YOUR RIGHTS UNDER THE EXISTING NOTES (AS DEFINED BELOW) AND EXISTING FACILITIES (AS DEFINED BELOW).**

**THIS EXPLANATORY STATEMENT IS MADE IN COMPLIANCE WITH SECTION 71 OF THE INSOLVENCY, RESTRUCTURING AND DISSOLUTION ACT 2018 OF THE REPUBLIC OF SINGAPORE.**

This Explanatory Statement is directed at Scheme Creditors (as defined below) in respect of the proposed Scheme referred to below. Only Scheme Creditors which are Holders (as defined below) at the Record Time (as defined below) are entitled to vote on the Scheme.

The record time for voting on the Scheme is 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time) or such later time or date as may be notified by the Company or the Information Agent (as defined below) to the Scheme Creditors (the "**Record Time**"). If you have assigned, sold or otherwise transferred, or assign, sell or otherwise transfer all of your interests as a Scheme Creditor before the Record Time, the Company requests that you forward a copy of this Explanatory Statement to the Person or Persons to whom you have assigned, sold or otherwise transferred, or to whom you assign, sell or otherwise transfer, such interests; thereafter, you need not take any further action with respect to the Scheme. If you have only partially assigned, sold or transferred such interests before the Record Date, the Company requests that you:

(i) read this Explanatory Statement carefully;

(ii) forward a copy of this Explanatory Statement to the Person or Persons to whom you have assigned, sold or transferred such partial interests; and

(iii) take such steps as you consider appropriate following consideration of the matters described in this Explanatory Statement.

This Explanatory Statement contains important information which should be read carefully before any decision is made with respect to the Scheme. If any Scheme Creditor is in any doubt as to the action it should take, it is recommended to immediately seek its own advice, including tax advice relating to the consequences resulting from the offer from its stockbroker, bank manager, solicitor, accountant or other independent financial or legal advisor. Any individual whose Existing Notes are held on its behalf by a broker, dealer, bank, custodian, trust company or other nominee must contact such entity if it wishes to vote on the Scheme.

**PT Pan Brothers Tbk (the "Company")**
**(Indonesia Registration No. 8120214123901)**

**relating to a proposed scheme of arrangement under Section 71 of the Insolvency, Restructuring and Dissolution Act 2018 (the "Scheme") in respect of:**

**(a) the US$200,000,000 7.625% Guaranteed Senior Notes due 2022 (ISIN: XS1555631925, Common Code: 155563192) issued by PB International B.V. (the "Issuer") on 26 January 2017 (the "Existing Notes");**

**(b) the revolving credit facility of up to US$150,000,000 arranged by PT Bank ANZ Indonesia, PT Bank HSBC Indonesia and ING Bank N.V., Singapore Branch for, among others, the Company and as amended on 10 April 2018 and 29 October 2018 (the "Existing Syndicated Facility"); and**

(c) certain outstanding bilateral facility claims against, among others, the Company (the "Existing Bilateral Facilities" as defined below),

(the indebtedness under the Existing Notes, the Existing Syndicated Facility and the Existing Bilateral Facilities collectively, the "Existing Debt").

Instructions regarding actions to be taken by Scheme Creditors in respect of the Scheme are set out in Section 7 (Scheme Voting Instructions and Information Meetings) of this Explanatory Statement.

Information Meetings for Scheme Creditors will be held (a) at 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 (Singapore time) via videoconference (for the Noteholders) and (b) at 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) via videoconference (for the Holders of the Existing Facilities). Scheme Creditors who wish to attend the relevant Information Meeting(s) may register to receive access details by contacting the Information Agent (contact details below) at any time following the date of this Explanatory Statement and providing (unless the Scheme Creditor is a Noteholder) their Proof of Debt and relevant documentary evidence dated no more than one month prior to the date of submission of the same.

In the event that all of the Scheme Conditions (as defined below) are satisfied, the Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme) and all of their respective successors, assigns and transferers. The implementation of the Scheme and the Restructuring (as defined below) shall be deemed to be completed upon the satisfaction of the Restructuring Conditions (as defined below) and on the Restructuring Effective Date (as defined below).

**WARNING** - The contents of this Explanatory Statement have not been reviewed by any regulatory authority in Indonesia, Singapore, the United States of America or any other jurisdiction. You are advised to exercise caution in relation to the terms of the Scheme set out in this Explanatory Statement. If any Scheme Creditor is in any doubt as to the action it should take, it is recommended to immediately seek its own legal and financial advice, including tax advice relating to the consequences resulting from the offer from its stockbroker, bank manager, solicitor, accountant or other independent financial or legal advisor. Any individual whose Existing Notes are held on its behalf by a broker, dealer, bank, custodian, trust company or other nominee must contact such entity if it wishes to vote on the Scheme.

This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this Explanatory Statement may be sold, issued or transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the Scheme will not be registered with the U.S. Securities and Exchange Commission (the "**SEC**") under the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), or the securities laws of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the U.S. Securities Act.

Application will be made to the Singapore Exchange Securities Trading Limited (the "**SGX-ST**") for the listing and quotation of the Amended Notes (as defined below) on the SGX-ST. The SGX-ST assumes no responsibility for the correctness of any of the statements made or opinions expressed or reports contained herein. Approval in-principle for the listing and quotation of the Amended Notes on the SGX-ST is not to be taken as an indication of the merits of the Company, the Guarantors (as defined below) or any of their respective subsidiaries or associated companies, the Amended Notes or the Amended Notes Guarantees (as defined below), any member of the Group or the quality of disclosure in this document. For so long as the Amended Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Amended Notes will be traded in a minimum board lot size of US$200,000.

Notification under Section 309B(1) of the Securities and Futures Act, Chapter 289 of Singapore (the "**SFA**") — the Company has determined, and hereby notifies all persons (including all relevant persons

(as defined in Section 309A(1) of the SFA)), that the Amended Notes are prescribed capital markets products (as defined in the Securities and Futures (Capital Markets Products) Regulations 2018 of Singapore) and Excluded Investment Products (as defined in MAS Notice SFA 04-N12: Notice on the Sale of Investment Products and MAS Notice FAA-N16: Notice on Recommendations on Investment Products).

Further important information is set out under Section 12 (Important Notice to Scheme Creditors) and Section 13 (Important Securities Law Notice).

If you have any questions relating to this Explanatory Statement, please contact the Information Agent at:

**Information Agent:**
**Morrow Sodali Limited**

| **In Hong Kong** | **In London** | **In New York** |
|---|---|---|
| Unit 23-016, LKF Tower | 103 Wigmore Street | 509 Madison Avenue, Suite 1206, |
| 33 Wyndham Street, Central | W1U 1QS | New York, NY 10022 |
| | | |
| Telephone: +852 2319 4130 | Telephone: +44 20 4513 6933 | Telephone: +1 203 609 4910 |

**Email:** panbrothers@investor.morrowsodali.com
**Scheme Website:** https://bonds.morrowsodali.com/PanBrothers

This Explanatory Statement is dated 12 November 2021

| **Clause** | **Page** |
|---|---|

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 2. | EXECUTIVE SUMMARY | 14 |
| 3. | OVERVIEW OF THE GROUP, INDEBTEDNESS AND MANAGEMENT | 16 |
| 4. | BACKGROUND TO THE SCHEME | 24 |
| 5. | OVERVIEW OF THE SCHEME | 35 |
| 6. | SCHEME TIMELINES | 45 |
| 7. | SCHEME VOTING INSTRUCTIONS AND INFORMATION MEETINGS | 47 |
| 8. | RISKS ASSOCIATED WITH PARTICIPATING IN THE SCHEME | 54 |
| 9. | MATERIAL INTERESTS DISCLOSURE OF DIRECTORS IN THE SCHEME | 78 |
| 10. | TAXATION | 78 |
| 11. | QUESTIONS AND ANSWERS | 79 |
| 12. | IMPORTANT NOTICE TO SCHEME CREDITORS | 87 |
| 13. | IMPORTANT SECURITIES LAW NOTICE | 42 |

Appendix 1 (The Scheme) ........................................................................................... i

Appendix 2 (Financial Statements) ............................................................................. ii

Appendix 3 (Deeds of Release) ................................................................................... iii

Appendix 4 (Voting Instruction Form) ....................................................................... xxvii

Appendix 5 (Existing Non-Active Bilateral Facility Agreements) ............................. xxx

Appendix 6 (Restructuring Term Sheet (Existing Notes)) .......................................... xxxii

Appendix 7 (Restructuring Term Sheet (Syndicated Facility)) ................................... xxxiii

Appendix 8 (Restructuring Term Sheet (Amended Bilateral Facilities)) .................... xxxiv

## 1.    DEFINITIONS AND INTERPRETATION

1.1    Unless otherwise indicated or the context requires otherwise, in this Explanatory Statement:

"**Accepted**" means, in relation to a Scheme Claim:

(a)    the acceptance by the Chairman and/or the Company of such Claim (or part thereof); or

(b)    where applicable, the acceptance or determination by the Independent Assessor of such Claim (or part thereof) in accordance with the procedures for proving debts as set out in the Scheme,

in each case, for the purposes of determining entitlement to vote in the Scheme and pursuant to clause 6 (Voting Procedures) of the Scheme and "**Accept**" shall have a corresponding meaning.

"**Account Holder**" means a Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of the Existing Notes in such an account at the Record Time.

"**Active Bilaterals Common Security Agent (UOB and Permata)**" means PT Bank Permata Tbk.

"**Active Bilaterals Security Sharing Agreement (UOB and Permata)**" means the security sharing agreement to be entered into by the Company, among others, in favour of the Active Bilaterals Common Security Agent (UOB and Permata) in respect of the security to be granted to secure the Amended Facility Agreement (UOB) and the Amended Facility Agreement (Permata) as set out in the Restructuring Term Sheet (UOB) and the Restructuring Term Sheet (Permata).

"**Administrative Parties**" means the Existing Notes Administrative Parties, the Amended Notes Administrative Parties, the Existing Syndicated Facility Administrative Parties, the Amended Syndicated Facility Administrative Parties and the Active Bilaterals Common Security Agent (UOB and Permata).

"**Advisors**" means AJCapital, Baker & McKenzie.Wong & Leow, the Information Agent, or any of their affiliates.

"**AJCapital**" means PT AJCapital Advisory.

"**Amended Bilateral Facilities**" means the Existing Bilateral Facilities as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Bilateral Facilities on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on the Existing Bilateral Facilities up to (but excluding) the Restructuring Effective Date.

"**Amended Facilities**" means the Amended Bilateral Facilities and the Amended Syndicated Facilities.

"**Amended Facilities Guarantees**" means the guarantees granted or amended (as relevant) to secure the Amended Facilities as set out in the Restructuring Term Sheet (Syndicated Facility), the Restructuring Term Sheet (UOB), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (Permata) and the Restructuring Term Sheet (HSBC) (as applicable).

"**Amended Facilities Security**" means the security to be granted or amended (as relevant) to secure the Amended Facilities as set out in the Restructuring Term Sheet (Syndicated Facility), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (HSBC), the Restructuring Term Sheet (UOB) and the Restructuring Term Sheet (Permata) (as applicable).

"**Amended Facility Agreements**" means, collectively, the Amended Syndicated Facility Agreement, each Existing Non-Active Bilateral Facility Agreement as amended or supplemented (as relevant) by the Common Framework Agreement (Non-Active Bilaterals), the Amended Facility Agreement (UOB), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (HSBC).

"**Amended Facility Agreement (HSBC)**" means the Existing Facility Agreement (HSBC) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Facility Agreement (Maybank)**" means the Existing Facility Agreement (Maybank) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Facility Agreement (Permata)**" means the Existing Facility Agreement (Permata) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Facility Agreement (UOB)**" means the Existing Facility Agreement (UOB) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Notes**" means the Existing Notes as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Notes on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest (if any)) on the Existing Notes up to (but excluding) the Restructuring Effective Date.

"**Amended Notes Administrative Parties**" means the Amended Notes Trustee, Amended Notes Agents and Amended Notes Depositary.

"**Amended Notes Agents**" means collectively, The Bank of New York Mellon, London Branch in its capacity as paying agent for the Amended Notes, The Bank of New York Mellon SA/NV, Luxembourg Branch in its capacities as transfer agent and registrar for the Amended Notes, and the Amended Notes Collateral Agent.

"**Amended Notes Collateral**" means the security to be granted to secure the Amended Notes or Amended Notes Guarantees as set out in the Restructuring Term Sheet (Existing Notes).

"**Amended Notes Collateral Agent**" means The Bank of New York Mellon, in its capacity as the interest reserve account collateral agent under the Amended Notes Indenture.

"**Amended Notes Depositary**" means The Bank of New York Mellon, London Branch, in its capacity as common depositary in respect of the Amended Notes.

"**Amended Notes Guarantees**" means the Amended Notes Parent Guarantee and the Amended Notes Subsidiary Guarantees.

"**Amended Notes Indenture**" means the Existing Notes Indenture, as amended, restated supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Notes Parent Guarantee**" means any guarantee of the obligations of the Issuer under the Amended Notes Indenture and the Amended Notes by the Parent Guarantor.

"**Amended Notes Subsidiary Guarantee**" means any guarantee of the obligations of the Issuer under the Amended Notes Indenture and the Amended Notes by any Subsidiary Guarantor referred to as a guarantor of those obligations in the Restructuring Term Sheet (Existing Notes).

"**Amended Notes Trustee**" means The Bank of New York Mellon, London Branch, in its capacity as trustee under the Amended Notes Indenture.

"**Amended Syndicated Facilities**" means the Existing Syndicated Facilities as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Syndicated Facilities on the Restructuring Effective Date.

"**Amended Syndicated Facility Administrative Parties**" means the Amended Syndicated Facility Agent and the Amended Syndicated Facility Security Agent.

"**Amended Syndicated Facility Agent**" means Madison Pacific Trust Limited in its capacity as facility agent for the Amended Syndicated Facility Agreement.

"**Amended Syndicated Facility Agreement**" means the Existing Syndicated Facility Agreement as amended, restated supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Syndicated Facility on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on the Existing Syndicated Facility up to (but excluding) the Restructuring Effective Date.

"**Amended Syndicated Facility Security Agent**" means PT Bank Permata Tbk in its capacity as security agent for the Amended Syndicated Facility Agreement.

"**Application(s) for Cross-Border Recognition**" means any application(s) for Cross-Border Recognition in any jurisdiction (other than an application contemplated in paragraph (b) of clause 2.7 of the Scheme) as may be required by the Company (acting reasonably) where the Company has given prior notification of such application to the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, and consulted or taken reasonable steps to consult with the Administrative Parties (and any Scheme Creditor that has requested such consultation promptly upon receipt of such notification) for a period of five Business Days from the date of the notification of such application.

"**Authorised Person**" means the Company, the Chairman, AJCapital, the Information Agent, the Administrative Parties and their respective directors and officers (where applicable).

"**Blocking and Voting Instruction**" means an electronic blocking and voting instruction to (a) prevent the trading of the Existing Notes and (b) to specify voting instructions for the purposes of the Scheme, provided by a Noteholder via its Account Holder to the applicable Clearing System, in accordance with the standard practices and procedures required by the applicable Clearing System.

"**Blocking Reference Number**" means the unique blocking reference number provided by the Clearing Systems, with respect to a Blocking and Voting Instruction that has been submitted in accordance with the instructions contained in the Scheme.

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in The City of New York, London, Singapore and Indonesia.

"**Chairman**" means the chairman of the Scheme process, namely Geoffrey D Simms of AJCapital.

"**Chapter 15**" means Chapter 15 of the U.S. Bankruptcy Code and such other chapters and sections of the U.S. Bankruptcy Code made applicable to cases thereunder.

"**Chapter 15 Order**" means an order or orders of the U.S. Bankruptcy Court which recognizes the Scheme as a foreign main or non-main proceeding under Chapter 15 of the U.S. Bankruptcy Code and grants other related relief and additional assistance as may be necessary to effectuate the Scheme.

"**Claims**" means all and any actions, causes of action, claims, counterclaims, suits, debts, sums of money, accounts, contracts, agreements, promises, damages, judgments, executions, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of Singapore or New York, or under any other law or in any other jurisdiction howsoever arising and "**Claim**" shall be construed accordingly.

"**Clearing Systems**" means each of Euroclear and Clearstream, and "**Clearing System**" means any one of them.

"**Clearstream**" means Clearstream Banking S.A. and any successor.

"**Committee**" means the ad hoc committee of certain Noteholders (as constituted from time to time) holding over 25% of the outstanding principal amount of the Existing Notes, which is represented by Alvarez & Marsal as financial advisor and some members of which are represented by Clifford Chance Pte. Ltd. as legal advisor.

"**Committee Party**" means each Noteholder that is a member of the Committee and its predecessors, successors, assigns and affiliates, as well as their respective agents, advisors, representatives, directors, officers and employees.

"**Common Framework Agreement (Non-Active Bilaterals)**" means a common framework agreement which amends and/or supplements the Existing Non-Active Bilateral Facility Agreements on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Non-Active Bilateral Facilities on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on the Existing Non-Active Bilateral Facilities up to (but excluding) the Restructuring Effective Date.

"**Companies Act**" means the Singapore Companies Act (Chapter 50).

"**Company**" means PT Pan Brothers Tbk, a company incorporated in Indonesia and having its registered office at Jl. Raya Siliwangi KM.1, No. 178, Jatiuwung, Tangerang, Banten.

"**Court**" means the High Court of Singapore, or any other court in Singapore as the context may require.

"**Court Order**" means the order of the Court sanctioning the Scheme under section 71(1) of the Insolvency, Restructuring and Dissolution Act.

"**COVID-19**" means the SARS-CoV-2 pandemic as declared by the World Health Organization, including any resurgence, evolutions or mutations thereof.

"**Creditors Advisor Fees**" means the fees, costs and expenses incurred by (a) Alvarez & Marsal in its capacity as financial advisor to the Committee and (b) BlackOak LLP, Kirkland & Ellis

LLP and Kyora Law in their capacities as professional advisors to the lenders under the Existing Syndicated Facility that the Company has agreed to reimburse.

"**Cross-Border Recognition**" means in connection with any Insolvency Proceeding commenced in any one jurisdiction the recognition of that Insolvency Proceeding in another jurisdiction, whether under laws relating to bankruptcy, liquidation, insolvency, reorganization, winding-up, or composition or adjustment of debts or similar law, international principles of judicial comity, statute, enactment or other regulation, or the seeking of curial assistance in matters related to that Insolvency Proceeding.

"**Deeds of Release**" means the Deed of Release (Existing Bilateral Facility Agreements), the Deed of Release (Existing Syndicated Facility Agreement) and the Deed of Release (Existing Notes) and each, a "**Deed of Release**".

"**Deed of Release (Existing Bilateral Facilities)**" means the Indonesian law governed deed of release to be granted by the Holders of the Existing Bilateral Facilities for the benefit of the Company and other beneficiaries on the Restructuring Effective Date, substantially in the form set out in Appendix 3 (Deeds of Release).

"**Deed of Release (Existing Syndicated Facility Agreement)**" means the English law governed deed of release to be granted by the Holders of the Existing Syndicated Facility Agreement for the benefit of the Company and other beneficiaries on the Restructuring Effective Date, substantially in the form set out in Appendix 3 (Deeds of Release).

"**Deed of Release (Existing Notes)**" means the New York law governed deed of release to be granted by the Noteholders for the benefit of the Company and other beneficiaries on the Restructuring Effective Date, substantially in the form set out in Appendix 3 (Deeds of Release).

"**EEA**" means the European Economic Area.

"**Euroclear**" means Euroclear Bank SA/NV and any successor.

"**Excluded Liabilities**" means (a) the Scheme Costs and (b) all Claims in respect of rights created under the Scheme and/or any Restructuring Document or which arise as a result of a failure by the Company or any party to the Scheme to comply with any terms of the Scheme and/or any Restructuring Document from and after the Scheme Effective Date.

"**Existing Bilateral Facilities**" means the Existing Non-Active Bilateral Facilities, the Existing Facility (Permata), the Existing Facility (Maybank), the Existing Facility (UOB) and the Existing Facility (HSBC).

"**Existing Debt**" means the indebtedness under the Existing Notes, the Existing Syndicated Facility and the Existing Bilateral Facilities.

"**Existing Facilities**" means the Existing Syndicated Facility and the Existing Bilateral Facilities.

"**Existing Facilities Transaction Documents**" means the Existing Syndicated Facility Transaction Documents, the Existing Non-Active Bilateral Facility Agreements, the Existing Facility Agreement (Permata), the Existing Facility Agreement (Maybank), the Existing Facility Agreement (UOB) and the Existing Facility Agreement (HSBC).

"**Existing Facility (HSBC)**" means the facility provided by PT Bank HSBC Indonesia to, among others, the Company under the Existing Facility Agreement (HSBC).

"**Existing Facility (Maybank**)" means the facility provided by PT Bank Maybank Indonesia Tbk to, among others, the Company under the Existing Facility Agreement (Maybank).

6

"**Existing Facility (Permata)**" means the facility provided by PT Bank Permata Tbk to, among others, the Company under the Existing Facility Agreement (Permata).

"**Existing Facility (UOB)**" means the facility provided by PT Bank UOB Indonesia to, among others, the Company under the Existing Facility Agreement (UOB).

"**Existing Facility Agreement (HSBC)**" means the letter of credit facilities with a facility limit of up to US$50,000,000 as documented under the Indonesian law governed facility agreement between the Company and PT Bank HSBC Indonesia dated 9 August 2017, most recently amended by a second amendment dated 21 October 2019.

"**Existing Facility Agreement (Maybank)**" means the letter of credit facilities with facility limit of up to US$25,000,000 as documented under the Indonesian law governed facility agreement between the Company and PT Bank Maybank Indonesia Tbk dated 12 March 2003, most recently amended on 13 November 2020 and an L/C facility with a limit of up to US$15,000,000 and sub limit Negotiation/Discounting of up to US$10,000,000, supplemented with an additional amendment on facility limit based on an email sent by PT Bank Maybank Indonesia Tbk on 14 December 2020.

"**Existing Facility Agreement (Permata)**" means the letter of credit facilities with facility limit of up to US$5,000,000 for the Company, US$5,000,000 for PT Pancaprima Ekabrothers, and US$10,000,000 for PT Prima Sejati Sejahtera, as documented under a Indonesian law governed facility agreement between these companies and PT Bank Permata Tbk dated 26 August 2014, with the latest amendment dated 2 February 2021.

"**Existing Facility Agreement (UOB)**" means the letter of credit facilities with facility limit of up to US$23,000,000 documented under the Indonesian law governed facility agreement between the Company, certain subsidiaries and PT Bank UOB Indonesia dated 20 April 2011, with the latest amendment dated 4 May 2021 with an L/C facility limit of up to US$8,600,000 and FX facility of up to US$10,000,000, supplemented with additional amendments on facility limit and pricing based on an email sent by PT Bank UOB Indonesia on 10 December 2020.

"**Existing Facility Agreements**" means the Existing Facility Agreement (Permata), the Existing Facility Agreement (Maybank), the Existing Facility Agreement (UOB), the Existing Facility Agreement (HSBC), the Existing Non-Active Bilateral Facility Agreements and the Existing Syndicated Facility Agreement.

"**Existing Non-Active Bilateral Facilities**" means the facilities provided to, among others, the Company under the Existing Non-Active Bilateral Facility Agreements.

"**Existing Non-Active Bilateral Facility Agreements**" means the facility agreements set out in Appendix 5 (Existing Non-Active Bilateral Facility Agreements) entered into between among others, the Company and each relevant lender set out therein.

"**Existing Notes**" means the US$200,000,000 7.625% Guaranteed Senior Notes due 2022 (ISIN: XS1555631925, Common Code: 155563192) issued by the Issuer on 26 January 2017 pursuant to the Existing Notes Indenture.

"**Existing Notes Administrative Partie**s" means the Existing Notes Trustee, Existing Notes Agents and Existing Notes Depositary.

"**Existing Notes Agents**" means collectively, The Bank of New York Mellon, London Branch in its capacity as paying agent for the Existing Notes, The Bank of New York Mellon SA/NV, Luxembourg Branch in its capacities as transfer agent and registrar for the Existing Notes and the Existing Notes Collateral Agent.

"**Existing Notes Collateral**" has the meaning given to the term "**Interest Reserve Account Collateral**" in the Existing Notes Indenture.

"**Existing Notes Collateral Agent**" means The Bank of New York Mellon in its capacity as interest reserve account collateral agent under the Existing Notes Indenture.

"**Existing Notes Depositary**" means The Bank of New York Mellon, London Branch, in its capacity as common depositary in respect of the Existing Notes.

"**Existing Notes Guarantees**" means the Existing Notes Parent Guarantee and the Existing Notes Subsidiary Guarantees.

"**Existing Notes Indenture**" means the indenture dated 26 January 2017 between the Issuer, the Existing Notes Trustee, the Existing Notes Collateral Agent, the Parent Guarantor and the Subsidiary Guarantors, with respect to the Existing Notes.

"**Existing Notes Parent Guarantee**" has the meaning given to the term "**Parent Guarantee**" in the Existing Notes Indenture.

"**Existing Notes Security Documents**" has the meaning given to the term "**Security Documents**" in the Existing Notes Indenture.

"**Existing Notes Subsidiary Guarantees**" has the meaning given to the term "**Subsidiary Guarantees**" in the Existing Notes Indenture.

"**Existing Notes Transaction Documents**" means all documents related, or connected, to the Existing Notes, the Existing Notes Guarantees and the Existing Notes Collateral, including the Existing Notes Indenture, the Global Notes, the Existing Notes Parent Guarantee documents, the Existing Notes Subsidiary Guarantee documents and the Existing Notes Security Documents.

"**Existing Notes Trustee**" means The Bank of New York Mellon in its capacity as trustee under the Existing Notes Indenture.

"**Existing Notes Trustee Fees**" means any fees, costs and expenses of the Existing Notes Trustee and its professional advisors that the Company or the Issuer is obliged to reimburse under the terms of the Existing Notes Indenture or which the Company or the Issuer has otherwise agreed to reimburse.

"**Existing Syndicated Facility**" means the revolving credit facility of up to US$150,000,000 provided to, among others, the Company under the Existing Syndicated Facility Agreement.

"**Existing Syndicated Facility Administrative Parties**" means the Existing Syndicated Facility Agent and the Existing Syndicated Facility Security Agent.

"**Existing Syndicated Facility Administrative Party Fees**" means any fees, costs and expenses of the Existing Syndicated Facility Administrative Parties and their professional advisors that the Company is obliged to reimburse under the terms of the Existing Syndicated Facility Agreement or which the Company has otherwise agreed to reimburse.

"**Existing Syndicated Facility Agent**" means, following its appointment as such (which appointment shall occur prior to the Restructuring Effective Date), Madison Pacific Trust Limited in its capacity as facility agent for the Existing Syndicated Facility.

"**Existing Syndicated Facility Agreement**" means the revolving credit facility agreement (as amended from time to time) of up to US$150,000,000 dated 27 December 2017 between, among others, the Company, the Existing Syndicated Facility Agent and the Existing Syndicated Facility Security Agent.

"**Existing Syndicated Facility Guarantees**" means any Guarantee Agreement (as defined in the Existing Syndicated Facility Agreement) and the guarantee in clause 17 (*Guarantee and Indemnity)* of the Existing Syndicated Facility Agreement.

"**Existing Syndicated Facility Security**" means any mortgage, security rights (*hak tanggungan*), fiducia security, pledge, lien, charge, assignment, hypothecation or security interest created by the Existing Syndicated Facility Security Documents.

"**Existing Syndicated Facility Security Agent**" means PT Bank Permata Tbk in its capacity as security agent for the Existing Syndicated Facility.

"**Existing Syndicated Facility Security Documents**" has the meaning given to the term "**Security Documents**" in the Existing Syndicated Facility Agreement.

"**Existing Syndicated Facility Transaction Documents**" has the meaning given to the term "**Finance Documents**" in the Existing Syndicated Facility Agreement.

"**Explanatory Statement**" means this explanatory statement relating to the Scheme.

"**Fitch**" means Fitch Ratings.

"**Gazette**" means the gazette published in electronic or other form by order of the Singapore government and includes any supplement thereto and any gazette extraordinary so published.

"**Global Notes**" has the meaning given to that term in the Existing Notes Indenture.

"**Group**" means the Company as well as all its Subsidiaries.

"**Guarantors**" means the Parent Guarantor, the Subsidiary Guarantors and the Syndicated Facility Guarantors.

"**Holder**" means any Person with an economic or beneficial interest in the Existing Debt and "**Holders**" shall be construed accordingly.

"**Hong Kong**" means the Hong Kong Special Administrative Region of the People's Republic of China.

"**IDX**" means the Indonesian Stock Exchange promulgated by PT Bursa Efek Indonesia.

"**Independent Assessor**" has the meaning given to that term in clause 5.5 (Scheme Participation and Information) of the Scheme.

"**Indonesia**" means the Republic of Indonesia.

"**Information Agent**" means Morrow Sodali Limited in its capacity as the Company's information agent.

"**Information Meeting**" means either of the videoconference meetings of the Scheme Creditors to be convened by the Company (a) at 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 (Singapore time) (for the Noteholders) and (b) at 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) (for the Holders of the Existing Facilities), to provide the Scheme Creditors with a summary of the arrangement and compromise effected by the Scheme, and to address any queries which the Scheme Creditors may have in relation to the Scheme.

"**Insolvency Proceeding**" means any proceeding, process, appointment or application under any law relating to insolvency, reorganization, winding-up, or composition or adjustment of debts, including, without limitation, winding-up, liquidation, bankruptcy, provisional liquidation, receivership, administration, provisional supervision, company voluntary

arrangement, scheme of arrangement, suspension of payment under court supervision or any other analogous proceedings in any jurisdiction (including any of the foregoing brought for the purpose of obtaining Cross-Border Recognition).

"**Insolvency, Restructuring and Dissolution Act**" means the Singapore Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018).

"**ITA**" means the Singapore Income Tax Act (Chapter 134).

"**KSEI**" means PT Kustodian Sentral Efek Indonesia, the Indonesian Central Securities Custodian.

"**Long Stop Date**" means 31 March 2022, subject to any extension under the terms of the Scheme.

"**MAS**" means the Monetary Authority of Singapore.

"**Moody's**" means Moody's Investor Service.

"**Moratoria Filings**" means the applications of, among others, the Company, the Issuer and the Subsidiary Guarantors for moratoria under Sections 64 and 65 of the Insolvency, Restructuring and Dissolution Act 2018 in HC/OS 515/2021-HC/OS 520/2021 and HC/OS 522/2021 to HC/OS 536/2021 before the General Division of the High Court of the Republic of Singapore.

"**New York**" means the State of New York, the United States of America.

"**Noteholders**" means all Persons with an economic or beneficial interest as principal in the Existing Notes held through the Clearing Systems and "**Noteholder**" shall mean any one of them.

"**OJK**" means the Otoritas Jasa Keuangan, the Indonesian Financial Services Authority.

"**Parent Guarantor**" means the Company, in its capacity as parent guarantor under the Existing Notes Indenture, the Indonesian law corporate guarantee granted by the Company in the form of a notarial deed dated 26 January 2017 and/or the Amended Notes Indenture (as applicable).

"**Person**" means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, governmental entity or other entity whatsoever.

"**PKPU**" means a court-supervised debt restructuring process known as suspension of debt payment obligations (*penundaan kewajiban pembayaran utang*) in Indonesia.

"**Proceeding**" means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or Insolvency Proceedings in any jurisdiction.

"**Proof of Debt**" means written proof of debt claimed by Scheme Creditors (other than Noteholders), in accordance with the form set out in schedule 3 (Form of Proof of Debt) of the Scheme and ultimately adjudicated upon solely in accordance with the terms of the Scheme.

"**Prospectus Regulation**" means Regulation (EU) 2017/1129 of the European Union.

"**Record Date**" means 7 December 2021.

"**Record Time**" means 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time) or such later time or date as may be notified by the Company

or the Information Agent (each acting reasonably) to the Scheme Creditors, where such date shall be no later than the date of the Voting Results Announcement.

"**Released Claims**" means all Scheme Claims and all past, present and future claims arising out of, relating to and in respect of (a) any breach or default under the Existing Notes and/or the Existing Notes Transaction Documents; (b) any breach or default under the Existing Facilities and/or the Existing Facilities Transaction Documents; and (c) preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents, including any acts of an Authorised Person or otherwise in carrying out the steps and transactions contemplated in the Scheme or the Restructuring Documents in accordance with their terms; and "**Released Claim**" shall be construed accordingly.

"**Released Parties**" means (a) the Company, the Issuer, the Guarantors, the Security Providers, all obligors under the Existing Facility Agreements and their respective affiliates; (b) the Advisors and the Chairman; (c) each agent, advisor, representative, director, officer and employee of each of the parties set out in (a) and (b) above; and (d) each predecessor, successor and assign of each of the parties set out in (a), (b) and (c) above, and "**Released Party**" shall mean any one of them.

"**Releasing Parties**" means the Scheme Creditors and their predecessors, successors and assigns as well as any current, prior or future holder of any legal, beneficial or economic interest in the Existing Notes or the Existing Facilities, and their respective directors, officers and employees.

"**Requisite Majority**" means a majority in number of the relevant class of Scheme Creditors who cast valid votes in favour of the Scheme in respect of such class, whose Accepted Scheme Claims in aggregate represent at least three-fourths in value of the Accepted Scheme Claims of all such voting Scheme Creditors in respect of such class.

"**Restructuring**" means the proposed restructuring in accordance with the terms of the Scheme.

"**Restructuring Conditions**" means each of the conditions to the occurrence of the Restructuring Effective Date, as set out in clause 2.7 (Scheme Overview and Conditions) of the Scheme.

"**Restructuring Documents**" has the meaning given to it in the Scheme.

"**Restructuring Effective Date**" means such date as may be notified by the Company or the Information Agent to the Scheme Creditors in accordance with clauses 2.8 (Scheme Overview and Conditions), 2.9 (Scheme Overview and Conditions) and 3.7 (Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions) of the Scheme.

"**Restructuring Term Sheet (Existing Notes)**" means the term sheet in relation to the Restructuring of the Existing Notes, as set out in paragraph 5.3 (Restructuring Term Sheet (Existing Notes)).

"**Restructuring Term Sheet (HSBC)**" means the term sheet in relation to the Restructuring of the Existing Facility (HSBC), as set out in paragraph 5.8 (Restructuring Term Sheet (HSBC)).

"**Restructuring Term Sheet (Maybank)**" means the term sheet in relation to the Restructuring of the Existing Facility (Maybank), as set out in paragraph 5.9 (Restructuring Term Sheet (Maybank)).

"**Restructuring Term Sheet (Non-Active Bilaterals)**" means the term sheet in relation to the Restructuring of the Existing Non-Active Bilateral Facilities, as set out in paragraph 5.5 (Restructuring Term Sheet (Non-Active Bilaterals)).

"**Restructuring Term Sheet (Permata)**" means the term sheet in relation to the Restructuring of the Existing Facility (Permata), as set out in paragraph 5.6 (Restructuring Term Sheet (Permata)).

"**Restructuring Term Sheet (Syndicated Facility)**" means the term sheet in relation to the Restructuring of the Existing Syndicated Facility, as set out in paragraph 5.4 (Restructuring Term Sheet (Syndicated Facility)).

"**Restructuring Term Sheet (UOB)**" means the term sheet in relation to the Restructuring of the Existing Facility (UOB), as set out in paragraph 5.7 (Restructuring Term Sheet (UOB)).

"**Restructuring Term Sheets**" means the Restructuring Term Sheet (Existing Notes), the Restructuring Term Sheet (HSBC), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (Non-Active Bilaterals), the Restructuring Term Sheet (Permata), the Restructuring Term Sheet (Syndicated Facility) and the Restructuring Term Sheet (UOB).

"**Rupiah**", "**IDR**" or "**Rp**" means the Indonesian Rupiah, the lawful currency of the Republic of Indonesia.

"**S&P**" means S&P Global Ratings.

"**Sanction Application**" means the Company's application to the Court under Section 71 of the Insolvency, Restructuring and Dissolution Act for the Court's sanction of the Scheme.

"**Sanction Hearing**" means the hearing of the Sanction Application by the Court.

"**Scenario Analysis**" means the high-level analysis prepared by AJCapital to estimate the recovery to the Holders under the Amended Notes and the Amended Facilities against potential scenarios in which the Scheme and/or the Restructuring does not proceed, which is available upon request by Scheme Creditors to the Information Agent.

"**Scheme**" means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme, the terms of which are set out in Appendix 1 (The Scheme).

"**Scheme Claims**" means all Claims under or in respect of the Existing Notes Transaction Documents and the Existing Facilities Transaction Documents and any related transactions (including all Claims to principal, interest, penalties or other amounts due in relation to the Existing Notes and the Existing Facilities), whether in tort, contract or otherwise, but excluding in each case the Excluded Liabilities.

"**Scheme Conditions**" means each of the conditions precedent to the effectiveness of the Scheme, as set out in clause 2.4 (Scheme Overview and Conditions) of the Scheme.

"**Scheme Costs**" means the liability of the Company in respect of (a) the fees, costs and expenses of the Advisors, (b) the Creditors Advisor Fees, (c) the Existing Notes Trustee Fees and (d) the Existing Syndicated Facility Administrative Party Fees, in each case, in relation to the Restructuring which liabilities are not subject to the arrangements and compromises to be effected by the Scheme.

"**Scheme Creditors**" means holders of economic or beneficial ownership interests in the Existing Notes and the Existing Facilities, and any other Person who holds any Scheme Claims, as at the Record Time and "**Scheme Creditor**" shall mean any one of them.

"**Scheme Effective Date**" means the date on which all of the Scheme Conditions have been satisfied and upon which the Scheme shall become effective and binding.

"**Scheme Website**" means https://bonds.morrowsodali.com/PanBrothers.

"**SEC**" means the United States Securities and Exchange Commission.

"**Security Providers**" means the Company, the Issuer and the Subsidiary Guarantors, as the providers of the Existing Notes Collateral pursuant to the terms of the Existing Notes Indenture and the Existing Syndicated Facility Security pursuant to the terms of the Existing Syndicated Facility Security Documents.

"**SFC**" means the Securities and Futures Commission of Hong Kong.

"**SGXNet**" means a website maintained by the SGX-ST.

"**SGX-ST**" means the Singapore Exchange promulgated by Singapore Exchange Securities Trading Limited, on which the Existing Notes are listed.

"**Singapore**" means the Republic of Singapore.

"**Subsidiary**" has the meaning given to that term in the Existing Notes Indenture.

"**Subsidiary Guarantor**" means each entity acting as subsidiary guarantor under the Existing Notes Indenture, each Indonesian law corporate guarantee granted by each such entity in the form of a notarial deed dated 26 January 2017 and/or the Amended Notes Indenture (as applicable).

"**Syndicated Facility Guarantors**" has the meaning given to the term "Guarantors" in the Existing Syndicated Facility Agreement.

"**UK**" means the United Kingdom.

"**United States**" or "**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code in connection with the Scheme.

"**U.S. Securities Act**" means the United States Securities Act of 1933, as amended.

"**USD**" or "**US$**" or "**U.S. Dollar**" means the United States Dollar, the lawful currency of the United States of America.

"**Voting Instruction Form**" means the voting instruction form to be submitted by the Holders of the Existing Facilities in the form set out in Appendix 4 (Voting Instruction Form).

"**Voting Results Announcement**" means an announcement on the results of voting on the Scheme currently scheduled for 7 December 2021, or such later date as may be notified by the Company or Information Agent (acting reasonably) to the Scheme Creditors, to be issued to Scheme Creditors via the Clearing Systems, email (where email addresses are available) and the Scheme Website.

1.2     In this Explanatory Statement, unless otherwise stated:

(a)     references to Sections, Appendices and paragraphs are references to sections, appendices and paragraphs of this Explanatory Statement;

(b)     references to a person include a reference to any individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)     references to a person include their respective successors and predecessors, and lawful assignees;

(d)     references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re-enacted from time to time;

(e)     references to an agreement, deed or document include references to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(f)     the singular includes the plural and vice versa and words importing one gender shall include all genders;

(g)     headings to Sections and Appendices are for ease of reference only and shall not affect the interpretation of this Explanatory Statement;

(h)     the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "**other**" are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

(i)     references to days shall include Saturdays, Sundays and public holidays and any date or end of a period not falling on a Business Day shall be amended to fall on the immediately following Business Day; and

(j)     references to time shall be to Singapore time.

## 2.    EXECUTIVE SUMMARY

2.1    This summary contains basic information about the Scheme. It does not contain all information that may be important to a Scheme Creditor when deciding to accept the Scheme and is qualified in its entirety by the more detailed information included within this Explanatory Statement and the Scheme.

**Overview of the Scheme**

2.2    This Explanatory Statement summarises and explains the terms of the Scheme which is being submitted to the Scheme Creditors for their consideration and approval.

2.3    The Scheme involves the amendment and restatement of the Existing Notes and the Existing Facilities. If the Requisite Majority of each class of Scheme Creditors – being a simple majority in number of the Scheme Creditors in each class who cast valid votes in the Scheme, whose Accepted Scheme Claims in aggregate represent at least 75% in value of the Accepted Scheme Claims of all such voting Scheme Creditors in such class – approve the Scheme, the Company plans to submit the Scheme for sanction by the Court as a pre-packaged scheme of arrangement under Section 71 of the Insolvency, Restructuring and Dissolution Act.

2.4    In the event that all of the Scheme Conditions are satisfied, the Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme

Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme) and all of their respective successors, assigns and transferees.

2.5    The implementation of the Scheme and the Restructuring shall be deemed to be completed on the Restructuring Effective Date. For more details on the Scheme, see Section 5 (Overview of the Scheme).

**Summary Timetable**

2.6    The following summarises the current key timelines for the Scheme. Note that the dates listed below may be subject to extension in accordance with the Scheme terms.

2.7    For more details, see Section 6 (Scheme Timelines).

| Event | Date |
| --- | --- |
| Announcement of the Scheme through email, the Scheme Website, the Clearing Systems and SGXNet and filing of Proofs of Debt. | 12 November 2021 |

| Event | Date |
| --- | --- |
| Information Meetings and Deadline for filing of Proofs of Debt | Information Meeting for the Noteholders<br><br>7.30 a.m. on 19 November 2021 (London time) /<br><br>3.30 p.m. on 19 November 2021 2021 (Singapore time)<br><br>Information Meeting for the Holders of the Existing Facilities<br><br>6.00 a.m. on 19 November (London time) /<br><br>2.00 p.m. on 19 November 2021 (Singapore time) |
| Deadline to complete adjudication on Proofs of Debt | 23 November 2021 |
| Deadline to submit objections (if any) to the results of the adjudication of Proofs of Debt | 26 November 2021 |
| Deadline for Independent Assessor to make a decision on the objections (if any) | 3 December 2021 |
| Record Time | 2.00 p.m. on 7 December 2021 (London time) /<br><br>10.00 p.m. on 7 December 2021 (Singapore time) |
| Voting Results Announcement | As soon as practicable and in any event within two Business Days after the Record Time. |
| Sanction Hearing | Week of 3 January 2022 (*indicative*) |
| Scheme Effective Date | As soon as practicable after the Sanction Hearing |
| Restructuring Effective Date | By the Long Stop Date |

| | |
|---|---|
| Long Stop Date | 31 March 2022, subject to any extension under the terms of the Scheme. |

## 3.   OVERVIEW OF THE GROUP, INDEBTEDNESS AND MANAGEMENT

### Background to the Company

3.1   The Company was incorporated on 21 August 1980 and its registration number is 8120214123901. The registered office of the Company is located at Jalan Raya Prabu Siliwangi No 178, Kelurahan Alam Jaya, Kecamatan Jatiuwung, Kota Tangerang, Provinsi Banten.

3.2   According to article 3 of the Company's articles of association, the scope of the Company's activities are industry, distribution of products, import of equipment, transportation and representative or agency, office building management and rental, recreation business and bonded zones. The Company's registered office and headquarters is in Tangerang, West Java, Indonesia. The Company is a garment manufacturer and produces a variety of medium to high complexity garment products, ranging from non-sports and lifestyle wear, such as t-shirts, dresses, shorts, pants, dress shirts, padded and light weight jackets, golf shirts, track suits and sweat suits, to technical, functional and active performance wear, including for snowboarding, skiing, jogging, hiking and other sports and outdoor activities.

3.3   The details of the board of commissioners and board of directors of the Company are as follows:

| Board of Commissioners | |
|---|---|
| **Name** | **Title** |
| Benny Soetrisno | President Commissioner / Independent Commissioner |
| Supandi Widi Siswanto | Vice President Commissioner / Independent Commissioner |
| Dhanny Cahyadi | Commissioner |

| Board of Directors | |
|---|---|
| **Name** | **Title** |
| Ludijanto Setijo | President Director |
| Anne Patricia Sutanto | Vice President Director |
| Fitri Ratnasari Hartono | Director |
| Jean Pierre Seveke | Director |

3.4   On 26 January 2017, the Issuer entered into the Existing Notes Indenture pursuant to which the Existing Notes were constituted and such indebtedness was guaranteed by the Company and the Subsidiary Guarantors.

3.5   On 27 December 2017, the Company and certain of its Subsidiaries (PT Pancaprima Ekabrothers, PT Hollit International, PT Ocean Asia Industry, PT Prima Sejati Sejahtera, PT Eco Laundry Hijau Indonesia, PT Eco Smart Garment Indonesia, PT Berkah Indo Garment, PT Victory Pan Multitex, PT Teodore Pan Garmindo, PB Apparel Pte. Ltd., Continent 8 Pte. Ltd., and Cosmic Gear Limited) entered into the Existing Syndicated Facility Agreement. The Existing Syndicated Facility is guaranteed by corporate guarantees from the Syndicated Facility Guarantors and secured by land and building security rights, fiducia security over machinery and equipment, fiducia security over insurance claims and pledges of cash proceeds accounts. Further details of the Existing Syndicated Facility Agreement are documented in paragraph 3.19.

3.6   The Company and its Subsidiaries also have bilateral facilities with PT Bank BNP Paribas Indonesia, PT Bank HSBC Indonesia, Strait Merchants Pte. Ltd., SC Lowy Primary

Investments, Ltd., PT Bank Maybank Indonesia Tbk., PT Bank Permata Tbk., and PT Bank UOB Indonesia. These bilateral facilities are unsecured. Further details of the Existing Bilateral Facilities are set out in paragraph 3.22.

3.7    Other than the Existing Notes and the Existing Facilities, as at the date of this Explanatory Statement, the Company has no material borrowings or other indebtedness (including loan capital issued, or created but unused), term loans or other material liabilities.

**Background to the Group**

3.8    The Company was established based on notarial deed of Misahardi Wilamarta, S.H, Jakarta No. 96 on 21 August 1980, which was subsequently amended by notarial deed No. 58 on 16 October 1980. The articles of association were approved by the Minister of Justice of the Republic of Indonesia in decree dated 30 October 1980, No. YA/5/500/11 and were published in the State Gazette of the Republic of Indonesia No. 59. The Company's articles of association have been amended several times and the latest amendment was based on Notarial Deed No. 64 dated 27 August 2020 as notarised by Notary Fathiah Helmi, S.H. and which were approved by The Minister of Law and Human Rights in decree No. AHU-AH 01.03-0389263 dated 22 September 2020.

3.9    The Company became a listed company on the Indonesia Stock Exchange in 1990, under the stock code: PBRX.

3.10    The Group consists of the Company as the holding company and 20 Subsidiaries. 10 of the Subsidiaries are effectively wholly owned by the Company and the rest are joint ventures. The Group's main business activity is garment manufacturing, focusing on the production of medium to high complexity garment products. As part of its garment manufacturing business, the Group also engages in product development and sourcing activities, as well as retail. The Group further engages in textile manufacturing of thread and knit fabrics for downstream production.

3.11    The corporate structure of the Group as at the date of this Explanatory Statement is set out below:



*15% owned by Mitsubishi Corporation
**Joint ventures with same partner – PT Selaras Dua Tiga
***Partners include member of BOD or family of shareholder

3.12    The Company's subsidiaries and their operations as at the date of this Explanatory Statement is set out below:

| Entity | Domicile | Nature of Business | Start of commercial operations | Number of Factories | Factory Location and Capacity (in pieces) |
|---|---|---|---|---|---|
| PT Pan Brothers Tbk (the Company) | Indonesia | Garment manufacturing | 1980 | 4 | 20 million |
| PT Pancaprima Ekabrothers | Indonesia | Garment manufacturing | 1998 | 3 | 11.4 million |
| PT Eco Smart Garment Indonesia | Indonesia | Garment manufacturing | 2013 | 4 | 28 million |
| PT Prima Sejati Sejahtera | Indonesia | Garment manufacturing | 2014 | 3 | 27.6 million |
| PT Teodore Pan Garmindo | Indonesia | Garment manufacturing | 2015 | 6 | 18 million |
| PT Berkah Indo Garment | Indonesia | Garment manufacturing | 2016 | 1 | 12 million |
| PT Eco Laundry Hijau Indonesia | Indonesia | Garment manufacturing support (laundry) | 2015 | - | - |
| PT Prima Cosmic Screen Graphic | Indonesia | Garment manufacturing support (printing) | 2014 | - | - |
| PB Apparel (S) Pte Ltd | Singapore | Product development and sourcing | 2016 | - | - |
| PT Prima Kreasi Gemilang | Indonesia | Garment manufacturing support (embroidery) | 2011 | - | - |
| PB Island Pte Ltd | Singapore | Product development and sourcing | 2017 | - | - |
| PT Hollit International | Indonesia | Product development and sourcing | 2005 | - | - |
| Cosmic Gear Ltd | Hongkong | Product development and sourcing | 2014 | - | - |
| Continent 8 Pte Ltd | Singapore | Product development and sourcing | 2012 | - | - |
| PT Ocean Asia Industry | Indonesia | Textile (knit fabrics) | 2011 | - | - |
| PT Victory Pan Multitex | Indonesia | Textile (threads) | 2015 | - | - |
| PT Apparelindo Prima Sentosa | Indonesia | Retail | 2013 | - | - |
| PT Mitra Busana Sentosa | Indonesia | Retail | 2014 | - | - |
| PT Apparelindo Mitra Andalan | Indonesia | Retail | 2013 | - | - |
| PB International B.V. | Netherlands | Issuer of the Existing Notes | 2016 | - | - |
| PB Fashion B.V | Netherlands | Trading | 2016 | - | - |

3.13    The Group's operations are divided into two main segments, namely garment and textile. As of 30 June 2021, garment and textile business accounts for approximately 96.7% and 3.3% of the Group's sales, respectively.

3.14    The description of the Group's business activities is as follows:

    (a)    Garment Business

        (i)    Garment Manufacturing

            (A)    The Group's main product categories are:

                (1)    technical and fashion cut sewn knit garments, which primarily comprise woven apparel, such as t-shirts, polo shirts, yoga wear, casual pants and dress shirts;

                (2)    technical and lifestyle woven garments, which primarily comprise cut and sewn apparel, such as sports jerseys and track suits; and

                (3)    technical and functional wear, which primarily comprise light and heavy woven outerwear, such as down jackets and jackets for various winter and outdoor activities such as hiking.

            (B)    Approximately 95% of the Group's sales are export and its customers include some of the world's largest brands such as, among several others, Adidas, Uniqlo, The North Face, Salomon, Arcteryx, Kathmandu, IKEA, Columbia, Scotch & Soda, Mavic, Ralph Lauren, Atomic, Stella McCartney, Tommy Hilfiger and LL Bean.

            (C)    In response to the current COVID-19 pandemic, the Group began producing Personal Protective Equipment ("**PPE**") products in March 2020, including various types of medical and non-medical grade face masks and hazmat suits. The Group's PPE customers include the Red Cross and Indonesia's Ministry of Health (amongst other Indonesian ministries), as well as private companies.

        (ii)    Product development and sourcing

            (A)    The Group also engages in design, development and sourcing of garments and fabric materials featuring the latest trends in style, finishing and materials. This adds value to its garment manufacturing business by allowing the Group to actively engage and support customers in the design and development stages of their businesses and in turn, provide the Group with access to them ahead of order placements.

            (B)    The Group's design and development capabilities include three-dimensional product sampling, which allows them to increase turnaround time and improves the overall development process, and computer-aided design, including digital pattern making, grading and market making, which enables them to reduces manual labor and fabric consumption in the manufacturing process.

        (iii)    Retail

The Group designs and sell garments under its brands such as Salt n Pepper, Asylum, FTL, and Zoe. Retail currently accounts for a small proportion of the

20

Group's business and represented less than 2.0% of total sales for the last five years.

(iv)    Garment Manufacturing Support

Some of the Group's Subsidiaries are engaged in supporting activities to the garment manufacturing business, such as laundry, printing, and embroidery.

(v)    Textile Business

The Group produces sewing and embroidery thread and various kinds of knit fabrics, which are used in its downstream production and sold to other downstream textile manufacturers. Approximately 90% of the textile products are sold to third parties with the remaining used in the Group's downstream operations.

3.15    The business activities of the Group are mainly driven by four garment manufacturing companies, namely the Company, PT Pancaprima Ekabrothers, PT Prima Sejati Sejahtera and PT Eco Smart Garment Indonesia. As of 30 June 2021, these companies contribute approximately 74.0% of the Group's sales.

3.16    Audited consolidated financial statements of the Group for the financial years ended 31 December 2018, 2019, 2020 and Unaudited Interim Consolidated Financial Statement as of 30 June 2021 are set out in Appendix 2 (Financial Statements).

**Financial Position**

3.17    The Group had US$377,641,712 in total borrowings as at 30 June 2021, which comprised of US$171,078,000 in outstanding Existing Notes, US$138,400,000 of the outstanding Existing Syndicated Facility and US$68,163,712[1] of outstanding Existing Bilateral Facilities. Further details of the Group's total borrowings are set out in paragraph 4.26. For the purposes of this Explanatory Statement, the exchange rate used is US$1= IDR14,496.

*The Existing Notes*

3.18    As at 30 June 2021, the Group had US$171,078,000 million in principal amount outstanding under the Existing Notes. The Existing Notes are represented by a Global Note, in fully registered form without interest coupons. The Existing Notes were deposited with and registered in the name of a nominee of the Common Depositary for the Clearing Systems. The Clearing Systems each hold securities for their customers and facilitate the clearance and settlement of securities transactions by electronic book-entry transfer between their respective Account Holders. So long as the Existing Notes Depositary (or its nominee) is the registered owner of the global notes, it shall be considered the registered holder of the Existing Notes. Under certain circumstances, the Issuer may be obliged to issue individual Certificated Notes (as defined in the Existing Notes Indenture) in fully registered form in exchange for the Global Note, in which case the holders of those Certificated Notes shall be considered the registered holder of the Existing Notes.

*The Existing Syndicated Facility*

3.19    On 27 December 2017, the Company and certain of its Subsidiaries entered into a US$150,000,000 revolving credit facility agreement for the purpose of repaying the Company's then existing syndicated facility and to finance working capital requirements. The facilities are divided into 2 tranches, Tranche A with a total commitment of US$123,500,000 and Tranche

---

[1] Total usage of letter of credit facilities under the Existing Bilateral Facilities, including the usage amount that is not yet due.

B with a total commitment of US$15,000,000. The facility was last amended by an amendment agreement dated 10 April 2018.

3.20    As of 30 June 2021, the lenders under the Existing Syndicated Facility are SC Lowy Primary Investments, Ltd., SC Lowy Financial (HK) Ltd, PT Bank China Construction Bank Indonesia Tbk., PT Bank Maybank Indonesia Tbk, PT Bank Rakyat Indonesia (Persero) Tbk, (Singapore Branch), PT Bank BNP Paribas Indonesia, PT Bank Shinhan Indonesia, and PT Bank KEB Hana Indonesia.

3.21    The Existing Syndicated Facility is guaranteed by corporate guarantees from the Syndicated Facility Guarantors and secured by security rights over certain lands of the Company and PT Pancaprima Ekabrothers, fiduciary security over machinery and equipment of the Company and PT Pancaprima Ekabrothers, fiduciary security over insurance claims of the Company and PT Pancaprima Ekabrothers, and pledges of cash proceeds accounts of the Company, PT Pancaprima Ekabrothers, PT Prima Sejati Sejahtera and PT Eco Smart Garment Indonesia. The Existing Syndicated Facility matured on 27 January 2021 and is now in default. The total outstanding principle under the Existing Syndicated Facility as of 30 June 2021 was US$138,400,000.

*The Existing Bilateral Facilities*

3.22    As of 30 June 2021, the Company and certain of its Subsidiaries had bilateral facilities with PT Bank BNP Paribas Indonesia, PT Bank HSBC Indonesia, Strait Merchants Pte. Ltd., SC Lowy Primary Investments, Ltd., PT Bank Maybank Indonesia Tbk., PT Bank Permata Tbk., and PT Bank UOB Indonesia. Details of each of these facilities are as follows:

(a)    PT Bank BNP Paribas Indonesia

Letter of credit facilities with facility limit of up to US$7,500,000, documented under the facility agreement between the Company and certain Subsidiaries and PT Bank BNP Paribas Indonesia as amended from time to time, most recently pursuant to a sixth amendment dated 13 March 2019 and as extended by the notification letter dated 27 February 2020. The facilities are currently non-active with total outstanding of US$2,401,084 as of 30 June 2021.

(b)    PT Bank HSBC Indonesia

Letter of credit facilities with facility limit of up to US$50,000,000 as documented under the facility agreement between the Company and PT Bank HSBC Indonesia dated 9 August 2017, most recently amended by a second amendment dated 21 October 2019. The facilities are currently non active with total outstanding of US$12,132,702 as of 30 June 2021.

(c)    PT Bank Maybank Indonesia Tbk.

Letter of credit facilities with facility limit of up to US$25,000,000 as documented under the facility agreement between the Company and PT Bank Maybank Indonesia Tbk. dated 12 March 2003, most recently amended on 13 November 2020 and a L/C facility with a limit up to US$15,000,000 and sub-limit Negotiation/Discounting up to US$10,000,000, supplemented with an additional amendment on facility limit based on an email sent by PT Bank Maybank Indonesia Tbk. on 14 December 2020. The facilities are currently non-active with total outstanding of US$4,217,282 as of 30 June 2021.

(d)    Straits Merchants Pte. Ltd.

Letter of credit facilities with facility limit of up to US$54,000,000, which was novated to Straits Merchants Pte. Ltd. from PT Bank ANZ Indonesia on 16 July 2021. The

facilities are currently non-active with total outstanding of US$7,455,273 as of 30 June 2021.

(e)    SC Lowy Primary Investments, Ltd.

Letter of credit facilities with facility limit of up to US$35,000,000 which was novated to SC Lowy Primary Investments, Ltd. from MUFG Bank Ltd., Jakarta Branch on 16 March 2021, and letter of credit facilities of up to US$3,000,000 and bank guarantee facilities of up to US$3,000,000 which were transferred to SC Lowy Primary Investments, Ltd. from PT Bank Mizuho Indonesia on 28 April 2021. These are currently non-active with total outstanding of US$21,372,256 as of 30 June 2021.

(f)    PT Bank Permata Tbk.

Letter of credit facilities with facility limit of up to US$5,000,000 for the Company, US$5,000,000 limit for PT Pancaprima Ekabrothers and US$10,000,000 limit for PT Prima Sejati Sejahtera, as documented under a facility agreement between those companies and PT Bank Permata Tbk. dated 26 August 2014, with latest amendment dated 2 February 2021. The facilities are currently active with total outstanding of US$12,161,604 as of 30 June 2021.

(g)    PT Bank UOB Indonesia

Letter of credit facilities with facility limit of up to US$23,000,000 documented under the facility agreement between the Company and certain of its Subsidiaries and PT Bank UOB Indonesia dated 20 April 2011, with the latest amendment dated 4 May 2021 with L/C facility limit of up to US$18,600,000 (Note: FX Facility US$10,000,000), supplemented with additional amendments on facility limit and pricing based on an email sent by PT Bank UOB Indonesia on 10 December 2020. The facilities are currently active with total outstanding of US$8,423,511 as of 30 June 2021.

**Principal Shareholders, Commissioners and Directors**

*Principal Shareholders*

3.23    The following table sets forth certain information, as at the date of this Explanatory Statement, with respect to the ownership of the Company's shares:

| Shareholder | Shares (#) | Ownership (%) |
|---|---|---|
| PT Ganda Sawit Utama | 1,036,857,200 | 16.01% |
| PT Trisetijo Manunggal Utama | 1,813,303.823 | 27.99% |
| UBS AG Singapore S/A Burlingham International Ltd | 450,000,000 | 6.95% |
| General Public | 3,178,134,588 | 49.06% |
| **Total** | **6,478,295,611** | **100.00%** |

*Commissioners and Directors*

3.24    The Company's management and day-to-day operations are carried out by its Board of Directors under the supervision of its Board of Commissioners, the members of whom are appointed through a general meeting of shareholders. As at the date of this Explanatory Statement, the

Company's Board of Commissioners is composed of 3 members, and its Board of Directors is composed of 4 members.

3.25    As at the date of this Explanatory Statement, the Board of Commissioners of the Company are as follows:

| Board of Commissioners | |
|---|---|
| Name | Title |
| Benny Soetrisno | President Commissioner / Independent Commissioner |
| Supandi Widi Siswanto | Vice President Commissioner / Independent Commissioner |
| Dhanny Cahyadi | Commissioner |

3.26    As at the date of this Explanatory Statement, the Board of Directors of the Company is as follows:

| Board of Directors | |
|---|---|
| Name | Title |
| Ludijanto Setijo | President Director |
| Anne Patricia Sutanto | Vice President Director |
| Fitri Ratnasari Hartono | Director |
| Jean Pierre Seveke | Director |

### Legal Proceedings

3.27    From time to time the Group may be involved in legal proceedings concerning matters arising in connection with the conduct of its business, including proceedings that challenge actions taken by the Group. To the best of the knowledge and belief of the Group, other than the proceedings described in paragraphs 4.12 to 4.20 below, there are no material pending claims or legal proceedings against it as at the date of this Explanatory Statement.

## 4.    BACKGROUND TO THE SCHEME

### Events Leading to the Moratoria Filings

4.1    On 11 March 2020, the World Health Organization declared COVID-19 a pandemic, expanding its assessment of the threat beyond the global health emergency it had announced in January 2020. On 31 March 2020, the President of Indonesia declared COVID-19 a Public Health Emergency (Darurat Kesehatan Masyarakat) and on 14 April 2020, a National Disaster (Bencana Nasional). The COVID-19 pandemic and preventive actions taken by the government authorities around the world, including social distancing, office closures, travel restrictions and imposition of quarantines, have resulted in a period of business disruption and restriction in business activities.

4.2    The COVID-19 pandemic resulted in challenges to the overall garment manufacturing industry, causing disruption in demand, production and the cash conversion cycle due to delays in shipment, extension of payments from customers, and higher advances requested by suppliers. Furthermore, starting in May 2020 through to April 2021, the Group's Existing Bilateral Facilities were gradually frozen, leading to a reduction in active lines from approximately US$222.5 million as of 31 March 2020 to as little as US$23.6 million by 17 April 2021. This reduction placed extreme pressure on the Group's working capital and led to further lengthening of Group's cash conversion cycle.

4.3    On 20 April 2020, Moody's downgraded the Group's credit rating to B2 from B1, citing heightened refinancing risk associated with the Existing Syndicated Facility. This was based on

its assessment of the Group's narrowing liquidity buffer to withstand deterioration in earnings or unexpected stretches in working capital. The downgrade was followed by further downgrades to B3 on 6 July 2020 and to Caa1 on 16 October 2020. The Group's credit rating was last downgraded by Moody's to Ca on 15 January 2021 as Moody's cited uncertainty around the recovery rate for the Existing Notes and the Group's ability to service financial obligations being mainly dependent on its ability to reach resolution with the lenders under the Existing Syndicated Facility.

4.4    Similarly, on 23 October 2020, Fitch downgraded the Group's credit rating to B- from B, citing pressure on the Group's liquidity and the elevated refinancing risk associated with the Existing Syndicated Facility and the Existing Notes. The downgrade was followed by further downgrades to CCC- on 10 December 2020, to CC on 8 January 2021 and to C on 1 February 2021. The Group's credit rating was last downgraded by Fitch to RD on 9 March 2021 following the expiry of the standstill period under the standstill letter (as further elaborated on in paragraph 4.10 below).

4.5    On 4 November 2020, the Company appointed AJCapital as independent financial advisor and Baker & McKenzie.Wong & Leow as international and Singapore legal counsel, to facilitate a restructuring of the Existing Notes and the Existing Facilities.

4.6    An "**Event of Default**" under the Existing Notes Indenture occurs in the event of, among others:

(a)    pursuant to section 6.01(n) of the Existing Notes Indenture, a failure to maintain an amount in cash equal to the amount of one (1) semi-annual interest payment under the Existing Notes (the "**Minimum Amount**") in the Interest Reserve Account (as defined in the Existing Notes Indenture) in accordance with the terms of the Existing Notes Indenture; or

(b)    pursuant to section 6.01(e) of the Existing Notes Indenture, a cross-default with respect to any indebtedness of the Company or its Subsidiary Guarantors having an outstanding principal amount of US$5,000,000 or more in aggregate for all such indebtedness.

If such an Event of Default occurs and is continuing under the Existing Notes Indenture, the Existing Notes Trustee or the Holders of at least 25% in aggregate principal amount of the Existing Notes, then outstanding, by written notice to the Issuer, may, and the Existing Notes Trustee at the written request of such Holders may, declare the principal of, premium, if any, and accrued and unpaid interest on the Existing Notes to be immediately due and payable. Upon a declaration of acceleration, such principal, premium, if any, and accrued and unpaid interest will be immediately due and payable.

4.7    The Issuer defaulted under the Existing Notes Indenture when funds in the Interest Reserve Account were used for the payment of the semi-annual interest that was due on 26 January 2021 under the Existing Notes, resulting in a failure to at all times maintain the Minimum Amount in the Interest Reserve Account. As at the date of this Explanatory Statement, the Issuer has topped up the Interest Reserve Account to ensure the Minimum Amount is held in the Interest Reserve Account as required in accordance with the terms of the Existing Notes Indenture.

4.8    The Company and the Issuer have also defaulted under the Existing Notes Indenture as a result of cross-defaults in respect of the Existing Facilities, further details of which are outlined in paragraph 4.9 below.

4.9    Further details of the defaults under the Existing Facilities are as follows:

(a)    the Company defaulted under the Existing Syndicated Facility Agreement when it failed to make payment for amounts due and payable on 27 January 2021 as non-

payment of such amounts is an event of default under the Existing Syndicated Facility Agreement;

(b)    the Company defaulted under the Existing Syndicated Facility Agreement as a result of cross-defaults triggered by defaults under the Existing Bilateral Facilities as a cross-default is an event of default under the Existing Syndicated Facility Agreement; and

(c)    the Company defaulted under the Existing Bilateral Facilities when it failed to make payment for amounts due and payable under the Existing Bilateral Facilities and as a result of a cross-default triggered by the defaults under the Existing Syndicated Facility Agreement set out in sub-paragraphs (a) and (b) above.

4.10    In connection with the defaults under the Existing Bilateral Facilities and the Existing Syndicated Facility Agreement outlined above, the Company and certain Subsidiary Guarantors who were also borrowers under the Existing Bilateral Facilities, entered into a standstill letter dated 22 January 2021 (the "**Standstill Letter**") with the creditors under the Existing Bilateral Facilities and the Existing Syndicated Facility Agreement, pursuant to which these creditors agreed not to take enforcement action in exchange for the provision of information and other obligations to be undertaken by the Company and such Subsidiary Guarantors. The standstill period has since expired on 31 March 2021.

**Subsequent Discussions and Next Steps**

4.11    Between January 2021 to May 2021, the Company had various discussions:

(a)    with the creditors under the Existing Bilateral Facilities and the Existing Syndicated Facility Agreement to extend the standstill period under the Standstill Letter;

(b)    with the lenders under the Existing Bilateral Facilities to resume lines of credit which were frozen and to keep others open;

(c)    with Noteholders by conducting a number of informal discussions regarding, among other things, a possible voluntary out-of-court restructuring of the Existing Notes; and

(d)    with the creditors under the Existing Bilateral Facilities and the Existing Syndicated Facility Agreement for new commitments and a consensual extension and amendment to the Existing Syndicated Facility Agreement, with separate amendments to the Existing Non-Active Bilateral Facilities, the Existing Facility Agreement (Permata), the Existing Facility Agreement (Maybank), the Existing Facility Agreement (UOB) and the Existing Facility Agreement (HSBC). Various drafts of term sheets in relation to such proposed extensions and amendments were circulated during this period.

The Company's intention was to propose a scheme of arrangement in Singapore to restructure the Existing Debt.

4.12    On 24 May 2021, PT Bank Maybank Indonesia Tbk ("**Maybank**") petitioned the Central Jakarta Commercial Court to enter the Company into a PKPU ("**Maybank's PKPU Application**"). The Central Jakarta Commercial Court scheduled a hearing on 8 June 2021 to hear Maybank's PKPU Application.

4.13    In line with the Company's intention to propose a scheme of arrangement in Singapore between the Group and its creditors, the Company filed an application in the Singapore High Court for a moratorium under Section 64 of the Insolvency, Restructuring and Dissolution Act 2018 in case number HC/OS 551/2021 ("**OS 551**") on 1 June 2021 (the "**Moratorium Application**"). Further applications were filed under Section 65 of the Insolvency, Restructuring and Dissolution Act 2018 (the "**Subsidiaries' OS**") on 1 June 2021 for corresponding moratoriums to restrain proceedings and actions against the Company's Subsidiaries, in support of the

26

proposed Group restructuring. Each of OS 551 and the Subsidiaries' OS sought an order that the moratorium applies to restrain proceedings and actions against the Company and its Subsidiaries taking place in Singapore or elsewhere.

4.14    An automatic moratorium (the "**Automatic Moratorium"**) commences upon the filing of the Moratorium Application and ends on either a date that is 30 days after the date on which the Moratorium Application is made or the date on which the Moratorium Application is decided by the Court, whichever is earlier. This further triggered events of default under the Existing Notes Indenture, the Existing Syndicated Facility Agreement and the Existing Bilateral Facilities.  In respect of the Automatic Moratorium, OS 551 and the Subsidiaries' OS, the relevant members of the Group sough orders that the Automatic Moratorium applies to restrain proceedings and actions against the Company and its Subsidiaries taking place in Singapore or elsewhere ("**Interim Application**").

4.15    The Interim Application was fixed and heard on 4 June 2021 at the General Division of the Singapore High Court, where the Honourable Judicial Commissioner Philip Jeyaretnam and the Company granted the Interim Application in terms, up until 1 July 2021.

4.16    On 28 June 2021, the Honourable Judicial Commissioner Philip Jeyaretnam heard and granted OS 551 and the Subsidiaries' OS, with the moratoria effective until 28 December 2021 (the "**Moratoria**").

4.17    The Moratorium Application, Interim Application, Automatic Moratorium and the Moratoria also triggered other events of default under the Existing Notes Indenture and the Existing Facilities Transaction Documents.

**Further Developments during the Moratoria Period**

4.18    During the Moratoria period, the Company has continued to engage the creditors under the Existing Bilateral Facilities and the Existing Syndicated Facility Agreement to finalize the term sheets for the proposed scheme of arrangement in respect of, among other things, the Existing Bilateral Facilities and the Existing Syndicated Facility Agreement. Various drafts of term sheets were circulated and discussed. The latest versions of the Restructuring Term Sheet (Syndicated Facility), the Restructuring Term Sheet (Non-Active Bilaterals), the Restructuring Term Sheet (Permata), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (UOB) and the Restructuring Term Sheet (HSBC) are set out in paragraph 5.4 (Restructuring Term Sheet (Syndicated Facility) to paragraph 5.9 (Restructuring Term Sheet (Maybank).

4.19    In addition, the Company also sought to engage the Noteholders to initiate discussions on the restructuring proposal in respect of the Existing Notes. A notification regarding an initial Noteholders' meeting to discuss the restructuring of the Existing Notes to be held on 13 August 2021 was sent to Noteholders through the Existing Notes Trustee, and also publicly announced on SGXNet by the Issuer on 5 August 2021. Subsequent Noteholders' meetings were held on 1 September 2021 and 16 September 2021. Drafts of the Restructuring Term Sheet (Existing Notes) were circulated and discussed with the Committee following these meetings.  The latest draft of the Restructuring Term Sheet (Existing Notes) is set out in paragraph 5.3 (Restructuring Term Sheet (Existing Notes)).

4.20    In the meantime, on 26 July 2021, the Central Jakarta Commercial Court dismissed Maybank's PKPU Application on the basis that Maybank is bound by the ongoing Moratoria granted by the Singapore High Court.

4.21    On 2 August 2021, Maybank filed a bankruptcy petition against the Company in the Central Jakarta Commercial Court under Law No. 37 of 2004 on Bankruptcy and Suspension of Debt Payment Obligations (the "**Maybank Bankruptcy Petition**"). The first court hearing was held on 19 August 2021 in respect of the issue on legal standing. Subsequently, several hearings

were held for the Company and Maybank to present their respective positions and evidence on the Maybank Bankruptcy Petition. The Company's understanding is that The Central Jakarta Commercial Court has rejected Maybank's bankruptcy petition and that The Central Jakarta Commercial Court is expected to issue a written decision confirming this rejection after the date of this Explanatory Statement.

4.22    In the meantime, the Company wishes to continue to progress and complete the restructuring of the Existing Notes and the Existing Facilities under a Scheme, as further elaborated on in paragraphs 4.27 to 4.41 below.

**The Group's Financial Position**

4.23    The financial statements of the Company are a consolidation of the financial statements of the Company and Subsidiaries in the Group.

4.24    The Group's historical consolidated income statement as at 30 June 2021 is set out below:

| Interim Consolidated Statements of Profit or Loss as at 30 June 2021 | Amount (in US$) |
|---|---|
| Sales | 300,783,185 |
| Garment | 290,875,501 |
| Textile | 9,907,684 |
| Cost of Goods Sold | (261,678,614) |
| **Gross Profit** | **39,104,571** |
| Operating Expense | |
| Selling Expense | (5,120,528) |
| General & Administrative Expense | (12,656,424) |
| **Profit from Operations** | **21,327,619** |
| Other Income | 2,835,873 |
| Finance Expense | (9,447,503) |
| Other Expense | (518,857) |
| **Profit Before Income Tax** | **14,197,132** |
| Income Tax Expenses | (3,054,389) |
| **Profit for The Period** | **11,142,743** |

4.25    The Group's historical consolidated financial position as at 30 June 2021 is set out below:

| Interim Consolidated Statement of Financial Position as at 30 June 2021 | Amount (in US$) |
|---|---|
| **Current Assets** | |
| Cash and Cash Equivalents | 47,096,981 |
| Trade Receivables | 134,434,673 |
| Other Receivables | 15,559,904 |
| Inventories | 226,787,098 |

| Interim Consolidated Statement of Financial Position as at 30 June 2021 | Amount (in US$) |
|---|---|
| Prepaid Taxes | 12,166,119 |
| Prepaid Expenses | 2,120,886 |
| Advances | 164,222,528 |
| **Total Current Assets** | **602,388,189** |
| **Non-Current Assets** | |
| Asset on Right of Use | 4,277,537 |
| Deferred Tax Assets | 8,308,637 |
| Fixed Assets | 94,535,427 |
| Intangible Assets | 3,370,594 |
| Other Assets | 1,844,977 |
| **Total Non-Current Assets** | **112,337,172** |
| **TOTAL ASSETS** | **714,725,361** |
| **Current Liabilities** | |
| Trade Payables | 82,123,822 |
| Other Payables | 5,154,964 |
| Sales Advances | 226,249 |
| Accrued Expenses | 16,511,603 |
| Taxes Payables | 2,566,047 |
| Syndication Loan | 138,400,000 |
| Bonds | 170,761,533 |
| Lease Liabilities | 1,125,538 |
| **Total Current Liabilities** | **416,869,756** |
| **Non-Current Liabilities** | |
| Lease Liabilities | 2,417,548 |
| Deferred Tax Liability | 79,490 |
| Employment Benefit Liabilities | 5,660,723 |
| **Total Non-Current Liabilities** | **8,157,761** |
| **TOTAL LIABILITIES** | **425,027,517** |
| **Equity** | |

| Interim Consolidated Statement of Financial Position as at 30 June 2021 | Amount (in US$) |
|---|---|
| Share Capital | 30,206,632 |
| Additional Paid-in Capital | 125,266,024 |
| Retained Earnings | 135,834,297 |
| Other Comprehensive Loss | (2,476,600) |
| Non-Controlling Interest | 867,491 |
| **TOTAL EQUITY** | **289,697,844** |
| **Interim Consolidated Statements of Cash Flow as at 30 June 2021** | **Amount (in US$)** |
| **Cash Flows from Operating Activities** | |
| Receipt from customers | 299,479,416 |
| Payment to suppliers | (241,392,043) |
| Payment to employees | (48,473,718) |
| Interest Receipt | 599,532 |
| Interest Paid | (8,234,341) |
| Received from tax | 914,642 |
| Payment of income tax | (691,931) |
| Other receipt | 2,236,341 |
| Other cash payment | (317,285) |
| **Net Cash Used in Operating Activities** | **4,120,613** |
| | |
| **Cash Flows from Investing Activities** | |
| Payment of advance on purchase of fixed assets | (160,927) |
| Additions of assets under construction | (2,848) |
| Acquisitions of fixed assets | (1,559,275) |
| Proceeds from disposal of fixed assets | 319,866 |
| **Net Cash Used in Investing Activities** | **(1,403,184)** |
| | |
| **Cash Flows from Financing Activities** | |
| Receipt of syndication loans | - |
| (Payment) of finance lease payables | (1,005,952) |
| **Net Cash Provided from (Used In) Financing Activities** | **(1,005,952)** |
| | |
| Increase (Decrease) in cash and cash equivalents | 1,711,477 |
| Effect of Foreign Exchange Rate Changes | (322,698) |
| Cash and Cash Equivalents at the Beginning of the Period | 45,708,202 |

| Interim Consolidated Statement of Financial Position as at 30 June 2021 | Amount (in US$) |
|---|---|
|  |  |
| **Cash and Cash Equivalents at the End of the Period** | **47,096,981** |

4.26    The Group had US$377.6 million in total borrowings as at 30 June 2021:

| Instrument / Lender | Outstanding Amount (in US$) |
|---|---|
| Existing Notes | 171,078,000 |
| Existing Syndicated Facility | 138,400,000 |
| Existing Bilateral Facilities |  |
| Strait Merchants Pte. Ltd. | 7,455,273 |
| PT Bank HSBC Indonesia | 12,132,702 |
| PT Bank BNP Paribas Indonesia | 2,401,084 |
| SC Lowy Primary Investments, Ltd. | 21,372,256 |
| PT Bank Permata Tbk.[2] | 12,161,604 |
| PT Bank UOB Indonesia[3] | 8,423,511 |
| PT Bank Maybank Indonesia Tbk. | 4,217,282 |
| **Total Borrowings** | **377,641,712** |

### The Need for the Proposed Scheme

4.27    In 2020, COVID-19 substantially impacted the Group and the Indonesian textile market. As a direct impact from the COVID-19 pandemic, the Group experienced, among others, a decrease in sales to global brands, and a lengthening cash conversion cycle in 2020 and 1H 2021.

4.28    In 2020, garment sales (excluding sales of PPE products) decreased by 9.6% compared to 2019 as the customers reduced their orders following a drop in global consumer demand and a decline in consumer demand amidst the lockdown measures, closure of clothing stores and various travel restrictions. However, this decline in revenue from the global brands was offset by PPE sales, resulting in an overall increase in the Group's total revenue in 2020. Sales from PPE products, however, are expected to continue only up to the end of 2022. In 1H 2021, consumer demand has slowly recovered and sales achievement is on track at 42.5% of the Group's full year sales expectation (1H historically accounted for 42% - 48% of full year sales).

| Description | 2018 (in US$) | 2019 (in US$) | 2020 (in US$) | 1H 2021 (in US$) |
|---|---|---|---|---|
| Garment sales (excl. PPE products) | 591.939,915 | 646,873,241 | 585,144,487 | 263,340,609 |
| PPE products | - | - | 78,108,803 | 27,534,893 |

---

[2] Total usage of letter of credit facilities under the Existing Facility (Permata), including the usage amount that is not yet due.
[3] Total usage of letter of credit facilities under the Existing Facility (UOB), including the usage amount that is not yet due.

| | | | | |
|---|---|---|---|---|
| Textile | 19,431,396 | 18,175,802 | 21,639,011 | 9,907,684 |
| **Total Sales** | **611,371,311** | **665,049,043** | **684,892,301** | **300,783,186** |

4.29    The garment manufacturing industry typically has a long cash conversion cycle, driven by the lead time required for raw material procurement, production, shipment and collection from customers. The bulk of the Group's assets are invested in working capital (being accounts receivable, inventory, and advance payments). Historically, along with the increase in sales, the Group's cash conversion cycle has also grown, resulting in increases in working capital consumption and cash flow constraints.

| Description | 2018 | 2019 | 2020 | 1H 2021 |
|---|---|---|---|---|
| Add: Days of Receivable Turnover | 64 | 64 | 72 | 80 |
| Add: Days of Inventory Turnover | 91 | 101 | 129 | 159 |
| Add: Days of Advances Turnover | 79 | 91 | 101 | 115 |
| Less: Days of Payable Turnover | (28) | (29) | (29) | (25) |
| **Cash Conversion Cycle** | **206** | **226** | **273** | **331** |

4.30    As a direct impact of the COVID-19 pandemic, the Group's long cash conversion cycle further increased significantly in 2020. A number of significant customers requested extensions on their terms of payment by up to 14 days. This led to an increase in the Group's days of receivable turnover. Aside from requesting for relaxation in the form of terms of payment, in the early period of the Covid-19 pandemic, some customers also requested delays to the delivery of goods leading to an increase in finished goods inventory. Furthermore, some suppliers asked for shorter terms of payment or requested advance payments for material purchase to manage the impact of the pandemic. This resulted in increase in days of advances turnover as well as decrease in days of payable turnover.

4.31    In line with the growth in its sales and cash conversion cycle, the Group's working capital needs have also grown over the past few years. During 2018 to 2020, net working capital (including unrestricted cash) has grown from US$373.4 million as of 31 December 2018 to US$504.7 million as of 31 December 2020, being an increase of US$131.4 million. This increase has been primarily funded by the Existing Notes and retained earnings. While there have been fluctuations in the facilities under the Existing Syndicated Facility and its predecessor facilities over this period, as to be expected with revolving credit facilities, the net position has been marginal.

4.32    In 1H 2021, the Group's cash conversion cycle further lengthened. Up until May 2021, some customers continued to request for delays in shipment and payments, due to the slower recovery in demand from the COVID-19 pandemic and low vessel availability, further pushing the days of receivable and inventory turnover. In addition, some suppliers also requested for more full or partial advance cash payments in replacement of reduced active letter of credit trade lines.

4.33    The use of letter of credit trade lines has been a critical element of the Group's raw material ordering and working capital management. However, in 2020, 5 banks (PT Bank ANZ Indonesia, PT Bank BNP Paribas Indonesia, MUFG Bank Ltd. Jakarta Branch, PT Bank HSBC Indonesia, and PT Bank Mizuho Indonesia) froze the Group's trade lines under the respective Existing Bilateral Facilities. The combined limit of the frozen trade facilities amounted to US$149.5 million. The remaining bilateral banks (PT Bank Maybank Indonesia Tbk., PT Bank

UOB Indonesia, and PT Bank Permata Tbk.) reduced their credit limits under the respective Existing Bilateral Facilities, with a combined limit down from US$73 million to US$28.1 million. In April 2021, PT Bank Maybank Indonesia Tbk. froze the Group's trade lines under its Existing Bilateral Facility, further reducing the Group's trade lines limit to only US$23.6 million. It should be noted that the bilateral trade lines had first been frozen shortly after the first credit downgrade of the Group by Moody's. Following that, there were further credit downgrades by Moody's and Fitch as discussed in paragraphs 4.3 and 4.4 during the period when further trade lines were being frozen. Although there is no clear causative link between the credit downgrade and the freezing of trade lines, there is a possibility that they did impact one another.

4.34    Without sufficient active trade lines, a number of suppliers have requested for partial or full advance cash payments, therefore accelerating cash consumption and putting further pressure on the Group's working capital consumption. This ultimately led to the default in payment of maturing trade lines under the Existing Non-Active Bilateral Facilities in 2020. The defaults also triggered cross-defaults under the Existing Syndicated Facility Agreement and the Existing Notes and the Group was further pressured by the close maturity of these loans. The Existing Syndicated Facility matured on 1 February 2021 and is presently in default. The Existing Notes will mature in 26 January 2022 and accordingly, a restructuring of the Existing Notes is also required.

4.35    As previously mentioned in this Explanatory Statement, given its available cash and the impact of cancellations and demand on the near-term outlook for earnings of the Group, the Issuer had to use the funds in the Interest Reserve Account for the payment of the semi-annual interest that was due on 26 January 2021 under the Existing Notes, triggering an event of default under the Existing Notes Indenture. Furthermore, as a result of the Moratorium Application, Interim Application, Automatic Moratorium and the Moratoria, an event of default has occurred and is continuing in respect of the Existing Notes. Therefore, under the Existing Notes Indenture, the principal of, premium, if any, and accrued and unpaid interest on the Existing Notes has automatically become and is immediately due and payable without any declaration or other act on the part of the Existing Notes Trustee or any Noteholder. The Existing Notes have now technically become immediately due and payable, cross defaults have been triggered and neither the Issuer nor the Company is in a position to make such payments. Accordingly, a restructuring of the Existing Notes is required.

4.36    Similarly, as previously mentioned in this Explanatory Statement, events of default under the Existing Syndicated Facility Agreement and various Existing Bilateral Facilities have occurred and are continuing.

4.37    In respect of the Existing Bilateral Facilities, events of default have already occurred under the facilities of SC Lowy Primary Investments Ltd. (previously MUFG Ltd Jakarta Branch and PT Bank Mizuho Indonesia), Strait Merchants Pte. Ltd. (previously PT Bank ANZ Indonesia), PT Bank BNP Paribas Indonesia, PT Bank HSBC Indonesia, and PT Bank Maybank Indonesia Tbk., due to, inter alia:

(a)    failure to pay amounts due under the relevant facility;

(b)    suspension of payments by certain members of the Group who are borrowers by reason of financial difficulties, and who have begun negotiations on debt restructuring; and

(c)    cross-defaults for failure to pay amounts due under separate facilities.

4.38    In respect of the Existing Syndicated Facility, amounts under the facility became due and payable on 1 February 2021, non-payment of which is an event of default under the Existing

Syndicated Facility Agreement. In addition, defaults under the Bilateral Facilities have also triggered cross-defaults under the Syndicated Facility Agreement because:

(a)    an event of default under the Existing Syndicated Facility Agreement includes cross-defaults when the "Financial Indebtedness of any member of the Group" (as referred to and defined in the Existing Syndicated Facility Agreement) is not paid when due;

(b)    "Financial Indebtedness" (as referred to and defined in the Existing Syndicated Facility Agreement) includes indebtedness in respect of "moneys borrowed" and "any amount raised pursuant to any note purchase facility or the issue of bonds, notes, debentures, loan stock or other similar instrument"; and

(c)    accordingly, when sums are due but unpaid under the Existing Bilateral Facilities, a cross default is triggered under the Existing Syndicated Facility Agreement.

4.39    Based on the Company's financial position as discussed above, the Company is not in the position to make payments on all amounts due and payable under the Existing Syndicated Facility Agreement and the Bilateral Facilities. Further, upon such events of defaults having occurred and continuing, acceleration rights are provided for and include, *inter alia*, the enforcement of all rights and remedies available under the Existing Syndicated Facility Agreement and the Bilateral Facilities. The Company will not be in a position to make such payments under the Existing Syndicated Facility Agreement and the Bilateral Facilities. Accordingly, a restructuring of the Existing Syndicated Facility Agreement and the Bilateral Facilities is required.

**The Need for a Court Process**

4.40    Under the Existing Notes Indenture, any modification, amendment or waiver of the Existing Notes Indenture and the Existing Notes to, among other things, change the maturity of the principal of the Existing Notes, reduce the interest on the Existing Notes or waive a default in the payment of principal of, premium, if any, or interest on the Existing Notes would require the consent of each Noteholder. Accordingly, the Company believes that the Restructuring of the Existing Notes, if it were to be conducted in accordance with the Existing Notes Indenture, would require the unanimous consent of all the Noteholders. Further, given that the Company has not been able to identify all the Noteholders as at the date of this Explanatory Statement, the Company is proposing to implement the Restructuring of the Existing Notes on terms set out in the Restructuring Term Sheet (Existing Notes) by way of the Scheme.

4.41    Similarly, under the Existing Syndicated Facility Agreement and the Bilateral Facilities, modification, amendment or waiver of key terms, which includes, among other things, changing the maturity of such facilities, amending the interest payable on such facilities or waiving a default in the payment of principal of, premium, if any, or interest on such facilities would require all lenders consent.

4.42    In the event that all of the Scheme Conditions are satisfied, the Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor voted against the Scheme) and all of their respective successors, assigns and transferers. The implementation of

the Scheme and the Restructuring shall be deemed to be completed upon the satisfaction of all of the Restructuring Conditions and on the Restructuring Effective Date.

## 5.    OVERVIEW OF THE SCHEME

5.1    Appendix 1 (The Scheme) of this Explanatory Statement sets out the terms of the Scheme. The Scheme is the basis of the compromise and arrangement between the Company and the Scheme Creditors and should be read in its entirety.

**Restructuring Term Sheets**

5.2    The key commercial terms of the Restructuring and the Scheme are set out in the restructuring term sheets.  Details of each of the restructuring term sheets are set out at  paragraphs 5.3 to 5.9 below. The restructuring term sheets referred to in paragraphs 5.3 to 5.9 are not intended to be a comprehensive list of all relevant terms and conditions of the Restructuring or the Scheme. The transactions contemplated by the restructuring term sheets shall be subject to, amongst other things, the execution of definitive documentation by the parties.

**Restructuring Term Sheet (Existing Notes)**

5.3    Please see Appendix 6 (Restructuring Term Sheet (Existing Notes)).

**Restructuring Term Sheet (Syndicated Facility)**

5.4    Please see Appendix 7 (Restructuring Term Sheet (Syndicated Facility)).

**Restructuring Term Sheet (Non-Active Bilaterals)**

5.5    Please see Appendix 8 (Restructuring Term Sheet (Amended Bilateral Facilities)).

**Restructuring Term Sheet (Permata)**

5.6    Please see Appendix 8 (Restructuring Term Sheet (Amended Bilateral Facilities)).

**Restructuring Term Sheet (UOB)**

5.7    Please see Appendix 8 (Restructuring Term Sheet (Amended Bilateral Facilities)).

**Restructuring Term Sheet (HSBC)**

5.8    Please see Appendix 8 (Restructuring Term Sheet (Amended Bilateral Facilities)).

**Restructuring Term Sheet (Maybank)**

5.9    Please see Appendix 8 (Restructuring Term Sheet (Amended Bilateral Facilities)).

**Management's Position Regarding the Scheme**

5.10    The management of the Company, having considered the terms of the Scheme and the advice from appropriate Advisors, considers that the Scheme is in the best interests of the Company and its stakeholders. The key aims of the Scheme are to:

(a)    adjust the ongoing interest payments under the Existing Facilities to a more manageable level to align with the latest forecast cash flows of the Company and the Group which have been prepared in light of the latest market circumstances (and the adjustments to the Group's detailed business and development plans in light of those market circumstances);

(b)    extend the maturity date of the Existing Notes and the Existing Facilities to allow the Company more time  (including to execute its business plans) to repay the Holders (and

in turn strengthen the capital structure of the Group and improve working capital sustainability of the Company and the Group), which presents the Holders with better recovery prospects compared to potential recovery through enforcement of their rights under the Existing Notes and the Existing Facilities; and

(c)     allow the Group to continue carrying on its business as a going concern.

5.11    The Company does not take the decision to propose the Scheme for the Existing Notes and the Existing Facilities lightly. The Company believes that the successful implementation of the Scheme will reduce the short-term debt burden of the Group, leaving it with a sustainable capital structure that will allow the Company and the Group to comply with their post-restructuring obligations and liabilities under the Existing Notes and the Existing Facilities and to trade on a going concern basis, as well as to put the Group in an improved financial position to refinance its debts, if the need and opportunity arise.

5.12    The purpose of the Scheme is to effect an arrangement and compromise in respect of the Existing Notes and the Existing Facilities. The Scheme envisions that Scheme Creditors will release their Scheme Claims in connection with the Existing Notes and the Existing Facilities in consideration of the rights provided to the Scheme Creditors under the Scheme – in particular, the Existing Notes will be amended and restated in the form of the Amended Notes and the Existing Facilities will be amended, restated and/or supplemented (as relevant) in the form of or by the Amended Facility Agreements on the Restructuring Effective Date.

5.13    Excluded Liabilities shall not be subject to the arrangement and compromise effected by the Scheme.

**Conditions to the Scheme and the Scheme Effective Date**

5.14    The Scheme shall only become effective and binding following the satisfaction of all of the following conditions to the Scheme (the "**Scheme Conditions**"):

(a)     the Requisite Majority of the Scheme Creditors in respect of each class of Scheme Creditors voting to approve the Scheme in accordance with the voting procedures set out in clauses 5 and 6 (Voting Procedures) of the Scheme;

(b)     the sanction of the Scheme by the Court; and

(c)     completion of the requisite administrative filings in respect of the sanction of the Scheme by the Court, with the Singapore Registrar of Companies in accordance with the requirements of the Insolvency, Restructuring and Dissolution Act, and

upon such satisfaction, the Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme) and all of their respective successors, assigns and transferers (the date on which the Scheme becomes effective and binding being the "**Scheme Effective Date**").

5.15    The Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website of the satisfaction of the Scheme Conditions and the occurrence of the Scheme Effective Date.

**Conditions to the Restructuring and the Restructuring Effective Date**

5.16   The implementation of the Scheme and the Restructuring shall be deemed to be completed on the Restructuring Effective Date.

5.17   The Restructuring Effective Date shall only occur on the date of satisfaction of all of the following conditions to the Restructuring Effective Date (the "**Restructuring Conditions**") and shall occur in accordance with the terms and conditions of clause 3 (Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions) and clause 4 (Restructuring Steps) of the Scheme:

(a)   each of the Scheme Conditions has been satisfied and the Scheme Effective Date has occurred;

(b)   a Chapter 15 Order has been entered by the U.S. Bankruptcy Court and that such Chapter 15 Order is final and no longer subject to rehearing or appeal;

(c)   any other Application(s) for Cross-Border Recognition have been completed and the applicable recognition order(s) have been obtained and are in full effect;

(d)   all corporate (including approval by shareholders, board of commissioners and/or board of directors), legal and regulatory approvals deemed necessary by the Company (acting reasonably) to implement the Restructuring Effective Date, including, but not limited to, shareholder, director and/or commissioner approvals (as applicable) from the Company, the Guarantors or any other member of the Group and any approvals required from the OJK, IDX, KSEI or SGX-ST or under the laws of Indonesia or Singapore have been obtained; and

(e)   all Restructuring Documents are in agreed form and have been executed by or on behalf of the relevant parties to them in accordance with the terms of the Scheme.

5.18   The Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of:

(a)   the date on which all the Restructuring Conditions have been satisfied and/or waived (where one or more Restructuring Conditions have been waived by a Requisite Majority of Scheme Creditors in respect of each class) (such notice being the "**Restructuring Conditions Satisfaction Notice**"); and

(b)   subject to clauses 2.9 (Scheme Overview and Conditions) and 3.7 (Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions) of the Scheme, the proposed date of completion of the Restructuring which shall be a Business Day (chosen by the Company (acting reasonably)), provided that such date is as soon as reasonably practicable (but at least two Business Days after the date of such notice) and no later than the Long Stop Date (the "**Restructuring Effective Date**").

5.19   The Company may, acting reasonably, at any time before the occurrence of the Restructuring Effective Date, defer in good faith the Restructuring Effective Date to a later date as set out in this paragraph and in accordance with clause 2.9 of the Scheme. In the event that the Company wishes to postpone the Restructuring Effective Date, the Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of the deferred Restructuring Effective Date which shall be a Business Day (chosen by the Company (acting reasonably), provided that such date is as soon as reasonably practicable (but at least two Business Days after the date of such notice) and no later than the Long Stop Date.

5.20   The Company may in good faith defer the Long Stop Date if (a) the relevant deferment is approved by Scheme Creditors whose Accepted Scheme Claims in aggregate represent at least

35% in value in respect of each class of Scheme Creditors  and (b) the Company has not defaulted on the payment of any interest (excluding default interest) owing to Scheme Creditors under the Existing Notes Indenture (in the case of the Noteholders) or Scheme Creditors under the Existing Facilities (in the case of Scheme Creditors that are creditors thereunder) that has an originally scheduled payment date that falls within the period commencing from the announcement of this Scheme and ending on the date on which the 35% in value in respect of each class of Scheme Creditors threshold referred to in paragraph (a) is met (the "**Approval Threshold**"). However notwithstanding anything to the contrary in this Scheme, the Long Stop Date may not in any event be deferred beyond 30 June 2022.

5.21    If the Company wishes to postpone the Long Stop Date under circumstances set out in paragraph 5.20 above, the Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website of the proposed deferred Long Stop Date and request that the Scheme Creditors consent to such new Long Stop Date by responding to the Company (or the Information Agent, as relevant) within 21 days of the date of such notification (the "**Response Deadline**").  If the Approval Threshold is met, the Long Stop Date shall be deferred to such relevant new Long Stop Date and the Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website of the new Long Stop Date.

**Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions**

5.22    Drafts of the Restructuring Documents shall be circulated to the Scheme Creditors (through the Information Agent in the case of the Scheme Creditors that are Noteholders and the Scheme Creditors of the Existing Syndicated Facility and in the case of other Scheme Creditors through the applicable Administrative Parties where relevant) and any applicable Administrative Party executing any Restructuring Document on behalf of Scheme Creditors for review as soon as practicable after the Scheme Effective Date. Whilst drafts of the applicable Restructuring Documents shall be circulated to all Noteholders in accordance with this paragraph 5.22, individual Noteholders shall not, for the avoidance of doubt, execute those Restructuring Documents and the relevant Existing Notes Administrative Parties will be authorised, as described in paragraph 5.23 and paragraph 5.24 and Clause 9 of the Scheme to execute those Restructuring Documents on behalf of the applicable Noteholders.

5.23    To the extent a Scheme Creditor or Administrative Party has comments on the draft Restructuring Documents to which it is party (or to which it will be bound) circulated as set out in paragraph 5.22 above, that Scheme Creditor or Administrative Party (as the case may be) shall provide those comments on those Restructuring Documents in writing to the Information Agent in the case of the Scheme Creditors that are Noteholders, the Scheme Creditors of the Existing Syndicated Facility, or where there is no Administrative Party relevant to that Scheme Creditor or otherwise through the applicable Administrative Parties promptly and in a timely fashion and in any event no later than fourteen days after the date the relevant draft Restructuring Document is circulated. Each Scheme Creditor, Administrative Party (as the case may be) and the Company shall act reasonably and in good faith and take into account the Scheme timetable for the purpose of resolving such comments.

5.24    Once each Scheme Creditor or (in the case of Noteholders the relevant Administrative Party on its behalf) has agreed to the draft Restructuring Documents to which it is party or to which it will be bound as described in paragraph 5.23 above:

(a)    the execution version of each Restructuring Document shall be circulated by or on behalf of the Company to the Scheme Creditors (and (where relevant) the relevant Administrative Parties and the Scheme Creditors on whose behalf the relevant

Administrative Party is executing the relevant Restructuring Document) party to it for execution; and.

(b)    following circulation of the Restructuring Document in accordance with paragraph (a) above, the Company, each Scheme Creditor (or to the extent that an Administrative Party will execute that Restructuring Document on behalf of that Scheme Creditor, the relevant Administrative Parties on its behalf) and each other party to the Restructuring Documents shall execute (but leave undated) all Restructuring Documents to which it is a party, and return a PDF copy of its relevant signature page to the Information Agent no later than the date falling fourteen days after the execution version of each Restructuring Document is circulated (with the original signature page to follow).

For the purposes of the above:

(i)    If an Administrative Party is executing a Restructuring Document on behalf of any applicable Scheme Creditor, that Administrative Party is irrevocably authorised (pursuant to Clause 9.1 of the Scheme) to complete, enter into, execute and deliver, and shall complete, enter into, execute and deliver that Restructuring Document (whether as a deed or otherwise) and perform all incidental acts related thereto on behalf of that Scheme Creditor if that Restructuring Document has been circulated to it in accordance with paragraph (a) above and that Restructuring Document conforms substantially to the terms of the applicable Restructuring Term Sheet.

(ii)    Each Administrative Party may assume that any Restructuring Document circulated to it pursuant to (a) above has been agreed to have been agreed to by the applicable Scheme Creditors as described in paragraph 5.23 above.

(iii)    In the event that an Administrative Party (having taken legal advice from its legal advisers) is not able to verify to its satisfaction that an applicable Restructuring Document which it is executing on behalf of any applicable Scheme Creditor conforms substantially to the terms of the applicable Restructuring Term Sheet, that Restructuring Document shall be circulated to the applicable Scheme Creditors (being the Scheme Creditors for whom the Administrative Party is executing that Restructuring Document) through the applicable Administrative Parties where relevant, provided that this paragraph (iii) shall not apply in respect of an Administrative Party executing a Restructuring Document on behalf of any Noteholder.

(iv)    Each applicable Scheme Creditor shall, if it has agreed to the draft Restructuring Documents to which it is party as described in paragraph 5.23 above, confirm to the Information Agent within fourteen days of receipt of a Restructuring Document pursuant to paragraph (iii) above that that Restructuring Document is agreed, provided that this paragraph (ii) shall not apply in respect of an Administrative Party executing a Restructuring Document on behalf of any Noteholder.

(v)    If an applicable Scheme Creditor confirms that a Restructuring Document is agreed pursuant to paragraph (iv) above or does not respond within fourteen days of the date on which the applicable Restructuring Document was circulated pursuant to paragraph (iii) above, the Administrative Party is irrevocably authorised (pursuant to Clause 9.1 of the Scheme) to execute, complete and deliver, and shall execute, complete and deliver the Restructuring Document and perform all incidental acts related thereto on behalf of that Scheme Creditor provided that this paragraph (v) shall not apply in respect of

an Administrative Party executing a Restructuring Document on behalf of any Noteholder.

If a Restructuring Document is to be executed by an Administrative Party and that Restructuring Document has been agreed pursuant to paragraph 5.23 above and the Administrative Party is executing that document pursuant to paragraphs (i) to (v) above (or in the case of an Administrative Party executing a Restructuring Document on behalf of any Noteholder paragraphs (i) and (ii) above) that Administrative Party and the Company shall designate that document in writing as an agreed form document prior to the same being executed in accordance with this paragraph 5.24.

5.25    Notwithstanding paragraph 5.24 above, the amendment agreements in respect of the Amended Facility Agreement (HSBC), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (UOB) and any security documents in respect of those facilities may be dated by the parties to them once they have been entered into and in any event shall be entered into and dated and be effective no later than 31 December 2021 or other date as agreed between the Company and the respective lenders.

5.26    The Company shall promptly notify the Scheme Creditors when all conditions precedent under the amendment agreements in respect of the Amended Facility Agreements (the "**Finance Conditions Precedent**") have been satisfied or waived (such notification being the "**Finance CP Satisfaction Notice**").

5.27    For the avoidance of doubt, none of the restructuring steps set out below shall take place until both the Restructuring Conditions and the Finance Conditions Precedent have been satisfied or waived in accordance with the terms of the Scheme and each Amended Facility Agreement.

5.28    Upon the later of:

(a)    the delivery of the Restructuring Conditions Satisfaction Notice; and

(b)    the delivery of the Finance CP Satisfaction Notice,

the Company shall deliver a duly executed notice to the Scheme Creditors:

(i)    confirming the completion of the Restructuring Conditions and the Finance Conditions Precedent; and

(ii)    notifying them of the date of the Restructuring Effective Date (being the date on which the restructuring steps in clause 4 (Restructuring Steps) of the Scheme will commence),

(such notice to be the "**Restructuring Effective Date Notice**").

**Restructuring Steps**

5.29    The Company will pay (or procure the payment of) the Scheme Costs that the Company is required to pay pursuant to the terms agreed between the Company and the relevant party to whom such Scheme Costs are owed no later than five Business Days before the Restructuring Effective Date (provided such Scheme Costs have been duly invoiced).

5.30    On the Restructuring Effective Date (or in the case of the step set out at paragraph (a) of clause 4.4 (Restructuring Steps) of the Scheme at the time specified therein), all of the steps set out in clause 4.4 (Restructuring Steps) of the Scheme will be completed, including that (to the extent not already executed by the applicable Administrative Party thereto) the Company (or the relevant Authorised Persons) shall execute, complete and deliver (if applicable) and the Chairman shall date and release  and release the Deeds of Release, these documents along with the releases set out at clause 11.2 of the Scheme shall be deemed to become effective and the

Scheme Creditors shall fully release and discharge all Scheme Claims against the Released Parties and the Administrative Parties (as applicable).

**Scheme Creditor Undertakings and Releases**

5.31    In consideration for its rights and entitlements under the Scheme, each Scheme Creditor will give the undertakings, releases and waivers in clause 11 (Scheme Creditor Undertakings and Releases) of the Scheme.

5.32    Among other things set out in further detail in clause 11 (Scheme Creditor Undertakings and Releases) of the Scheme, with immediate effect on and from the Restructuring Effective Date and conditional upon completion of each of the steps outlined in Clause 4.4 (Restructuring Steps) of the Scheme and subject to Clause 16 (Termination of the Scheme) of the Scheme, each Scheme Creditor (for and on behalf of itself and its Releasing Parties) conclusively, irrevocably, unconditionally, fully and absolutely:

(a)    waives, discharges and releases all of its rights, title and interest in and to its Scheme Claims in consideration for its rights and entitlements under the Scheme;

(b)    waives, discharges and releases the Released Parties and the Administrative Parties from the Released Claims;

(c)    waives, discharges and releases the Committee Parties from any Claims arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents;

(d)    ratifies and confirms everything which any Released Party or Administrative Party may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge: (a) the validity of any act done or omitted to be done; or (b) the exercise or omission to exercise any power conferred in accordance with the provisions of the Scheme in good faith by any Released Party or Administrative Party;

(e)    undertakes to the Released Parties and Administrative Parties that it will not (and shall use all reasonable endeavours to procure that its Releasing Parties will not) commence or continue, or instruct, direct or authorise any other Person to commence or continue, any Proceedings in respect of or arising from any Released Claim which it has any interest in; and

(f)    acknowledges and agrees that it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and any of the Released Parties and Administrative Parties in respect of the Released Claims on the terms set out in the Scheme

5.33    The releases, waivers and undertakings under clause 11 (Scheme Creditor Undertakings and Releases) of the Scheme shall:

(a)    not prejudice or impair any rights of any Scheme Creditor created under the Scheme or any other Restructuring Document and/or which arise as a result of a failure by the Company or any party to the Scheme to comply with any terms of the Scheme or any other Restructuring Document, and all such rights shall remain in full force and effect; and

(b)    not prejudice or impair any Claims or causes of action of any Scheme Creditor, arising from or relating to the gross negligence, breach of fiduciary duty, fraud, dishonesty, wilful default or wilful misconduct of any other party (other than any Administrative

Party) or any gross negligence, fraud or wilful default of any Administrative Party, in each case which is seeking to rely on such releases, waivers or undertakings.

**Cross-Border Recognition**

5.34    A duly appointed person or body appointed in the course or context of the Scheme proceedings shall make an application to the U.S. Bankruptcy Court for a suitable Chapter 15 Order. The Company, or such person or body acting on its behalf, may also (acting reasonably) make an application for a suitable order under any other applicable law, legal doctrine or Proceeding concerning Cross-Border Recognition (including any other applicable law, legal doctrine or Proceeding in Indonesia, the United States or England and Wales) and for such other additional relief and/or assistance as the Company may require.

5.35    The Company considers the entry of a Chapter 15 Order to be a prudent course of action given that, while the Company is incorporated under the laws of Indonesia and the Group's assets are predominantly located within Indonesia, the Existing Notes Indenture is governed by New York law and subject to the jurisdiction of New York courts. In order to mitigate the risk of enforcement in the United States and to give effect to the Scheme (conditional upon satisfaction of the other Scheme Conditions) in the United States, the Company has resolved to appoint Geoffrey D Simms of AJCapital as its foreign representative (the "**Foreign Representative**") and to commence the filing with the U.S. Bankruptcy Court for the grant of the Chapter 15 Order on or around the Scheme Effective Date.

5.36    The filing with the U.S. Bankruptcy Court for the grant of the Chapter 15 Order will request that the U.S. Bankruptcy Court recognize the Scheme as a foreign main or nonmain proceeding under Chapter 15 of the U.S. Bankruptcy Code and grant other related relief. For example, recognition of the Scheme under Chapter 15 can trigger the automatic stay on creditor enforcement action within the territorial jurisdiction of the United States contained in section 362 of the U.S. Bankruptcy Code, breach of which could lead to an award of monetary damages or such other relief as the U.S. Bankruptcy Court may grant. In addition, recognition of the Scheme under Chapter 15 permits a U.S. bankruptcy court to grant "appropriate relief" and provide "additional assistance" to a foreign representative under sections 1521 and 1507 of the U.S. Bankruptcy Code, respectively. In determining whether to provide additional assistance, and the scope of any such assistance, federal law directs the court to do so "consistent with the principles of comity".

**Costs and Expenses relating to the Restructuring**

5.37    In the Scheme, the Company agrees to pay, or procure the payment of, in full all costs, charges, expenses and disbursements incurred by it in connection with the preparation, conduct, sanctioning, implementation and execution of the Scheme as and when they arise, including, but not limited to, any costs in connection with the Information Meetings, the tabulation of votes on the Scheme, the costs of obtaining the sanction of the Court and the costs of issuing notices (if any) required by the Scheme.

5.38    The Company has also agreed to bear certain Creditors Advisor Fees and fees of the Trustee. Set out below is an approximate breakdown of the key professional costs and expenses which the Company expects to bear in connection with the preparation, conduct, sanctioning, implementation and execution of the Scheme, excluding applicable taxes. Such breakdown (a) has been computed using indicative figures and estimates, which in some cases have yet to be incurred, agreed or finalised, and (b) represents only the key estimated costs of the Restructuring currently foreseen by the Company and may not be comprehensive.

**US$ (approx.)**

| | |
|---|---:|
| Fees of the Company's Advisors with respect to the Restructuring | 4,615,000 |
| Creditors Advisor Fees | 700,000 |
| Trustee Fees | 87,500 |
| **Total** | 5,402,500 |

**What happens if the Scheme fails?**

5.39    The proposed Scheme is the result of extensive, arms-length discussions and negotiations with the Holders, with the objective of treating all stakeholders fairly and follows a comprehensive consideration of the strategic options available to the Company.

5.40    The scope and feasibility of other strategic restructuring options available to the Company are limited, taking into consideration market conditions and the Company's development plans, financial position, available financing sources and cash flow position. For further details in this respect, see "*The Group's Financial Position*" and "*The Need for the Proposed Scheme*" under Section 4 (Background to the Scheme).

5.41    As mentioned in this Explanatory Statement, the Company believes that it will be unable to repay outstanding amounts under the Existing Facilities and the Existing Notes if the Scheme does not proceed. If the Scheme fails and the Moratoria ends without any restructuring of the Existing Notes and the Existing Facilities, the Scheme Creditors are able to commence proceedings against the Company and the Guarantors and cross-defaults will be triggered across the Group's other financing arrangements which may provoke other creditors of the Group (who are not currently seeking any enforcement action against the Group) to enforce a variety of cross-default rights against the Group in Indonesia, Singapore and elsewhere.

5.42    The Company considers that, if the Scheme were not to be successfully implemented, the possibility of successfully implementing an alternative financial restructuring would be very unlikely, given the time and cost of negotiating the Scheme and the fact that pursuant to the Existing Notes Indenture and the Existing Facility Agreements, all amounts of principal, premium, if any, and accrued and unpaid interest on the Existing Notes and the Existing Facilities are already due and payable.

**What happens if the Scheme Effective Date occurs, but the Restructuring Effective Date does not occur by the Long Stop Date?**

5.43    The applicable timelines are set out in Section 6 (Scheme Timelines). The Company has the ability to, in accordance with the terms of the Scheme, extend certain timelines such as the dates of the Information Meetings, the Voting Results Announcement, the Restructuring Effective Date and the Long Stop Date. If the Restructuring Effective Date does not occur by the Long Stop Date, the Scheme shall automatically terminate, which means that the terms of and the obligations of the parties under or pursuant to the Scheme shall lapse and all the compromises and arrangements provided by the Scheme and any releases granted pursuant to the Scheme shall be of no effect and shall be construed as if it had never become effective or binding, and the rights and obligations of the Scheme Creditors shall not be affected by the Scheme and shall be reinstated and remain in full force and effect.

**Expected Returns under the Scheme**

5.44    AJCapital has prepared a high-level analysis to estimate the recovery to Holders of the Existing Notes and Existing Facilities against potential scenarios in which the Scheme and/or the Restructuring does not proceed and the Scheme Creditors exercise their enforcement rights under the Existing Notes and the Existing Facility Agreements (the "**Scenario Analysis**").

5.45    As a general summary, the Scenario Analysis considers the estimated recovery rate to Scheme Creditors in two situations:

(a)    the "Restructuring Scenario" where the Scheme and Restructuring are completed; and

(b)    the "Liquidation Scenario" where the Group is put into liquidation under the Indonesian law.

5.46    The estimated recovery rates are presented below as high-case scenarios and low-case scenarios, in each case, based on certain recovery assumptions as set out in further detail in the full Scenario Analysis report.

| Scenarios | Estimated Recovery | |
|---|---|---|
| | **High Case** | **Low Case** |
| **Restructuring Scenario** | | |
| Existing Bilateral Facilities | 100% | N/A |
| Trade creditors | 100% | N/A |
| Existing Syndicated Facilities | 100% | N/A |
| Existing Notes | 100% | N/A |
| | | |
| **Liquidation Scenario** | | |
| Existing Bilateral Facilities | 30.3% | 10.7% |
| Trade creditors | 30.3% | 10.7% |
| Existing Syndicated Facilities | 43.8% | 19.3% |
| Existing Notes | 33.0% | 14.1% |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

5.47    Based on the above, the Company believes that the Scheme offers the Scheme Creditors the best prospects of maximizing their recovery whilst also allowing the Group to continue to carry on its business as a going concern.

5.48    The full Scenario Analysis report is available upon request by Scheme Creditors to the Information Agent. The Scenario Analysis has been prepared by AJCapital Advisory solely for the use of the Company and the Company's professional advisors as well as for the information (on a non-reliance basis) of the Scheme Creditors. Any disclosure of the Scenario Analysis to

Scheme Creditors is strictly on a non-reliance basis. Reliance on the Scenario Analysis is limited to the Company only and does not extend to any other party including Scheme Creditors.

## 6.    SCHEME TIMELINES

6.1    The proposed timelines for the Scheme are set out below. The Company has the right, acting reasonably, to extend in good faith certain timelines under the Scheme. In any such case, the dates below will be adjusted accordingly:

| | | |
|---|---|---|
| (a) | **Announcement**. The announcement of the Scheme through the Scheme Website, the Clearing Systems, email (where email addresses are available) and SGXNet and filing of Proofs of Debt. | 12 November 2021 |
| (b) | **Information Meetings and Deadline for filing Proofs of Debt**. Videoconferences with Scheme Creditors to provide a summary of the Scheme and address any queries. | Information Meeting for Noteholders 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 2021 (Singapore time)<br><br>Information Meeting for Holders of Existing Facilities 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) |
| (c) | Deadline to complete adjudication on Proofs of Debt | 23 November 2021 |
| (d) | Deadline to submit objections (if any) to the results of the adjudication of Proofs of Debt | 26 November 2021 |
| (e) | Deadline for Independent Assessor to make a decision on the objections (if any) | 3 December 2021 |
| (f) | **Record Time**. The deadline for Scheme Creditors to submit their Blocking and Voting Instruction through the Clearing Systems (in respect of the Existing Notes) and the Voting Instruction Form by way of email to the Information Agent (in respect of the Existing Facilities). Only Scheme Creditors which are Holders at the Record Time are entitled to vote on the Scheme. | 2.00 p.m. on 7 December 2021 (London time) /<br><br>10.00 p.m. on 7 December 2021 (Singapore time) |
| (g) | **Voting Results Announcement**. Announcement of the results of voting on the Scheme to be issued to the Scheme Creditors via the Clearing Systems, SGXNet, and the Scheme Website. | As soon as practicable and in any event within two Business Days after the Record Time. |

| | | |
|---|---|---|
| (h) | **Sanction Application**. The Company submits a Sanction Application to seek the Court's sanction of the Scheme. | Shortly after the Voting Results Announcement. |
| (i) | **Sanction Hearing**. The Court hears the petition to sanction the Scheme. | Week of 3 January 2022 (*indicative*) |
| (j) | **Scheme Effective Date**. The Scheme becomes effective and binding in accordance with its terms on the Company, all Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme), and all of their respective successors, assigns and transferers. This occurs upon the satisfaction of all of the Scheme Conditions. | Shortly after the Sanction Hearing |
| (k) | **Restructuring Effective Date**. The Restructuring Effective Date is the date on which the arrangement and compromise provided for in the Scheme (including, but not limited to, the amendment and restatement of the Existing Notes and the Existing Facilities) will be implemented, subject to the prior satisfaction of all of the Restructuring Conditions. | By the Long Stop Date. |
| (l) | **Long Stop Date**. The deadline for the Company to satisfy the Restructuring Conditions and implement the Restructuring Effective Date. | 31 March 2022, subject to any extension under the terms of the Scheme. |

6.2    All Scheme Creditors will be entitled to attend the Sanction Hearing before the Court in person or through legal counsel to support or oppose the sanction of the Scheme. The Company will notify the Scheme Creditors of the precise date and location of the Sanction Hearing (once known) by circulating a notice via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website.

6.3    Among other assumptions, the dates in this timetable and mentioned throughout this Explanatory Statement assume no additional court hearings or creditor meetings and that no court hearing or creditor meeting is adjourned or delayed, and that the Requisite Majority in respect of each class of Scheme Creditors provide their Blocking and Voting Instruction (in respect of the Existing Notes) or submit their Voting Instruction Form (in respect of the Existing Facilities) (and take all other steps to submit a valid vote) in favour of the Scheme before the Record Time.

6.4    The amount of the Accepted Scheme Claims that are attributed for voting purposes to each Scheme Creditor, will be calculated as at the Record Time. Only Scheme Creditors which are Holders at the Record Time are entitled to vote on the Scheme. Specifically, votes of Scheme Creditors will be Accepted for voting purposes at a value equal to the sum of:

(a)    the outstanding principal amount of the Existing Notes or the Existing Facilities held by each Scheme Creditor at the Record Time (without double counting); and

(b)    all accrued and unpaid interest on such Existing Notes or such Existing Facilities up to but excluding the Record Date. Every Scheme Creditor shall have one vote for every US$1 of its Accepted Scheme Claims (rounded down to the nearest US$1) as calculated for voting purposes.

6.5    Upon the occurrence of the Restructuring Effective Date, the Existing Notes Transaction Documents and the Existing Facilities Transaction Documents will be amended, restated, supplemented or otherwise modified as set out in the Scheme, the Restructuring Documents will be entered into and the Scheme Creditors will provide certain releases in respect of their Scheme Claims. For further details on the steps that will take place on the Restructuring Effective Date, please refer to (a) each term sheet set out in paragraphs 5.3 to 5.9 and (b) clauses 3 (Entry into the Restructuring Documents and Fulfilment of Restructuring Conditions), 4 (Restructuring Steps) and 11 (Scheme Creditor Undertakings and Releases) of the Scheme.

6.6    The Restructuring Effective Date (or any postponement thereof) will be notified by the Company or the Information Agent to the Scheme Creditors, in accordance with the procedure set out in paragraphs 5.18, 5.19 and 5.27 (Conditions to the Restructuring and the Restructuring Effective Date). The Company may defer the Long Stop Date in accordance with the procedure set out in paragraphs 5.20 and 5.21. In the event that the Long Stop Date is deferred, the Company or the Information Agent shall promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of the deferred Long Stop Date.

6.7    The Company reserves the unilateral right, acting reasonably, to extend in good faith the Information Meeting dates, the Record Time (subject to paragraph 7.38 in respect of the Record Time and Record Date) and the Voting Results Announcement date to increase participation in the Scheme. In such a case, the dates above will be adjusted accordingly. The Company or Information Agent will promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of any change to the Information Meeting dates, Record Time and Voting Results Announcement date.

6.8    If a Scheme Creditor has any comments on the key commercial terms of a Restructuring Term Sheet which relates to Restructuring Documents to which it will be party (or to which it will be bound) (an "**Applicable Original Term Sheet**") and it has notified those comments in writing to the Company (through the Information Agent) by no later than 3.59 p.m. (London time) / 11.59 p.m. (Singapore time) on 16 November 2021, the Company shall consider those comments in good faith and, to the extent any changes to the Applicable Original Term Sheet proposed by the applicable Scheme Creditor are agreed by the Company (acting in good faith but taking into account previous negotiations and agreements reached and without reopening agreed points), a revised version of the Applicable Original Term Sheet (marked to show the changes made) (the "**Applicable Revised Term Sheet**") will be circulated to Scheme Creditors (through the Information Agent in the case of the Scheme Creditors that are Noteholders and in the case of other Scheme Creditors through the applicable Administrative Parties where relevant) and any applicable Administrative Party executing any Restructuring Document on behalf of Scheme Creditors for review.  Any Applicable Revised Term Sheet must be circulated in accordance with this paragraph 6.8 as soon as practicable and in any event prior to 6.00 a.m. (London time) / 2.00 p.m. (Singapore time) on 18 November 2021.  If an Applicable Revised Term Sheet is circulated in accordance with this Clause 14.5 that Applicable Revised Term Sheet shall replace the Applicable Original Term Sheet for the purposes of the Scheme without any further action or consent being required.

7.    **SCHEME VOTING INSTRUCTIONS AND INFORMATION MEETINGS**

7.1    Each Scheme Creditor (excluding Noteholders) may commence lodging, and in any event shall lodge, with the Information Agent, its Proof of Debt in respect of its Scheme Claim, no later than 19 November 2021, for the purposes of voting and participating in the Scheme.  Such Proof of Debt shall be in the form set out in Schedule 3 of the Scheme. If a Scheme Creditors (excluding any Noteholder) does not submit a Proof of Debt by 19 November 2021 the Chairman shall assign such value to that Scheme Creditors Scheme Claims as the Chairman (acting reasonably) determines accords with the Company's records (an "**Assigned Value**") and

the terms of paragraphs 7.3 to 7.6 below will not apply in respect of those Scheme Claims and Assigned Value assigned to those Scheme Claims. Noteholders are not required to submit a Proof of Debt. For each Scheme Creditor that is a Noteholder at the Record Time, that Scheme Creditor will be entitled to vote in the Scheme provided that they submit (where applicable via their Relying Person) an electronic Blocking and Voting Instruction prior to the Record Time in accordance with paragraphs 7.15 to 7.27 below.

7.2     The Chairman shall adjudicate the Proofs of Debt and send the result of such adjudication (along with any Assigned Value for any Scheme Creditor (other than a Noteholder) that has not filed a Proof of Debt) to every creditor who has filed a Proof of Debt by 23 November 2021, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website.

7.3     If any Scheme Creditor who has filed a Proof of Debt pursuant to paragraph 7.1 above objects to the results of the adjudication referred to in paragraph 7.2 above, such a Scheme Creditor shall, no later than 26 November 2021, send a written request, seeking agreement for the appointment of an independent assessor (the "**Independent Assessor**") to the Company and the Chairman.

7.4     The written request referred to in paragraph 7.3 shall nominate a person to be appointed as the Independent Assessor and state the dispute the Independent Assessor (if appointed) is to adjudicate.

7.5     The Chairperson will, as soon as practicable after the appointment of an Independent Assessor, provide the relevant Proof of Debt to the Independent Assessor, following which the Independent Assessor must, not later than 3 December 2021, make a decision on the objection and send a written notice of the decision, with reasons for the decision, to the Chairman, the Company and the Scheme Creditor whose Scheme Claim will be affected by the decision of the Independent Assessor.

7.6     Where an application is made to the Court relating to the results of the adjudication referred to above, the opposing party shall immediately upon making the application send written notice of the application to:

(a)     the Company, unless the objecting party is the Company;

(b)     the Chairman; and

(c)     the Scheme Creditor whose Scheme Claim will be affected by the decision of the Independent Assessor, unless the objecting party is that Scheme Creditor.

7.7     The Company shall convene the Information Meetings via videoconferences with Scheme Creditors, to provide the Scheme Creditors with a summary of the compromise and arrangement effected by the Scheme, and to address any queries which Scheme Creditors may have in relation to the Scheme. The Administrative Parties will not be required to attend the Information Meetings.

7.8     The Information Meetings will take place virtually via videoconference due to COVID-19 related health and safety procedures. The Information Meetings are currently scheduled to take place (a) at 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 (Singapore time) via videoconference (for the Noteholders) and (b) at 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) via videoconference (for the Holders of the Existing Facilities). Scheme Creditors who wish to attend the Information Meetings may register to receive access details by contacting the Information Agent at any time following the date of this Explanatory Statement and providing (unless the Scheme Creditor is a Noteholder) its Proof of Debt, such Proof of Debt and relevant

documentary evidence to be dated no more than one month from the date of submission of the same and or (if the Scheme Creditor is a Noteholder) reasonable documentary evidence of its holding.

**Voting Classes**

7.9    The Scheme will proceed on the basis that Scheme Creditors constitute four classes of creditors of the Company. Having considered the existing rights of the Scheme Creditors viz the Company (and the various Subsidiaries as relevant) and the way in which those rights will be compromised under the Scheme, the Company considers that the Scheme Creditors should be classed into four classes for the purposes of voting on the Scheme.

(a)    **Noteholders**: The Noteholders rank pari passu as between themselves as (effectively) unsecured creditors of the Company and have the benefit of the Existing Notes Guarantees and the Existing Notes Security Documents. Under the Restructuring Term Sheet (Existing Notes), the Noteholders would have materially the same rights against the Company under the Amended Notes Guarantees and the Amended Notes Collateral. There is no change in the Noteholders' principal economic and legal rights against the Company.

(b)    **Syndicated Facility**: The Holders of the Existing Syndicated Facility Agreement are secured creditors of the Company and have the benefit of the Existing Syndicated Facility Guarantees and Existing Syndicated Facility Security. Under the Restructuring Term Sheet (Syndicated Facility), the Holders will receive enhancements to the Existing Syndicated Facility Security and this would alter the rights against the Company and if the Group were to go into any Insolvency Proceedings, the Holders would receive a different level of recovery in comparison with their existing interests under the Existing Syndicated Facility Agreement. Their principal economic and legal rights under the Existing Syndicated Facility Agreement would have changed.

(c)    **Active Bilaterals**: The Holders of the Existing Facility (HSBC), the Existing Facility (UOB), the Existing Facility (Permata) and the Existing Facility (Maybank) are individual, unsecured creditors of the Company and do not have the benefit of any security or guarantee. Under the Restructuring Term Sheet (UOB), the Restructuring Term Sheet (Maybank) and the Restructuring Term Sheet (Permata), the Holders will receive security which will secure (as the case may be) the Amended Facility Agreement (UOB), the Amended Facility Agreement (Maybank) and the Amended Facility Agreement (Permata).  The Amended Facility Agreement (HSBC) also provides for supply chain or vendor financing backed by invoices from reputable buyers of the Company from which credit comfort is obtained. This would alter the rights against the Company and if the Group were to go into any Insolvency Proceedings, the Holders would receive a different level of recovery in comparison with their existing interests. Their principal economic and legal rights under the Existing Facility Agreement (Permata), the Existing Facility Agreement (Maybank), the Existing Facility Agreement (UOB) and the Existing Facility Agreement (HSBC) would have changed.

(d)    **Non-Active Bilaterals**: The Holders of the Existing Non-Active Bilateral Facilities are individual, unsecured creditors of the Company and do not have the benefit of any security or guarantee. Under the Restructuring Term Sheet (Non-Active Bilaterals), the Holders are given various options for the restructuring of the Existing Non-Active Bilateral Facility Agreements but no security is provided. The Holders would have materially the same rights against the Company under the Common Framework Agreement (Non-Active Bilaterals). If the Group were to go into any Insolvency Proceedings, the Holders would receive the same level of recovery in comparison with

their existing interests. Their principal economic and legal rights under the Existing Non-Active Bilateral Facility Agreements would not have changed.

**Voting Instructions**

7.10    To be eligible to vote in respect of this Scheme and to ensure the vote so casted is valid, Scheme Creditors must follow the steps set out in this Explanatory Statement (as further detailed in clauses 5.3 (Scheme Participation and Information) to 5.5 (Scheme Participation and Information) and clause 6 (Voting Procedures) of the Scheme). (or have had an Assigned Value assigned to their Scheme Claims in accordance with the procedure set out at paragraph 7.1 above (and any such Scheme Creditor that has had an Assigned Value assigned to any of its Scheme Claims in accordance with the procedure set out at paragraph 7.1 above shall only be eligible to vote in respect of such Scheme Claims based on that Assigned Value)). Only Scheme Creditors which are Noteholders or Holders of the Existing Facilities at the Record Time are entitled to vote in respect of the Scheme.

7.11    Voting instructions provided under the electronic Blocking and Voting Instruction for the Noteholders and under the Voting Instruction Form for the Holders of the Existing Facilities will be definitive and may not be changed, and additional voting instructions will not be accepted through any other means.

7.12    An announcement on the results of voting on this Scheme will be issued to Scheme Creditors via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, and such announcement will be as soon as practicable and in any event within two Business Days after the Record Time (the "**Voting Results Announcement**").

7.13    The Chairman shall tabulate the votes as at the Record Time in accordance with clause 5.13 (Scheme Participation and Information) of the Scheme and shall determine whether the Requisite Majority in respect of each class of Scheme Creditors has been met.

7.14    If the Requisite Majority of Scheme Creditors in respect of each class of Scheme Creditors vote in favour of the Scheme, the Chairman shall declare the Scheme successful and the Company shall submit the Scheme for sanction by the Court.

**Submission of Blocking and Voting Instruction for Scheme Creditors that are Noteholders**

7.15    Each Scheme Creditor that is a Noteholder at the Record Time will be entitled to vote on the Scheme, in accordance with the terms of the Scheme, in respect of all of the Existing Notes in which it owns an economic or beneficial interest as principal at the Record Time, provided that it has submitted (where applicable via its Relying Person) an electronic Blocking and Voting Instruction prior to the Record Time. The Existing Notes Administrative Parties (including any nominee of the Existing Notes Depositary as registered holder of the Existing Notes) will not be entitled to vote on the Scheme to avoid any double counting of votes. Prior to the Record Time, the Company shall cancel or procure the cancellation of any Existing Notes that it or any other member of the Group has a beneficial interest in or which it or any other member of the Group has redeemed, converted, acquired or purchased (if any) and, for the avoidance of doubt, any such Existing Notes shall not be voted in the Scheme.

7.16    The Chairman shall determine the amount of each Noteholder's Scheme Claims for voting purposes, in each case, as of the Record Time and by verifying the same against the relevant information provided to the Information Agent by the Clearing System through which that Noteholder (or its Account Holder acting on its behalf) holds its interest in the Existing Notes at the Record Time.

7.17    To vote in the Scheme, each Noteholder must, in respect of its holding in the Existing Notes held through the Clearing System, submit (or procure the submission of) an electronic Blocking

and Voting Instruction through the applicable Clearing System prior to the Record Time to block its interests in the Existing Notes from being traded and specify its voting instruction in respect of its blocked position for the purposes of the Scheme. Each Blocking and Voting Instruction must include the details of the Noteholder, including such Noteholder's name/entity name, registered address, contact email address and contact phone number. In submitting a Blocking and Voting Instruction each Noteholder thereby gives consent for the electronic Blocking and Voting Instruction and such details to be provided to the Information Agent and shared with the Company and its advisors and agents on a need to know basis and consents for such information to be used for the purposes of giving notice in respect of foreign law recognition proceedings (where applicable) to the extent the Company considers such information as being reasonably required to be used for the purposes of giving notice in respect of foreign law recognition proceedings. The required submission prior to the Record Time of a Blocking and Voting Instruction to the relevant Clearing System is likely to take place via a Noteholder's custodian and/or Account Holder and in accordance with the standard practices and procedures required by the relevant Clearing System.

7.18    The Blocking and Voting Instructions must be submitted in respect of a minimum principal amount of Existing Notes of no less than the minimum denomination of US$200,000 and in integral multiples of US$1 in excess thereof.

7.19    The Chairman and/or the Information Agent may request, and each Noteholder undertakes to deliver, such evidence as may be reasonably required by the Chairman and/or the Information Agent to confirm that such Noteholder holds the direct or beneficial interest as principal in the aggregate principal amount of the Existing Notes that such Noteholder is purporting to vote under the Scheme (including but not limited to a proof of holding).

7.20    To ensure timely submission of the Blocking and Voting Instruction, each Noteholder shall liaise with its relevant custodian to check with the Clearing System as to whether any separate procedural requirements or timelines are applicable and ensure that the Blocking and Voting Instruction is provided before any applicable deadline, as the Clearing System in which it (or its custodian) holds its Existing Notes may impose separate procedural requirements and timelines for the submission of Blocking and Voting Instructions.

7.21    Each Noteholder (and/or its clearing system participant) will be deemed to, by delivering a Blocking and Voting Instruction with respect to its Existing Notes through any Clearing System, consent to the disclosure by such Clearing System of details concerning its identity, the aggregate principal amount of such Existing Notes and its account details to the Information Agent.

7.22    Voting instructions provided under the electronic Blocking and Voting Instruction will be definitive and may not be changed, and additional voting instructions will not be accepted through any other means. An announcement of the results of voting on the Scheme will be issued to Noteholders via the Clearing Systems, SGXNet and the Scheme Website, and such Voting Results Announcement will be as soon as practicable and in any event within two Business Days after the Record Time.

7.23    Any Blocking and Voting Instruction submitted for a Noteholder shall be irrevocable for all purposes in connection with the Scheme. By procuring the submission of a Blocking and Voting Instruction, the relevant Noteholder will be deemed to have undertaken to the Company that it will not, from the time of submission of its Blocking and Voting Instruction, sell, transfer, assign or otherwise dispose of its interest in all or any part of its specified Existing Notes until such time as the Existing Notes are unblocked in accordance with the following paragraph.

7.24    The Blocking and Voting Instruction shall block the interests in the Existing Notes from the earlier of the Record Time or the time of submission of such Blocking and Voting Instruction.

The Company shall be required to provide an irrevocable instruction to the Information Agent to immediately cause the Existing Notes to be unblocked within two Business Days after the issuance of the Voting Results Announcement by the Company (which Voting Results Announcement shall be as soon as practicable and in any event within two Business Days after the Record Time).

7.25    Any Blocking and Voting Instruction submitted after the Record Time will be disregarded for voting purposes. Notwithstanding any other provision of the Scheme, the Chairman will be entitled, acting reasonably, to permit a Noteholder which has not otherwise submitted a valid Blocking and Voting Instruction in accordance with the procedures and deadlines set out in the Scheme to vote if: (a) the relevant Noteholder has otherwise completed the requirements in Section 7.17 before the publication of the Voting Results Announcement, (b) the relevant Scheme Creditor is a Noteholder at the Record Time and (c) the Chairman considers that there is no risk of double-counting of votes as a result.

7.26    The Company and Chairman shall not be required to Accept a Noteholder and its Scheme Claim for the purposes of determining entitlement to vote in the Scheme unless the Noteholder has submitted a valid Blocking and Voting Instruction in accordance with the procedures and deadlines set out in the Scheme.

7.27    For the avoidance of doubt, neither the Existing Notes Administrative Parties nor the Amended Notes Administrative Parties shall be responsible for or involved in the submission of Blocking and Voting Instruction for Scheme Creditors that are Noteholders.  All communications or questions relating to the submission of Blocking and Voting Instruction for Scheme Creditors that are Noteholders should be raised with the Information Agent and not with the Existing Notes Administrative Parties or the Amended Notes Administrative Parties.

**Submission of Voting Instruction Form for Scheme Creditors of Existing Facilities**

7.28    Each Scheme Creditor that is a Holder of any part of the Existing Facilities at the Record Time will be entitled to vote on the Scheme, in accordance with the terms of the Scheme, in respect of all of the parts of the Existing Facilities in which it owns an economic or beneficial interest as principal at the Record Time, provided that it has submitted its Proof of Debt for adjudication in accordance with clause 5 (Scheme Participation and Information) of the Scheme or, if it has not submitted its Proof of Debt for adjudication in accordance with clause 5 of the Scheme, if it has had an Assigned Value assigned to its Scheme Claims by the Chairman in accordance with clause 5.3 of the Scheme (provided that such Scheme Creditor shall only be eligible to vote in respect of such Scheme Claims based on the Assigned Value assigned to those Scheme Claims). The Existing Syndicated Facility Administrative Parties shall refrain from voting on the Scheme to avoid any double counting of votes.

7.29    The Company shall determine (a) each such Scheme Creditor's standing to vote in the Scheme in accordance with the adjudication procedure of Assigned Value procedure (as applicable) set out in clause 5 (Scheme Participation and Information) of the Scheme, and (b) the amount of each such Scheme Creditor's Scheme Claims for voting purposes, in each case, as of the Record Time and by verifying the same against the relevant information provided to the Information Agent by submission of the Voting Instruction Form.

7.30    To establish standing to vote in the Scheme, each Holder of the Existing Facilities must submit (or procure the submission of) a Voting Instruction Form (in the form set out in Appendix 4 (Voting Instructions Form) by way of email to the Information Agent at panbrothers@investor.morrowsodali.com prior to the Record Time to specify its voting instruction in respect of the Scheme.

7.31    Any Voting Instruction Form submitted after the Record Time will be disregarded for voting purposes. Notwithstanding any other provision of the Scheme, the Chairman will be entitled,

acting reasonably, to permit a Scheme Creditor that is a Holder of any part of the Existing Facilities at the Record Time which has not otherwise submitted a valid Voting Instruction Form in accordance with the procedures and deadlines set out in the Scheme to vote if: (a) the relevant Scheme Creditor has otherwise completed the requirements in clause 6.15 (Voting Procedures) of the Scheme before the Voting Results Announcement and (b) the Chairman considers that there is no risk of double-counting of votes as a result.

7.32    The Company and Chairman shall not be required to Accept a Scheme Creditor that is a Holder of any part of the Existing Facilities at the Record Time and its Scheme Claim for the purposes of determining entitlement to vote in the Scheme unless the Scheme Creditor has submitted a valid Voting Instruction Form in accordance with the procedures and deadlines set out in the Scheme.

**Results of Voting**

7.33    If a Scheme Claim is unascertained, contingent or disputed, the Company and/or the Chairman may Accept the Scheme Claim for voting purposes only at a value which the Chairman considers is a fair and reasonable assessment of the sums owed by the Company or the relevant Group member in respect of that Scheme Claim.

7.34    The Chairman shall calculate the amount of all Scheme Claims as at the Record Time. Every Scheme Creditor whose vote is validly cast in the Scheme shall have one vote for every US\$1 of its Accepted Scheme Claims (rounded down to the nearest US\$1) as calculated for voting purposes in accordance with clauses 6.3 and 6.15 (Voting Procedures) of the Scheme.

7.35    The Chairman and the Information Agent shall promptly inform the relevant Scheme Creditor of a refusal to accept (in full or in part) a Voting Instruction Form for the purposes of qualifying as a Scheme Claim along with reasons for such refusal.

7.36    Votes of Scheme Creditors at the Record Time will be Accepted for voting purposes at a value equal to the sum of (a) the outstanding principal amount of the Existing Notes or Existing Facilities held by each Scheme Creditor at the Record Time (without double counting) and (b) all accrued and unpaid interest on such Existing Notes or Existing Facilities (including default interest) up to but excluding the Record Date. No other Scheme Claims are Accepted by the Company, and the Chairman will not consider any other Scheme Claims for voting purposes unless an application is made in writing to the Chairman before the Record Time.

7.37    The Chairman may, acting fairly and reasonably, vary any of the above procedures, including but not limited to proceeding with the voting by way of the mechanism provided under Section 210 of the Companies Act. In such case, the Scheme Creditors shall be informed of such variation as soon as reasonably practicable via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website.

7.38    Notwithstanding any other provision of the Scheme, if the Company or the Chairman (each acting reasonably and in good faith) determines an extension of the Record Date or the Record Time is necessary, the Record Date and/or the Record Time (as applicable) may be extended on one occasion and such extension must be for a period of no more than 14 days.

**Blocking Reference Number**

7.39    After submission of the Blocking and Voting Instruction, a Blocking Reference Number shall be generated by the relevant Clearing System.

7.40    The Chairman and/or the Information Agent may request, and each Noteholder undertakes to deliver, such evidence as may be reasonably required by the Chairman and/or the Information Agent to confirm that such Noteholder holds the direct or beneficial interest as principal in the

aggregate principal amount of the Existing Notes that such Noteholder is purporting to vote under the Scheme (including but not limited to a Blocking Reference Number).

**Voting Instruction Form**

7.41    The Chairman and/or the Information Agent may request, and each Holder of the Existing Facilities undertakes to deliver, such evidence as may be reasonably required by the Chairman and/or the Information Agent to confirm that such Holder holds the direct or beneficial interest as principal in the aggregate principal amount of the Existing Facilities that such Holder is purporting to vote under the Scheme (including but not limited to a proof of holding).

**Sales Assignments or Transfers of the Scheme Claims**

7.42    Subject to paragraph 7.43 below, the Company, Chairman and the Information Agent shall not be under any obligation to recognise any sale, assignment or transfer of any Existing Notes, Existing Facilities or Scheme Claims after the Record Time for the purposes of determining any entitlement to vote on the Scheme.

7.43    If the Company has received written notice of a sale, assignment or transfer of any Existing Notes, Existing Facilities or Scheme Claims (from each relevant party to such sale, assignment or transfer), the Company may, subject to such evidence as it may reasonably require and any other terms and conditions which the Company may consider necessary or desirable, agree to recognise such sale, assignment or transfer for the purposes of determining any entitlement to vote on the Scheme. It shall be a term of such recognition that such purchaser, assignee or transferee so recognised by the Company shall be bound by the terms of the Scheme and for the purposes of the Scheme shall be a Scheme Creditor.

7.44    Notwithstanding paragraphs 7.42 and 7.43 above, any purchaser, assignee or other transferee of any Existing Notes, Existing Facilities or Scheme Claims after the Record Time shall be bound by the terms of the Scheme in the event that the Scheme Effective Date occurs.  For the avoidance of doubt, such purchaser, assignee or other transferee shall be entitled to enforce the terms of the Scheme as if it were an Original Scheme Creditor on the Scheme Effective Date.

**Other matters**

7.45    During the period commencing from the announcement of this Scheme and ending on the Restructuring Effective Date (or if earlier the date on which the Scheme is terminated or withdrawn) (for the purposes of this paragraph the "**Applicable Period**"), the Company shall pay any interest (excluding default interest) owing to Scheme Creditors under the Existing Notes Indenture (in the case of the Noteholders) or Scheme Creditors under the Existing Facilities (in the case of Scheme Creditors that are creditors thereunder) that has an originally scheduled payment date that falls within the Applicable Period.

## 8.    RISKS ASSOCIATED WITH PARTICIPATING IN THE SCHEME

*The following summarises some of the principal risks and uncertainties that may arise in connection with the Scheme. It should be read in conjunction with all of the other information contained in this Explanatory Statement. Additional risks and uncertainties not presently known to the Group or that the Group currently deems immaterial may become material and have a material adverse effect on the business, financial condition or results of operations of the Group. This Explanatory Statement also contains forward- looking statements relating to the Group's plans, objectives, expectations and intentions. Actual results may differ materially from those anticipated in these forward-looking statements as a result of various factors and circumstances, including the risks and uncertainties described in this Explanatory Statement.*

*For ease of reference, the risk factors set out below have been grouped into the following four categories:*

    (a)     *risks relating to the implementation of the Scheme;*

    (b)     *risks relating to a failure to implement or a delay in implementing the Scheme;*

    (c)     *risks relating to the Amended Notes, the Amended Notes Guarantees, the Amended Notes Collateral, the Amended Facilities, the Amended Facilities Guarantees and the Amended Facilities Security; and*

    (d)     *risks following the implementation of the Scheme.*

*If a Scheme Creditor is in any doubt about the action it should take, such Scheme Creditor is advised to consult an appropriately authorised independent financial advisor who specialises in advising on the acquisition of equity, debt and other securities.*

**Risks Relating to the Implementation of the Scheme**

8.1    Effectiveness of the Scheme requires the approval of Scheme Creditors.

The Scheme must be approved by a simple majority in number of the Scheme Creditors in respect of each class of Scheme Creditors ("**majority in number**") representing at least 75% in value of the Scheme Claims in respect of each class of Scheme Creditors ("**majority in value**"). The Scheme Creditors voting on the Scheme will be counted to ascertain the "**majority in number**" requirement, and the principal amount of the Scheme Claims of the Scheme Creditors voting on the Scheme will be counted to ascertain the "**majority in value**" requirement in respect of each class of Scheme Creditors. If the requisite majorities of Scheme Creditors in respect of each class of Scheme Creditors do not vote in favour of the Scheme and the Scheme Effective Date does not occur, the Restructuring will not be implemented pursuant to the Scheme or possibly at all.

8.2    Even if the Requisite Majority of Scheme Creditors in respect of each class of Scheme Creditors approve the Scheme, the Scheme may not be approved by the Court.

The Scheme must be sanctioned by the Court at the Sanction Hearing. The Court will not sanction the Scheme unless it is satisfied that the conditions set out in section 71(3) of the Insolvency, Restructuring and Dissolution Act have been satisfied. The Court also has discretion whether or not to sanction the Scheme and may not do so unless it is satisfied that, amongst others:

    (a)     the provisions of the Insolvency, Restructuring and Dissolution Act have been complied with;

    (b)     the statutory majority acted bona fide without coercing the minority; and

    (c)     the arrangement is such that an intelligent and honest man, being a member of the class concerned, and acting in respect of his interests, might reasonably approve.

There can be no assurance that the Court will sanction the Scheme. If the Court does not sanction the Scheme, including for any of the reasons described above, or approves the Scheme subject to conditions or amendments which (i) the Company or other relevant parties regard as unacceptable or (ii) would have (directly or indirectly) a material adverse effect on the interests of any Scheme Creditors and such conditions or amendments are not approved by the Scheme Creditors, the Scheme will not become effective and the transactions contemplated by the Scheme will not be implemented.

Even if the Scheme is approved by the Requisite Majority of Scheme Creditors in respect of each class of Scheme Creditors, it is possible for a person with an interest in the Scheme (whether a Scheme Creditor or otherwise) to object to the Scheme and to attend or be represented at the Sanction Hearing in order to make representations that the Scheme should

not be approved or to appeal against the order of the Court granted by the Court which sanctions the Scheme. Any such objections or appeal will delay or possibly prevent the implementation of the Scheme as contemplated in the Restructuring.

8.3     A long and protracted alternative restructuring may be on worse terms and could adversely impact management's ability to manage the Group's operations and may otherwise adversely affect its business.

If the Scheme is not approved, there can be no assurance that the Group would be able to obtain terms for an alternative financial restructuring on better terms for stakeholders in the Group or that any such alternative financial restructuring would be successfully implemented. Any alternative to the Restructuring that the Group is required to pursue, may take substantially longer to complete than the Restructuring and could disrupt its business further. In addition, the negotiation of an alternative financial restructuring would require significant management resources and would divert the attention of management away from the operation of the Group's business and the implementation of its business plan and may cause some members of management to leave.

A protracted business rescue process would also likely result in a large amount of negative publicity, which would harm the Group's reputation and may make it harder for the Group to attract and maintain customers, investors and employees. Such reputational damage could lead to a decreased customer base, reduced income and higher operating costs and may have a material adverse effect on the Group's business, financial condition and results of operations. In addition, concerns about the financial health of the Group may cause certain of the Group's customers to breach or terminate their contracts with it.

8.4     Adverse publicity relating to the Restructuring or the financial condition of the Group may adversely affect the Group's client and supplier relationships and/or the market perception of the Group's business.

Adverse publicity relating to the Restructuring or the financial condition of the Group or of other participants in the market(s) in which it operates may have a material adverse effect on the Group's customer and supplier relationships (including financial and insurance institutions) and/or the market perception of its business. Customers may choose not to (and it may be more difficult to convince such customers to) continue business relationships with the Group. Existing suppliers may also choose not to do business with the Group, may demand quicker payment terms and/or may not extend normal trade credit. The Group may find it difficult to obtain new or alternative suppliers. Ongoing negative publicity may have a long-term negative effect on the Group's reputation and brand which may make it more difficult for the Group to market its products in the future.

8.5     This Explanatory Statement may contain certain forward-looking statements relating to the Group's plan, objectives, expectations and intentions, which may not represent its actual performance for the periods of time to which such statements relate.

Such forward-looking statements involve known and possibly known risks, uncertainties and other factors which may cause actual performance or achievements of the Group to be materially different from the anticipated performance or achievements expressed or implied by the forward-looking statements in this Explanatory Statement. Such forward-looking statements are based on numerous assumptions as to the Group's present and future condition and the reasonableness and appropriateness of certain assumptions are subject to the risk that the information used by the Company to derive such assumptions may be inaccurate or inadequate. The actual performance or achievements of the Group may differ materially from those disclosed in this Explanatory Statement.

**Risks Relating to a Failure to Implement or a Delay in Implementing the Scheme**

8.6    The Restructuring may not be completed in accordance with the timeline envisaged by this Explanatory Statement.

Factors unknown to the Company as at the date of this Explanatory Statement may result in delays to the completion of the Restructuring. The Scheme Effective Date is subject to a number of conditions precedent including, but not limited to, the Requisite Majority of the Scheme Creditors in respect of each class of Scheme Creditors voting to approve the Scheme and the sanction of the Scheme by the Court. In addition, the Restructuring Effective Date is subject to a number of conditions precedent including, but not limited to, all Restructuring Documents being in agreed form and being executed by or on behalf of the relevant parties to them and a Chapter 15 Order being issued by the U.S. Bankruptcy Court.

The Company does not control the granting of the Chapter 15 Order or the timing thereof, and there can be no assurance that it will be granted on a timely basis or at all. If the Scheme is not recognized by the U.S. Bankruptcy Court, and/or relief and additional assistance are not granted by that Court as consistent with the terms of the Scheme, the Scheme will not be implemented. Even if the Scheme is approved by the Requisite Majority of Scheme Creditors in respect of each class of Scheme Creditors and is sanctioned by the Court, it is possible for a person with an interest in the Scheme (whether a Scheme Creditor or otherwise) to object to entry of the Chapter 15 Order and to attend or be represented in the Chapter 15 case in order to make representations that the Chapter 15 Order should not be approved.

If such conditions precedent are not met or waived pursuant to the terms of the Scheme, the Scheme Effective Date and/or the Restructuring Effective Date will not take place. Furthermore, there is no guarantee that the Restructuring Effective Date will occur by the Long Stop Date, at which time the Scheme Creditors will no longer be bound by their obligations under the Scheme to support the Restructuring and not to take action against the Company and/or any member of the Group, and the Scheme will lapse. The Long Stop Date may, however, be extended by the Company in accordance with the terms of the Scheme.

8.7    Insolvency proceedings if the Restructuring is not implemented promptly.

As the Company (or the relevant member(s) of the Group) were unable to meet their obligations to make the relevant payments under the Existing Notes and the Existing Facilities, the Company and such member(s) of the Group are in default of their obligations under the Existing Notes Indenture and the Existing Facility Agreements. The Group and the Company currently have limited available cash and, should the Restructuring not proceed, the overdue indebtedness under and in connection with the Existing Notes or the Existing Facilities will not be able to be repaid. The Company's failure to extend, restructure or refinance the Existing Notes and the Existing Facilities may also trigger a mandatory prepayment under the Group's other indebtedness. Unless the Company is able to complete an alternative financial restructuring (which the Company considers very unlikely given the time and cost of negotiating the Restructuring), it is likely that enforcement proceedings will be brought against the Company and other members of the Group and/or that they may have to enter into liquidation or other appropriate Insolvency Proceedings. In such scenarios, the proceeds available to Scheme Creditors will likely be reduced to a level that is considerably lower than the potential value of the consideration they would receive under the Scheme. Any such process could be lengthy, expensive and uncertain and there can be no assurance that Scheme Creditors would recover any of the value of their Existing Notes or Existing Facility Agreements.

**Risks Relating to the Amended Notes, the Amended Notes Guarantees, the Amended Notes Collateral, the Amended Facilities, the Amended Facilities Guarantees and the Amended Facilities Security**

8.8    The terms of the Amended Notes, the Amended Notes Guarantees, the Amended Notes Collateral, the Amended Facilities, the Amended Facilities Guarantees and the Amended Facilities Security will contain covenants limiting the Group's financial and operating flexibility.

Covenants contained in the documentation relating to the Amended Notes, the Amended Notes Guarantees, the Amended Notes Collateral, the Amended Facilities, the Amended Facilities Guarantees and the Amended Facilities Security will restrict the ability of the Company and certain of its Subsidiaries to, among other things:

(a)    incur or guarantee additional indebtedness and issue certain redeemable or preferred stock (for example, see the section titled "Limitation on Indebtedness" of the Existing Notes Indenture which will be replicated for the Amended Notes and clause 21.7 (Financial Indebtedness) of the Existing Syndicated Facility Agreement which will be replicated for the Amended Syndicated Facility Agreement), subject to the carve outs which shall include (1) the "Permitted Indebtedness" as defined under the Existing Notes Indenture, (2) indebtedness permitted under clause 21.7(b) (Financial Indebtedness) of the Existing Syndicated Facility Agreement, (3) all indebtedness under the Amended Notes and the Amended Facilities and (4) indebtedness permitted to be incurred and/or referred to in the Restructuring Term Sheets;

(b)    create or incur certain liens which shall include all existing "Permitted Liens" under the Existing Notes Indenture and permitted security under clause 21.5(c) (Negative Pledge) of the Existing Syndicated Facility Agreement and will also include liens permitted to secure (1) the relevant Amended Facilities, (2) the Amended Notes and (3) any security or liens permitted to be granted and/or referred to in the Restructuring Term Sheets;

(c)    make certain payments, including dividends or other distributions, with respect to the shares of the Company, or its restricted subsidiaries (subject to, among others, (1) carve outs in the Existing Notes Indenture which will be replicated for the Amended Notes and clause 21.13(b) (Dividends) of the Existing Syndicated Facility Agreement which will be replicated for the Amended Syndicated Facility Agreement) and (2) any permitted distributions or payments referred to in the Restructuring Term Sheets;

(d)    prepay or redeem subordinated debt or equity;

(e)    make certain investments and capital expenditures (other than, among others, (1) the Permitted Investments (as defined in the Existing Notes Indenture to be replicated for the Amended Notes), (2) any existing permitted investments and capital expenditures under any of the Existing Facilities and (3) any permitted investments and capital expenditures referred to in the Restructuring Term Sheets

(f)    sell, lease or transfer certain assets, including stock of certain of its subsidiaries;

(g)    enter into sale and leaseback transactions except in the ordinary course of business;

(h)    engage in certain transactions with affiliates except in the ordinary course of business;

(i)    enter into unrelated businesses or engage in prohibited activities;

(j)    consolidate or merge with other entities; and

(k)    impair the security interest for the benefit of the Holders of the Amended Notes or Amended Facilities.

Among other things, the Company must also comply with certain financial ratios calculated in respect of the Group as set out in the Restructuring Term Sheets.

All of these covenants will be subject to the limitations, exceptions and qualifications to be set out in the Amended Notes Indenture and the Amended Facility Agreements. These covenants could limit the Group's ability to pursue its growth plan, restrict the Group's flexibility in planning for, or reacting to, changes in its business and industry, and increase the Group's vulnerability to general adverse economic and industry conditions. The Group may also enter into additional financing arrangements in the future, which could further restrict its flexibility.

Any defaults of covenants contained in the Amended Notes or the Amended Facilities may lead to an event of default under the Amended Notes or Amended Facilities and may lead to cross-defaults under the Group's other indebtedness. No assurance can be given that the Company will be able to pay any amounts due to holders of the Amended Notes or Amended Facilities in the event of such default, and any default may significantly impair the Company's ability to pay, when due, the interest of and principal on the Amended Notes or the Amended Facilities and the Company's, Issuer's, any Subsidiary Guarantor's or the Amended Facilities Guarantees' guarantors', ability to satisfy its obligations under the Amended Notes Guarantees or Amended Facilities Guarantees.

8.9     The Group may incur additional indebtedness which could further exacerbate the risks described above.

Subject to restrictions to be set out in the Amended Notes or the Amended Facilities, the Group may incur additional indebtedness, which could increase the risks associated with its existing indebtedness. If the Group incurs any additional indebtedness that ranks ahead of the Amended Notes or Amended Facilities, the relevant creditors will be entitled to any proceeds distributed in connection with any insolvency, liquidation, reorganisation, dissolution or other winding-up of the Company or a Guarantor in preference and/or priority to the holders of the Amended Notes or Amended Facilities. This may have the effect of reducing the amount of proceeds paid to the holders of the Amended Notes or Amended Facilities. Covenants in agreements governing debt that the Group may incur in the future may also materially restrict its operations, including its ability to incur debt, pay dividends, make certain investments and payments, and encumber or dispose of assets. In addition, the Group could be in default of financial covenants contained in agreements relating to its future debt in the event that its results of operations do not meet any of the terms in the covenants, including the financial thresholds or ratios. A default under one debt instrument may also trigger cross-defaults under other debt instruments. An event of default under any debt instrument, if not cured or waived, could have a material adverse effect on the Group.

8.10    The Group may not be able to generate sufficient cash flows to meet its debt service obligations.

The Group's ability to make scheduled payments on, or to refinance its obligations with respect to, its indebtedness, including the Amended Notes and the Amended Facilities, will depend on its financial and operating performance, which in turn will be affected by general economic conditions and by financial, competitive, regulatory and other factors beyond its control. The Group may not generate sufficient cash flow from operations and future sources of capital may not be available to it in an amount sufficient to enable it to service its indebtedness, including the Amended Notes or the Amended Facilities, or to fund its other liquidity needs. If the Group is unable to generate sufficient cash flow and capital resources to satisfy its debt obligations or other liquidity needs, it may have to undertake alternative financing plans, such as refinancing or restructuring its debt, selling assets, reducing or delaying capital investments or seeking to raise additional capital. There is no assurance that any refinancing would be possible, that any assets could be sold or, if sold, of the timing of the sales and the amount of proceeds that may be realised from those sales, or that additional financing could be obtained on acceptable terms, if at all. In the absence of such cash flow and resources, the Group could face substantial liquidity problems and might be required to dispose of material assets or operations to meet its debt service and other obligations. The Amended Notes Indenture and the Amended Facility

Agreements will restrict the Group's ability to dispose of assets and use the proceeds from the disposition. The Group may not be able to consummate those dispositions or to obtain the proceeds which it could realise from them and such proceeds may not be adequate to meet any debt service obligations then due. The Group's inability to generate sufficient cash flows to satisfy its debt obligations, or to refinance its indebtedness on commercially reasonable terms and in a timely manner, would materially and adversely affect its financial condition and results of operations and the Company's ability to satisfy its obligations under the Amended Notes or Amended Facilities.

8.11    Enforcing the rights of Holders under the Amended Notes, the Amended Facilities, the Amended Facilities Guarantees, the Amended Facilities Security or the Amended Notes Guarantees across multiple jurisdictions may prove difficult.

The Amended Notes are issued by the Issuer and guaranteed by the Company and the Subsidiary Guarantors. The Issuer is incorporated in the Netherlands. The Company is, and the Subsidiary Guarantors are, incorporated under the laws of Indonesia. The Amended Notes, the Amended Notes Guarantees and the Amended Notes Indenture are governed by the laws of the State of New York.

The Amended Syndicated Facility is incurred by the Company and its various subsidiaries which are incorporated in Indonesia. Various other subsidiaries of the Company which are incorporated in Indonesia, Singapore and Hong Kong will be guarantors to the Amended Syndicated Facility. The Amended Syndicated Facility (and the guarantee provisions built into the Amended Syndicated Facility) are governed by the laws of England.

The Common Framework Agreement (Non-Active Bilaterals), the Amended Facility Agreement (UOB), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (HSBC) are incurred by the Company and its various subsidiaries which are incorporated in Indonesia and are governed by the laws of Indonesia.

The Amended Facilities Security include various security granted by the Company and its various subsidiaries over assets in Indonesia in favour of the respective Scheme Creditors and the relevant security documents are governed by Indonesia law.

In the event of a bankruptcy, insolvency or similar event, proceedings could be initiated in Indonesia, Singapore, England and the United States. Such multi-jurisdictional proceedings are likely to be complex and costly for creditors and may result in greater uncertainty and delay regarding the enforcement of investors' rights. The rights of Holders of the Amended Notes under the Amended Notes and the Amended Notes Guarantees and the Amended Facilities under the Amended Facility Agreements, the Amended Facility Guarantees and the Amended Facilities Security will be subject to the insolvency and administrative laws of several jurisdictions and there can be no assurance that investors will be able to effectively enforce their rights in such complex multiple bankruptcy, insolvency or similar proceedings. In addition, the bankruptcy, insolvency, administrative and other laws of Indonesia, Singapore, England and the United States may be materially different from, or be in conflict with, each other and those the Holders may be familiar, including in the areas of rights of creditors, priority of governmental and other creditors, ability to obtain post- petition interest and duration of proceedings. The application of these laws, or any conflict among them, could call into question whether any particular jurisdiction's laws should apply, adversely affect investors' ability to enforce their rights under the Amended Notes, the Amended Facilities, the Amended Facilities Guarantees, the Amended Facilities Security and the Amended Notes Guarantees in the relevant jurisdictions or limit any amounts that investors may receive.

8.12    It may not be possible for investors to effect service of process or to enforce judgments of a foreign court on the Company or the Guarantors in Indonesia.

The Company, each of the Subsidiary Guarantors and certain guarantors under the Amended Facilities Guarantees are limited liability companies incorporated in Indonesia operating within the framework of Indonesian laws relating to investment and all of its significant assets are located in Indonesia. All of the Company's, certain guarantors under the Amended Facilities Guarantees and each of the Subsidiary Guarantor's commissioners and directors reside in Indonesia. As a result, it may be difficult for investors to effect service of process, including judgments, on the Company, certain guarantors under the Amended Facilities Guarantees or a Subsidiary Guarantor or their respective commissioners and directors in Indonesia, or to enforce judgments obtained in non-Indonesian courts against the Company, certain guarantors under the Amended Facilities Guarantees, a Subsidiary Guarantor or their respective commissioners and directors in Indonesia.

Judgments of non-Indonesian courts may not be enforceable in Indonesian courts, although such judgments could be admissible as non-conclusive evidence in a proceeding on the underlying claim in an Indonesian court. There may be doubt as to whether Indonesian courts will recognise judgments in original actions brought in Indonesian courts based only upon the civil liability provisions of the securities laws of other countries. In addition, an Indonesian court may refuse to hear an original action based on securities laws of other countries. As a result, Holders of the Amended Notes or Amended Facilities would be required to pursue claims against the Company, certain guarantors under the Amended Facilities Guarantees or a Subsidiary Guarantor or their respective commissioners, directors and executive officers in Indonesian courts.

The claims and remedies available under Indonesian law may not be as extensive as those available in other jurisdictions. No assurance can be given that the Indonesian courts will protect the interests of Holders of the Amended Notes or Amended Syndicated Facility Agreement in the same manner or to the same extent as would courts in more developed countries outside of Indonesia.

8.13    An Indonesian court has limited certain rights of the trustee, acting on behalf of the holders of U.S. Dollar bonds, in relation to the parent guarantor, in a decision that affected the holders' rights and the terms of the bonds in connection with a debt restructuring of the parent guarantor.

On 8 December 2014, the Supervisory Judge in proceedings before the Commercial Court of the Central Jakarta District Court determined that noteholders were not creditors of PT Bakrie Telecom Tbk. ("**Bakrie Tel**") for purposes of its court-supervised debt restructuring, known as a PKPU (the "**Bakrie Tel PKPU**"). Bakrie Tel, an Indonesian telecommunications company, is the guarantor of US$380 million of senior notes issued in 2010 and 2011 by a Singapore-incorporated special purpose vehicle that is a subsidiary of Bakrie Tel. The proceeds from the offering of the notes were on-lent to Bakrie Tel pursuant to an intercompany loan agreement, which was guaranteed by Bakrie Tel and assigned to the noteholders as collateral. In its decision affirming the composition plan, the Commercial Court accepted the Supervisory Judge's determination that the relevant creditor of Bakrie Tel in respect of the US$380 million notes was the issuer subsidiary, rather than the noteholders or the indenture trustee, and gave no effect to the guarantee. As such, only the intercompany loan was recognised by the Commercial Court as indebtedness on which Bakrie Tel was liable for purposes of the Bakrie Tel PKPU. As a result, only the issuer subsidiary had standing as a Bakrie Tel creditor to vote in the Bakrie Tel PKPU proceedings, which substantially altered the terms of the U.S. Dollar bonds and the guarantee.

Similar to the Bakrie Tel PKPU case, an Indonesian company, PT Trikomsel Oke Tbk ("**Trikomsel**"), in early 2016 entered into PKPU proceedings. The PKPU administrators were

reported to have rejected claims that arose from holders of their two Singaporean Dollar bonds and have taken the stance that the trustees under such bonds did not have any standing to make claims on behalf of bondholders. Further, they asserted that only individual bondholders that had filed claims on their own would be able to participate in the PKPU proceedings and to vote on any restructuring plan. On 28 September 2016, the PKPU process was settled between Trikomsel and its creditors through the establishment of a composition plan (*rencana perdamaian*) which was approved by certain bondholders, and then ratified by the Jakarta Commercial Court. Based on an announcement from Trikomsel, under the composition plan, the bondholders of the two of Singaporean Dollar bonds may be required to convert their notes into new shares to be issued by Trikomsel, thereby extinguishing the bonds.

It may be difficult or impossible for Holders to enforce all of their rights under a guarantee provided by an Indonesian guarantor such as the Company (and its subsidiaries), including but not limited to being able to vote in court supervised debt restructuring or bankruptcy proceedings in Indonesia. Further, no assurance can be given that the Indonesian courts will recognise all or part of a guarantee provided by an Indonesian guarantor in these proceedings. Indonesia's legal system is a civil law system based on written statutes in which judicial and administrative decisions do not constitute binding precedent and are not systematically published. Indonesian judges have very broad fact-finding powers and a high level of discretion with respect to the manner in which those powers are exercised, and may be guided less by legal principles and precedent than would their counterparts in other jurisdictions.

8.14    Indonesian companies have filed suits in Indonesian courts to invalidate transactions with structures similar to the Amended Notes and the Amended Notes Guarantees and have brought legal action against lenders and other transaction participants; moreover, such legal actions have resulted in judgments against such defendants invalidating all obligations under the applicable debt instruments and in damages against such defendants in excess of the amounts borrowed.

The Indonesian Supreme Court has affirmed several District Court decisions that invalidated transactions with structures similar to the Amended Notes and the Amended Notes Guarantees. These cases have generally involved Indonesian companies that had defaulted on notes and other debt incurred through offshore financing entities in transactions structured similarly to the Amended Notes and the Amended Notes Guarantees and had successfully sued their creditors as well as other parties such as underwriters and trustees with respect to such debt and have obtained, among other relief:

(a)    a declaration that the entire debt obligation is null and void;

(b)    disgorgement of prior payments made to holders of the notes;

(c)    damages from lenders and other transaction participants in amounts exceeding the original proceeds of the debt issued; and

(d)    injunctions prohibiting holders of the notes from enforcing their rights under the relevant transaction documents and trading in the notes.

Under the Indonesian Civil Code, a guarantor of a debt obligation may waive its right to require the beneficiary of the guarantee to exhaust its legal remedies against the principal obligor's assets prior to the beneficiary exercising its rights against the guarantor under the guarantee. Although the Amended Notes Guarantees include a waiver of this right, the Indonesian incorporated Guarantors may, nonetheless, require that a beneficiary of the Amended Notes Guarantees first prove that all available legal remedies against the Company, as the obligor, have been exhausted.

In several court cases in Indonesia, Indonesian companies that had defaulted on debt incurred through offshore financing entities and guaranteed by Indonesian companies have sued their

creditors under such debt to, among other things, invalidate their debt obligations, and have sought damages in amounts exceeding the original principal amounts of the relevant debt from such creditors. In a case which was subsequently settled, an Indonesian court voided the transaction documents under a transaction involving a guarantee issued by an Indonesian company of the debt of an offshore subsidiary. In another case, an Indonesian court declared a loan agreement between an offshore entity and its creditors null and void and awarded damage s to the defaulting borrower. The courts' reports of these decisions do not provide a clear factual basis or legal rationale for the judgments.

Following several lower court cases involving PT Indah Kiat Pulp & Paper Tbk., an Indonesian listed company ("**Indah Kiat**"), the Indonesian Supreme Court in a June 2006 decision (the "**June 2006 Decision**") released in November 2006 affirmed lower court judgments that invalidated US$500 million of notes issued by Indah Kiat International Finance Company B.V. ("**Indah Kiat BV**"), a Dutch subsidiary of Indah Kiat, and guaranteed by Indah Kiat. The lower courts had ruled that the defendants (including the trustee, underwriter and security agent with respect to the notes) committed an unlawful act (perbuatan melawan hukum), and therefore the issuance of the notes was null and void. Indah Kiat argued that by acting as both guarantor of the notes issued by Indah Kiat BV and borrower under an inter-company loan from Indah Kiat BV, Indah Kiat acted as both debtor and guarantor of the same debt. The lower courts reasoned that the transaction documents with respect to the notes were signed without any legal cause and did not meet the provisions of Article 1320 of the Indonesian Civil Code, which requires an agreement to have a legal cause in order to be a valid agreement. The lower courts also ruled that the establishment of Indah Kiat BY was unlawful, as it was established for the purposes of avoiding Indonesian withholding tax liability.

On 19 August 2008, the Indonesian Supreme Court granted a civil review (peninjauan kembali) (the "**August 2008 Decision**") and annulled the June 2006 Decision, stating that Indah Kiat had failed to prove that the transaction was an act of legal manipulation that caused damages to Indah Kiat and concluding that the defendants did not commit any unlawful acts. Further, the Indonesian Supreme Court maintained that it was clear that the money borrowed from Indah Kiat BY Indah Kiat originated from the issuance of the notes, as evidenced by the relevant inter-company loan agreement, and therefore there was no merit to the claim that the transaction was an act of legal manipulation. The Indonesian Supreme Court further stated that it had misapplied the tax law in the June 2006 Decision, as the tax law did not prohibit tax saving. Finally, the Indonesian Supreme Court stated that the guarantees with respect to the notes were enforceable as long as the relevant security documents were valid and enforceable, and that claims with respect to certain New York-law governed documents, such as the indenture, the intercompany loan agreement and the underwriting agreement, should be brought in the appropriate court in the state of New York.

The Indonesian Supreme Court in March 2009 refused a civil review (the "**March 2009 Decision**") of a judgment by the District Court of Kuala Tungkal, South Sumatra, which invalidated US$500 million of notes issued by APP International Finance Company B.Y. ("**APPC**") and guaranteed by PT Lontar Papyrus Pulp & Paper Industry ("**Lontar Papyrus**"), a sister corporation of Indah Kiat. Although the Indonesian Supreme Court's official judgment is not publicly available, Lontar Papyrus' legal arguments in its lower court case were substantially similar to those made by Indah Kiat and rejected by the Indonesian Supreme Court in its August 2008 Decision. The Indonesian Supreme Court's refusal to grant a civil review effectively affirmed and made final the lower court's decision to invalidate the transaction documents and Lontar Papyrus's guarantor obligations under the notes. The Indonesian Supreme Court reasoned that the loan agreement between APPC and Lontar Papyrus and the indenture with respect to the notes required revisions in order to comply with Indonesia's prevailing laws and regulations and that because Lontar Papyrus had repaid in full the loan from APPC, it had no outstanding legal obligations as debtor under the loan agreement with APPC

or as guarantor under the indenture. Lontar Papyrus and Indah Kiat are subsidiaries of Asia Pulp & Paper Company Ltd., and their original lower court cases against their creditors were filed at approximately the same time. While the lower court decisions in certain of these cases have been annulled by the Indonesian Supreme Court, as in the August 2008 Decision, the Indonesian Supreme Court has taken a contradictory view in the March 2009 Decision.

In a September 2011 decision, the Indonesian Supreme Court, whose judgment has not been made publicly available, refused a civil review (the "**September 2011 Decision**") of a decision by the District Court of Bengkalis (whose judgment was the subject of the Indonesian Supreme Court's June 2006 Decision and August 2008 Decision), which invalidated the notes issued by Indah Kiat BY. The facts and legal claims presented by Indah Kiat BY were substantially the same as those made by Indah Kiat in the lower court cases that were the subject of the June 2006 Decision. The September 2011 Decision specifically noted that the Indonesian Supreme Court chose to not consider its August 2008 Decision despite such substantially similar facts and legal claims.

The Supreme Court's refusal to grant civil reviews of the lower court decisions in the March 2009 Decision and September 2011 Decision effectively affirmed the lower courts' decisions to invalidate the relevant notes and the issuers' and guarantors' obligations under such notes, and such lower court decisions are now final and not subject to further review.

Indonesian court decisions are not binding precedents and do not constitute a source of law at any level of the judicial hierarchy as in common law jurisdictions such as the United States and the United Kingdom. However, the Group cannot assure investors that a court would not issue a decision similar to the September 2011 Decision with respect to the validity and enforceability of the Amended Notes and the Amended Notes Guarantees or grant any additional relief, which in each case would be adverse to the interests of Noteholders. The Group cannot assure investors that the Indonesian Supreme Court and lower Indonesian courts will not invalidate the Amended Notes, the Amended Notes Guarantees and other transaction documents, or that investors will be able to enforce their rights in Indonesia, where substantially all of the Guarantors' assets are located. In addition, in jurisdictions where courts recognise such Indonesian court decisions, holders of the Amended Notes may also be unable to enforce their rights under the Amended Notes, the Amended Notes Guarantees or other transaction documents, or have recourse to the Company's or any Subsidiary Guarantor's assets. Holders of the Amended Notes may have no effective or practical recourse to any assets or legal process in Indonesia to enforce their rights against the Company or the Guarantors.

Noteholders may be exposed to affirmative judgments by Indonesian courts against them in amounts exceeding the value of the notes held by them. In addition, in jurisdictions where courts recognise such Indonesian court decisions, non-Indonesian courts may enforce such judgments against the assets of Noteholders as well as other parties such as underwriters and trustees located outside of Indonesia.

8.15    Through the holding of the Amended Notes, the Amended Facilities, the Amended Facilities Guarantees, the Amended Facilities Security and the Amended Notes Guarantees, Holders may be exposed to a legal system subject to considerable discretion and uncertainty; it may be difficult or impossible for holders of the Amended Notes or the Amended Facilities to pursue claims under the Amended Notes, the Amended Facilities, the Amended Facilities Guarantees, the Amended Facilities Security or the Amended Notes Guarantees because of considerable discretion and uncertainty of the Indonesian legal system.

Indonesian legal principles relating to the rights of debtors and creditors, or their practical implementation by Indonesian courts, may differ materially from those that would apply within the jurisdictions of the United States, the European Union or other jurisdictions. Neither the rights of debtors nor the rights of creditors under Indonesian law are as clearly established or

recognised as under legislation or judicial precedent in the United States and most European Union member states. In addition, under Indonesian law, debtors may have rights and defences to actions filed by creditors that these debtors would not have in jurisdictions with more established legal regimes such as those in the United States and the European Union member states.

Indonesia's legal system is a civil law system based on written statutes in which judicial and administrative decisions do not constitute binding precedent and are not systematically published. Indonesia's commercial and civil laws, as well as rules on judicial process, were historically based on Dutch law as in effect prior to Indonesia's independence in 1945, and some have not been revised to reflect the complexities of modern financial transactions and instruments. Indonesian courts may be unfamiliar with sophisticated commercial or financial transactions, leading in practice to uncertainty in the interpretation and application of Indonesian legal principles. The application of Indonesian law depends upon subjective criteria such as the good faith of the parties to the transaction and principles of public policy, the practical effect of which is difficult or impossible to predict. Indonesian judges operate in an inquisitorial legal system, have very broad fact-finding powers and a high level of discretion in relation to the manner in which those powers are exercised. In practice, Indonesian court decisions may omit, or may not be decided upon, a legal and factual analysis of the issues presented in a case, and as a result, the administration and enforcement of laws and regulations by Indonesian courts and Indonesian governmental agencies may be subject to considerable discretion and uncertainty. Furthermore, corruption in the court system in Indonesian has been widely reported in publicly available sources.

In addition, under the Indonesian Civil Code, although a guarantor may waive its right to require the obligee to exhaust its legal remedies against the obligor's assets prior to the obligee exercising its rights under the related guarantee, a guarantor may be able to argue successfully that the guarantor can nonetheless require the obligee to exhaust such remedies before acting against the guarantor. No assurance can be given that an Indonesian court would not side with the Company, a Subsidiary Guarantor or a guarantor under the Amended Facilities Guarantees on this matter, despite the express waiver by the Company, each Subsidiary Guarantor or each guarantor under the Amended Facilities Guarantees of this obligation in the Amended Notes Guarantees or the Amended Syndicated Facility Agreement.

Furthermore, on 2 September 2013 the holders of notes issued by BLD Investments Pte. Ltd. and guaranteed by PT Bakrieland Development Tbk. ("**Bakrieland**"), under a trust deed governed under English law, filed a postponement of debt payment petition with the Jakarta Commercial Court on several grounds, including that Bakrieland had failed to comply with its obligation to repay the principal amount of the notes when noteholders exercised their put option under the terms of the notes. In its decision dated 23 September 2013, the Jakarta Commercial Court ruled, among other things, that because the trust deed relating to the notes is governed by English law, all disputes arising out of or in connection with the trust deed must be settled by English courts and, accordingly, that the Jakarta Commercial Court does not have authority to examine and adjudicate this case.

Accordingly, it may be difficult for Holders of the Amended Notes or Amended Facilities to pursue a claim against the Company, any of the Subsidiary Guarantors or guarantors under the Amended Facilities Guarantees in Indonesia, which may adversely affect or eliminate entirely the ability of the Holders to obtain and enforce a judgment against the Company, any of the Subsidiary Guarantors or guarantors under the Amended Facilities Guarantees in Indonesia or increase the costs incurred by holders of the Amended Notes or Amended Facilities in pursuing, and the time required to pursue, claims against the Company, any of the Subsidiary Guarantors or guarantors under the Amended Facilities Guarantees.

8.16    The Amended Notes Guarantees or Amended Facilities Guarantees may be challenged under applicable bankruptcy, insolvency, fraudulent transfer, financial assistance, unfair preference or similar laws, which could impair the enforceability of the Amended Notes Guarantees or Amended Facilities Guarantees.

Under bankruptcy, insolvency, fraudulent transfer, financial assistance, unfair preference or similar laws in Indonesia, where the Guarantors are incorporated and where all of their significant assets are currently located (as well as under the law of certain other jurisdictions to which a Guarantor may be subject or in which insolvency proceedings against a Guarantor may be commenced), the enforceability of the Amended Notes Guarantees or Amended Facilities Guarantees may be impaired if certain statutory or other conditions are met. In particular, the Amended Notes Guarantees or Amended Facilities Guarantees may be voided, or claims in respect of the Amended Notes Guarantees or Amended Facilities Guarantees could be subordinated to all other debts of such Guarantor, if at the time of the incurrence of the indebtedness evidenced by, or when it gives, its Amended Notes Guarantees or Amended Facilities Guarantees, it:

(a)    incurred the debt with the intent to hinder, delay or defraud creditors or was influenced by a desire to put the beneficiary of the Amended Notes Guarantees or Amended Facilities Guarantees in a position which, in the event of such Guarantor's insolvency, would be better than the position the beneficiary would have been in had the Amended Notes Guarantees or Amended Facilities Guarantees not been given;

(b)    received less than reasonably equivalent value or fair consideration for the incurrence of such Amended Notes Guarantees or Amended Facilities Guarantees;

(c)    received no commercial benefit;

(d)    was insolvent or rendered insolvent by reason of such incurrence;

(e)    was engaged in a business or transaction for which such Guarantor's remaining assets constituted unreasonably small capital; or

(f)    intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature.

The test for insolvency, the other particular requirements for the enforcement of fraudulent transfer law, and the nature of the remedy if a fraudulent transfer is found, may vary depending on the law of the jurisdiction which is being applied. Under the laws of Indonesia, it would also be necessary for the directors to ensure that such Guarantor is solvent immediately after entry into, and performance of any obligation under, the transaction, that:

(a)    it will be able to satisfy its liabilities as they become due in the ordinary course of its business; and

(b)    the realisable value of the assets of such Guarantor will not be less than the sum of its total liabilities other than deferred taxes, as shown in the books of account, and its capital.

The directors are required to ensure that the issued capital of such Guarantor is maintained and that, after the giving of the Amended Notes Guarantee or Amended Facilities Guarantees, such Guarantor would have sufficient net assets to cover the nominal value of its issued share capital.

If a court voided the Amended Notes Guarantees or the Amended Facilities Guarantees, or held the Amended Notes Guarantees or the Amended Facilities Guarantees unenforceable for any other reason, then the holders of the Amended Notes or the Amended Facilities would cease to have a claim against such Guarantor based upon such Amended Notes Guarantees or Amended

Facilities Guarantees, and would solely be creditors of the Company. If a court subordinated the Amended Notes Guarantees or Amended Facilities Guarantees to other indebtedness of such Guarantor, then claims under the Amended Notes Guarantees or Amended Facilities Guarantees would be subject to the prior payment of all liabilities (including trade payables). The Group cannot assure investors that there would be sufficient assets to satisfy the claims of holders of the Amended Notes or Amended Facilities after providing for all such prior claims.

8.17    Claims of the secured creditors of the Guarantors will have priority with respect to their security over the claims of unsecured creditors to the extent of the value of the assets securing such indebtedness.

Certain of the Group's credit facilities are secured. The terms of the Amended Notes Indenture or Amended Facilities will permit the Group to incur additional secured indebtedness under certain circumstances.

Claims of the secured creditors of the Company and the Guarantors will have priority with respect to the assets securing their indebtedness over the claims of unsecured creditors. Therefore, the Amended Facilities which are unsecured, Amended Facilities Guarantees and the Amended Notes Guarantees will be effectively subordinated to any secured indebtedness and other secured obligations of the Guarantors to the extent of the value of the assets securing such indebtedness or other obligations. In the event of any foreclosure, dissolution, winding up, liquidation, reorganisation, administration or other bankruptcy or insolvency proceeding of the Guarantors that has secured obligations, holders of secured indebtedness will have prior claims to the assets of the Guarantors that constitute their collateral. The holders of the unsecured Amended Facilities will participate rateably with all holders of the unsecured indebtedness of the Guarantors, and potentially with all of their other general creditors, based upon the respective amounts owed to each holder or creditor, in the remaining assets of the Guarantors. In the event that any of the secured indebtedness of the Guarantors becomes due or the creditors thereunder proceed against the assets that secure such indebtedness, the Guarantors' assets remaining after repayment of that secured indebtedness may not be sufficient to repay all amounts owing in respect of the Amended Notes Guarantees or Amended Facilities Guarantees. As a result, holders of the unsecured Amended Facilities may receive less than holders of secured indebtedness of the Guarantors.

8.18    Current Bapepam-LK or OJK regulations may restrict the Group's ability to issue any additional debt securities.

Pursuant to the OJK Regulation No. 17/POJK.04/2020 on Material Transactions and Changes in Core Business (the "**Material Transactions Regulation**"), each borrowing and lending in one transaction or a series of related transactions for a particular purpose or activity having a transaction value of 20% to 50% of a publicly listed company's equity, as determined by the latest audited annual financial statements, semi-annual limited reviewed financial statements or audited interim financial statements (whichever is the latest), must be announced to the public and the publicly listed company must also get a fairness opinion from an independent appraiser registered with the OJK. The public announcement relating to the material transaction must be made in at least (i) the website of the Company; and (ii) the IDX website, no later than two business days after the date of the material transaction. The announcement is required to include a summary of the transaction, an explanation of the considerations and reasons for such material transaction and the effect of the transaction on the company's financial condition, a summary of the appraisal report (including its purpose, the object, the parties involved, the assumptions, qualifications and methodology used in the appraisal report), and the fairness opinion on the transaction, which must not be dated more than six months prior to the date of the material transaction, the amount borrowed or lent, and a summary of the terms and conditions of the borrowing or lending. Publicly listed companies must submit evidence of an announcement as

referred to above, including the fairness opinion and the independent appraisal report to OJK by the end of the second business day after the date of the material transaction.

Subject to certain exceptions under the Material Transactions Regulation, a material transaction (in this case, borrowing and lending) with a value in excess of 50% of a company's equity must be approved by shareholders holding more than half of all shares with valid voting rights who are present or represented, and more than half of such shareholders present or represented approve the transaction, in addition to fulfilling the appraisal disclosure requirements. If the Company decided to issue additional debt securities other than through a public offering in Indonesia, and the amount issued exceeds the 50% threshold, it would be required to obtain shareholders' approval, as well as a new fairness opinion.

Furthermore, under OJK Regulation No. 42/POJK.04/2020 on Affiliated Party Transaction and Conflict of Interest Transaction.(the "**Affiliated Party Regulation**"), an activity and/or transaction carried out (in context of debt securities, e.g. giving a guarantee or providing collateral) by the public company for the interest of the affiliates of the public company or *vice versa* is considered as an affiliated party transaction. An affiliated party transaction is also subject to certain disclosure requirements and obtaining a fairness opinion.

Subject to certain exceptions under Material Transaction Regulation and Affiliated Party Regulation, if a transaction falls under both (i) affiliated party transaction and (ii) material transaction that requires shareholders' approval, such transaction must be approved by independent shareholders holding more than half of all shares with valid voting rights, and more than half of the total independent shareholders must approve the transaction, in addition to fulfilling the appraisal disclosure requirements. If the transaction falls under a material and/or affiliated transaction, there is no assurance that the Company would be able to obtain the approval of its shareholders (or independent shareholders, as relevant) or a favorable fairness opinion in order to issue such additional debt securities.

The above requirements could limit the Group's ability to finance its future operations and capital needs, or pursue business opportunities or activities that may be in the Group's interest. Any limitation on the Group's ability to raise funds to finance its operations could materially and adversely affect the Group's business, financial condition, results of operations and prospects.

8.19    Payments with respect to the Amended Notes and Amended Notes Guarantees will be structurally subordinated to liabilities, contingent liabilities and obligations of certain of the Company's subsidiaries.

The Amended Notes are guaranteed by certain subsidiaries of the Company. Under the terms of the Amended Notes Indenture, future Restricted Subsidiaries which are Excluded Restricted Subsidiaries (as defined in the Amended Notes Indenture) may not be required to become guarantors of the Amended Notes. In addition, the terms of the Amended Notes Indenture permit the Company to designate certain of its existing Subsidiary Guarantors, as well as future Restricted Subsidiaries, as non-guarantor subsidiaries. Creditors, including trade creditors of the Group's non-guarantor subsidiaries and any holders of preferred shares in such entities, would have a claim on its non-guarantor subsidiaries' assets that would be prior to the claims of holders of the Amended Notes. As a result, the Group's payment obligations under the Amended Notes and the Amended Notes Guarantees will be effectively subordinated to all existing and future obligations of the Group's non-guarantor subsidiaries (including obligations of its non-guarantor subsidiaries under guarantees issued in connection with its business), and all claims of creditors of its non-guarantor subsidiaries will have priority as to the assets of such entities over the Group's claims and those of its creditors, including holders of the Amended Notes.

8.20    The Group may be subject to future bankruptcy, insolvency and similar proceedings in Indonesia or other jurisdictions, which may delay or prevent payment on the Amended Notes, the Amended Notes Guarantees, Amended Facilities or the Amended Facilities Guarantees.

Any future defaults in amounts of interest, or principal of, and premium or additional amounts, if any, due on the Amended Notes, the Amended Notes Guarantees, the Amended Facilities or the Amended Facilities Guarantees may, under the terms of the Amended Notes Indenture or Amended Facility Agreements, only be waived with the consent of each Holder of the Amended Notes or Amended Facilities. Should the Company launch an exchange offer and/or consent solicitation in the future to obtain such waiver for the Amended Notes or seek consent for waiver for the Amended Facilities, it cannot assure investors that all holders of the Amended Notes or Amended Facilities will waive such future defaults in amounts of interest or, principal of, and premium or additional amounts, if any, due on the Amended Notes or Amended Facilities. Holders of the Amended Facilities or Holders of 25% or more of the aggregate principal amount of the outstanding Amended Notes may accelerate and declare immediately payable interest on, principal of, and premium or additional amounts, if any, due on the Amended Notes or Amended Facilities.

Upon acceleration, the Company may negotiate with creditors to enter into a composition plan and although the Company expects that any composition plan that it enters into will bar holders of the Amended Notes or Amended Facilities from bringing future bankruptcy, insolvency or similar proceedings in Indonesia, Indonesian principles of law relating to the rights of creditors have not been clearly or consistently applied by the Indonesian courts. In addition, the Group has not sought court protection from its creditors in Indonesia or where it has significant contractual obligations. As a result of the foregoing, there can be no assurance that holders of the Amended Notes or Amended Facilities will not in the future seek to file a petition for bankruptcy, insolvency or similar proceeding against the Group in Indonesia or other jurisdictions.

Under Indonesian bankruptcy law, a creditor that foresees its debtor would not be able to continue to pay its debts when they become due and payable, or a debtor which is unable, or predicts that it would be unable, to pay its debts when they become due and payable, may file for suspension of payment of debt or bankruptcy with the Commercial Court. In addition, a debtor who has two or more creditors and who is unable to pay any of its debt may be declared bankrupt by virtue of a Commercial Court decision. Under the Indonesian bankruptcy law, a suspension of debt payment proceeding takes priority over a bankruptcy proceeding and must be decided first. As such, a suspension of debt payment proceeding will effectively postpone the bankruptcy proceeding. As a result, creditors are unlikely to receive any payment during the course of the suspension of debt payment proceeding (with the exception of secured creditors subject to certain conditions) and the bankruptcy estate is likely to be insufficient to fully settle their claims.

In addition, during the suspension of debt payment proceeding (for a period of up to 270 days), the debtor may propose a composition plan to its creditors. Such composition, if approved at a creditors' meeting and ratified by the Commercial Court, will be binding on all unsecured creditors and on secured creditors that voted for the composition plan, and the suspension of debt payment proceeding ends. The debtor can then continue its business and service its debt in accordance with the composition plan proposed by the debtor and approved at the creditors' meeting and ratified by the court. The secured creditors that did not attend the creditors' meeting or vote on the plan or who reject the plan are not bound by the plan and are entitled to enforce their security interests.

As a composition plan, if approved, is approved by a majority of the creditors on a collective basis, it may not be in the best interest of any particular creditor. If the Guarantor becomes a debtor in a bankruptcy proceeding or a suspension of debt payment proceeding in Indonesia,

the Group may file for suspension of debt payment with a proposed composition plan which may not be satisfactory to investors. If such composition plan is approved, it will be binding on investors.

8.21    The Company may not have the ability to raise the funds necessary to finance an offer to repurchase the Amended Notes or prepay the Amended Facilities upon the occurrence of certain events constituting a Change of Control as required by the Amended Notes Indenture or "change of control" as required by the Amended Syndicated Facility Agreement.

Upon a Change of Control under the Amended Notes Indenture, the Company must make an offer to repurchase all outstanding Amended Notes. Pursuant to this offer, the Company must repurchase the outstanding Amended Notes at 101% of their principal amount plus accrued and unpaid interest, if any, up to the date of repurchase.

Upon a "change of control" under the Amended Syndicated Facility Agreement, if any lender under the Amended Syndicated Facility Agreement requires a mandatory prepayment, the Company must immediately pay such lender its share in the Amended Syndicated Facility together with all accrued interest and such amounts will become immediately due and payable.

However, the Company may not have enough available funds at the time of any Change of Control under the Amended Notes Indenture or "change of control" under the Amended Syndicated Facility Agreement to pay the purchase price of the tendered outstanding Amended Notes or prepay all amounts owing to the requesting lender under the Amended Syndicated Facility Agreement. The Company's failure to make the offer to repurchase or repurchase tendered Amended Notes or make prepayment under the Amended Syndicated Facility Agreement would constitute an event of default under the Amended Notes Indenture or Amended Syndicated Facility Agreement. This Event of Default may, in turn, constitute an event of default under other indebtedness, any of which could cause the related debt to be accelerated after any applicable notice or grace periods. If such other debt were accelerated, the Group may not have sufficient funds to repurchase the Amended Notes prepay under the Amended Syndicated Facility Agreement and repay the debt.

In addition, the definition of Change of Control for the purposes of the Amended Notes Indenture does not necessarily afford protection for the holders of the Amended Notes in the event of some highly-leveraged transactions, including certain acquisitions, mergers, refinancings, restructurings or other recapitalisations, although these types of transactions could increase the Group's indebtedness or otherwise affect its capital structure or credit ratings and the holders of the Amended Notes. The definition of Change of Control for purposes of the Amended Notes Indenture also includes a phrase relating to the sale of "**all or substantially all**" of the Company's properties or assets and its subsidiaries taken as a whole. Although there is a limited body of case law interpreting the phrase "substantially all", there is no precise established definition under applicable law. Accordingly, the Company's obligation to make an offer to repurchase the Amended Notes, and the ability of a holder of Amended Notes to require the Group to repurchase the Amended Notes pursuant to the offer, as a result of a highly leveraged transaction or a sale of less than all of the Group's assets, may be uncertain.

8.22    The ratings assigned to the Amended Notes may be lowered or withdrawn entirely in the future.

As at the date of this Explanatory Statement, the Amended Notes are rated "**Ca**" by Moody's and "**Restricted Default (RD)**" by Fitch. The ratings represent the opinions of the ratings agencies and their assessment of the ability of the Company to perform its respective obligations under the terms of the Amended Notes, Amended Facilities, Amended Facilities Guarantees and the Amended Notes Guarantees and credit risks in determining the likelihood that payments will be made when due under the Amended Notes or Amended Facilities. On 11 December 2020, Fitch Ratings lowered its long-term issuer default rating for the Company to "**CCC-**"

from "**B-**" and the Company's national long-term rating to "**CCC-(idn)**" from "**BBB-(idn)**", citing pressure on the Company's liquidity and the elevated refinancing risk for the Existing Notes and the Existing Facilities. At around the same time, Moody's had also downgraded the Company's corporate rating to "**Ca**" from "**Caa1**". On 12 March 2021, Fitch had also further lowered the Company's credit rating to "**Restricted Default (RD)**". A rating is not a recommendation to buy, sell or hold securities and may be subject to revision, suspension or withdrawal at any time. No assurances can be given that a rating will remain for any given period of time or that a rating will not be lowered or withdrawn entirely by the relevant rating agency if in its judgment circumstances in the future so warrant. The Group has no obligation to inform holders of the Amended Notes or Amended Facilities of any such revision, downgrade or withdrawal. In addition, the Group cannot assure investors that rating agencies other than S&P, Moody's and Fitch would not rate the Amended Notes or Amended Facilities differently. A suspension, reduction or withdrawal at any time of the rating assigned to the Amended Notes, the Amended Facilities or the assignment by a rating agency other than S&P, Moody's or Fitch of a rating of the Amended Notes or the Amended Facilities lower than those provided may adversely affect the market price of the Amended Notes or the Amended Facilities.

8.23    An active trading market for the Amended Notes may not develop and the trading price of the Amended Notes could be materially and adversely affected.

There is currently no active trading market for the Amended Notes. The Company cannot predict whether an active trading market for the Amended Notes will develop or be sustained. If an active trading market were to develop, the Amended Notes could trade at prices that may be lower than their initial offering price. The liquidity of any market for the Amended Notes depends on many factors, including:

(a)    the number of holders of Amended Notes;

(b)    the interest of securities dealers in making a market in the Amended Notes;

(c)    prevailing interest rates and the markets for similar securities;

(d)    general economic conditions; and

(e)    the Group's financial condition, historical financial performance and future prospects.

If an active market for the Amended Notes fails to develop or be sustained, the trading price of the Amended Notes could be materially and adversely affected. Application will be made to the SGX-ST for the listing and quotation of the Amended Notes on the SGX-ST. However, no assurance can be given that the Company will be able to obtain or maintain such listing or that, if listed, a trading market will develop. The Company does not intend to apply for listing of the Amended Notes on any securities exchange other than the SGX-ST. Lack of a liquid, active trading market for the Amended Notes may adversely affect the price of the Amended Notes or may otherwise impede a holder's ability to dispose of the Amended Notes.

8.24    The transfer of the Amended Notes is restricted which may adversely affect their liquidity and the price at which they may be sold.

The Amended Notes and the Amended Notes Guarantees have not been registered under, and the Company is not obligated to register the Amended Notes or the Amended Notes Guarantees under, the U.S. Securities Act or the securities laws of any other jurisdiction and, unless so registered, may not be offered or sold except pursuant to an exemption from, or a transaction not subject to, the registration requirements of the U.S. Securities Act and any other applicable laws. The Company has not agreed to or otherwise undertaken to register the Amended Notes and the Amended Notes Guarantees (including by way of an exchange offer), and the Company has no intention to do so.

8.25    Investment in the Amended Notes may subject Noteholders to foreign exchange risks

The Amended Notes are denominated and payable in U.S. Dollars. If investors measure their investment returns by reference to a currency other than U.S. Dollars, an investment in the Amended Notes entails foreign exchange-related risks, including possible significant changes in the value of the U.S. Dollars relative to the currency by reference to which investors measure their returns, due to, among other things, economic, political and other factors over which the Group has no control. Depreciation of the U.S. Dollar against the currency by reference to which investors measure their investment returns could cause a decrease in the effective yield of the Amended Notes below their stated coupon rates and could result in a loss to them when the return on the Amended Notes is translated into the currency by reference to which they measure their investment returns. In addition, there may be tax consequences for investors as a result of any foreign exchange gains resulting from any investment in the Amended Notes.

8.26    Global stock, currency and financial markets have recently experienced substantial volatility following the referendum in the United Kingdom on the United Kingdom's membership in the European Union.

Global stock, currency and financial markets have experienced substantial volatility following the referendum in the United Kingdom on 23 June 2016, in which a majority of voters voted that the United Kingdom should leave the European Union. There remains substantial uncertainty as to the effect of the United Kingdom's departure from the European Union on the global economy. There can be no assurance that such volatility will not continue or that it will not adversely affect the Group's business, its ability to raise capital in the future or the trading price of the Amended Notes.

8.27    Holders of the Amended Notes are exposed to risks relating to Singapore taxation. Under Section 12(6) of the Income Tax Act, Chapter 134 of Singapore (the "**ITA**"), the following payments are deemed to be derived from Singapore:

(a)    any interest, commission, fee or any other payment in connection with any loan or indebtedness or with any arrangement, management, guarantee, or service relating to any loan or indebtedness which is (i) borne, directly or indirectly, by a person resident in Singapore or a permanent establishment in Singapore (except in respect of any business carried on outside Singapore through a permanent establishment outside Singapore or any immovable property situated outside Singapore) or (ii) deductible against any income accruing in or derived from Singapore; or

(b)    any income derived from loans where the funds provided by such loans are brought into or used in Singapore.

Such payments, where made to a person not known to the paying party to be a resident in Singapore for tax purposes, are generally subject to withholding tax in Singapore. The rate at which tax is to be withheld for such payments (other than those subject to the 15.0 per cent. final withholding tax described below) to non-resident persons (other than non- resident individuals) is currently 17.0 per cent. The applicable rate for non-resident individuals is currently 22.0 per cent. However, if the payment is derived by a person not resident in Singapore otherwise than from any trade, business, profession or vocation carried on or exercised by such person in Singapore and is not effectively connected with any permanent establishment in Singapore of that person, the payment is subject to a final withholding tax of 15.0 per cent. The rate of 15.0 per cent. may be reduced by applicable tax treaties.

Certain Singapore-sourced investment income derived by individuals from financial instruments is exempt from tax, including interest, discount income (not including discount income arising from secondary trading), prepayment fee, redemption premium or break cost

from debt securities, except where such income is derived through a partnership in Singapore or is derived from the carrying on of a trade, business or profession.

On the basis that the Existing Notes are qualifying debt securities ("**QDS**") for the purposes of the ITA:

(i)     interest, discount income (not including discount income arising from secondary trading), prepayment fee, redemption premium and break cost (the "**Qualifying Income**") from the Existing Notes derived by a holder who is not resident in Singapore and who (aa) does not have any permanent establishment in Singapore or (bb) carries on any operation in Singapore through a permanent establishment in Singapore but the funds used by that person to acquire the Existing Notes are not obtained from such person's operation through a permanent establishment in Singapore, are exempt from Singapore tax;

(ii)    Qualifying Income from the Existing Notes derived by any company or body of persons (as defined in the ITA) in Singapore is subject to income tax at a concessionary rate of 10% (except for holders of the relevant Financial Sector Incentive(s) who may be taxed at different rates); and

(iii)   payments of Qualifying Income derived from the Existing Notes by the company are not subject to withholding of tax by the Company.

However, it is not clear whether the Amended Notes will be regarded as QDS by the Inland Revenue Authority of Singapore (the "**IRAS**") for the purposes of the ITA, and whether the Company and holders of the Amended Notes would be entitled to the above tax exemptions and concessions for QDS under the ITA.

In particular, if the Company and holders of the Amended Notes are not entitled to the above tax exemptions and concessions for QDS under the ITA, holders of the Amended Notes may be subject to tax in Singapore (without any tax concessions or exemptions) on income derived from the Amended Notes, and the Company may be required to withhold tax on payments of interest and other amounts made to non-residents of Singapore (other than Singapore branches of foreign companies).

No assurance, warranty or guarantee is given on the tax treatment to Noteholders in respect of the tax treatment of the Amended Notes. Noteholders should therefore consult their own accounting and tax advisors regarding the Singapore tax consequences of their receipt, holding and disposal of the Amended Notes, and their action to take in respect of the Scheme.

Where interest, discount income, prepayment fee, redemption premium or break cost (i.e. the Qualifying Income) is derived from the Existing Notes and Amended Notes by any person who is not resident in Singapore and who carries on any operations in Singapore through a permanent establishment in Singapore, the tax exemption available for QDS under the ITA (if available) shall not apply if such person acquires the Existing Notes and the Amended Notes using the funds and profits of such person's operations through a permanent establishment in Singapore.

Any person whose interest, discount income, prepayment fee, redemption premium or break cost (i.e. the Qualifying Income) derived from the Existing Notes and the Amended Notes is not exempt from tax (including for the reasons described above) is required to include such income in a return of income made under the ITA.

8.28    The Group must comply with the restrictions and covenants in the Amended Facility Agreements and the Amended Notes Indenture to avoid defaulting under the terms of these agreements.

If the Group is unable to comply with the restrictions and covenants in the Amended Facility Agreements and the Amended Notes Indenture, there may be a default under the terms of the Amended Facility Agreements and the Amended Notes Indenture. In the event of a default under the Amended Facility Agreements and the Amended Notes Indenture, the lenders may terminate their commitments to lend to the Group and the lenders or Holders of 25% or more of the aggregate principal amount of the outstanding Amended Notes may accelerate the indebtedness and declare all amounts borrowed due and payable or terminate the agreements (as the case may be). Furthermore, some of the Group's indebtedness agreements, including the Amended Facility Agreements and the Amended Notes Indenture contain cross-acceleration or cross-default provisions. As a result, the Group's default under one indebtedness agreement may cause the acceleration of other indebtedness, including the Amended Facility Agreements and the Amended Notes Indenture or result in a default under the Group's other indebtedness agreements, including the Amended Facility Agreements and the Amended Notes Indenture. If any of these events occur, the Group cannot assure investors that its assets and cash flow would be sufficient to repay in full all of its indebtedness, or that the Group would be able to find alternative financing. Even if the Group may obtain alternative financing, it cannot assure investors that such alternative financing would be on terms that are favourable or acceptable to the Group.

8.29    The Group will follow the applicable disclosure standards for debt securities listed on the SGX-ST, which standards may be different from those applicable to companies in certain other countries.

The Group is subject to reporting obligations in respect of the Amended Notes which are listed on the SGX-ST. The disclosure standards imposed by the SGX-ST may be different than those imposed by securities exchanges in other countries or regions such as Indonesia, the U.S. or the United Kingdom. As a result, the level of information that is available may not correspond to what investors in the Amended Notes are accustomed to.

8.30    Holders of the Amended Notes or Amended Facilities will not have voting rights at shareholders' meetings.

Holders of the Amended Notes or Amended Facilities do not have any right to vote at any of the Company's shareholders' meetings. Consequently, holders of the Amended Notes or Amended Facilities cannot influence any decisions by the Company's Board of Directors or any decisions by shareholders concerning its capital structure, including the declaration of dividends in respect of its ordinary shares.

8.31    Interest rate risks may affect the value of the Amended Notes.

The Amended Notes are fixed interest rate securities. Subsequent changes in market interest rates may adversely affect the value of the Amended Notes.

8.32    The Amended Notes are held in book-entry form.

The Amended Notes have been issued in global certificated form and held through the facilities of a common depositary for Euroclear and Clearstream. Interests in the global notes will trade in book-entry form only, and Amended Notes in certificated notes, will be issued in exchange for book-entry interests only in very limited circumstances. Owners of book-entry interests will not be considered owners or holders of Amended Notes. The nominee of the common depositary will be the sole registered holder of the global notes representing the Amended Notes. Payments of principal, interest and other amounts owing on or in respect of the global notes

representing the Amended Notes will be made to the paying agent, which will make payments to the common depositary. Thereafter, these payments will be credited to participants' accounts that hold book-entry interests in the global notes representing the Amended Notes (including Euroclear and Clearstream) and credited by such participants to indirect participants. After payment to the paying agent, the Group will have no responsibility or liability for the payment of interest, principal or other amounts to the owners of book-entry interests. Accordingly, if an investor owns a book-entry interest, such investor must rely on the procedures of the Clearing Systems, and if such investor is not a direct participant, on the procedures of the participant through which such investor owns its interest, to exercise any rights and obligations of a holder of Amended Notes under the Amended Notes Indenture.

Unlike the holders of the Amended Notes themselves, owners of book-entry interests will not have the direct right to act upon the Issuer's solicitations for consents, requests for waivers or other actions from holders of the Amended Notes. Instead, if an investor owns a book-entry interest, she will be permitted to act only to the extent available via the procedures of the participant through which she holds her book-entry interest. The procedures implemented for such actions may not be sufficient to enable investors to vote on a timely basis.

Similarly, upon the occurrence of an event of default under the Amended Notes Indenture, unless and until certificated notes are issued in respect of all book-entry interests, owners of book-entry interests will be restricted to acting through the participant through which an investor holds her book-entry interest. The procedures to be implemented through the depositary may not be adequate to ensure the timely exercise of rights under the Amended Notes.

8.33    The value of the Amended Notes Collateral or the Amended Facilities Security may not be sufficient to satisfy the Group's obligations under the Amended Notes or the Amended Facilities.

The obligations of the Company, Issuer and the Guarantors under the Amended Notes and the Amended Facilities will be secured by the Amended Notes Collateral and the Amended Facilities Security respectively. The amount of proceeds that would ultimately be realised from the Amended Notes Collateral or Amended Facilities Security upon any enforcement action may not be sufficient to satisfy the Group's obligations under the Amended Notes or the Amended Facilities. The value of the Amended Notes Collateral or the Amended Facilities Security and any amount to be recovered upon enforcement action against the Amended Notes Collateral or the Amended Facilities Security will depend upon many factors including, among others, the jurisdiction in which the enforcement action or sale is completed, the ability to sell the Amended Notes Collateral or the Amended Facilities Security in an orderly sale, the availability of buyers and the condition of the Amended Notes Collateral or the Amended Facilities Security. The sale of certain Amended Notes Collateral or the Amended Facilities Security may violate provisions of certain of the Group's operating agreements and may result in the termination of such agreements. The Group cannot assure investors that the proceeds of any sale of the Amended Notes Collateral or the Amended Facilities Security following an acceleration of the Amended Notes or the Amended Facilities or otherwise would be sufficient to satisfy, or would not be substantially less than, the Group's obligations under the Amended Notes or the Amended Facilities. Each of these factors could reduce the likelihood of an enforcement action as well as reduce the amount of any proceeds in the event of an enforcement action.

The ability of the Amended Notes Collateral Agent to foreclose on the Amended Notes Collateral or the relevant security agent or lender to foreclose on the Amended Facilities Security, upon the occurrence of an event of default or otherwise, will be subject in certain instances to perfection and priority issues. Although procedures will be undertaken to support the validity and enforceability of the security interests, the Group cannot assure investors that the holders of the Amended Notes or the Amended Facilities will be able to enforce any of the

security interests. The value of the Amended Notes Collateral or the Amended Facilities Security in the event of a liquidation will depend upon market and economic conditions, the availability of buyers and similar factors. By its nature, some or all of the Amended Notes Collateral or the Amended Facilities Security may be illiquid and may have no readily ascertainable market value. The Group cannot assure investors that the Amended Notes Collateral or the Amended Facilities Security will be saleable or, if saleable, that there will not be substantial delays in its liquidation.

8.34   The rights over the Amended Notes Collateral or the Amended Facilities Security will not be granted directly to holders of the Amended Notes or the Amended Facilities.

The rights over the Amended Notes Collateral securing the obligations of the Company and the Issuer under the Amended Notes and the Amended Notes Indenture and the rights over the Amended Facilities Security under the Amended Facilities have not been and will not be granted directly to holders of the Amended Notes or the Amended Facilities, but will be granted only in favour of the Amended Notes Collateral Agent, the Amended Syndicated Facility Security Agent or the Active Bilaterals Common Security Agent (UOB and Permata). As a consequence, holders of the Amended Notes or Amended Facilities will not have direct security and will not be entitled to take enforcement action in respect of the security for the Amended Notes and the Amended Facilities, except through the Amended Notes Collateral Agent, the Amended Syndicated Facility Security Agent or the Active Bilaterals Common Security Agent (UOB and Permata), which has agreed to apply any proceeds of enforcement on such security towards such obligations. Other than the Indonesian capital markets regulations, Indonesian law does not recognise the concept of trust including, without limitation, the relationship of trustee and beneficiary or other fiduciary relationships. Accordingly, enforcement of the provisions granting security in favour of third-party beneficiaries and otherwise relating to the nature of the relationship between a trustee (in its capacity as such) and the beneficiaries of a trust in Indonesia will be subject to an Indonesian court accepting the concept of trustee under New York law and Singapore law and accepting proof of the application of equitable principles under such security documents.

8.35   The pledge of certain Amended Notes Collateral or the Amended Facilities Security may in certain circumstances be voidable.

The pledge of the Amended Notes Collateral securing the Amended Notes or the Amended Facilities Security securing the Amended Facilities may be voidable under insolvency, bankruptcy, fraudulent transfer or similar laws of Singapore, Indonesia and other jurisdictions, if and to the extent applicable. In the case of the Amended Notes Collateral or the Amended Facilities Security being voidable under such laws in Singapore, the relevant time period during which such security is voidable could be within six months of the date of the pledge or, under some circumstances, it could be voidable within longer periods. If pledges of the Amended Notes Collateral or the Amended Facilities Security were to be voided for any reason, holders of the Amended Notes or Amended Facilities would have only an unsecured claim against the Group. In addition, if the pledge of certain Amended Notes Collateral or the Amended Facilities Security is voided or challenged under such laws, this could impair the enforceability of the Amended Notes Guarantees or Amended Facilities Guarantees.

**Risks Following the Implementation of the Scheme**

8.36   The Group's business, financial condition and results of operations may be materially and adversely affected by market fluctuations and economic slowdowns in Indonesia and the global economy, particularly as a result of the COVID-19 pandemic.

The Group's business is subject to global market fluctuations and general economic conditions in Indonesia and the global economy. Any prolonged downturn, recession or other condition

that adversely affects the Group's business and economic environment, including the ongoing COVID-19 pandemic, could materially and adversely impact its business, financial condition and results of operations.

The Indonesian economy has also been severely affected by the global COVID-19 pandemic. In December 2019, the emergence of COVID-19 was reported in Wuhan, Hubei Province, China, and the virus subsequently spread throughout the world, including Indonesia. On 30 January 2020, the World Health Organization declared COVID-19 a public health emergency of international concern and on 11 March 2020, the World Health Organization declared the outbreak a pandemic. The COVID-19 outbreak is currently having a severe adverse impact on the global economy, including that of Indonesia. Governments of many countries, including Indonesia, have reacted by instituting lockdowns, business shutdowns, quarantines and restrictions on travel. Businesses have also implemented countermeasures and safety measures to reduce the risk of transmission. These measures have caused unprecedented drops in GDP and economic productivity in many countries, including significant increases in levels of unemployment, and have caused significant drops and volatility in stock markets and substantial decreases in the earnings of many corporations. The economic impact of the COVID-19 crisis could continue for an extended period of time.

On 31 March 2020, by virtue of Presidential Decree No. 11 of 2020, the President of Indonesia declared COVID-19 a Public Health Emergency (Darurat Kesehatan Masyarakat) and on 13 April 2020 through Presidential Decree No. 12 of 2020, a National Disaster (Bencana Nasional). The Indonesian Government implemented various protective measures, including imposing temporary travel restrictions on inbound travellers, closing of certain schools and workplaces, restrictions on religious activities and activities in public places. A number of governments revised GDP growth forecasts downward for 2020, in response to the economic slowdown caused by the spread of COVID-19, and the outbreak of COVID-19 has caused a prolonged and deep global economic crisis or recession. Statistics Indonesia announced that Indonesia's GDP growth rate for the second quarter descended to -5.3% following the outbreak of the COVID-19 pandemic. The slowdown in economic growth was largely due to the negative impact on domestic demands as a result of the COVID-19 outbreak. There is still significant uncertainty relating to the severity of the near-and long-term adverse impact of the COVID-19 pandemic whether globally or in Indonesia, causing heightened economic uncertainty and volatile financial market performance. It is possible that the current COVID-19 pandemic will cause a prolonged global economic crisis or recession. The Indonesian Government cannot predict the duration, ultimate severity or effect of the pandemic or any current or future containment efforts.

The economic impact of COVID-19 on Indonesia has already been substantial and may increase. The rate of economic growth has slowed, unemployment has increased and is expected to increase, valuations and trading prices of financial and other assets have declined and the Rupiah has depreciated significantly against the U.S. Dollar. Initially, the COVID-19 pandemic affected sectors related to travel, such as tourism, hospitality, food and beverage and their subsectors. Subsequently, the pandemic affected a broader set of sectors such as the manufacturing industry. The number of reported cases of COVID-19 worldwide, as well as the number of reported deaths as a consequence of COVID-19 worldwide, significantly exceeds that observed during the Severe Acute Respiratory Syndrome ("**SARS**") epidemic that occurred from November 2002 to July 2003. The COVID-19 pandemic has already resulted in a high number of cases and deaths in Indonesia. This pandemic has become more severe and resulted in a more widespread health crisis than that observed during the SARS epidemic, which has in turn resulted in protracted volatility in international markets and/or resulted in a global recession as a consequence of disruptions to travel and retail segments, tourism, and manufacturing supply chains. In the medium to long term, if the spread of COVID-19 is prolonged, it could further adversely affect the economies and financial markets of Indonesia

and of many other countries, resulting in an economic downturn that could, among other effects, reduce international trade flows through Indonesia.

Given the nature of its activities, the business of the Group has been significantly impacted. In particular the following factors have materially and adversely affected the Group's cash flows:

(a)     disruption in the cash conversion cycle due to delays in shipment and extension of payments from customers;

(b)     disruptions to the sales process, as described above; and

(c)     incurring additional expenses to comply with the lockdowns, business shutdowns, quarantines and restrictions on travel imposed by the Indonesian Government such as temperature checks, mandatory use of face masks and provision of hand sanitizers within indoor premises, increasing the frequency of disinfection of facilities and providing employees with personal protective equipment.

If the pandemic continues to spread and more restrictive measures are implemented or reimposed by the Indonesian Government, the Group's business, financial condition, results of operations and prospects may be materially impacted. Further waves of outbreaks of COVID-19 or the future outbreak of another contagious or infectious disease or any other serious public health concern in Indonesia may adversely affect the Group's business, financial condition, results of operations and prospects, and its ability to make payments under the Amended Notes or Amended Facilities. The perception that an outbreak of a contagious disease may occur may also have an adverse effect on the economic conditions of countries in Asia, including Indonesia.

As of the date of this Explanatory Statement, there is significant uncertainty relating to the severity of the near-and long-term adverse impact of the COVID-19 pandemic on the global economy, global financial markets and economy, and the Group is unable to accurately predict the near-term or long-term impact of the COVID-19 pandemic on its business. To the extent that the COVID-19 pandemic adversely affects the Group's business and operations, it may also have the effect of heightening many of the other risks described in this Section 8 (Risks Associated with Participating in the Scheme).

## 9.     MATERIAL INTERESTS DISCLOSURE OF DIRECTORS IN THE SCHEME

9.1     The directors of the Company have no material interest (whether as directors or as members or as creditors of the Company or otherwise) under the Scheme, other than as a director of the Company receiving remuneration for such role and each director having an interest in the Company avoiding liquidation

9.2     The Company is not aware of any relevant interests of the Existing Notes Trustee.

## 10.    TAXATION

10.1    The Company has not analysed, and this Explanatory Statement does not discuss, the tax consequences to any Scheme Creditor of the Restructuring. Such tax consequences may be complex and each Scheme Creditor is urged to consult its own tax advisor with respect to the tax consequences of the Restructuring in light of such person's particular circumstances. The Scheme Creditors are liable for any taxes that may arise as a result of the Scheme and the Restructuring, and shall have no recourse to the Company, the Subsidiary Guarantors, any other member of the Group, the Administrative Parties, the Information Agent or any other person in respect of such taxes or any filing obligation with respect thereto.

10.2    Certain Singapore tax risks to holders of the Amended Notes are set out in Section 8.27 above. Where interest, discount income, prepayment fee, redemption premium or break cost (i.e. the Qualifying Income) is derived from the Existing Notes and the Amended Notes by any person

who is not resident in Singapore and who carries on any operations in Singapore through a permanent establishment in Singapore, the tax exemption available for qualifying debt securities under the ITA (if available) shall not apply if such person acquires the Existing Notes and the Amended Notes using the funds and profits of such person's operations through a permanent establishment in Singapore. Any person whose interest, discount income, prepayment fee, redemption premium or break cost (i.e. the Qualifying Income) derived from the Existing Notes and the Amended Notes is not exempt from tax (including for the reasons described above) is required to include such income in a return of income made under the ITA.

## 11.    QUESTIONS AND ANSWERS

To assist Scheme Creditors in making a decision to vote either in favour of or against the Scheme, the following Questions and Answers have been prepared.

Reading these Questions and Answers is not a substitute for reading this Explanatory Statement in full. Capitalised words and phrases used in these Questions and Answers have the meaning provided in Section 1 (Definitions and Interpretation).

11.1    What is the purpose of this Explanatory Statement?

The purpose of this Explanatory Statement is to:

(a)    provide Scheme Creditors with sufficient information to make an informed decision to vote for or against the Scheme;

(b)    inform Scheme Creditors of the voting procedures; and

(c)    inform Scheme Creditors of the expected timelines.

11.2    What is a scheme of arrangement?

A scheme of arrangement is a statutory procedure under Singapore law which allows a debtor to agree on a compromise or arrangement with its creditors, and for the terms of that compromise or arrangement to bind any non-consenting or opposing minority creditors.

Pursuant to Section 71(1) of the Insolvency, Restructuring and Dissolution Act, where a scheme of arrangement is proposed between the Company and the Scheme Creditors, the Court may, on an application made by the Company, make an order approving the scheme of arrangement, even though no meeting of the Scheme Creditors has been ordered under Section 210(1) of the Companies Act.

The following conditions under Section 71(3) of the Insolvency, Restructuring and Dissolution Act must be satisfied before the Court approves the scheme of arrangement under Section 71(1):

(a)    the Company must provide each Scheme Creditor meant to be bound by the scheme of arrangement with a statement that complies with Section 71(6) of the Insolvency, Restructuring and Dissolution Act, and contains the following information:

(i)    information concerning the Company's property, assets, business activities, financial conditions and prospects;

(ii)    information on the manner in which the terms of the compromise or arrangement will, if it takes effect, affect the rights of the Scheme Creditors; and

(iii)    such other information as is necessary to enable the Scheme Creditor to make an informed decision whether to agree to the compromise or arrangement;

(b)     the Company must publish a notice of the application for the scheme of arrangement in the Gazette and in at least one English local daily newspaper, and send a copy of the notice published in the Gazette to the Registrar of Companies;

(c)     the Company must send a notice and a copy of the application for the scheme of arrangement to each Scheme Creditor meant to be bound by the scheme of arrangement; and

(d)     the Court must be satisfied that had a meeting of the Scheme Creditors been summoned, a majority in number, representing at least three-fourths in value of the Scheme Creditors present and voting at the meeting, would agree to the scheme of arrangement.

To satisfy the condition in sub-paragraph (d) above, the Company has engaged in extensive discussions and negotiations with a wide range of Holders over the terms of the restructuring of the Existing Notes and the Existing Facilities and the Scheme and the Company is requesting that Holders vote on the terms of the Scheme by submitting prior to or on the Record Time, (a) a Blocking and Voting Instruction, in each case, through the applicable Clearing System (in respect of the Existing Notes) or (b) a Voting Instruction Form by way of email to the Information Agent (in respect of the Existing Facilities), in favour of the Scheme.

See Section 7 (Scheme Voting Instructions and Information Meetings) for more detail on the voting process.

The Chairman shall then tabulate the votes on the Scheme as at the Record Time and shall determine whether the Requisite Majority in respect of each class of Scheme Creditors has been met. For more details on how votes will be tabulated, please see paragraph 11.16 (How is the Requisite Majority for the Scheme calculated?).

If the Requisite Majority in respect of each class of Scheme Creditors vote in favour of the Scheme, the Chairman shall declare the Scheme successful and the Company shall submit the Scheme for sanction by the Court.

In the event that all of the Scheme Conditions are satisfied, the Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor voted against the Scheme or did not vote) and all of their respective successors, assigns and transferers.

11.3    When is a scheme of arrangement used?

A scheme of arrangement is used as a means of implementing a financial restructuring and as an alternative to commencing insolvency proceedings.

For further details as to why a scheme of arrangement is required for the restructuring of the Existing Notes and the Existing Facilities, please see "**The Need for a Court Process**" under Section 4 (Background to the Scheme).

11.4    What is the objective of implementing the Scheme?

The objective of the Scheme is to implement a compromise between the Company and the Scheme Creditors, principally the Holders, in order to:

(a)     give Holders a better recovery compared to their recovery in the event of a liquidation or an enforcement of (a) the Existing Notes Guarantees and/or the Existing Notes Collateral or (b) the Existing Syndicated Facility Guarantees and/or the Existing Syndicated Facility Security; and

(b)     enable the Company to continue carrying on its business as a going concern.

For further details, please see "**The Need for the Proposed Scheme**" under Section 4 (Background to the Scheme) and "**Management's Position Regarding the Scheme**" under Section 5 (Overview of the Scheme).

11.5    What is the role of the Company under the Scheme?

If the Scheme becomes effective and binding:

(a)    the Company intends to procure the satisfaction of the Restructuring Conditions, and implement the Restructuring Effective Date, as soon as possible thereafter (and in any event on or before the Long Stop Date); and

(b)    the Company intends to fulfil its obligations under the Scheme – in particular, it will (i) ensure that the Existing Notes Transaction Documents and the Existing Facilities Transaction Documents are amended, restated, supplemented or otherwise modified in accordance with the terms of the Scheme on the Restructuring Effective Date, (ii) ensure that the Restructuring Documents are entered into on the Restructuring Effective Date and (iii) pay (or procure the payment of) the Scheme Costs (in each case, as summarised in the Restructuring Term Sheet (Existing Notes), the Restructuring Term Sheet (Syndicated Facility), the Restructuring Term Sheet (Non-Active Bilaterals), the Restructuring Term Sheet (Permata), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (UOB) and the Restructuring Term Sheet (HSBC).

11.6    What is the position of the management with regard to the Scheme?

The management of the Company, having considered the terms of the Scheme, and the opinions and advice from the appropriate Advisors, considers that the Scheme is in the best interests of the Company and its stakeholders, and will provide a better recovery for the Holders as compared to a liquidation scenario.

In particular, the management of the Company believes that a successful implementation of the Scheme is the most feasible way for the Company to restructure the Existing Notes and the Existing Facilities in a way which will reduce the short-term debt burden of the Group, leaving it with a sustainable capital structure that will allow the Company and the Group to comply with their post-restructuring obligations and liabilities under the Existing Notes and the Existing Facilities and to trade on a going concern basis.

For further details, please see "**Management's Position Regarding the Scheme**" under Section 5 (Overview of the Scheme).

11.7    What arrangement and compromise does the Scheme seek to implement?

The Scheme seeks to compromise claims arising from the Existing Notes and Existing Facilities, by amending and restating them in the form of the Amended Notes and Amended Facility Agreements in accordance with the terms of the Scheme.

11.8    What are the financial consequences of the Scheme?

If the Scheme becomes effective and binding on the Scheme Effective Date and the Restructuring is implemented on the Restructuring Effective Date:

(a)    the Scheme Claims shall be compromised in full and thereby cease to be enforceable against the Company, the Guarantors or any other relevant entity; and

(b)    the Company shall amend and restate the Existing Notes and the Existing Facilities in the form of the Amended Notes and Amended Facility Agreements in accordance with the terms of the Scheme.

11.9    What happens if Scheme Creditors do not approve the Scheme or if the Scheme is not approved at the Sanction Hearing or does not become effective and binding for any other reason?

If the Scheme is not approved by the Requisite Majority of the Scheme Creditors or is not approved by the Court at the Sanction Hearing, the Scheme will not become effective or binding, and the Scheme Creditors will retain all rights they have had in respect of their claims as if the Scheme had never been launched.

The Company considers that, if the Scheme were not to be successfully implemented, the possibility of successfully implementing an alternative financial restructuring would be very unlikely.

If the Scheme fails and the moratoria end without any restructuring of the Existing Notes and the Existing Facilities, the Holders may be able to commence proceedings against the Company and the Guarantors and cross-defaults may be triggered across the Group's other financing arrangements which may provoke other creditors of the Group (who are not currently seeking any enforcement action against the Group) to enforce a variety of cross-default rights against the Group in Indonesia, Singapore and elsewhere.

For further details, please see "**What happens if the Scheme fails?**" under Section 5 (Overview of the Scheme).

11.10   How does a Scheme Creditor cast a vote?

Only Scheme Creditors which are Holders at the Record Time are entitled to vote on the Scheme. Any Scheme Creditor who wishes to cast a vote must ensure that its Scheme Claims are Accepted for voting purposes by complying with the requirements and timelines set out in clause 6 (Voting Procedures) of the Scheme. These requirements and timelines are also summarised in this Explanatory Statement.

The procedure for casting votes depends on the Clearing System through which the Noteholder's interest in the Existing Notes is held and the procedure for casting votes for the Existing Facilities is via the submission of a Voting Instruction Form to the Information Agent.

11.11   What happens if a Holder fails to comply with the voting procedures for the Scheme?

If a Holder fails to comply with the voting procedures for the Scheme, including by:

(a)     in respect of the Existing Notes:

    (i)      failing to submit a Blocking and Voting Instruction to the Clearing Systems by the Record Time (regardless of whether such Noteholder goes on to submit such a Blocking and Voting Instruction prior to the Voting Results Announcement); or

    (ii)     unblocking its position in the Existing Notes prior to the Voting Results Announcement,

    the Company or the Chairman reserves the right not to Accept the Scheme Claim of the Noteholder and, consequently, such Noteholder's vote will not be considered; or

(b)     in respect of the Existing Facilities:

    (i)      failing to submit its Proof of Debt by the relevant time set out in this Explanatory Statement and the Scheme; or

    (ii)     failing to submit a Voting Instruction Form by way of email to the Information Agent by the Record Time,

the Company or the Chairman reserves the right not to accept the Scheme Claim of the relevant Holder, and consequently, such a Holder's vote will not be considered.

Please note that the Company and the Chairman respectively have the discretion, acting reasonably, to extend in good faith the timelines provided to improve Scheme participation.

11.12    What is the Blocking Reference Number and what should a Noteholder do with it?

A Noteholder that wishes to vote on the Scheme must ensure that its Account Holder submits, prior to the Record Time, the Blocking and Voting Instruction to the relevant Clearing System in accordance with the standard practices and procedures required by the relevant Clearing System.

The relevant Clearing System will automatically assign a Blocking Reference Number in respect of the Blocking and Voting Instruction. A Noteholder should retain this Blocking Reference Number. The Company, Chairman and/or Information Agent may request that a Noteholder quote such Blocking Reference Number to confirm that such Scheme Creditor holds the direct or beneficial interest as principal in the aggregate principal amount of the Existing Notes that such Noteholder is purporting to vote under the Scheme.

11.13    What can a Scheme Creditor do if it wishes to oppose or object to the Company's or the Chairman's adjudication on whether to Accept its Scheme Claim?

If any Scheme Creditor who has filed a Proof of Debt objects to the results of the adjudication referred to in clause 5.4 (Scheme Participation and Information) of the Scheme, such a Scheme Creditor shall, no later than 26 November 2021, send a written request, seeking agreement for the appointment of an independent assessor (the "**Independent Assessor**") to the Company and the Chairman.

The written request referred to above shall nominate a person to be appointed as the Independent Assessor and state the dispute the Independent Assessor (if appointed) is to adjudicate.

The Chairperson will, as soon as practicable after the appointment of an Independent Assessor, provide the relevant Proof of Debt to the Independent Assessor, following which the Independent Assessor must, not later than 3 December 2021 after being provided with the relevant Proof of Debt, make a decision on the objection and send a written notice of the decision, with reasons for the decision, to the Chairman, the Company and the Scheme Creditor whose Scheme Claim will be affected by the decision of the Independent Assessor.

11.14    What is the location, date and time of the Information Meetings?

The Information Meetings will take place virtually via videoconference due to COVID-19 related health and safety procedures. The Information Meetings are currently scheduled to take place (a) at 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 (Singapore time) via videoconference (for the Noteholders) and (b) at 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) via videoconference (for the Holders of the Existing Facilities). Scheme Creditors who wish to attend the Information Meetings may register to receive access details by contacting the Information Agent (contact details below in Section 11.26) at any time following the date of this Explanatory Statement and (unless the Scheme Creditor is a Noteholder) providing their Proof of Debt and relevant documentary evidence dated no more than one month from the date of submission of the same.

11.15   How will the Scheme Creditors be classed for the purposes of determining the Requisite Majority?

Having considered the existing rights of the Scheme Creditors, and the way in which those rights will be compromised under the Scheme, the Company considers that the Scheme Creditors should be classed into four classes for the purposes of voting on the Scheme. Please see paragraph 7.9 (Voting Classes) for more details.

11.16   How is the Requisite Majority for the Scheme calculated?

The number of Scheme Creditors in each class who have cast valid votes (via electronic Blocking and Voting Instructions in respect of the Existing Notes or Voting Instruction Forms in respect of the Existing Facilities) in respect of the Scheme will be counted for the majority in number requirement. The Accepted quantum of Scheme Claims represented by such Scheme Creditors will be counted for the three-fourths in value requirement in respect of each class.

The Company is requesting that Holders vote on the terms of the Scheme by submitting, prior to or on the Record Time, (a) (in the case of a Noteholder) a Blocking and Voting Instruction through the applicable Clearing System (in respect of the Existing Notes) or (b) (for all other Holders) a Voting Instruction Form by way of email to the Information Agent (in respect of the Existing Facilities) in favour of the Scheme.

See Section 7 (Scheme Voting Instructions and Information Meetings) for more detail on the voting process.

The Information Agent shall tabulate as at the Record Time:

(a)     the total number of Scheme Creditors with Accepted Scheme Claims who cast a valid vote either way in the Scheme;

(b)     the total number of Scheme Creditors with Accepted Scheme Claims who cast a valid vote in favour of the Scheme;

(c)     the total number of Scheme Creditors with Accepted Scheme Claims who cast a valid vote against the Scheme; and

(d)     the total number of votes by value attributable to each group of Scheme Creditors set out in sub-paragraphs (a), (b) and (c) above, on the basis of one vote for every US$1 of Accepted Scheme Claim (rounded down to the nearest US$1) and subject to the detailed provisions of Section 7 (Scheme Voting Instructions and Information Meetings) of this Explanatory Statement and clause 6 (Voting Procedures) of the Scheme),

and shall determine whether the Requisite Majority in respect of each class of Scheme Creditors has been met. If the Requisite Majority in respect of each class of Scheme Creditors vote in favour of the Scheme, the Chairman shall declare the Scheme successful and the Company shall submit the Scheme for sanction by the Court.

11.17   When will the Scheme become effective and binding?

Upon satisfaction of all of the Scheme Conditions, the Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme) and all of their respective successors, assigns and transferers.

11.18   What happens on the Scheme Effective Date?

The Scheme Effective Date is the date on which the terms of the Scheme become effective and binding on the parties to the Scheme, being the Company and the Scheme Creditors (regardless

of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme), and all of their respective successors, assigns and transferers. The Scheme shall only become effective and binding following the satisfaction of all of the Scheme Conditions set out in paragraph 5.14 (Overview of the Scheme).

11.19    What happens if the Restructuring Conditions are not satisfied and the Restructuring Effective Date does not occur by the Long Stop Date?

The Company will have until the Long Stop Date to satisfy the Restructuring Conditions and implement the Restructuring Effective Date. If the Restructuring Effective Date does not occur by the Long Stop Date, the Scheme shall automatically terminate which means that the terms of, and the obligations of the parties under or pursuant to, the Scheme shall lapse and all the compromises and arrangements provided by the Scheme and any releases granted pursuant to the Scheme shall be of no effect and shall be construed as if it had never become effective or binding, and the rights and obligations of the Scheme Creditors shall not be affected by the Scheme and shall be reinstated and remain in full force and effect.

If the Scheme terminates, significant doubt will be cast on the ability of the Company to continue carrying on its business as a going concern.

11.20    Who is authorised to execute documents and other steps to implement the Scheme?

Pursuant and subject to the terms of the Scheme, on and from the Scheme Effective Date, each Scheme Creditor appoints and authorises, among other parties, the Company, the Chairman, AJCapital, Baker & McKenzie, the Information Agent, the Administrative Parties and their respective directors and officers, to for and behalf of such Scheme Creditor:

(a)    enter into, execute and deliver (whether as a deed or otherwise) any document; and/or

(b)    take any other action, step or procedure,

to the extent necessary or reasonably appropriate to give effect to or implement the Scheme (or any part thereof) including, but not limited to, any document required to amend, restate, supplement or otherwise modify the Existing Notes, the Existing Notes Transaction Documents, the Existing Facility Agreements and/or the Existing Facilities Transaction Documents in accordance with the terms of the Scheme.

11.21    When is the Restructuring considered completed?

The Scheme Effective Date is the date on which the terms of the Scheme become effective and binding on the parties to the Scheme, being the Company and the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme), and all of their respective successors, assigns and transferers.

The implementation of the Scheme and the completion of the Restructuring shall be deemed to be completed on the Restructuring Effective Date.

11.22    What are the Scheme Creditor releases under the Scheme?

On and from the Restructuring Effective Date, the Scheme Creditors shall, among other things, fully release (a) all Scheme Claims in consideration for its rights and entitlements under the Scheme, (b) the Released Parties and the Administrative Parties from the Released Claims and (c) the Committee Parties from any Claims arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of the Scheme or any Restructuring Documents.

Under the Scheme, the Scheme Creditors also authorise the Company to enter into, execute and deliver for and on behalf of each relevant Scheme Creditor the Deeds of Release to take effect on the Restructuring Effective Date.

Furthermore, each Deed of Release also includes a confirmation that (without in any way limiting the terms of Clause 9.1 and 9.2 of the Scheme which, amongst other things, authorise any Authorised Person to execute and deliver for and on behalf of a Scheme Creditor each document that is necessary or appropriate to give effect to or implement the Scheme) each Administrative Party is authorised to enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of a Scheme Creditor each document that is necessary or appropriate to give effect to or implement the Scheme, which includes the Restructuring Documents and any other document referred to, contemplated by or ancillary to any of the foregoing and to date, complete and release the Restructuring Documents to which that Scheme Creditor is a party and to accept delivery or service on their behalf of any Restructuring Documents (and any other documents, notices or evidence expressly referred to in the Scheme or in connection with the Restructuring Documents) required to be delivered to it, without being required to obtain any further authorisations.

11.23    What are the Scheme Creditor ratifications and undertakings under the Scheme?

On and from the Restructuring Effective Date, each Scheme Creditor:

(a)    ratifies and confirms everything which any Released Party or Administrative Party may lawfully do or cause to be done in accordance with any authority conferred by the Scheme and agrees not to challenge: (i) the validity of any act done or omitted to be done; or (ii) the exercise or omission to exercise any power conferred in accordance with the provisions of the Scheme in good faith by any Released Party;

(b)    undertakes to the Released Parties and Administrative Parties that it will not (and shall use all reasonable endeavours to procure that its Releasing Parties will not) commence or continue, or instruct, direct or authorise any other Person to commence or continue, any Proceedings in respect of or arising from any Released Claim; and

(c)    undertakes to execute any documents or instructions, and take any action, as may reasonably be required to implement the Scheme.

11.24    What happens to the Existing Notes after the Restructuring Effective Date?

The Existing Notes and the Existing Notes Transaction Documents will be amended, restated, supplemented or otherwise modified in accordance with the terms of the Scheme (as summarised in the Restructuring Term Sheet) to reflect and constitute the Amended Notes.

11.25    What happens to the Existing Facility Agreements after the Restructuring Effective Date?

The Existing Facility Agreements and the Existing Facilities Transaction Documents will be amended, restated, supplemented or otherwise modified in accordance with the terms of the Scheme (as summarised in the Restructuring Term Sheet (Syndicated Facility), the Restructuring Term Sheet (Non-Active Bilaterals), the Restructuring Term Sheet (UOB), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (HSBC) and the Restructuring Term Sheet (Permata)) to reflect and constitute the Amended Facilities.

11.26    Where can Scheme Creditors obtain additional copies of this Explanatory Statement and any other supplemental information?

Further copies of this Explanatory Statement and other supplemental information can be obtained via e-mail request to the Information Agent. The relevant contact details are set out below in Section 11.27.

11.27    Who can Scheme Creditors contact for further queries?

If any Scheme Creditor has questions relating to this Explanatory Statement and the Scheme, please contact the Information Agent in the first instance. Alternatively, Scheme Creditors may also contact the Chairman or the Company's legal counsel. The relevant contact details are set out below.

**Information Agent:**
**Morrow Sodali Limited**

| **In Hong Kong** | **In London** | **In New York** |
|---|---|---|
| Unit 23-016, LKF Tower | 103 Wigmore Street | 509 Madison Avenue, Suite 1206, |
| 33 Wyndham Street, Central | W1U 1QS | New York, NY 10022 |
| Telephone: +852 2319 4130 | Telephone: +44 20 4513 6933 | Telephone: +1 203 609 4910 |

**Email:** panbrothers@investor.morrowsodali.com
**Scheme Website:** https://bonds.morrowsodali.com/PanBrothers

**Chairman:**
Geoffrey D Simms
E-mail: panbrothers@ajcapital.co.id

**Company's Solicitors:**
Baker & McKenzie
E-mail: SIN-PanBrothers@bakermckenzie.com

## 12.    IMPORTANT NOTICE TO SCHEME CREDITORS

Unless otherwise indicated, all capitalised terms used in this Explanatory Statement shall have the meanings assigned to those terms in Section 1 (Definitions and Interpretation).

12.1    Information

(a)    This Explanatory Statement has been prepared pursuant to section 71 of the Insolvency, Restructuring and Dissolution Act and in relation to the Scheme between the Company and the Scheme Creditors, and has been prepared solely for the purpose of providing information to the Scheme Creditors in relation to the Scheme.

(b)    Nothing in this Explanatory Statement or any other document issued with or appended to it should be relied on for any purpose other than for the Scheme Creditors in their capacity as creditor of the Company to make a decision whether or not to approve the Scheme. In particular and without limitation, nothing in this Explanatory Statement should be relied on in connection with the purchase or acquisition of any Scheme Claim or any other financial instruments, securities, assets or liabilities of the Company, any of the Guarantors or any other member of the Group.

(c)    Nothing contained in this Explanatory Statement constitutes a recommendation, or the giving of advice, by the Company, the Guarantors or any other member of the Group to take a particular course of action or to exercise any right conferred by the Existing Notes or the Existing Facilities, including in relation to, buying, selling, subscribing for, exchanging, redeeming, holding, underwriting, disposing of, or converting Existing Note, the Existing

Facilities or any other financial instruments, securities, assets or liabilities of the Company, any of the Guarantors or any other member of the Group.

12.2    Scheme Creditors

This Explanatory Statement is to be distributed to persons who it is believed are or may be Scheme Creditors at the Record Time.

12.3    Notice to Scheme Creditors

(a)    Nothing contained in this Explanatory Statement shall constitute a warranty, undertaking, or guarantee of any kind, express or implied, nor any admission of any fact or liability on the part of the Company or any of the Guarantors with respect to any asset to which it may be entitled or any claim against it. Without prejudice to the generality of the foregoing, nothing in this Explanatory Statement or the distribution thereof evidences to any person, or constitutes any admission by the Company or any of the Guarantors, that a liability is owed to any person in respect of any claim (including without limitation any Scheme Claim) or that any person is or may be a Scheme Creditor. The failure to distribute this Explanatory Statement to any Scheme Creditor shall not constitute an admission by the Company or any of the Guarantors that such person is not a Scheme Creditor.

(b)    No person has been authorised by the Company to give any information or make any representations concerning the Scheme which is inconsistent with this Explanatory Statement and, if made, such representations shall not be relied upon as having been so authorised.

(c)    The information contained in this Explanatory Statement has been prepared based upon information available to the Company prior to and on the date of this Explanatory Statement. The delivery of this Explanatory Statement does not imply that the information herein is correct as at any time subsequent to the date hereof. To the best of the Company's knowledge, information and belief, the information contained in this Explanatory Statement is in accordance with the facts and does not omit anything likely to affect the import of such information, each in a material respect. The Company has taken all reasonable steps to ensure that this Explanatory Statement contains the information reasonably necessary and material to enable Scheme Creditors to make an informed decision on how the Scheme and/or Restructuring affects them.

(d)    None of the Advisors, the Existing Notes Administrative Parties, the Existing Syndicated Facility Administrative Parties or any of their respective directors, officers, employees, agents, affiliates or advisors have verified the information contained in this Explanatory Statement and each of those persons expressly disclaims responsibility and liability for such information.

(e)    This Explanatory Statement has not been reviewed, verified or approved by any rating agency or any regulatory authority. Without prejudice to any representations and warranties to be given by the Company in the Restructuring Documents, to the fullest extent permitted by law, neither the Company, the Guarantors or any other member of the Group will have any tortious, contractual or any other liability to any person in connection with the use of this Explanatory Statement and the Company, the Guarantors and any other member of the Group will not accept any liability whatsoever to any person, regardless of the form of action, for any lost profits or lost opportunity, or for any indirect, special, consequential, incidental or punitive damages arising from any use of this Explanatory Statement, its contents or preparation or otherwise in connection with it, even if the Company, any of the Guarantors, or any other member of the Group has been advised of the possibility of such damages.

(f)    The Information Agent is an agent of the Company and owes no duty to any Scheme Creditor, express or implied.

(g)    Neither the Existing Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisors is acting for, or owes any duty to, any Scheme Creditors, nor will any of

39

them be responsible for providing any advice to any Scheme Creditors in relation to the terms of the Amended Notes. Accordingly, neither the Existing Notes Trustee nor any of its directors, officers, employees, agents, affiliates or advisors make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Existing Notes Trustee expresses no opinion on the merits of the Scheme and the terms of the Amended Notes. The Existing Notes Trustee has not been involved in negotiating or determining the terms of the Amended Notes and makes no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme.

(h)     Neither the Existing Syndicated Facility Administrative Parties nor any of their respective directors, officers, employees, agents, affiliates or advisors) is acting for, or owes any duty to, any Scheme Creditors, nor will any of them be responsible for providing any advice to any Scheme Creditors in relation to the terms of the Amended Facilities. Accordingly, neither the Existing Syndicated Facility Administrative Parties nor any of their respective directors, officers, employees, agents, affiliates or advisors make any recommendations as to whether any Scheme Creditor should take any of the actions contemplated in the Scheme. The Existing Syndicated Facility Administrative Parties express no opinion on the merits of the Scheme and the terms of the Amended Facilities. The Existing Syndicated Facility Administrative Parties have not been involved in negotiating or determining the terms of the Amended Facilities and make no representation that all relevant information has been disclosed to the Scheme Creditors in or pursuant to the Scheme.

(i)     The Existing Notes Trustee shall not be responsible for calculating, verifying or paying any amounts payable in relation to the Scheme or any late interest payable. The Existing Notes Trustee shall not be required to take any steps to ascertain whether a Noteholder is eligible to vote under the Scheme.

(j)     The Existing Notes Trustee shall not be responsible for monitoring the Scheme and shall not be required to take any steps to monitor or ascertain whether any event that triggers the termination of the Scheme has occurred and will not be responsible to the Scheme Creditors or any other person for any loss arising from any failure to do so.

(k)     The Existing Syndicated Facility Administrative Parties shall not be responsible for calculating, verifying or paying any amounts payable in relation to the Scheme or any late interest payable. The Existing Syndicated Facility Administrative Parties shall not be required to take any steps to ascertain whether a Holder is eligible to vote under the Scheme.

(l)     The Existing Syndicated Facility Administrative Parties shall not be responsible for monitoring the Scheme and shall not be required to take any steps to monitor or ascertain whether any event that triggers the termination of the Scheme has occurred and will not be responsible to the Scheme Creditors or any other person for any loss arising from any failure to do so.

12.4    Summary Only

(a)     The summary of the principal provisions of the Scheme contained in this Explanatory Statement is qualified in its entirety by reference to the Scheme itself. The full text of the Scheme is set out in Appendix 1 (The Scheme). Each Scheme Creditor is advised to read and consider carefully the text of the Scheme. This Explanatory Statement has been prepared solely to assist Scheme Creditors in respect of voting on the Scheme.

(b)     In the event of a conflict between the information and terms described in:

(i)      this Explanatory Statement; and

(ii)     the Scheme,

the terms of the Scheme as set out in Appendix 1 (The Scheme) shall prevail.

(c)     Subject to the terms of the Scheme, the Company shall be at liberty to modify the Scheme, or to propose a different scheme or schemes of arrangement, at any time prior to the sanction of the Scheme. However, this may require the Company to seek further directions from the Court and/or obtain further approval from the Scheme Creditors. The Company shall enjoy such liberty notwithstanding any actions in reliance on the Scheme or this Explanatory Statement by a Scheme Creditor or any other person. The Court may also impose modifications, additions or conditions to the Scheme.

12.5    Forward-Looking Statements

(a)     Nothing in this Explanatory Statement shall be deemed to be a forecast, projection or estimate of the future financial performance of the Company, the Issuer, any Guarantor and/or any member of the Group except where otherwise specifically stated.

(b)     This Explanatory Statement contains statements, estimates, opinions, and projections with respect to the Company, the Issuer, the Guarantors and the Group and certain plans and objectives of the Company, the Issuer, the Guarantors and the Group. These forward-looking statements can be identified by the fact that they do not relate only to historical or current facts. Forward-looking statements often use words such as "**anticipate**", "**target**", "**expect**", "**estimate**", "**intend**", "**plan**", "**goal**", "**believe**", "**will**", "**may**", "**should**", "**would**", "**could**" or other words of similar import. These statements are based on numerous assumptions and assessments made by the Company as appropriate in light of its experience and perception of historical trends, current conditions, expected future developments, and other factors that it believes appropriate. No assurance can be given that such expectations will prove to be correct. Forward-looking statements involve significant risks and uncertainties, should not be read as guarantees of future performance or results, and will not necessarily be accurate indications of whether or not such results will be achieved. Such forward-looking statements only speak as at the date of this Explanatory Statement. A number of factors could cause actual results to differ materially from the results discussed in the forward-looking statements, including, but not limited to, the factors and uncertainties set out in Section 8 (Risks Associated with Participating in the Scheme). Each Scheme Creditor is urged to make its own assessment of the validity of such forward-looking statements and their underlying assumptions and no liability is accepted by the Company in respect of the achievement or failure of such forward-looking statements and assumptions. Without limiting the above, none of the Company, the Issuer, any of the Guarantors, any other member of the Group, any director of the Company, the Issuer, any of the Guarantors or any other member of the Group assumes any obligation to update or correct any forward-looking statements contained in this Explanatory Statement to reflect any change of expectations with respect thereto or any change in event, situation, or circumstances on which any such forward-looking statement was based.

12.6    Risk Factors

(a)     Scheme Creditors' attention is drawn to certain risks and uncertainties associated with the Scheme and the Restructuring that are set out in Section 8 (Risks Associated with Participating in the Scheme).

(b)     These important risk factors could cause the Group's actual results and future prospects to differ materially from those expressed in this Explanatory Statement (including any forward-looking statements).

(c)     Each Scheme Creditor should carefully read and analyse such risk factors and uncertainties, and fully understand their impact, which may be material and adverse, on the Group's financial condition and prospects. The statement of risk factors is not and is not intended to be an exhaustive statement of such factors or of all possible factors that might influence the decision of Scheme Creditors with respect to the Scheme.

12.7    Legal, Tax, and Financial Advice

(a)    Without limiting any of the above, Scheme Creditors should not construe the contents of this Explanatory Statement as legal, tax, or financial advice. Except as otherwise expressly stated in this Explanatory Statement, none of the Company, the Issuer, any of the Guarantors, any member of the Group, the Existing Notes Administrative Parties, the Existing Syndicated Facility Administrative Parties, the Advisors or the Information Agent and their respective financial or legal advisors has expressed any opinion as to the merits of the Scheme or with respect to the consequences of the Scheme. If any Scheme Creditor is in any doubt as to the action it should take, it is recommended to immediately seek its own financial advice, including tax advice relating to the consequences resulting from the offer from its stockbroker, bank manager, accountant or other independent financial or legal advisor.

(b)    This Explanatory Statement has been prepared without taking into account the objectives, financial situation or needs of any particular recipient of it, and consequently, the information contained in this Explanatory Statement may not be sufficient or appropriate for the purpose for which a recipient might use it. Each Scheme Creditor should conduct its own due diligence and consider the appropriateness of the information in this Explanatory Statement having regard to its own objectives, financial situations and needs. Scheme Creditors are also recommended to consult their own professional advisors as to legal, tax, financial or other aspects relevant to any action Scheme Creditors might take in relation to the Scheme and the Restructuring, or the implications/consequences of such action.

12.8    Restrictions

(a)    The distribution of this Explanatory Statement to or in certain jurisdictions may be restricted by law or regulation and persons into whose possession this Explanatory Statement comes are requested to inform themselves about, and to observe, any such restrictions. Failure to comply with any such restrictions could result in a violation of the laws of such jurisdictions.

(b)    In the event that receipt of this Explanatory Statement by overseas Scheme Creditors is prohibited by any relevant law or regulation or may only be effected after compliance with conditions or requirements that the Company regards as unduly onerous or burdensome (or otherwise not in the best interests of the Company or the Scheme Creditors), this Explanatory Statement may not be despatched to such overseas Scheme Creditors.

(c)    The implications of the Scheme and the Restructuring for Scheme Creditors who are residents or citizens of jurisdictions other than Singapore may be affected by the laws of the relevant jurisdictions. Any person outside Singapore who is resident in, or who has a registered address in, or is a citizen of, an overseas jurisdiction should consult independent professional advisors and satisfy themselves as to the full observance of the laws of the relevant jurisdiction in connection with the Scheme and the Restructuring, including obtaining any requisite governmental or other consents, observing any other requisite formalities and paying any issue, transfer or other taxes due in such jurisdiction.

**13.    IMPORTANT SECURITIES LAW NOTICE**

This Explanatory Statement does not constitute an offer to sell or the solicitation of an offer to buy any securities in any jurisdiction in contravention of applicable law. None of the securities referred to in this Explanatory Statement shall be sold, issued or transferred in any jurisdiction in contravention of applicable law.

13.1    General

(a)    The distribution of this Explanatory Statement and the offering, sale or delivery of the Amended Notes is subject to restrictions and may not be made except pursuant to registration with or authorisation by the relevant securities regulatory authorities or an exemption therefrom. Therefore, persons who may come into possession of this Explanatory Statement

are advised to consult with their own legal advisors as to what restrictions may be applicable to them and to observe such restrictions. This Explanatory Statement may not be used for the purpose of an offer or invitation in any circumstances in which such offer or invitation is not authorised.

(b)  No action has been or will be taken in any jurisdiction by the Company that would or is intended to permit a public offering, or any other offering under circumstances not permitted by applicable law, of the Amended Notes. Persons into whose hands this Explanatory Statement comes are required by the Company to comply with all applicable laws and regulations in each country or jurisdiction in which they purchase, offer, sell or deliver the Amended Notes or have in their possession, distribute or publish this Explanatory Statement or any other materials relating to the Scheme, in all cases at their own expense.

13.2  U.S. Securities Law Considerations

(a)  The Amended Notes have not been and will not be registered under the U.S. Securities Act or the securities laws of any state or other jurisdiction.

(b)  The Amended Notes will be issued in reliance upon the exemption from the registration requirements of the U.S. Securities Act provided by section 3(a)(10) thereof. No public offering of the Amended Notes will be made in the United States. For the purpose of qualifying for the exemption from the registration requirements of the U.S. Securities Act provided by section 3(a)(10) thereof with respect to Amended Notes that may be issued pursuant to the Scheme, the Court (i) has been advised that its sanctioning of the Scheme will be relied upon as an approval of the Scheme and (ii) must approve the fairness of the terms and conditions of the Scheme to those security holders to whom Amended Notes will be issued, after holding an open hearing at which all such security holders are entitled to attend in person or through counsel to support or oppose the sanctioning of the Scheme and with respect to which notification has been given to all such security holders. Such transaction will not be approved or disapproved by the SEC, nor will the SEC or any U.S. state securities commission pass upon the merits or fairness of the transaction or upon the adequacy or accuracy of the information contained in this Scheme Document. Any representation to the contrary is a criminal offence in the United States. The information disclosed in this Explanatory Statement is not the same as that which would have been disclosed if this Explanatory Statement had been prepared for the purpose of complying with the registration requirements of the U.S. Securities Act or in accordance with the laws and regulations of any state or other jurisdiction of the United States.

(c)  The Amended Notes will not be listed on any U.S. securities exchange or with any inter-dealer quotation system in the United States. The Company does not intend to take action to facilitate a market of the Amended Notes in the United States. Consequently, the Company believes that it is unlikely that an active trading market in the United States will develop for such Amended Notes.

**The Amended Notes have not been and will not be registered with the SEC or any U.S. federal, state or other securities commission or regulatory authority and neither the SEC nor any U.S. federal, state or other securities commission or regulatory authority has registered, approved or disapproved any of the Amended Notes or passed upon the accuracy or adequacy of the Scheme or this Explanatory Statement. Any representation to the contrary is a criminal offence in the United States.**

**Scheme Creditors who are citizens or residents of the United States should consult their own legal, financial and tax advisors with respect to the legal, financial and tax consequences of the Scheme in their particular circumstances.**

13.3    Securities Law Considerations for Certain Other Jurisdictions

*European Economic Area*

(a)    The Amended Notes are not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the European Economic Area ("**EEA**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client as defined in point (11) of Article 4(1) of Directive 2014/65/EU ("**MiFID II**"); (ii) a customer within the meaning of Directive 2002/92/EC (as amended or superseded), where that customer would not qualify as a professional client as defined in point (10) of Article 4(1) of MiFID II; or (iii) not a qualified investor as defined in Regulation (EU) 2017/1129 ("**Prospectus Regulation**"). Consequently, no key information document required by Regulation (EU) No 1286/2014 (the "**PRIIPs Regulation**") for offering or selling the Amended Notes or otherwise making it available to retail investors in the EEA has been prepared and therefore offering or selling the Amended Notes or otherwise making it available to any retail investor in the EEA may be unlawful under the PRIIPs Regulation.

(b)    In addition, this Explanatory Statement has been prepared on the basis that all offers of the Amended Notes will be made pursuant to an exemption under the Prospectus Regulation, as directly effective in member states of the EEA ("**Member States**"), from the requirement to produce a prospectus for offers of the Amended Notes. Accordingly, any person making or intending to make any offer within the EEA of the Amended Notes should only do so in circumstances in which no obligation arises for the Company to produce a prospectus for such offer. The Company has not authorised and does not authorise the making of an offer of any of the Amended Notes through any financial intermediary, other than offers made by the Company, as contemplated by this Explanatory Statement.

(c)    In relation to each Member State, no offer of Amended Notes to the public in that Member State may be made other than to any legal entity which is a qualified investor as defined in the Prospectus Regulation or in any other circumstances falling within Article 1(3) or Article 1(4) of the Prospectus Regulation, provided that no such offer of Amended Notes shall require the Company to publish a prospectus pursuant to Article 3(1) or Article 3(3) of the Prospectus Regulation.

(d)    For the purposes of this provision, the expression an "**offer to the public**" in relation to the Amended Notes in any Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the Amended Notes to be offered so as to enable an investor to decide to purchase or subscribe for the Amended Notes, as the same may be varied in that Member State by any measure adopted in that Member State pursuant to the Prospectus Regulation (and amendments thereto).

*United Kingdom*

(a)    the Amended Notes not intended to be offered, sold or otherwise made available to and should not be offered, sold or otherwise made available to any retail investor in the United Kingdom ("**UK**"). For these purposes, a retail investor means a person who is one (or more) of: (i) a retail client, as defined in point (8) of Article 2 of Regulation (EU) No 2017/565 as it forms part of domestic law by virtue of the European Union (Withdrawal) Act 2018 ("**EUWA**"); or (ii) a customer within the meaning of the provisions of the United Kingdom's Financial Services and Markets Act 2000, as amended ("**FSMA**") and any rules or regulations made under the FSMA to implement Directive (EU) 2016/97, where that customer would not qualify as a professional client, as defined in point (8) of Article 2(1) of Regulation (EU) No 600/2014 as it forms part of domestic law by virtue of the EUWA or (iii) not a qualified investor as defined in Article 2 of Regulation (EU) 2017/1129 as it forms part of domestic law by virtue of the EUWA (the "**UK Prospectus Regulation**"). Consequently, no key information document required by Regulation (EU) No 1286/2014 as it forms part of domestic law by virtue of the EUWA (the "**UK PRIIPs Regulation**") for offering or selling the

Amended Notes or otherwise making them available to retail investors in the UK has been prepared and therefore offering or selling the Amended Notes or otherwise making them available to any retail investor in the UK may be unlawful under the UK PRIIPs Regulation.

(b)     This Explanatory Statement has not been approved by an authorised person for the purposes of section 21 of the FSMA. Accordingly, this Explanatory Statement is not being distributed to, and must not be passed on to, the general public in the United Kingdom. This Explanatory Statement is for distribution only to persons who: (i) are outside the United Kingdom; (ii) are investment professionals, as such term is defined in Article 19(5) of the U.K. Financial Services and Markets Act 2000 (Financial Promotion) Order 2000 (as amended, the "**Financial Promotion Order**"); (iii) are persons falling within Article 49(2)(a) to (d) (high net-worth companies, unincorporated associations, etc.), of the Financial Promotion Order; or (iv) are persons to whom an invitation or inducement to engage in investment activity (within the meaning of section 21 of the FSMA in connection with the issue, transfer or sale of any Amended Notes) may otherwise lawfully be communicated or caused to be communicated (all such persons together being referred to in this paragraph as "**Relevant Persons** "). This Explanatory Statement is directed only at Relevant Persons and must not be acted on or relied on by persons who are not Relevant Persons. Any investment or investment activity to which this Explanatory Statement relates is available only to Relevant Persons and will be engaged in only with Relevant Persons. No part of this Explanatory Statement should be published, reproduced, distributed or otherwise made available in whole or in part to any other person.

### Hong Kong

This Explanatory Statement has not been and will not be registered with the SFC or the Hong Kong Registrar of Companies. The Amended Notes has not been and will not be offered or sold in Hong Kong, by means of any document, other than: (a) to "professional investors " within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder; or (b) in other circumstances which do not result in the document being a "prospectus" as defined in the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32 of the Laws of Hong Kong) ("**C(WUMP)O**") or which do not constitute an offer to the public within the meaning of C(WUMP)O. No advertisement, invitation or document relating to the Amended Notes may be issued or may be in the possession of any person other than with respect to Amended Notes which is or is intended to be disposed of only to persons outside Hong Kong or only to "**professional investors**" within the meaning of the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) and any rules made thereunder.

### Singapore

This Explanatory Statement has not been and will not be registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this Explanatory Statement and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of Amended Notes may not be circulated or distributed, nor may Amended Notes be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to any person in Singapore other than:

(a)     to an institutional investor (as defined in Section 4A of the SFA) pursuant to Section 274 of the SFA,

(b)     to a relevant person (as defined in Section 275(2) of the SFA) pursuant to Section 275(1) of the SFA, or any person pursuant to Section 275(1A) of the SFA, and in accordance with the conditions specified in Section 275 of the SFA and (where applicable) Regulation 3 of the Securities and Futures (Classes of Investors) Regulations 2018, or

(c)     otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where Amended Notes are subscribed or purchased under Section 275 of the SFA by a relevant person which is:

(a)     a corporation (which is not an accredited investor (as defined in Section 4A of the SFA)) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or

(b)     a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary of the trust is an individual who is an accredited investor,

securities or securities-based derivatives contracts (each term as defined in Section 2(1) of the SFA) of that corporation or the beneficiaries' rights and interest (howsoever described) in that trust shall not be transferred within six months after that corporation or that trust has acquired the Amended Notes pursuant to an offer made under Section 275 of the SFA except:

(a)     to an institutional investor, or to a relevant person, or to any person arising from an offer referred to in Section 275(1A) or Section 276(4)(i)(B) of the SFA;

(b)     where no consideration is or will be given for the transfer;

(c)     where the transfer is by operation of law;

(d)     as specified in Section 276(7) of the SFA; or

(e)     as specified in Regulation 37A of the Securities and Futures (Offers of Investments) (Securities and Securities-based Derivatives Contracts) Regulations 2018.

Any reference to the SFA is a reference to the Securities and Futures Act, Chapter 289 of Singapore and a reference to any term as defined in the SFA or any provision in the SFA is a reference to that term or provision as modified or amended from time to time including by such of its subsidiary legislation as may be applicable at the relevant time.

**APPENDIX 1**

**(THE SCHEME)**

The Scheme is appended on the next following pages.

**SCHEME OF ARRANGEMENT**

dated

**12 NOVEMBER 2021**

by

**PT PAN BROTHERS TBK**
(Indonesia Registration No. 8120214123901)

and

**THE SCHEME CREDITORS**
as defined herein

**Clause**                                                                                                 **Page**

1.    DEFINITIONS AND INTERPRETATION ............................................................................. 2

2.    SCHEME OVERVIEW AND CONDITIONS ......................................................................... 14

3.    ENTRY INTO THE RESTRUCTURING DOCUMENTS AND FULFILMENT OF RESTRUCTURING CONDITIONS ...................................................................................... 17

4.    RESTRUCTURING STEPS .................................................................................................... 19

5.    SCHEME PARTICIPATION AND INFORMATION ............................................................. 21

6.    VOTING PROCEDURES ........................................................................................................ 24

7.    SALES, ASSIGNMENTS OR TRANSFERS .......................................................................... 28

8.    SECURITIES LAW CONSIDERATIONS ............................................................................... 28

9.    AUTHORISATION TO EXECUTE ANY DOCUMENT TO GIVE EFFECT TO THE SCHEME ................................................................................................................................. 28

10.   NO RIGHT TO COMMENCE PROCEEDINGS .................................................................... 30

11.   SCHEME CREDITOR UNDERTAKINGS AND RELEASES ............................................... 30

12.   CHAIRMAN AND INFORMATION AGENT ........................................................................ 32

13.   THE EXISTING NOTES TRUSTEE AND THE ADMINISTRATIVE PARTIES AND CERTAIN OTHER MATTERS ................................................................................................ 34

14.   AMENDMENTS TO THE SCHEME ..................................................................................... 35

15.   PROCEDURAL MODIFICATIONS TO THE SCHEME ....................................................... 36

16.   TERMINATION OF THE SCHEME ....................................................................................... 36

17.   COMPLETION OF THE SCHEME ........................................................................................ 36

18.   NOTICES ................................................................................................................................. 36

19.   COSTS AND EXPENSES ....................................................................................................... 38

20.   FORCE MAJEURE ................................................................................................................. 38

21.   CONFLICT AND INCONSISTENCY .................................................................................... 38

22.   SEVERABILITY ..................................................................................................................... 38

23.   GOVERNING LAW AND JURISDICTION ........................................................................... 38

Schedule 1 NOTICE OF SCHEME ..................................................................................................... 40

Schedule 2 TERMS OF ARRANGEMENT AND COMPROMISE ..................................................... 43

Schedule 3 FORM OF PROOF OF DEBT ........................................................................................... 44

1.    **DEFINITIONS AND INTERPRETATION**

1.1    In this Scheme, the following expressions shall have the following meanings:

"**Accepted**" means, in relation to a Scheme Claim:

(a)    the acceptance by the Chairman and/or the Company of such Claim (or part thereof); or

(b)    where applicable, the acceptance or determination by the Independent Assessor of such Claim (or part thereof) in accordance with the procedures for proving debts as set out in this Scheme,

in each case, for the purposes of determining entitlement to vote in this Scheme and pursuant to Clause 5 and "**Accept**" shall have a corresponding meaning.

"**Account Holder**" means a Person who is recorded in the books of a Clearing System as being a holder of a book-entry interest in the Existing Notes in an account with that Clearing System or, as the context may require, is or was recorded in such books as being such a holder of the Existing Notes in such an account at the Record Time.

"**Active Bilaterals Common Security Agent (UOB and Permata)**" means PT Bank Permata Tbk.

"**Active Bilaterals Security Sharing Agreement (UOB and Permata)**" means the security sharing agreement to be entered into by the Company, among others, in favour of the Active Bilaterals Common Security Agent (UOB and Permata) in respect of the security to be granted to secure the Amended Facility Agreement (UOB) and the Amended Facility Agreement (Permata) as set out in the Restructuring Term Sheet (UOB) and the Restructuring Term Sheet (Permata).

"**Administrative Parties**" means the Existing Notes Administrative Parties, the Amended Notes Administrative Parties, the Existing Syndicated Facility Administrative Parties, the Amended Syndicated Facility Administrative Parties and the Active Bilaterals Common Security Agent (UOB and Permata).

"**Advisors**" means AJCapital, Baker & McKenzie.Wong & Leow, the Information Agent, or any of their affiliates.

"**AJCapital**" means PT AJCapital Advisory.

"**Amended Bilateral Facilities**" means the Existing Bilateral Facilities as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Bilateral Facilities on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on the Existing Bilateral Facilities up to (but excluding) the Restructuring Effective Date.

"**Amended Facilities**" means the Amended Bilateral Facilities and the Amended Syndicated Facilities.

"**Amended Facilities Guarantees**" means the guarantees granted or amended (as relevant) to secure the Amended Facilities as set out in the Restructuring Term Sheet (Syndicated Facility), the Restructuring Term Sheet (UOB), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (Permata) and the Restructuring Term Sheet (HSBC) (as applicable).

"**Amended Facilities Security**" means the security to be granted or amended (as relevant) to secure the Amended Facilities as set out in the Restructuring Term Sheet (Syndicated Facility),

the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (HSBC), the Restructuring Term Sheet (UOB) and the Restructuring Term Sheet (Permata) (as applicable)

"**Amended Facility Agreements**" means, collectively, the Amended Syndicated Facility Agreement, each Existing Non-Active Bilateral Facility Agreement as amended or supplemented (as relevant) by the Common Framework Agreement (Non-Active Bilaterals), the Amended Facility Agreement (UOB), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (HSBC).

"**Amended Facility Agreement (HSBC)**" means the Existing Facility Agreement (HSBC) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Facility Agreement (Maybank)**" means the Existing Facility Agreement (Maybank) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Facility Agreement (Permata)**" means the Existing Facility Agreement (Permata) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Facility Agreement (UOB)**" means the Existing Facility Agreement (UOB) as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme.

"**Amended Notes**" means the Existing Notes as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Notes on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest (if any)) on the Existing Notes up to (but excluding) the Restructuring Effective Date.

"**Amended Notes Administrative Parties**" means the Amended Notes Trustee, Amended Notes Agents and Amended Notes Depositary.

"**Amended Notes Agents**" means collectively, The Bank of New York Mellon, London Branch in its capacity as paying agent for the Amended Notes, The Bank of New York Mellon SA/NV, Luxembourg Branch in its capacities as transfer agent and registrar for the Amended Notes and the Amended Notes Collateral Agent.

"**Amended Notes Collateral**" means the security to be granted to secure the Amended Notes or Amended Notes Guarantees as set out in the section titled "Security to be Granted " of the Restructuring Term Sheet (Existing Notes).

"**Amended Notes Collateral Agent**" means The Bank of New York Mellon, in its capacity as the interest reserve account collateral agent under the Amended Notes Indenture.

"**Amended Notes Depositary**" means The Bank of New York Mellon, London Branch, in its capacity as common depositary in respect of the Amended Notes.

"**Amended Notes Guarantees**" means the Amended Notes Parent Guarantee and the Amended Notes Subsidiary Guarantees.

"**Amended Notes Indenture**" means the Existing Notes Indenture, as amended, restated supplemented or otherwise modified on the Restructuring Effective Date in accordance with this Scheme.

"**Amended Notes Parent Guarantee**" means any guarantee of the obligations of the Issuer under the Amended Notes Indenture and the Amended Notes by the Parent Guarantor.

"**Amended Notes Subsidiary Guarantee**" means any guarantee of the obligations of the Issuer under the Amended Notes Indenture and the Amended Notes by any Subsidiary Guarantor referred to as a guarantor of those obligations in the Restructuring Term Sheet (Existing Notes).

"**Amended Notes Trustee**" means The Bank of New York Mellon, London Branch, in its capacity as trustee under the Amended Notes Indenture.

"**Amended Syndicated Facilities**" means the Existing Syndicated Facilities as amended, restated, supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Syndicated Facilities on the Restructuring Effective Date.

"**Amended Syndicated Facility Administrative Parties**" means the Amended Syndicated Facility Agent and the Amended Syndicated Facility Security Agent.

"**Amended Syndicated Facility Agent**" means Madison Pacific Trust Limited in its capacity as facility agent for the Amended Syndicated Facility Agreement.

"**Amended Syndicated Facility Agreement**" means the Existing Syndicated Facility Agreement as amended, restated supplemented or otherwise modified on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Syndicated Facility on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on the Existing Syndicated Facility up to (but excluding) the Restructuring Effective Date.

"**Amended Syndicated Facility Security Agent**" means PT Bank Permata Tbk in its capacity as security agent for the Amended Syndicated Facility Agreement.

"**Announcement**" means the announcement described in Clause 5.2.

"**Application(s) for Cross-Border Recognition**" means any application(s) for Cross-Border Recognition in any jurisdiction (other than an application contemplated in paragraph (b) of Clause 2.7) as may be required by the Company (acting reasonably) where the Company has given prior notification of such application to the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, and consulted or taken reasonable steps to consult with the Administrative Parties (and any Scheme Creditor that has requested such consultation promptly upon receipt of such notification) for a period of five Business Days from the date of the notification of such application.

"**Authorised Person**" means the Company, the Chairman, AJCapital, the Information Agent, the Administrative Parties and their respective directors and officers (where applicable).

"**Blocking and Voting Instruction**" means an electronic blocking and voting instruction to (a) prevent the trading of the Existing Notes and (b) to specify voting instructions for the purposes of this Scheme, provided by a Noteholder via its Account Holder to the applicable Clearing System, in accordance with the standard practices and procedures required by the applicable Clearing System.

"**Blocking Reference Number**" means the unique blocking reference number provided by the Clearing Systems, with respect to a Blocking and Voting Instruction that has been submitted in accordance with the instructions contained in this Scheme.

"**Business Day**" means a day (other than a Saturday or a Sunday) on which banks are open for general business in The City of New York, London, Singapore and Indonesia.

"**Chairman**" means the chairman of the Scheme process, namely Geoffrey D Simms of AJCapital.

4

"**Chapter 15**" means Chapter 15 of the U.S. Bankruptcy Code and such other chapters and sections of the U.S. Bankruptcy Code made applicable to cases thereunder.

"**Chapter 15 Order**" means an order or orders of the U.S. Bankruptcy Court which recognizes the Scheme as a foreign main or non-main proceeding under Chapter 15 of the U.S. Bankruptcy Code and grants other related relief and additional assistance as may be necessary to effectuate the Scheme.

"**Claims**" means all and any actions, causes of action, claims, counterclaims, suits, debts, sums of money, accounts, contracts, agreements, promises, damages, judgments, executions, demands or rights whatsoever or howsoever arising, whether present, future, prospective or contingent, known or unknown, whether or not for a fixed or unliquidated amount, whether or not involving the payment of money or the performance of an act or obligation or any failure to perform any obligation or any omission, whether arising at common law, in equity or by statute in or under the laws of Singapore or New York, or under any other law or in any other jurisdiction howsoever arising; and "**Claim** " shall be construed accordingly.

"**Clearing Systems**" means each of Euroclear and Clearstream, and "**Clearing System**" means any one of them.

"**Clearstream**" means Clearstream Banking S.A. and any successor.

"**Committee**" means the ad hoc committee of certain Noteholders (as constituted from time to time) holding over 25% of the outstanding principal amount of the Existing Notes, which is represented by Alvarez & Marsal as financial advisor and some members of which are represented by Clifford Chance Pte. Ltd. as legal advisor.

"**Committee Party**" means each Noteholder that is a member of the Committee and its predecessors, successors, assigns and affiliates, as well as their respective agents, advisors, representatives, directors, officers and employees.

"**Common Framework Agreement (Non-Active Bilaterals)**" means a common framework agreement which amends and/or supplements the Existing Non-Active Bilateral Facility Agreements on the Restructuring Effective Date in accordance with the Scheme, in an aggregate principal amount equal to the outstanding principal amount of the Existing Non-Active Bilateral Facilities on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on the Existing Non-Active Bilateral Facilities up to (but excluding) the Restructuring Effective Date.

"**Companies Act**" means the Singapore Companies Act (Chapter 50).

"**Company**" means PT Pan Brothers Tbk, a company incorporated in Indonesia and having its registered office at Jl. Raya Siliwangi KM.1, No. 178, Jatiuwung, Tangerang, Banten.

"**Court**" means the High Court of Singapore, or any other court in Singapore as the context may require.

"**Court Order**" means the order of the Court sanctioning this Scheme under section 71(1) of the Insolvency, Restructuring and Dissolution Act.

"**COVID-19**" means the SARS-CoV-2 pandemic as declared by the World Health Organization, including any resurgence, evolutions or mutations thereof.

"**Creditors Advisor Fees**" means the fees, costs and expenses incurred by (a) Alvarez & Marsal in its capacity as financial advisor to the Committee and (b) BlackOak LLP, Kirkland & Ellis LLP and Kyora Law in their capacities as professional advisors to the lenders under the Existing Syndicated Facility that the Company has agreed to reimburse.

"**Cross-Border Recognition**" means in connection with any Insolvency Proceeding commenced in any one jurisdiction the recognition of that Insolvency Proceeding in another jurisdiction, whether under laws relating to bankruptcy, liquidation, insolvency, reorganization, winding-up, or composition or adjustment of debts or similar law, international principles of judicial comity, statute, enactment or other regulation, or the seeking of curial assistance in matters related to that Insolvency Proceeding.

"**Deeds of Release**" means the Deed of Release (Existing Bilateral Facility Agreements), the Deed of Release (Existing Syndicated Facility Agreement) and the Deed of Release (Existing Notes) and each, a "**Deed of Release**".

"**Deed of Release (Existing Bilateral Facilities)**" means the Indonesian law governed deed of release to be granted by the Holders of the Existing Bilateral Facilities for the benefit of the Company and other beneficiaries on the Restructuring Effective Date, substantially in the form set out in Appendix 3 to the Explanatory Statement.

"**Deed of Release (Existing Syndicated Facility Agreement)**" means the English law governed deed of release to be granted by the Holders of the Existing Syndicated Facility Agreement for the benefit of the Company and other beneficiaries on the Restructuring Effective Date, substantially in the form set out in Appendix 3 to the Explanatory Statement.

"**Deed of Release (Existing Notes)**" means the New York law governed deed of release to be granted by the Noteholders for the benefit of the Company and other beneficiaries on the Restructuring Effective Date, substantially in the form set out in Appendix 3 to the Explanatory Statement.

"**Euroclear**" means Euroclear Bank SA/NV and any successor.

"**Excluded Liabilities**" means (a) the Scheme Costs and (b) all Claims in respect of rights created under this Scheme and/or any Restructuring Document or which arise as a result of a failure by the Company or any party to this Scheme to comply with any terms of this Scheme and/or any Restructuring Document from and after the Scheme Effective Date.

"**Existing Bilateral Facilities**" means the Existing Non-Active Bilateral Facilities, the Existing Facility (Permata), the Existing Facility (Maybank), the Existing Facility (UOB) and the Existing Facility (HSBC).

"**Existing Debt**" means the indebtedness under the Existing Notes, the Existing Syndicated Facility and the Existing Bilateral Facilities.

"**Existing Facilities**" means the Existing Syndicated Facility and the Existing Bilateral Facilities.

"**Existing Facilities Transaction Documents**" means the Existing Syndicated Facility Transaction Documents, the Existing Non-Active Bilateral Facility Agreements, the Existing Facility Agreement (Permata), the Existing Facility Agreement (Maybank), the Existing Facility Agreement (UOB) and the Existing Facility Agreement (HSBC).

"**Existing Facility (HSBC)**" means the facility provided by PT Bank HSBC Indonesia to, among others, the Company under the Existing Facility Agreement (HSBC).

"**Existing Facility (Maybank)**" means the facility provided by PT Bank Maybank Indonesia Tbk to, among others, the Company under the Existing Facility Agreement (Maybank).

"**Existing Facility (Permata)**" means the facility provided by PT Bank Permata Tbk to, among others, the Company under the Existing Facility Agreement (Permata).

6

"**Existing Facility (UOB)**" means the facility provided by PT Bank UOB Indonesia to, among others, the Company under the Existing Facility Agreement (UOB).

"**Existing Facility Agreement (HSBC)**" means the letter of credit facilities with a facility limit of up to US$50,000,000 as documented under the Indonesian law governed facility agreement between the Company and PT Bank HSBC Indonesia dated 9 August 2017, most recently amended by a second amendment dated 21 October 2019.

"**Existing Facility Agreement (Maybank)**" means the letter of credit facilities with facility limit of up to US$25,000,000 as documented under the Indonesian law governed facility agreement between the Company and PT Bank Maybank Indonesia Tbk dated 12 March 2003, most recently amended on 13 November 2020 and an L/C facility with a limit of up to US$15,000,000 and sub limit Negotiation/Discounting of up to US$10,000,000, supplemented with an additional amendment on facility limit based on an email sent by PT Bank Maybank Indonesia Tbk on 14 December 2020.

"**Existing Facility Agreement (Permata)**" means the letter of credit facilities with facility limit of up to US$5,000,000 for the Company, US$5,000,000 for PT Pancaprima Ekabrothers, and US$10,000,000 for PT Prima Sejati Sejahtera, as documented under a Indonesian law governed facility agreement between these companies and PT Bank Permata Tbk dated 26 August 2014, with the latest amendment dated 2 February 2021.

"**Existing Facility Agreement (UOB)**" means the letter of credit facilities with facility limit of up to US$23,000,000 documented under the Indonesian law governed facility agreement between the Company, certain subsidiaries and PT Bank UOB Indonesia dated 20 April 2011, with the latest amendment dated 4 May 2021 with an L/C facility limit of up to US$8,600,000 and FX facility of up to US$10,000,000, supplemented with additional amendments on facility limit and pricing based on an email sent by PT Bank UOB Indonesia on 10 December 2020.

"**Existing Facility Agreements**" means the Existing Facility Agreement (Permata), the Existing Facility Agreement (Maybank), the Existing Facility Agreement (UOB), the Existing Facility Agreement (HSBC), the Existing Non-Active Bilateral Facility Agreements and the Existing Syndicated Facility Agreement.

"**Existing Non-Active Bilateral Facilities**" means the facilities provided to, among others, the Company under the Existing Non-Active Bilateral Facility Agreements.

"**Existing Non-Active Bilateral Facility Agreements**" means the facility agreements set out in Appendix 5 (Existing Non-Active Bilateral Facility Agreements) to the Explanatory Statement entered into between among others, the Company and each relevant lender set out therein.

"**Existing Notes**" means the US$200,000,000 7.625% Guaranteed Senior Notes due 2022 (ISIN: XS1555631925, Common Code: 155563192) issued by the Issuer on 26 January 2017 pursuant to the Existing Notes Indenture.

"**Existing Notes Administrative Parties**" means the Existing Notes Trustee, Existing Notes Agents and Existing Notes Depositary.

"**Existing Notes Agents**" means collectively, The Bank of New York Mellon, London Branch in its capacity as paying agent for the Existing Notes, The Bank of New York Mellon SA/NV, Luxembourg Branch in its capacities as transfer agent and registrar for the Existing Notes, and the Existing Notes Collateral Agent.

"**Existing Notes Collateral**" has the meaning given to the term "**Interest Reserve Account Collateral**" in the Existing Notes Indenture.

"**Existing Notes Collateral Agent**" means The Bank of New York Mellon in its capacity as interest reserve account collateral agent under the Existing Notes Indenture.

"**Existing Notes Depositary**" means The Bank of New York Mellon, London Branch, in its capacity as common depositary in respect of the Existing Notes.

"**Existing Notes Guarantees**" means the Existing Notes Parent Guarantee and the Existing Notes Subsidiary Guarantees.

"**Existing Notes Indenture**" means the indenture dated 26 January 2017 between the Issuer, the Existing Notes Trustee, the Existing Notes Collateral Agent, the Parent Guarantor and the Subsidiary Guarantors, with respect to the Existing Notes.

"**Existing Notes Parent Guarantee**" has the meaning given to the term "**Parent Guarantee**" in the Existing Notes Indenture.

"**Existing Notes Security Documents**" has the meaning given to the term "Security Documents" in the Existing Notes Indenture.

"**Existing Notes Subsidiary Guarantees**" has the meaning given to the term "Subsidiary Guarantees" in the Existing Notes Indenture.

"**Existing Notes Transaction Documents**" means all documents related, or connected, to the Existing Notes, the Existing Notes Guarantees and the Existing Notes Collateral, including the Existing Notes Indenture, the Global Notes, the Existing Notes Parent Guarantee documents, the Existing Notes Subsidiary Guarantee documents and the Existing Notes Security Documents.

"**Existing Notes Trustee**" means The Bank of New York Mellon in its capacity as trustee under the Existing Notes Indenture.

"**Existing Notes Trustee Fees**" means any fees, costs and expenses of the Existing Notes Trustee and its professional advisors that the Company or the Issuer is obliged to reimburse under the terms of the Existing Notes Indenture or which the Company or the Issuer has otherwise agreed to reimburse.

"**Existing Syndicated Facility**" means the revolving credit facility of up to US$150,000,000 provided to, among others, the Company under the Existing Syndicated Facility Agreement.

"**Existing Syndicated Facility Administrative Parties**" means the Existing Syndicated Facility Agent and the Existing Syndicated Facility Security Agent.

"**Existing Syndicated Facility Administrative Party Fees**" means any fees, costs and expenses of the Existing Syndicated Facility Administrative Parties and their professional advisors that the Company is obliged to reimburse under the terms of the Existing Syndicated Facility Agreement or which the Company has otherwise agreed to reimburse.

"**Existing Syndicated Facility Agent**" means, following its appointment as such (which appointment shall occur prior to the Restructuring Effective Date), Madison Pacific Trust Limited in its capacity as facility agent for the Existing Syndicated Facility.

"**Existing Syndicated Facility Agreement**" means the revolving credit facility agreement (as amended from time to time) of up to US$150,000,000 dated 27 December 2017 between, among others, the Company, the Existing Syndicated Facility Agent and the Existing Syndicated Facility Security Agent.

"**Existing Syndicated Facility Guarantees**" means any Guarantee Agreement (as defined in the Existing Syndicated Facility Agreement) and the guarantee in clause 17 (*Guarantee and Indemnity)* of the Existing Syndicated Facility Agreement.

"**Existing Syndicated Facility Security**" means any mortgage, security rights (*hak tanggungan*), fiducia security, pledge, lien, charge, assignment, hypothecation or security interest created by the Existing Syndicated Facility Security Documents.

"**Existing Syndicated Facility Security Agent**" means PT Bank Permata Tbk in its capacity as security agent for the Existing Syndicated Facility.

"**Existing Syndicated Facility Security Documents**" has the meaning given to the term "**Security Documents**" in the Existing Syndicated Facility Agreement.

"**Existing Syndicated Facility Transaction Documents**" has the meaning given to the term "**Finance Documents**" in the Existing Syndicated Facility Agreement.

"**Explanatory Statement**" means the explanatory statement relating to this Scheme issued by the Company.

"**Fitch**" means Fitch Ratings.

"**Force Majeure Event**" means any event or circumstance that is beyond all reasonable control of the affected party (and not caused directly or indirectly by the affected party) including but not limited to fire, floods, embargoes, epidemics, pandemics, war, acts of war (whether war be declared or not), acts of terrorism, insurrections, riots, civil commotions, strikes, lockouts or other labor disturbances, acts of God or acts, omissions or delays in acting by any governmental authority or the other party.

"**Foreign Representative**" has the meaning provided in Clause 2.6.

"**Gazette**" means the gazette published in electronic or other form by order of the Singapore government and includes any supplement thereto and any gazette extraordinary so published.

"**Global Notes**" has the meaning given to that term in the Existing Notes Indenture.

"**Group**" means the Company as well as all its Subsidiaries.

"**Guarantors**" means the Parent Guarantor, the Subsidiary Guarantors and the Syndicated Facility Guarantors.

"**Holder**" means any Person with an economic or beneficial interest in the Existing Debt and "**Holders**" shall be construed accordingly.

"**IDX**" means the Indonesian Stock Exchange promulgated by PT Bursa Efek Indonesia.

"**Independent Assessor**" has the meaning provided in Clause 5.5.

"**Indonesia**" means the Republic of Indonesia.

"**Information Agent**" means Morrow Sodali Limited in its capacity as the Company's information agent.

"**Information Meeting**" means either of the videoconference meetings of the Scheme Creditors to be convened by the Company (a) at 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 (Singapore time) (for the Noteholders) and (b) at 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) (for the Holders of the Existing Facilities), to provide the Scheme Creditors with a summary of the

9

arrangement and compromise effected by the Scheme, and to address any queries which the Scheme Creditors may have in relation to the Scheme.

"**Insolvency Proceeding**" means any proceeding, process, appointment or application under any law relating to insolvency, reorganization, winding-up, or composition or adjustment of debts, including, without limitation, winding-up, liquidation, bankruptcy, provisional liquidation, receivership, administration, provisional supervision, company voluntary arrangement, scheme of arrangement, suspension of payment under court supervision or any other analogous proceedings in any jurisdiction (including any of the foregoing brought for the purpose of obtaining Cross-Border Recognition).

"**Insolvency, Restructuring and Dissolution Act**" means the Singapore Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018).

"**Intermediary**" means a Person (other than an Account Holder or Noteholder) who holds an interest in Existing Notes on behalf of another Person or other Persons.

"**Issuer**" means PB International B.V..

"**KSEI**" means PT Kustodian Sentral Efek Indonesia, the Indonesian Central Securities Custodian.

"**Long Stop Date**" means 31 March 2022, subject to any extension under the terms of the Scheme.

"**Moody's**" means Moody's Investor Service.

"**Moratoria Filings**" means the applications of, among others, the Company, the Issuer and the Subsidiary Guarantors for moratoria under Sections 64 and 65 of the Insolvency, Restructuring and Dissolution Act 2018 in HC/OS 515/2021-HC/OS 520/2021 and HC/OS 522/2021 to HC/OS 536/2021 before the General Division of the High Court of the Republic of Singapore.

"**New York**" means the State of New York, the United States of America.

"**Noteholders**" means all Persons with an economic or beneficial interest as principal in the Existing Notes held through the Clearing Systems and "**Noteholder**" shall mean any one of them.

"**OJK**" means the Otoritas Jasa Keuangan, the Indonesian Financial Services Authority.

"**Parent Guarantor**" means the Company, in its capacity as parent guarantor under the Existing Notes Indenture, the Indonesian law corporate guarantee granted by the Company in the form of a notarial deed dated 26 January 2017 and/or the Amended Notes Indenture (as applicable).

"**Person**" means any natural person, corporation, limited or unlimited liability company, trust, joint venture, association, corporation, partnership, governmental entity or other entity whatsoever.

"**Proceeding**" means any process, suit, action, legal or other legal proceeding including without limitation any arbitration, mediation, alternative dispute resolution, judicial review, adjudication, demand, statutory demand, execution, distraint, forfeiture, re-entry, seizure, lien, enforcement of judgment, enforcement of any security or Insolvency Proceedings in any jurisdiction.

"**Proof of Debt**" means written proof of debt claimed by Scheme Creditors (other than Noteholders), in accordance with the form set out in Schedule 3 and ultimately adjudicated upon solely in accordance with the terms of this Scheme.

"**Rating Agencies**" means S&P, Moody's and Fitch.

"**Record Date**" means 7 December 2021.

"**Record Time**" means 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time) or such later time or date as may be notified by the Company or the Information Agent (each acting reasonably) to the Scheme Creditors, where such date shall be no later than the date of the Voting Results Announcement.

"**Released Claims**" means all Scheme Claims and all past, present and future claims arising out of, relating to and in respect of (a) any breach or default under the Existing Notes and/or the Existing Notes Transaction Documents; (b) any breach or default under the Existing Facilities and/or the Existing Facilities Transaction Documents; and (c) preparation, conduct, sanctioning, implementation and execution of this Scheme or any Restructuring Documents, including any acts of an Authorised Person or otherwise in carrying out the steps and transactions contemplated in this Scheme or the Restructuring Documents in accordance with their terms; and "**Released Claim**" shall be construed accordingly.

"**Released Parties**" means (a) the Company, the Issuer, the Guarantors, the Security Providers, all obligors under the Existing Facility Agreements and their respective affiliates; (b) the Advisors and the Chairman; (c) each agent, advisor, representative, director, officer and employee of each of the parties set out in (a) and (b) above; and (d) each predecessor, successor and assign of each of the parties set out in (a), (b) and (c) above, and "**Released Party**" shall mean any one of them.

"**Releasing Parties**" means the Scheme Creditors and their predecessors, successors and assigns as well as any current, prior or future holder of any legal, beneficial or economic interest in the Existing Notes or the Existing Facilities, and their respective directors, officers and employees.

"**Relying Person**" has the meaning provided in Clause 9.1.

"**Requisite Majority**" means a majority in number of the relevant class of Scheme Creditors who cast valid votes in favour of the Scheme in respect of such class, whose Accepted Scheme Claims in aggregate represent at least three-fourths in value of the Accepted Scheme Claims of all such voting Scheme Creditors in respect of such class.

"**Restructuring**" means the restructuring of the indebtedness under the Existing Notes and the Existing Facilities, to be conducted in the manner envisaged by, and on the terms set out in, Schedule 2.

"**Restructuring Conditions**" has the meaning provided in Clause 2.7.

"**Restructuring Documents** " means:

(a)     the Deeds of Release;

(b)     the supplement to the Existing Notes Indenture;

(c)     the amendment agreements and Amended Facility Agreements;

(d)     the Common Framework Agreement (Non-Active Bilaterals);

(e)     the Active Bilaterals Security Sharing Agreement (UOB and Permata);

(f)     the ringfencing deed (as referred to in the Restructuring Term Sheet (Syndicated Facility)) (the "**Ringfencing Deed**");

11

(g)    the pledge or charge agreements and any other agreements or instruments that may evidence or create or confirm any security interest or guarantee in favor of the Amended Notes Trustee, the Amended Notes Collateral Agent, any other collateral agent and/or any holders of Amended Notes in any or all of the Amended Notes Collateral;

(h)    the pledge or charge agreements and any other agreements or instruments that may evidence or create or confirm any security interest or guarantee in favor of the Amended Syndicated Facility Security Agent, any other collateral agent and/or any lenders under the Amended Facilities in any or all of the Amended Facilities Security; and

(i)    any other documents that the Company considers necessary (acting reasonably) to give effect to the Restructuring which are ancillary to or are required to be entered into in connection with one or more documents referred to in paragraphs (a) to (h) above.

"**Restructuring Effective Date**" has the meaning given in Clause 2.8.

"**Restructuring Term Sheet (Existing Notes)**" means the term sheet in relation to the Restructuring of the Existing Notes, as set out in Schedule 2.

"**Restructuring Term Sheet (HSBC)**" means the term sheet in relation to the Restructuring of the Existing Facility (HSBC), as set out in Schedule 2.

"**Restructuring Term Sheet (Maybank)**" means the term sheet in relation to the Restructuring of the Existing Facility (Maybank), as set out in Schedule 2.

"**Restructuring Term Sheet (Non-Active Bilaterals)"** means the term sheet in relation to the Restructuring of the Existing Non-Active Bilateral Facilities, as set out in Schedule 2.

"**Restructuring Term Sheet (Permata)**" means the term sheet in relation to the Restructuring of the Existing Facility (Permata), as set out in Schedule 2.

"**Restructuring Term Sheet (Syndicated Facility)**" means the term sheet in relation to the Restructuring of the Existing Syndicated Facility, as set out in Schedule 2.

"**Restructuring Term Sheet (UOB)**" means the term sheet in relation to the Restructuring of the Existing Facility (UOB), as set out in Schedule 2.

"**Restructuring Term Sheets**" means the Restructuring Term Sheet (Existing Notes), the Restructuring Term Sheet (HSBC), the Restructuring Term Sheet (Maybank), the Restructuring Term Sheet (Non-Active Bilaterals), the Restructuring Term Sheet (Permata), the Restructuring Term Sheet (Syndicated Facility) and the Restructuring Term Sheet (UOB).

"**Rupiah**", "**IDR**" or "**Rp**" means the Indonesian Rupiah, the lawful currency of the Republic of Indonesia.

"**S&P**" means S&P Global Ratings.

"**Sanction Application**" means the Company's application to the Court under Section 71 of the Insolvency, Restructuring and Dissolution Act for the Court's sanction of the Scheme.

"**Sanction Hearing**" means the hearing of the Sanction Application by the Court.

"**Scheme**" means this scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of this Scheme.

"**Scheme Claims**" means all Claims under or in respect of the Existing Notes Transaction Documents and the Existing Facilities Transaction Documents and any related transactions (including all Claims to principal, interest, penalties or other amounts due in relation to the Existing Notes and the Existing Facilities), whether in tort, contract or otherwise, but excluding in each case the Excluded Liabilities.

"**Scheme Conditions**" has the meaning provided in Clause 2.4.

"**Scheme Costs**" means the liability of the Company in respect of (a) the fees, costs and expenses of the Advisors, (b) the Creditors Advisor Fees, (c) the Existing Notes Trustee Fees and (d) the Existing Syndicated Facility Administrative Party Fees, in each case, in relation to the Restructuring which liabilities are not subject to the arrangements and compromises to be effected by this Scheme.

"**Scheme Creditors**" means holders of economic or beneficial ownership interests in the Existing Notes and the Existing Facilities, and any other Person who holds any Scheme Claims, as at the Record Time and "**Scheme Creditor**" shall mean any one of them.

"**Scheme Effective Date**" means the date on which this Scheme becomes effective and binding as set out in Clause 2.4.

"**Scheme Website**" means https://bonds.morrowsodali.com/PanBrothers.

"**Security Providers**" means the Company, the Issuer and the Subsidiary Guarantors as the providers of the Existing Notes Collateral pursuant to the terms of the Existing Notes Indenture and the Existing Syndicated Facility Security pursuant to the terms of the Existing Syndicated Facility Security Documents.

"**SGXNet**" means a website maintained by the SGX-ST.

"**SGX-ST**" means the Singapore Exchange promulgated by Singapore Exchange Securities Trading Limited, on which the Existing Notes are listed.

"**Singapore**" means the Republic of Singapore.

"**Subsidiary**" has the meaning given to that term in the Existing Notes Indenture.

"**Subsidiary Guarantor**" means each entity acting as subsidiary guarantor under the Existing Notes Indenture, each Indonesian law corporate guarantee granted by each such entity in the form of a notarial deed dated 26 January 2017 and/or the Amended Notes Indenture (as applicable).

"**Syndicated Facility Guarantors**" has the meaning given to the term "Guarantors" in the Existing Syndicated Facility Agreement.

"**UK**" means the United Kingdom.

"**United States**" or "**U.S.**" means the United States of America.

"**U.S. Bankruptcy Code**" means Title 11 of the United States Code.

"**U.S. Bankruptcy Court**" means the United States Bankruptcy Court for the Southern District of New York or other court of competent jurisdiction presiding over any case filed under Chapter 15 of the U.S. Bankruptcy Code in connection with this Scheme.

"**U.S. Securities Act**" means the United States Securities Act of 1933, as amended.

"**USD**" or "**US$**" or "**U.S. Dollar**" means the United States Dollar, the lawful currency of the United States of America.

"**Voting Instruction Form**" means the voting instruction form to be submitted by the Holders of the Existing Facilities in the form set out in Appendix 4 (Voting Instruction Form) to the Explanatory Statement.

"**Voting Results Announcement**" has the meaning provided in Clause 5.12.

1.2    In this Scheme, unless otherwise stated:

(a)    references to Clauses and Schedules are references to clauses and schedules of this Scheme;

(b)    references to a person include a reference to any individual, firm, partnership, company, corporation, unincorporated body of persons or any state or state agency;

(c)    references to a person include their respective successors and predecessors, and lawful assignees;

(d)    references to a statute, statutory provision or regulatory rule or guidance include references to the same as subsequently modified, amended or re- enacted from time to time;

(e)    references to an agreement, deed or document include references to such agreement, deed or document as amended, supplemented, restated, verified, replaced and/or novated (in whole or in part) from time to time and to any agreement, deed or document executed pursuant thereto;

(f)    the singular includes the plural and vice versa and words importing one gender shall include all genders;

(g)    headings to Clauses and Schedules are for ease of reference only and shall not affect the interpretation of this Scheme;

(h)    the words "**include**" and "**including**" are to be construed without limitation, general words introduced by the word "other " are not to be given a restrictive meaning by reason of the fact that they are preceded by words indicating a particular class of acts, matters or things and general words are not to be given a restrictive meaning by reason of the fact that they are followed by particular examples intended to be embraced by the general words;

(i)    references to days shall include Saturdays, Sundays and public holidays and any date or end of a period not falling on a Business Day shall be amended to fall on the immediately following Business Day; and

(j)    references to time shall be to Singapore time.

## 2.    SCHEME OVERVIEW AND CONDITIONS

2.1    The principal object and purpose of this Scheme is to effect a compromise and arrangement between the Company and the Scheme Creditors in respect of the Scheme Claims. The arrangement and compromise effected pursuant to this Scheme will enable the Group to continue to carry on business as a going concern and is an alternative to the commencement of

enforcement and/or insolvency proceedings in respect of the Company, the Issuer, the Guarantors and any other member of the Group.

2.2 Excluded Liabilities shall not be subject to the arrangement and compromise effected by this Scheme.

2.3 The Scheme Creditors will be given the opportunity to consider this Scheme and must follow the steps set out in Clauses 5 and 6 to vote in respect of this Scheme. Should the Requisite Majority of Scheme Creditors in respect of each class of Scheme Creditors approve this Scheme, the Company shall apply to the Court for an order sanctioning this Scheme.

2.4 This Scheme shall only become effective and binding following the satisfaction of all of the following conditions to this Scheme (the "**Scheme Conditions**"):

(a) the Requisite Majority of the Scheme Creditors in respect of each class of Scheme Creditors voting to approve this Scheme in accordance with the voting procedures set out in Clauses 5 and 6;

(b) the sanction of this Scheme by the Court; and

(c) completion of the requisite administrative filings in respect of the sanction of this Scheme by the Court, with the Singapore Registrar of Companies in accordance with the requirements of the Insolvency, Restructuring and Dissolution Act, and

upon such satisfaction, this Scheme shall become effective and binding on the Company and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in this Scheme or not and even if such Scheme Creditor did not vote or voted against this Scheme) and all of their respective successors, assigns and transferers (the date on which this Scheme becomes effective and binding being the "**Scheme Effective Date**").

2.5 The Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of the satisfaction of the Scheme Conditions and the occurrence of the Scheme Effective Date.

2.6 Geoffrey D Simms of AJCapital is:

(a) appointed and ratified as the Company's foreign representative (the "**Foreign Representativ**e") in respect of any application for Cross-Border Recognition of this Scheme; and

(b) authorised to take all steps required, and is ratified in respect of any steps taken, to make an application on behalf of the Company for a suitable order:

(i) from the U.S. Bankruptcy Court under Chapter 15 of the U.S. Bankruptcy Code; and/or

(ii) under any other applicable law, legal doctrine or Proceeding concerning Cross-Border Recognition (including any other applicable law, legal doctrine or Proceeding in Indonesia, the United States or England and Wales) and for such other additional relief and/or assistance, as the Foreign Representative may be required by the Company to obtain.

2.7    The Restructuring Effective Date shall only occur on the date of satisfaction of all of the following conditions to the Restructuring Effective Date (the "**Restructuring Conditions**") and shall occur in accordance with the terms and conditions of Clauses 3 and 4 below:

(a)    each of the Scheme Conditions has been satisfied and the Scheme Effective Date has occurred;

(b)    a Chapter 15 Order has been entered by the U.S. Bankruptcy Court and that such Chapter 15 Order is final and no longer subject to rehearing or appeal;

(c)    any other Application(s) for Cross-Border Recognition have been completed and the applicable recognition order(s) have been obtained and are in full effect;

(d)    all corporate (including approval by shareholders, board of commissioners and/or board of directors), legal and regulatory approvals deemed necessary by the Company (acting reasonably) to implement the Restructuring Effective Date, including, but not limited to, shareholder, director and/or commissioner approvals (as applicable) from the Company, the Guarantors or any other member of the Group and any approvals required from the OJK, IDX, KSEI or SGX-ST or under the laws of Indonesia or Singapore have been obtained; and

(e)    all Restructuring Documents are in agreed form and have been executed by or on behalf of the relevant parties to them in accordance with the terms of this Scheme.

2.8    The Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of:

(a)    the date on which all the Restructuring Conditions have been satisfied and/or waived (where one or more Restructuring Conditions have been waived by a Requisite Majority of Scheme Creditors in respect of each class) (such notice being the "**Restructuring Conditions Satisfaction Notice**"); and

(b)    subject to Clauses 2.9 and 3.7 below, the proposed date of completion of the Restructuring which shall be a Business Day (chosen by the Company (acting reasonably)), provided that such date is as soon as reasonably practicable (but at least two Business Days after the date of such notice) and no later than the Long Stop Date (the "**Restructuring Effective Date**").

2.9    The Company may, acting reasonably, at any time before the occurrence of the Restructuring Effective Date, defer in good faith the Restructuring Effective Date to a later date in accordance with this Clause 2.9. In the event that the Company wishes to postpone the Restructuring Effective Date, the Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website, of the deferred Restructuring Effective Date which shall be a Business Day (chosen by the Company (acting reasonably)), provided that such date is as soon as reasonably practicable (but at least two Business Days after the date of such notice) and no later than the Long Stop Date.

2.10    The Company may in good faith defer the Long Stop Date if (a) the relevant deferment is approved by Scheme Creditors whose Accepted Scheme Claims in aggregate represent at least 35% in value in respect of each class of Scheme Creditors and (b) the Company has not defaulted on the payment of any interest (excluding default interest) owing to Scheme Creditors under the Existing Notes Indenture (in the case of the Noteholders) or Scheme Creditors under the Existing Facilities (in the case of Scheme Creditors that are creditors thereunder) that has an originally scheduled payment date that falls within the period commencing from the

announcement of this Scheme and ending on the date on which the 35% in value in respect of each class of Scheme Creditors threshold referred to in paragraph (a) is met (the "**Approval Threshold**"). However notwithstanding anything to the contrary in this Scheme,  the Long Stop Date may not in any event be deferred beyond 30 June 2022.

2.11    If the Company wishes to postpone the Long Stop Date under circumstances set out in Clause 2.10 above, the Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website of the proposed deferred Long Stop Date and request that the Scheme Creditors consent to such new Long Stop Date by responding to the Company (or the Information Agent, as relevant) within 21 days of the date of such notification.  If the Approval Threshold is met, the Long Stop Date shall be deferred to such relevant new Long Stop Date and the Company shall (or shall procure that the Information Agent will) promptly notify the Scheme Creditors, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website of the new Long Stop Date.

## 3.    ENTRY INTO THE RESTRUCTURING DOCUMENTS AND FULFILMENT OF RESTRUCTURING CONDITIONS

3.1    Drafts of the Restructuring Documents shall be circulated to the Scheme Creditors (through the Information Agent in the case of the Scheme Creditors that are Noteholders and the Scheme Creditors of the Existing Syndicated Facility and in the case of other Scheme Creditors through the applicable Administrative Parties where relevant) and any applicable Administrative Party executing any Restructuring Document on behalf of Scheme Creditors for review as soon as practicable after the Scheme Effective Date.  Whilst drafts of the applicable Restructuring Documents shall be circulated to all Noteholders in accordance with this Clause 3.1, individual Noteholders shall not, for the avoidance of doubt, execute those Restructuring Documents and the relevant Existing Notes Administrative Parties will be authorised, in accordance with Clause 3.2 and Clause 3.3 and Clause 9 to execute those Restructuring Documents on behalf of the applicable Noteholders.

3.2    To the extent a Scheme Creditor or Administrative Party has comments on the draft Restructuring Documents to which it is party (or to which it will be bound) circulated pursuant to Clause 3.1 above, that Scheme Creditor or Administrative Party (as the case may be) shall provide those comments on those Restructuring Documents in writing (to the Information Agent in the case of the Scheme Creditors that are Noteholders, the Scheme Creditors of the Existing Syndicated Facility, or where there is no Administrative Party relevant to that Scheme Creditor, or otherwise through the applicable Administrative Parties) promptly and in a timely fashion and in any event no later than fourteen days after the date the relevant draft Restructuring Document is circulated.  Each Scheme Creditor, Administrative Party (as the case may be) and the Company shall act reasonably and in good faith and take into account the Scheme timetable for the purpose of resolving such comments.

3.3    Once each Scheme Creditor or (in the case of Noteholders the relevant Administrative Party on its behalf) has agreed to the draft Restructuring Documents to which it is party or to which it will be bound as described in Clause 3.2 above:

(a)    the execution version of each Restructuring Document shall be circulated by or on behalf of the Company to the Scheme Creditors (and (where relevant) the relevant Administrative Parties and the Scheme Creditors on whose behalf the relevant Administrative Party is executing the relevant Restructuring Document) party to it for execution; and

(b)    following circulation of the Restructuring Document in accordance with paragraph (a) above, the Company, each Scheme Creditor (or to the extent that an Administrative

Party will execute that Restructuring Document on behalf of that Scheme Creditor, the relevant Administrative Parties on its behalf) and each other party to the Restructuring Documents shall execute (but leave undated) all Restructuring Documents to which it is a party, and return a PDF copy of its relevant signature page to the Information Agent no later than the date falling fourteen days after the execution version of each Restructuring Document is circulated (with the original signature page to follow);

For the purposes of this Clause 3.3:

(i) If an Administrative Party is executing a Restructuring Document on behalf of any applicable Scheme Creditor, that Administrative Party is irrevocably authorised (pursuant to Clause 9.1 below) to complete, enter into, execute and deliver, and shall complete, enter into, execute and deliver that Restructuring Document (whether as a deed or otherwise) and perform all incidental acts related thereto on behalf of that Scheme Creditor if that Restructuring Document has been circulated to it in accordance with paragraph (a) above and that Restructuring Document conforms substantially to the terms of the applicable Restructuring Term Sheet.

(ii) Each Administrative Party may assume that any Restructuring Document circulated to it pursuant to (a) above has been agreed to by the applicable Scheme Creditors as described in Clause 3.2 above.

(iii) In the event that an Administrative Party (having taken legal advice from its legal advisers) is not able to verify to its satisfaction that an applicable Restructuring Document which it is executing on behalf of any applicable Scheme Creditor conforms substantially to the terms of the applicable Restructuring Term Sheet, that Restructuring Document shall be circulated to the applicable Scheme Creditors (being the Scheme Creditors for whom the Administrative Party is executing that Restructuring Document) through the Information Agent in the case of the Scheme Creditors that are Noteholders and in the case of other Scheme Creditors through the applicable Administrative Parties where relevant, provided that this paragraph (iii) shall not apply in respect of an Administrative Party executing a Restructuring Document on behalf of any Noteholder.

(iv) Each applicable Scheme Creditor shall, if it has agreed the draft Restructuring Documents to which it is party as described in Clause 3.2 above, confirm to the Information Agent within fourteen days of receipt of a Restructuring Document pursuant to paragraph (iii) above that that Restructuring Document is agreed, provided that this paragraph (iii) shall not apply in respect of an Administrative Party executing a Restructuring Document on behalf of any Noteholder.

(v) If an applicable Scheme Creditor confirms that a Restructuring Document is agreed pursuant to paragraph (iv) above or does not respond within fourteen days of the date on which the applicable Restructuring Document was circulated pursuant to paragraph (iii) above, the Administrative Party is irrevocably authorised (pursuant to Clause 9.1 below) to execute, complete and deliver, and shall execute, complete and deliver the Restructuring Document and perform all incidental acts related thereto on behalf of that Scheme Creditor provided that this paragraph (iii) shall not apply in respect of an Administrative Party executing a Restructuring Document on behalf of any Noteholder.

If a Restructuring Document is to be executed by an Administrative Party and that Restructuring Document has been agreed pursuant to Clause 3.2 above and the Administrative Party is

executing that document pursuant to paragraphs (i) to (v) above (or in the case of an Administrative Party executing a Restructuring Document on behalf of any Noteholder paragraphs (i) and (ii) above) that Administrative Party and the Company shall designate that document in writing as an agreed form document prior to the same being executed in accordance with this Clause 3.3.

3.4 Notwithstanding Clause 3.3 above, the amendment agreements in respect of the Amended Facility Agreement (HSBC), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (UOB) and any security documents in respect of those facilities may be dated by the parties to them once they have been entered into and in any event shall be entered into and dated and be effective no later than 31 December 2021 or other date as agreed between the Company and the respective lenders.

3.5 The Company shall promptly notify the Scheme Creditors when all conditions precedent under the amendment agreements in respect of the Amended Facility Agreements (the "**Finance Conditions Precedent**") have been satisfied or waived (such notification being the "**Finance CP Satisfaction Notice**").

3.6 For the avoidance of doubt, none of the restructuring steps set out in Clause 4 below shall take place until both the Restructuring Conditions and the Finance Conditions Precedent have been satisfied or waived in accordance with the terms of this Scheme and each Amended Facility Agreement.

3.7 Upon the later of:

(a) the delivery of the Restructuring Conditions Satisfaction Notice; and

(b) the delivery of the Finance CP Satisfaction Notice,

the Company shall deliver a duly executed notice to the Scheme Creditors:

(i) confirming the completion of the Restructuring Conditions and the Finance Conditions Precedent; and

(ii) notifying them of the date of the Restructuring Effective Date (being the date on which the restructuring steps in Clause 4 below will commence),

(such notice to be the "**Restructuring Effective Date Notice**").

## 4. RESTRUCTURING STEPS

4.1 The restructuring steps set out in Clauses 4.3 and 4.4 below will take place on the Restructuring Effective Date in the sequence specified therein. Unless otherwise stated in this Scheme, each restructuring step (and sub-step thereof) shall only occur upon the completion, on the terms specified, of the immediately preceding restructuring step or sub-step (as the case may be). Whether each step or sub-step has been completed shall be determined by the Company (acting reasonably).

4.2 The Company and each Scheme Creditor acknowledge and agree that all of the steps and sub-steps described in Clauses 4.3 and 4.4 are inter-conditional.  If any of such steps or sub-steps are not completed, then:

(a) any Restructuring Document that is executed, delivered or released in accordance with, or pursuant to this Scheme, and any amendment, restatement, assignment, re-assignment, release, discharge or waiver that is made or given pursuant to this Clause 4, shall be rescinded (insofar as legally possible) and deemed never to have become effective;

(b)     the Company and each Scheme Creditor, to the extent legally and practically possible, shall be put back into the position it was in prior to the date on which such Restructuring Document was executed, delivered or released and such amendment, restatement, assignment, re-assignment, release, discharge or waiver was made or given (as applicable); and

(c)     the Company and each Scheme Creditor shall, and shall use all reasonable efforts to procure that any other party shall, execute such documents and perform such acts and things as may be required to restore each of the parties to the position it was in prior to the date on which such deed, document or agreement was executed, delivered or released and such amendment, restatement, assignment, re-assignment, release, discharge or waiver was made or given (as applicable).

4.3     The Company will pay (or procure the payment of) the Scheme Costs that the Company is required to pay pursuant to the terms agreed between the Company and the relevant party to whom such Scheme Costs are owed no later than five Business Days before the Restructuring Effective Date (provided such Scheme Costs have been duly invoiced).

4.4     On the Restructuring Effective Date (or in the case of paragraph (a) below on the date specified therein which shall be prior to the Restructuring Effective Date):

(a)     the Company shall provide evidence to the Scheme Creditors that US$50,000,000 has been deposited into and such amount is standing to the credit of the ringfence account by no later than the earlier of (i) 31 March 2022 and (ii) two Business Days immediately prior to the Restructuring Effective Date and the Chairman shall on such date, complete, deliver (if required) and release and date the Ringfencing Deed executed pursuant to Clause 3.3;

(b)     after the Chairman has dated, completed, delivered (if required) and released, the Ringfencing Deed pursuant to Clause 3.3, the Chairman shall date, complete, deliver (if required) and release the Restructuring Documents executed pursuant to Clause 3.3 (save for (i) the Ringfencing Deed and (ii) the amendment agreements in respect of the Amended Facility Agreement (HSBC), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (UOB) and any security documents in respect of the those facilities which have been dated in accordance with Clause 3.4 above and the Deeds of Release), which will result in:

(i)     the Existing Notes, the Existing Notes Indenture, the Existing Notes Security Documents and the Existing Notes Guarantees being amended, restated, supplemented or otherwise modified to reflect the terms under and constituting the Amended Notes, the Amended Notes Collateral and the Amended Notes Guarantees; and

(ii)    the Existing Facility Agreements, the Existing Syndicated Facility Security Documents and the Existing Syndicated Facility Guarantees being amended, restated, supplemented or otherwise modified to reflect and constitute the Amended Facility Agreements, the Amended Facilities Security and the Amended Facilities Guarantees (except to the extent the amendment agreements in respect of the Amended Facility Agreement (HSBC), the Amended Facility Agreement (Maybank), the Amended Facility Agreement (Permata) and the Amended Facility Agreement (UOB) and any security documents in respect of the those facilities have already been dated in accordance with Clause 3.4 above);

(c) upon the Amended Notes Indenture coming into effect, each Noteholder as of the Restructuring Effective Date shall hold a principal amount of Amended Notes equal to the outstanding principal amount of Existing Notes held by such Noteholder on the Restructuring Effective Date and all accrued and unpaid interest (excluding default interest) on such Existing Notes up to (but excluding) the Restructuring Effective Date, provided that:

(A) entitlements of Noteholders to such accrued and unpaid interest (excluding default interest) will be credited in integral multiples of US$1; and

(B) no fraction of Amended Notes will be credited; and

(d) he Chairman will date, complete, deliver (if required) and release the Deeds of Release and these documents and the releases set out in Clause 11.2 shall be deemed to become effective and the Scheme Creditors shall fully release and discharge all Scheme Claims against the Released Parties.

4.5 Each Restructuring Document shall take effect as a deed or an agreement (as applicable) separate from all other Restructuring Documents.

4.6 The Company (or the Information Agent, acting on behalf of the Company) is authorised by the Scheme Creditors to, and shall, give the Administrative Parties all such instructions as are required for the purposes of Clause 4.1 and to otherwise implement this Scheme and the Administrative Parties will not be liable to any person for taking any action giving effect to such instructions.

## 5. SCHEME PARTICIPATION AND INFORMATION

5.1 The key timelines in relation to voting on this Scheme are summarised below:

| Event | Date |
|---|---|
| Announcement of the Scheme through the Scheme Website, the Clearing Systems, email and SGXNet and filing of Proofs of Debt. | 12 November 2021 |

| Event | Date |
|---|---|
| Information Meetings and Deadline for filing Proofs of Debt | Information Meeting for the Noteholders<br><br>7.30 a.m. on 19 November 2021 (London time) /<br><br>3.30 p.m. on 19 November 2021 2021 (Singapore time)<br><br>Information Meeting for the Holders of the Existing Facilities<br><br>6.00 a.m. on 19 November 2021 (London time) /<br><br>2.00 p.m. on 19 November 2021 (Singapore time) |

| | |
|---|---|
| Deadline to complete adjudication on Proofs of Debt | 23 November 2021 |
| Deadline to submit objections (if any) to the results of the adjudication of Proofs of Debt | 26 November 2021 |
| Deadline for Independent Assessor to make a decision on the objections (if any) | 3 December 2021 |
| Record Time | 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time) |
| Voting Results Announcement | As soon as practicable and in any event within two Business Days after the Record Time. |
| Sanction Hearing | Week of 3 January 2022 (*Indicative*) |
| Scheme Effective Date | As soon as practicable after the Sanction Hearing |
| Restructuring Effective Date | By the Long Stop Date |
| Long Stop Date | 31 March 2022, subject to any extension under the terms of the Scheme. |

5.2    All Scheme Creditors shall be notified of this Scheme through (a) distribution of the Explanatory Statement through the Clearing Systems and the Scheme Website, (b) announcement on SGXNet, with a notice comparable to the notice set out in Schedule 1 (the "**Announcement**") and (c) email (where email addresses are available).

5.3    Each Scheme Creditor (excluding Noteholders) may commence lodging, and in any event shall lodge, with the Information Agent, its Proof of Debt in respect of its Scheme Claim no later than 19 November 2021, for the purposes of voting and participating in the Scheme. Such Proof of Debt shall be in the form set out in Schedule 3. If a Scheme Creditor (excluding any Noteholder) does not submit a Proof of Debt by 19 November 2021 , the Chairman shall assign such value to that Scheme Creditors Scheme Claims as the Chairman (acting reasonably) determines in accords with Company's records (an "**Assigned Value**"), and the terms of Clauses 5.5 to 5.8 below will not apply in respect of those Scheme Claims and Assigned Value assigned to those Scheme Claims. Noteholders are not required to submit a Proof of Debt. For each Scheme Creditor that is a Noteholder as at the Record Time, that Scheme Creditor will be eligible to vote in the Scheme provided that they submit (where applicable via their Relying Person) an electronic Blocking and Voting Instruction prior to the Record Time in accordance with Clauses 6.1 to 6.13 below.

5.4    The Chairman shall adjudicate the Proofs of Debt and send the result of such adjudication (along with any Assigned Value for any Scheme Creditor (other than a Noteholder) that has not filed a Proof of Debt) to every creditor who has filed a Proof of Debt by 23 November 2021, via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website.

5.5    If any Scheme Creditor who has filed a Proof of Debt pursuant to Clause 5.3 objects to the results of the adjudication referred to in Clause 5.4, such a Scheme Creditor shall, no later than

26 November 2021, send a written request, seeking agreement for the appointment of an independent assessor (the "**Independent Assessor**") to the Company and the Chairman.

5.6     The written request referred to in Clause 5.5 shall nominate a person to be appointed as the Independent Assessor and state the dispute the Independent Assessor (if appointed) is to adjudicate.

5.7     The Chairperson will, as soon as practicable after the appointment of an Independent Assessor, provide the relevant Proof of Debt to the Independent Assessor, following which the Independent Assessor must, not later than 3 December 2021 after being provided with the relevant Proof of Debt, make a decision on the objection and send a written notice of the decision, with reasons for the decision, to the Chairman, the Company and the Scheme Creditor whose Scheme Claim will be affected by the decision of the Independent Assessor.

5.8     Where an application is made to the Court relating to the results of the adjudication referred to at Clause 5.4 to 5.7 above, the opposing party shall immediately upon making the application send written notice of the application to:

(a)     the Company, unless the objecting party is the Company;

(b)     the Chairman; and

(c)     the Scheme Creditor whose Scheme Claim will be affected by the decision of the Independent Assessor, unless the objecting party is that Scheme Creditor.

5.9     The Company shall convene the Information Meetings via videoconferences with Scheme Creditors, to provide the Scheme Creditors with a summary of the compromise and arrangement effected by this Scheme, and to address any queries which Scheme Creditors may have in relation to this Scheme. The Administrative Parties will not be required to attend the Information Meetings. Scheme Creditors who wish to attend the Information Meetings may register to receive access details by contacting the Information Agent at any time following the date of the Explanatory Statement and providing (unless the Scheme Creditor is a Noteholder) its Proof of Debt, such Proof of Debt and relevant documentary evidence to be dated no more than one month from the date of its submission and or (if the Scheme Creditor is a Noteholder) reasonable documentary evidence of its holding.

5.10    To be eligible to vote in respect of this Scheme and to ensure the vote so casted is valid, Scheme Creditors must follow the steps set out in Clauses 5.3 to 5.5 above and Clause 6 below (or have had an Assigned Value assigned to their Scheme Claims in accordance with Clause 5.3 above (and any such Scheme Creditor that has had an Assigned Value assigned to any of its Scheme Claims in accordance with Clause 5.3 above shall only be eligible to vote in respect of such Scheme Claims based on that Assigned Value)). Only Scheme Creditors which are Noteholders or Holders of the Existing Facilities at the Record Time are entitled to vote in respect of this Scheme.

5.11    Voting instructions provided under the electronic Blocking and Voting Instruction for the Noteholders and under the Voting Instruction Form for the Holders of the Existing Facilities will be definitive and may not be changed, and additional voting instructions will not be accepted through any other means.

5.12    An announcement on the results of voting on this Scheme will be issued to Scheme Creditors via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme

Website, and such announcement will be as soon as practicable and in any event within two Business Days after the Record Time, (the "**Voting Results Announcement**").

5.13    The Chairman shall tabulate as at the Record Time:

(a)    the total number of Scheme Creditors with Accepted Scheme Claims who cast a valid vote either way in this Scheme;

(b)    the total number of Scheme Creditors with Accepted Scheme Claims who cast a valid vote in favour of this Scheme;

(c)    the total number of Scheme Creditors with Accepted Scheme Claims who cast a valid vote against this Scheme; and

(d)    the total number of votes by value attributable to each group of Scheme Creditors set out in Clauses 5.13(a) to 5.13(c) above, on the basis of one vote for every US$1 of Accepted Scheme Claim (rounded down to the nearest US$1) and subject to the detailed provisions of Clauses 5 and 6),

and shall determine whether the Requisite Majority in respect of each class of Scheme Creditors has been met.

5.14    If the Requisite Majority of Scheme Creditors in respect of each class of Scheme Creditors vote in favour of this Scheme, the Chairman shall declare this Scheme successful and the Company shall submit this Scheme for sanction by the Court.

5.15    The Company may, acting reasonably, extend in good faith any of the above dates to increase participation in this Scheme. In any such case, the dates above will be adjusted accordingly. Notice of extension of timing shall be provided to the Scheme Creditors as soon as reasonably practicable via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website.

5.16    Notwithstanding Clause 5.15 above or any other provision of this Scheme, if the Company or the Chairman (each acting reasonably and in good faith) determines an extension of the Record Date or the Record Time is necessary, the Record Date and/or the Record Time (as applicable) may be extended on one occasion and such extension must be for a period of no more than 14 days.

6.    **VOTING PROCEDURES**

**Submission of Blocking and Voting Instruction for Scheme Creditors that are Noteholders**

6.1    Each Scheme Creditor that is a Noteholder at the Record Time will be entitled to vote on this Scheme, in accordance with the terms of this Scheme, in respect of all of the Existing Notes in which it owns an economic or beneficial interest as principal at the Record Time, provided that it has submitted (where applicable via its Relying Person) an electronic Blocking and Voting Instruction prior to the Record Time. The Existing Notes Administrative Parties (including any nominee of the Existing Notes Depositary as registered holder of the Existing Notes) will not be entitled to vote on this Scheme to avoid any double counting of votes. Prior to the Record Time, the Company shall cancel or procure the cancellation of any Existing Notes that it or any other member of the Group has a beneficial interest in or which it or any other member of the Group has redeemed, converted, acquired or purchased (if any) and, for the avoidance of doubt, any such Existing Notes shall not be voted in this Scheme.

6.2    The Chairman shall determine  the amount of each Noteholder's Scheme Claims for voting purposes as of the Record Time and by verifying the same against the relevant information provided to the Information Agent by the Clearing System through which that Noteholder (or

its Account Holder acting on its behalf) holds its interest in the Existing Notes at the Record Time.

6.3    To vote in this Scheme, each Noteholder must, in respect of its holding in the Existing Notes held through the Clearing System, submit (or procure the submission of) an electronic Blocking and Voting Instruction through the applicable Clearing System prior to the Record Time to block its interests in the Existing Notes from being traded and specify its voting instruction in respect of its blocked position for the purposes of this Scheme.  Each Blocking and Voting Instruction must include the details of the Noteholder, including such Noteholder's name/entity name, registered address, contact email address and contact phone number. In submitting a Blocking and Voting Instruction each Noteholder thereby gives consent for the electronic Blocking and Voting Instruction and such details to be provided to the Information Agent and shared with the Company and its advisors and agents on a need to know basis and consents for such information to be used for the purposes of giving notice in respect of foreign law recognition proceedings (where applicable) to the extent the Company considers such information as being reasonably required to be used for the purposes of giving notice in respect of foreign law recognition proceedings.  The required submission prior to the Record Time of the Blocking and Voting Instruction to the relevant Clearing System is likely to take place via a Noteholder's custodian and/or Account Holder and in accordance with the standard practices and procedures required by the relevant Clearing System.

6.4    The Blocking and Voting Instructions must be submitted in respect of a minimum principal amount of Existing Notes of no less than the minimum denomination of US$200,000 and in integral multiples of US$1 in excess thereof.

6.5    The Chairman and/or the Information Agent may request, and each Noteholder undertakes to deliver, such evidence as may be reasonably required by the Chairman and/or the Information Agent to confirm that such Noteholder holds the direct or beneficial interest as principal in the aggregate principal amount of the Existing Notes that such Noteholder is purporting to vote under the Scheme (including but not limited to a proof of holding).

6.6    To ensure timely submission of the Blocking and Voting Instruction, each Noteholder shall liaise with its relevant custodian to check with the Clearing System as to whether any separate procedural requirements or timelines are applicable and ensure that the Blocking and Voting Instruction is provided before any applicable deadline, as the Clearing System in which it (or its custodian) holds its Existing Notes may impose separate procedural requirements and timelines for the submission of Blocking and Voting Instructions.

6.7    Each Noteholder (and/or its clearing system participant) will be deemed to, by delivering a Blocking and Voting Instruction with respect to its Existing Notes through any Clearing System, consent to the disclosure by such Clearing System of details concerning its identity, the aggregate principal amount of such Existing Notes and its account details to the Information Agent.

6.8    Voting instructions provided under the electronic Blocking and Voting Instruction will be definitive and may not be changed and additional voting instructions will not be accepted through any other means. An announcement of the results of voting on the Scheme will be issued to Noteholders via the Clearing Systems, SGXNet and the Scheme Website, and such Voting Results Announcement will be as soon as practicable and in any event within two Business Days after the Record Time.

6.9    Any Blocking and Voting Instruction submitted for a Noteholder shall be irrevocable for all purposes in connection with this Scheme. By procuring the submission of a Blocking and Voting Instruction, the relevant Noteholder will be deemed to have undertaken to the Company that it will not, from the time of submission of its Blocking and Voting Instruction, sell, transfer,

assign or otherwise dispose of its interest in all or any part of its specified Existing Notes until such time as the Existing Notes are unblocked in accordance with Clause 6.10.

6.10    The Blocking and Voting Instruction shall block the interests in the Existing Notes from the earlier of the Record Time or the time of submission of such Blocking and Voting Instruction. The Company shall be required to provide an irrevocable instruction to the Information Agent to immediately cause the relevant Existing Notes to be unblocked within two Business Days after the issuance of the Voting Results Announcement by the Company (which Voting Results Announcement shall be as soon as practicable and in any event within two Business Days after the Record Time).

6.11    Any Blocking and Voting Instruction submitted after the Record Time will be disregarded for voting purposes. Notwithstanding any other provision of this Scheme, the Chairman will be entitled, acting reasonably, to permit a Noteholder which has not otherwise submitted a valid Blocking and Voting Instruction in accordance with the procedures and deadlines set out in this Scheme to vote if: (a) the relevant Noteholder has otherwise completed the requirements in Clause 6.3 before the publication of the Voting Results Announcement, (b) the relevant Scheme Creditor is a Noteholder at the Record Time and (c) the Chairman considers that there is no risk of double-counting of votes as a result.

6.12    The Company and Chairman shall not be required to Accept a Noteholder and its Scheme Claim for the purposes of determining entitlement to vote in this Scheme unless the Noteholder has submitted a valid Blocking and Voting Instruction in accordance with the procedures and deadlines set out in this Scheme.

6.13    For the avoidance of doubt, neither the Existing Notes Administrative Parties nor the Amended Notes Administrative Parties shall be responsible for or involved in the submission of Blocking and Voting Instruction for Scheme Creditors that are Noteholders.  All communications or questions relating to the submission of Blocking and Voting Instruction for Scheme Creditors that are Noteholders should be raised with the Information Agent and not with the Existing Notes Administrative Parties or the Amended Notes Administrative Parties.

**Submission of Voting Instruction Form for Scheme Creditors of Existing Facilities**

6.14    Each Scheme Creditor that is a Holder of any part of the Existing Facilities at the Record Time will be entitled to vote on this Scheme, in accordance with the terms of this Scheme, in respect of all of the parts of the Existing Facilities in which it owns an economic or beneficial interest as principal at the Record Time, provided that it has submitted its Proof of Debt for adjudication in accordance with Clause 5 above or, if it has not submitted its Proof of Debt for adjudication in accordance with Clause 5 above, if it has had an Assigned Value assigned to its Scheme Claims by the Chairman in accordance with Clause 5.3 above (provided that such Scheme Creditor shall only be eligible to vote in respect of such Scheme Claims based on the Assigned Value assigned to those Scheme Claims). The Existing Syndicated Facility Administrative Parties shall refrain from voting on this Scheme to avoid any double counting of votes.

6.15    The Company shall determine (a) each such Scheme Creditor's standing to vote in this Scheme in accordance with the adjudication procedure or Assigned Value procedure (as applicable) set out in Clause 5 above, and (b) the amount of each such Scheme Creditor's Scheme Claims for voting purposes, in each case, as of the Record Time and by verifying the same against the relevant information provided to the Information Agent by submission of the Voting Instruction Form.

6.16    To establish standing to vote in this Scheme, each Holder of the Existing Facilities must submit (or procure the submission of) a Voting Instruction Form (in the form set out in Appendix 4 (Voting Instructions Form) to the Explanatory Statement by way of email to the Information

Agent at panbrothers@investor.morrowsodali.com prior to the Record Time to specify its voting instruction in respect of this Scheme.

6.17    Any Voting Instruction Form submitted after the Record Time will be disregarded for voting purposes. Notwithstanding any other provision of this Scheme, the Chairman will be entitled, acting reasonably, to permit a Scheme Creditor that is a Holder of any part of the Existing Facilities at the Record Time which has not otherwise submitted a valid Voting Instruction Form in accordance with the procedures and deadlines set out in this Scheme to vote if: (a) the relevant Scheme Creditor has otherwise completed the requirements in Clause 6.16 before the Voting Results Announcement and (b) the Chairman considers that there is no risk of double-counting of votes as a result.

6.18    The Company and Chairman shall not be required to Accept a Scheme Creditor that is a Holder of any part of the Existing Facilities at the Record Time and its Scheme Claim for the purposes of determining entitlement to vote in the Scheme unless the Scheme Creditor has submitted a valid Voting Instruction Form in accordance with the procedures and deadlines set out in the Scheme.

**Results of Voting**

6.19    If a Scheme Claim is unascertained, contingent or disputed, the Company and/or the Chairman may Accept the Scheme Claim for voting purposes only at a value which the Chairman considers is a fair and reasonable assessment of the sums owed by the Company or the relevant Group member in respect of that Scheme Claim.

6.20    The Chairman shall calculate the amount of all Scheme Claims as at the Record Time. Every Scheme Creditor whose vote is validly cast in this Scheme shall have one vote for every US$1 of its Accepted Scheme Claims (rounded down to the nearest US$1) as calculated for voting purposes in accordance with Clauses 6.3 and 6.16.

6.21    The Chairman and the Information Agent shall promptly inform the relevant Scheme Creditor of a refusal to accept (in full or in part) a Voting Instruction Form for the purposes of qualifying as a Scheme Claim along with the reasons for such refusal.

6.22    Votes of Scheme Creditors at the Record Time will be Accepted for voting purposes at a value equal to the sum of (a) the outstanding principal amount of the Existing Notes or Existing Facilities held by each Scheme Creditor at the Record Time (without double counting) and (b) all accrued and unpaid interest on such Existing Notes or Existing Facilities (including default interest) up to but excluding the Record Date. No other Scheme Claims are Accepted by the Company, and the Chairman will not consider any other Scheme Claims for voting purposes unless an application is made in writing to the Chairman before the Record Time.

6.23    The Chairman may, acting fairly and reasonably and subject to Clause 5.16 in respect of the Record Time and Record Date, vary any of the above procedures, including but not limited to proceeding with the voting by way of the mechanism provided under Section 210 of the Companies Act. In such case, the Scheme Creditors shall be informed of such variation as soon as reasonably practicable via the Clearing Systems, SGXNet, email (where email addresses are available) and the Scheme Website.

6.24    During the period commencing from the announcement of this Scheme and ending on the Restructuring Effective Date (or if earlier the date on which this Scheme is terminated or withdrawn) (for the purposes of this Clause 6.24 the "**Applicable Period**"), the Company shall pay any interest (excluding default interest) owing to Scheme Creditors under the Existing Notes Indenture (in the case of the Noteholders) or Scheme Creditors under the Existing

Facilities (in the case of Scheme Creditors that are creditors thereunder) that has an originally scheduled payment date that falls within the Applicable Period.

**7.    SALES, ASSIGNMENTS OR TRANSFERS**

7.1    Subject to Clause 7.2, the Company, Chairman and the Information Agent shall not be under any obligation to recognise any sale, assignment or transfer of any Existing Notes, Existing Facilities or Scheme Claims after the Record Time for the purposes of determining any entitlement to vote on this Scheme.

7.2    If the Company has received written notice of a sale, assignment or transfer of any Existing Notes, Existing Facilities or Scheme Claims (from each relevant party to such sale, assignment or transfer), the Company may, subject to such evidence as it may reasonably require and any other terms and conditions which the Company may consider necessary or desirable, agree to recognise such sale, assignment or transfer for the purposes of determining any entitlement to vote on this Scheme. It shall be a term of such recognition that such purchaser, assignee or transferee so recognised by the Company shall be bound by the terms of this Scheme and for the purposes of this Scheme shall be a Scheme Creditor.

7.3    Notwithstanding the above provisions of this Clause 7, any purchaser, assignee or other transferee of any Existing Notes, Existing Facilities or Scheme Claims after the Record Time shall be bound by the terms of this Scheme in the event that the Scheme Effective Date occurs. For the avoidance of doubt, such purchaser, assignee or other transferee shall be entitled to enforce the terms of this Scheme as if it were an original Scheme Creditor on the Scheme Effective Date.

**8.    SECURITIES LAW CONSIDERATIONS**

8.1    Amended Notes will not be distributed to or to the order, or for the account or benefit, of any person where such distribution would be prohibited by all applicable law (including United States federal and any state related securities law).

8.2    Amended Notes will not be registered under the U.S. Securities Act or any federal, state or other securities laws of the United States or any other jurisdiction. The Amended Notes will be issued in reliance upon the exemption from the registration requirements of the U.S. Securities Act provided by section 3(a)(10) thereof. No public offering of Amended Notes will be made in the United States. For the purpose of qualifying for the exemption from the registration requirements of the U.S. Securities Act provided by section 3(a)(10) thereof with respect to Amended Notes that may be issued pursuant to this Scheme, the Court (i) has been advised that its sanctioning of this Scheme will be relied upon as an approval of this Scheme and (ii) must approve the fairness of the terms and conditions of this Scheme to those security holders to whom Amended Notes will be issued, after holding an open hearing at which all such security holders are entitled to attend in person or through counsel to support or oppose the sanctioning of this Scheme and with respect to which notification has been given to all such security holders.

8.3    The distribution of the Amended Notes to persons resident in certain jurisdictions will also be subject to certain other limitations under securities laws of other jurisdictions.

8.4    Noteholders electing to receive Amended Notes represent that such election and subsequent delivery (as applicable) of the elected Amended Notes is permissible under all applicable law (including United States federal and any state related securities law).

**9.    AUTHORISATION TO EXECUTE ANY DOCUMENT TO GIVE EFFECT TO THE SCHEME**

9.1    On and from the Scheme Effective Date, each Scheme Creditor:

(a)    hereby irrevocably authorises and appoints each Administrative Party that is signing a Restructuring Document on its behalf as its attorney and agent to complete, enter into, execute and deliver (whether as a deed or otherwise) that Restructuring Document and perform all incidental acts related thereto for and on behalf of such Scheme Creditor, in accordance with Clause 3.3;

(b)    other than in the case of a Scheme Creditor of the Existing Syndicated Facility (who shall complete, enter into, execute and deliver (whether as a deed or otherwise) the Deed of Release relating to the Existing Syndicated Facility on its own behalf, or the Noteholders (where the relevant Administrative Party will execute on their behalf)), hereby irrevocably authorises and appoints the relevant Administrative Party on its behalf as its attorney and agent to, to the extent set out in (and in the order set out in) paragraph (d) of Clause 4.4, complete, enter into, execute and deliver (whether as a deed or otherwise) for and on behalf of such Scheme Creditor the Deeds of Release provided that such Deed of Releases are substantially in the form appended to the Explanatory Statement or are otherwise in agreed form pursuant to Clause 3.2 or Clause 3.3);

(c)    hereby irrevocably authorises and appoints the Chairman as its attorney and agent to date, complete, deliver (if required) and release the Restructuring Documents to which that Scheme Creditor is a party to the extent set out in (and in the order set out in) paragraph (b) of Clause 4.4; and

(d)    hereby irrevocably authorises, directs, instructs and empowers each Administrative Party that is signing a Restructuring Document on its behalf and the Information Agent (represented by any authorised representative) to, or to instruct each Intermediary and/or each Account Holder to (an Administrative Party, the Information Agent, an Intermediary and an Account Holder, each a "**Relying Person**"), to the fullest extent that it is entitled to do so, carry out whatever action, step or procedure that is necessary or appropriate to effect this Scheme and the transactions contemplated thereby, including (without limitation) carrying out such action, step or procedure to update the books and records of the Clearing Systems to reflect the terms of the Amended Notes and this Scheme, and further declares and acknowledges that:

(i)    no Relying Person will be held responsible for any liabilities or consequences arising directly or indirectly as a result of acts taken by them or pursuant to this Scheme (other than by reason of their fraud, gross negligence or wilful default which will not be the case if any Relying Person acts in accordance with the steps and instructions contemplated by this Scheme) and it further declares that none of the Relying Persons has responsibility for the terms of this Scheme or the transactions contemplated by thereby; and

(ii)    it will not take any action or commence or pursue any Proceeding or claim against any of the Relying Persons in respect of any Claim it might have against any of them or in respect of any act or omission of any kind by any Relying Person in relation to this Scheme or the transactions contemplated thereby (other than by reason of their fraud, gross negligence or wilful default which will not be the case if such Relying Person acts in accordance with the steps and instructions contemplated in this Scheme), and it hereby expressly and unreservedly waives its rights to take such Proceedings,

provided that and for the avoidance of doubt, any steps taken under this Clause 9.1 by the e Chairman or the Information Agent and/or their respective directors and officers (where

29

applicable) shall be taken in good faith, shall not have an adverse effect on the rights of any Scheme Creditor other than as contemplated by the terms of this Scheme and/or the Restructuring Documents and further provided that any steps taken under this Clause 9.1 by any Authorised Person shall be in accordance with the process set out in Clause 4 (and in the case of an Administrative Party, Clause 3) of this Scheme. For the avoidance of doubt, the authorisations, appointments, directions, instructions and empowerments set out herein are for each Authorised Person to act individually and shall not be construed as in any way requiring all Authorised Persons to act collectively.

9.2     The authority and power granted and conferred on each Authorised Person under this Clause 9 shall be treated, for all purposes whatsoever and without limitation, as having been granted and conferred by deed and the Authorised Person shall be entitled to delegate the authority granted and conferred by this Clause to any duly authorised officer or agent of the Authorised Person as appropriate.

## 10.     NO RIGHT TO COMMENCE PROCEEDINGS

10.1    From and after the Scheme Effective Date, no Scheme Creditor shall be entitled to commence, continue or procure the commencement or continuation of any Proceeding, whether directly or indirectly, against any of the Released Parties or in respect of any property of any of the Released Parties in respect of any Scheme Claim or any Released Claim (provided that, for the avoidance of doubt, nothing contained herein shall prevent or prohibit any Scheme Creditor from commencing and continuing any Proceeding by a Scheme Creditor to enforce its rights under this Scheme and/or to compel the Company or any other Person or entity to comply with its obligations under this Scheme).

10.2    Each Released Party (who is not a party to this Scheme) shall be fully entitled to enforce its rights under this Scheme, in its own name, (whether by way of a Proceeding or by way of defence or estoppel (or similar) in any jurisdiction whatsoever) as if it were a party hereto pursuant to the provisions of the Contracts (Rights of Third Parties) Act (Cap. 53B) of Singapore and/or any applicable law which so permits.

10.3    Each Scheme Creditor is deemed to acknowledge that if it, or any Person claiming through it, takes any Proceedings against the Released Parties in breach of Clauses 10.1 or 10.2 or the Deed of Release, the Released Party shall be entitled to obtain an order as of right staying those Proceedings and providing for payment, by the Scheme Creditor concerned and any Person claiming through it, of any reasonable costs, charges or other expenses properly incurred by such Released Party as a result of taking such Proceedings.

10.4    Each Scheme Creditor hereby acknowledges and agrees that any action taken by the Company in accordance with this Scheme or the Restructuring Documents will not constitute a breach of the Existing Notes Transaction Documents, Existing Facilities Transaction Documents or any other agreement or document governing the terms of any Scheme Claim.

## 11.     SCHEME CREDITOR UNDERTAKINGS AND RELEASES

11.1    In consideration for its rights and entitlements under this Scheme, each Scheme Creditor hereby gives the undertakings, releases and waivers in this Clause 11.

11.2    With immediate effect on and from the Restructuring Effective Date and conditional upon completion of each of the steps outlined in Clause 4.4 and subject to Clause 16, each Scheme Creditor (for and on behalf of itself and its Releasing Parties) conclusively, irrevocably, unconditionally, fully and absolutely:

(a)     waives, discharges and releases all of its rights, title and interest in and to its Scheme Claims in consideration for its rights and entitlements under this Scheme;

30

(b)     waives, discharges and releases the Released Parties and the Administrative Parties from the Released Claims;

(c)     agrees that all Scheme Claims shall be settled in full in accordance with the terms of this Scheme;

(d)     waives, discharges and releases the Committee Parties from any Claims arising out of, relating to and in respect of the preparation, conduct, sanctioning, implementation and execution of this Scheme or any Restructuring Documents;

(e)     ratifies and confirms everything which any Released Party or Administrative Party may lawfully do or cause to be done in accordance with any authority conferred by this Scheme and agrees not to challenge: (a) the validity of any act done or omitted to be done; or (b) the exercise or omission to exercise any power conferred in accordance with the provisions of this Scheme in good faith by any Released Party or Administrative Party;

(f)     undertakes to the Released Parties and Administrative Parties that it will not (and shall use all reasonable endeavours to procure that its Releasing Parties will not) commence or continue, or instruct, direct or authorise any other Person to commence or continue, any Proceedings in respect of or arising from any Released Claim which it has any interest in; and

11.3    acknowledges and agrees that it is its intention to fully, and finally forever settle and release any and all matters, disputes and differences, whether known or unknown, suspected or unsuspected, which presently exist, may later exist or may previously have existed between it and any of the Released Parties and Administrative Parties in respect of the Released Claims on the terms set out in this Scheme.At the reasonable request and cost of any Released Party, each Scheme Creditor shall, and shall use reasonable endeavours to procure that their respective Releasing Parties shall, execute and deliver such instructions and other documents at such times and places, and shall take any action, as may reasonably be required to give full effect to this Scheme, including (without limitation) to perfect or evidence any release, waiver or discharge referred to in this Scheme.

11.4    With effect on and from the Restructuring Effective Date, each Scheme Creditor on behalf of itself and each of its Releasing Parties irrevocably, unconditionally, fully and absolutely:

(a)     agrees that the Existing Notes and the Existing Notes Indenture will be amended, restated, supplemented or otherwise modified in accordance with the terms of this Scheme;

(b)     agrees that the Existing Facility Agreements, the Existing Syndicated Facility Security Documents and the Existing Syndicated Facility Guarantees will be amended, restated, supplemented or otherwise modified to reflect the terms of this Scheme; and

(c)     hereby authorises, directs, instructs and empowers each Authorised Person to release, discharge and/or (where relevant) reassign to the relevant grantor or assignor (as applicable) any rights (including any power of attorney) that they may have against any Released Party in connection with the Existing Notes and Existing Facility Agreements, including the Existing Notes Indenture, the other Existing Notes Transaction Documents and the other Existing Facilities Transaction Documents, as necessary to implement this Scheme, provided that any steps taken under this Clause 11.4(c) by the Company, the Chairman, AJ Capital or the Information Agent and/or their respective directors and officers (where applicable) shall be taken by the relevant party in good faith, shall not have an adverse effect on the rights of any Scheme Creditor other than as contemplated by the terms of this Scheme and/or the Restructuring Documents and

further provided that any steps taken under this Clause 11.4(c) by any Authorised Person shall be in accordance with the process set out in Clause 4 of this Scheme and in accordance with Clause 11.8 below.

11.5    The authority and power granted and conferred on each Authorised Person under Clause 11.4 shall be treated, for all purposes whatsoever and without limitation, as having been granted and conferred by deed and by way of a consent of each Holder. Each Authorised Person shall be entitled to, with no liability so doing, delegate the authority granted and conferred by Clause 11.4 to any duly authorised officer or agent of the respective parties as necessary.

11.6    To the extent permitted by law, none of the Scheme Creditors shall be entitled to challenge, or hold the Administrative Parties or any Authorised Person (as the case may be) liable in connection with, the validity of any act done or omitted to be done in good faith by the Company in connection with this Scheme or the exercise by the Administrative Parties or any Authorised Person of any power conferred upon it for the purposes of this Scheme if done, omitted or exercised (as the case may be) in accordance with the provisions of this Scheme.

11.7    The releases, waivers and undertakings under this Clause 11 shall notwithstanding the terms of Clause 11.2:

(a)    not prejudice or impair any rights of any Scheme Creditor created under this Scheme or any other Restructuring Document and/or which arise as a result of a failure by the Company or any party to this Scheme to comply with any terms of this Scheme or any other Restructuring Document, and all such rights shall remain in full force and effect; and

(b)    not prejudice or impair any Claims or causes of action of any Scheme Creditor, arising from or relating to the gross negligence, breach of fiduciary duty, fraud, dishonesty, wilful default or wilful misconduct of any other party (other than any Administrative Party) or any gross negligence, fraud or wilful default of any Administrative Party, in each case which is seeking to rely on such releases, waivers or undertakings.

11.8    For the avoidance of doubt notwithstanding the terms of Clause 11.2:

(a)    any outstanding indebtedness under Existing Notes shall continue pursuant to the terms of the Amended Notes in accordance with and to the extent set out therein and in Clause 4.4(b);

(b)    the security and guarantees created under the Existing Notes Security Documents and the Existing Notes Guarantees shall be confirmed by the relevant security providers or guarantors and shall continue and extend to cover the obligations of the Company and the relevant members of the Group under the Amended Notes (in each case, other than any guarantees contemplated as being released in the Restructuring Term Sheet (Existing Notes));

(c)    any outstanding indebtedness under the Existing Facilities shall continue pursuant to the terms of the Amended Facility Agreements in accordance with and to the extent set out therein and in Clause 4.4(b);

(d)    the security and guarantees created under the Existing Syndicated Facility Security Documents and the Existing Syndicated Facility Guarantees shall be confirmed by the relevant security providers or guarantors and shall continue and extend to cover the obligations of the Company and the relevant members of the Group under the Amended Syndicated Facility Agreement (in each case, other than any guarantees and/or security contemplated as being released in the Restructuring Term Sheet (Syndicated Facility)).

## 12.    CHAIRMAN AND INFORMATION AGENT

12.1    The Chairman shall oversee the implementation and conduct of, and compliance with the provisions of, this Scheme. If the Chairman reasonably believes that additional time is required for the implementation of any step set out in this Scheme, the Chairman may, acting reasonably, extend in good faith any deadline or date for implementation (save for any extension of the Long Stop Date or any deadline or date for implementation extending beyond the Long Stop Date and in the case of the Record Time or Record Date subject to Clause 5.16) by prior written notice to the Company, the Information Agent, the Scheme Creditors and the Clearing Systems as soon as reasonably practicable.

12.2    The Chairman and/or the Information Agent may request, and each Scheme Creditor undertakes to deliver, such evidence as may be reasonably required by the Chairman and/or the Information Agent to confirm that such Scheme Creditor holds the direct or beneficial interest as principal in the aggregate principal amount of the Existing Notes or Existing Facilities that such Scheme Creditor is purporting to vote under this Scheme (including but not limited to a Blocking Reference Number for the Noteholders).

12.3    Any decision, including calculations of Scheme Claims, made by the Chairman and/or the Information Agent in carrying out their respective functions and/or duties under and/or in fulfilment of this Scheme shall (in the absence of manifest error and, in the case of an adjudication decision or calculation made pursuant to Clause 5.4, subject to the terms of Clauses 5.5 to 5.8) be final and binding on all Scheme Creditors.

12.4    The Chairman and/or the Information Agent may consult the Advisors or engage independent legal, financial or other professional advisors and consultants to advise and assist the Chairman and/or the Information Agent in the performance or discharge of their respective duties.

12.5    The Chairman and/or the Information Agent may respectively rely on:

(a)    any representation, notice or document that they respectively believe to be genuine, correct and appropriately authorised; and

(b)    any statement made by any Person regarding any matters which may reasonably be assumed to be within such Person's knowledge or power to verify.

12.6    The Chairman and Information Agent shall not be liable to any Scheme Creditor for any and all losses, damages, charges, costs and expenses of whatsoever nature which such Scheme Creditor may sustain, incur or suffer in connection with or arising from their respective performance of their duties as Chairman and Information Agent (as applicable) under this Scheme, including (respectively) any decisions, calculations or payments in carrying out their functions and/or duties under and/or in fulfilment of this Scheme, unless directly caused by fraud, gross negligence or wilful misconduct on their respective parts. This Clause 12 shall remain in full force and effect notwithstanding the termination, resignation or removal of the Chairman or Information Agent.

12.7    Without prejudice to Clause 5, any Scheme Creditor that intends to challenge any act or omission of the Chairman and/or the Information Agent in connection with or arising from any decision, including calculations or payments, made by the Chairman and/or the Information Agent in carrying out their respective functions and/or duties under and/or in fulfilment of this Scheme shall notify the Chairman and/or the Information Agent (as applicable) of such intention to challenge at least seven days before any such challenge is made to the Court or in any other forum. Any Scheme Creditor who makes a challenge without providing such appropriate notice shall be deemed to have agreed to: (a) if such challenge is dismissed by the Court, be liable for the costs, expenses and disbursements incurred by the Chairman and/or the Information Agent (as applicable) in connection with resisting any such challenge on an

indemnity basis, and (b) in any case, be solely responsible for any cost, expenses and disbursements he incurs in connection with the challenge.

## 13.    THE EXISTING NOTES TRUSTEE AND THE ADMINISTRATIVE PARTIES AND CERTAIN OTHER MATTERS

13.1    None of the Administrative Parties have participated in the preparation of or verified or approved this Scheme or the terms of the arrangement and compromise effected by this Scheme or the Explanatory Statement. No Administrative Party expresses any opinion on the merits of any proposed modifications and amendments to the Existing Notes Indenture, any Existing Syndicated Facility Transaction Document, this Scheme, any aspect of the voting process (including, but not limited to, the verification of Scheme Claims) and the terms of the arrangement and compromise effected by this Scheme. None of the Administrative Parties have been involved in negotiating or determining the terms of the arrangement and compromise effected by this Scheme and no representation is made that all relevant information has been disclosed to the Scheme Creditors in or pursuant to this Scheme.

13.2    Each Administrative Party may, at the expense of the Company, appoint and act through its attorneys, delegates and agents and will not be responsible for the acts, omissions, misconduct or negligence of, or for, monitoring or supervising any attorney, delegates or agent appointed with due care by it hereunder. To the extent an agent has been named by an Administrative Party in connection with this Scheme, the parties hereto shall cooperate to ensure that such attorney, delegate or agent can perform the duties for which it was appointed.

13.3    Each of the Company and the Scheme Creditors on behalf of itself and each of its predecessors, successors and assigns to the fullest extent permitted by law (and without prejudice to any rights, privileges, immunities, indemnities and limitations of liability of the Administrative Parties under the Existing Notes Transaction Documents, the Existing Facilities Transaction Documents and the Restructuring Documents):

(a)    releases, discharges and exonerates each of the Administrative Parties, and any of their respective directors, officers, employers, advisors or agents duly appointed, from any and all liabilities, losses, damages or consequences to the Scheme Creditors:

(i)    for any of the Administrative Parties' acts or omissions in furtherance of or in connection with this Scheme and implementation of the same;

(ii)    by reason of any of the Administrative Parties acting in accordance with any authorisations and instructions provided to it in accordance with the terms of this Scheme;

(iii)    for the manner of performance of all acts carried out by the Administrative Parties on the authorisations and instructions provided to it in accordance with the terms of this Scheme; and

(iv)    under the Existing Notes Transaction Documents or the Existing Facilities Transaction Documents with effect from the Restructuring Effective Date;

(b)    hereby declares, confirms and acknowledges that each of the Administrative Parties will not be held responsible for any liabilities, losses, damages or consequences arising directly or indirectly in connection with this Scheme and it further declares that none of the Administrative Parties has responsibility for the terms of this Scheme or the transactions contemplated by thereby;

(c)    shall and shall be deemed to completely and forever release, waive, void, acquit, forgive, extinguish and discharge unconditionally the Administrative Parties, and any of their respective directors, officers, employers, advisors, affiliates or agents duly appointed,

from any Claim (whether asserted by the Company, any Scheme Creditor or any other Person) or liabilities, losses, damages or consequences in connection with the exercise or performance of any of their respective powers or duties under the Existing Notes Transaction Documents, the Existing Facilities Transaction Documents and this Scheme; and

(d)      hereby declares, confirms and acknowledges that it will not take any action or commence or pursue any Proceeding or Claim against any of the Administrative Parties in relation to this Scheme or the transactions contemplated thereby and it hereby expressly and unreservedly waives its rights to take any such actions or commence or pursue any such Proceedings or Claims,

in each case: (a) save to the extent of gross negligence, fraud or wilful default solely attributable to the Administrative Parties and (b) irrespective of whether the Company obtains any order pursuant to any applicable law, legal doctrine or Proceeding concerning Cross-Border Recognition.

13.4    If the Company in its sole discretion believes that it would be in the interests of implementing this Scheme and/or the Restructuring (in accordance with the terms herein) that the Amended Notes should be assigned a rating by only one of the Rating Agencies, then the Company may, in its sole discretion, engage any one of the Rating Agencies to assign a rating to the Amended Notes as of the Restructuring Effective Date as part of the implementation of the Restructuring.

## 14.    AMENDMENTS TO THE SCHEME

14.1    Subject to Clause 14.5 below, prior to the sanction of this Scheme by the Court, in the event that the Company wishes to propose any amendments or modifications to this Scheme, the Company may call for a vote to be cast in respect of such amendments or modification. The procedures and voting entitlement shall be the same (or as close as reasonably practicable to) as that set out in the original Scheme.

14.2    After the Scheme has been sanctioned by the Court, in the event that the Company wishes to propose any amendments or modifications to this Scheme (other than any amendments or modifications that are administrative or technical in nature), the Company must apply to the Court for a further sanction by the Court.

14.3    This Clause 14 is without prejudice to the right of the Company to apply for approval of an amendment or modification under this Clause 14 by the Court or any Scheme Creditor to apply to the Court to challenge the validity of such amendment or modification under this Clause 14.

14.4    The Company may, at any hearing to sanction this Scheme, consent on behalf of all Scheme Creditors to any modification of this Scheme, or any terms or conditions, which the Court may think fit to approve or impose and which would not directly or indirectly have a material adverse effect on the interests of any Scheme Creditor under this Scheme.

14.5    If a Scheme Creditor has any comments on the key commercial terms of a Restructuring Term Sheet which relates to Restructuring Documents to which it will be party (or to which it will be bound) (an "**Applicable Original Term Sheet**") and it has notified those comments in writing to the Company (through the Information Agent) by no later than 3.59 p.m. (London time) / 11.59 p.m. (Singapore time) on 16 November 2021, the Company shall consider those comments in good faith and, to the extent any changes to the Applicable Original Term Sheet proposed by the applicable Scheme Creditor are agreed by the Company (acting in good faith but taking into account previous negotiations and agreements reached and without reopening agreed points), a revised version of the Applicable Original Term Sheet (marked to show the changes made) (the "**Applicable Revised Term Sheet**") will be circulated to Scheme Creditors (through the Information Agent in the case of the Scheme Creditors that are Noteholders and in

the case of other Scheme Creditors through the applicable Administrative Parties where relevant) and any applicable Administrative Party executing any Restructuring Document on behalf of Scheme Creditors for review.  Any Applicable Revised Term Sheet must be circulated in accordance with this Clause 14.5 as soon as practicable and in any event prior to 6.00 a.m. (London time) / 2.00 p.m. (Singapore time) on 18 November 2021.  If an Applicable Revised Term Sheet is circulated in accordance with this Clause 14.5 that Applicable Revised Term Sheet shall replace the Applicable Original Term Sheet for the purposes of this Scheme without any further action or consent being required.

## 15.    PROCEDURAL MODIFICATIONS TO THE SCHEME

15.1    The Company may call for a vote to be cast in respect of any amendments to this Scheme that are procedural in nature, provided that such amendments do not have a material adverse effect on any of the Scheme Creditors and/or their rights under this Scheme. The procedures and voting entitlement shall be the same (or as close as reasonably practicable to) as that set out in the original Scheme.

15.2    Any amendment proposed in this Clause 15 shall be deemed passed if accepted by a majority in value of Scheme Claims and shall be binding on the Company and all Scheme Creditors without need for further sanction by the Court.

15.3    This Clause 15 is without prejudice to the right of the Company to apply for sanction of an amendment under this Clause 15 by the Court or any Scheme Creditor to apply to the Court to challenge the validity of such amendment under this Clause 15.

## 16.    TERMINATION OF THE SCHEME

16.1    If the Company is in material breach of its obligations under this Scheme, which breach is not remedied within 45 (forty five) days of any Scheme Creditor giving notice of the purported breach to the Company, then Holders whose Scheme Claims at such time in aggregate constitute more than 33.33% of the total of the Scheme Claims may give notice in writing to the Company to terminate this Scheme.

16.2    This Scheme shall terminate on the Long Stop Date if the Restructuring Effective Date has not occurred.

16.3    If this Scheme is terminated under Clause 16.1 or Clause 16.2, the terms of and the obligations of the parties under or pursuant to this Scheme shall lapse and all the compromises and arrangements provided by this Scheme and any releases granted pursuant to this Scheme shall be of no effect and shall be construed as if it had never become effective, and the rights and obligations of the Scheme Creditors shall not be affected and shall be reinstated and remain in full force and effect.

## 17.    COMPLETION OF THE SCHEME

The implementation and operation of this Scheme shall be deemed to be completed following the Restructuring Effective Date.

## 18.    NOTICES

18.1    Any notice or other written communication to be given under or in relation to this Scheme to any Scheme Creditor may be served by way of:

(a)    delivery by hand, courier, pre-paid first-class post or airmail to the last known address of the Scheme Creditor appearing in the records of the Company;

(b)    e-mail to the last known e-mail address of the Scheme Creditor appearing in the records of the Company;

(c)      in respect of a Noteholder, issuing the notice on SGXNet;

(d)      issuing the notice on the Scheme Website;

(e)      in respect of a Noteholder, issuing the notice through the Clearing Systems; or

(f)      placing an advertisement in an English language newspaper having general circulation in Singapore.

18.2    Any notice or other written communication to the Company must be sent via e-mail and may also be served by way of delivery by hand, courier, or pre-paid first class post or airmail, to the address set out below:

**PT Pan Brothers Tbk.**

| | |
|---|---|
| Address | : Jalan Siliwangi No. 178 Kelurahan Alam Jaya, Kecamatan Jatiuwung Tangerang, Banten 15133 - Indonesia |
| E-mail | : directors@pbrx.co.id<br>hudya@pbrx.co.id<br>legal@pbrx.co.id |
| Attention | : Ibu Anne Patricia Sutanto / Ibu Fitri Ratnasari Hartono |

**AJ Capital**

| | |
|---|---|
| Address | : 88@Kasablanka Office Tower A, 22nd Floor Jl Casablanca Raya Kav. 88 Jakarta 12870 |
| E-mail | : panbrothers@ajcapital.co.id |
| Attention | : Geoffrey D. Simms |

**Baker & McKenzie**

| | |
|---|---|
| Address | : 8 Marina Boulevard #05-01 Marina Bay Financial Centre Tower 1 |
| E-mail | : SIN-PanBrothers@bakermckenzie.com |
| Attention | : Emmanuel Hadjidakis |

18.3    Any notice or written communication given under or in relation to this Scheme shall be deemed to have been delivered and served:

(a)      if delivered by hand or courier, when actually received or, if such receipt occurs on a non-Business Day or after 5:00 p.m. in the place of receipt, the following Business Day;

(b)      if sent by pre-paid first-class post or airmail, on the second Business Day after posting if the recipient is in the country of dispatch, otherwise the seventh Business Day after posting;

(c)      if sent electronically through e-mail or the Clearing Systems, when transmitted or, if such transmission occurs on a non-Business Day or after 5:00 pm in the place of receipt, the following Business Day; and

(d)     if by advertisement or SGXNet announcement or announcement on the Scheme Website, on the date of publication.

18.4    In proving service, it shall be sufficient proof, in the case of (a) a notice sent by pre-paid first-class post or airmail, that the envelope was properly stamped, addressed and placed in the post or (b) a notice sent by e-mail, that the notice was transmitted by e-mail to the relevant e-mail address of the party.

18.5    The accidental omission to send any notice, written communication or other document in accordance with any of Clause 18.1 to Clause 18.4, or the non-receipt of any such notice by any Scheme Creditors, shall not affect any part or provision of this Scheme.

## 19.    COSTS AND EXPENSES

19.1    The Company shall pay, or procure the payment of, in full all costs, charges, expenses and disbursements incurred by it in connection with the preparation, conduct, sanctioning, implementation and execution of this Scheme as and when they arise, including, but not limited to, any costs in connection with the Information Meetings, the tabulation of votes on this Scheme, the costs of obtaining the sanction of the Court and the costs of issuing notices (if any) required by this Scheme.

## 20.    FORCE MAJEURE

20.1    No party to this Scheme shall be in breach of any obligations under this Scheme as a result of any delay or non-performance of its respective obligations under this Scheme arising from any Force Majeure Event.

## 21.    CONFLICT AND INCONSISTENCY

21.1    This Scheme, and not the Explanatory Statement, forms the basis of the compromise and arrangement between the Company and the Scheme Creditors. For the avoidance of doubt, in the case of a conflict or inconsistency between the terms of this Scheme and any statements made in the Explanatory Statement, the terms of this Scheme shall prevail.

21.2    After the Restructuring Effective Date (and for the avoidance doubt after all of the restructuring steps in Clause 4 have been completed) , in the case of a conflict or inconsistency between the terms of this Scheme and any Restructuring Documents the terms of the Restructuring Documents shall prevail (provided that, for the avoidance of doubt, this Clause shall not operate to invalidate in any way the terms of or completion of the Scheme (including, without limitation, any releases referred to in this Scheme or any Deed of Release) in accordance with the terms of the Scheme).

## 22.    SEVERABILITY

22.1    If any provision in this Scheme shall be held to be invalid, illegal or unenforceable, in whole or in part, the provision shall apply with whatever deletion or modification as and only to the extent necessary so that the provision is legal, valid and enforceable and gives effect to the commercial intentions of the parties to this Scheme.

22.2    To the extent it is not possible to delete or modify the provision in whole or in part, under this Clause, then such provision or part of it shall, to the extent that it is invalid, illegal or enforceable, be deemed not to form part of this Scheme and the validity, legality and enforceability of the remainder of this Scheme shall not be affected.

22.3    Nothing in this Scheme shall protect any Person from liability for fraud.

## 23.    GOVERNING LAW AND JURISDICTION

23.1    The operative terms of this Scheme and any non-contractual obligations arising out of or in connection with this Scheme shall be governed by and construed in accordance with the laws of Singapore.

23.2    The Scheme Creditors and the Company hereby agree that the courts of Singapore, including the Court shall have exclusive jurisdiction to hear and determine any suit, action or proceeding and to settle any dispute which arises out of or in connection with the terms of this Scheme or its implementation.

23.3    Without prejudice to the aforementioned:

   (a)    the Company shall make an application for a suitable Chapter 15 Order; and

   (b)    the Company may also (acting reasonably) make an application for a suitable order under any other applicable law, legal doctrine or Proceeding concerning Cross-Border Recognition (including any other applicable law, legal doctrine or Proceeding in Indonesia, the United States or England and Wales) and for such other additional relief and/or assistance as the Company may require.

23.4    Save as expressly provided in this Scheme, the operation of the Contracts (Rights of Third Parties) Act (Cap. 53B) of Singapore is hereby expressly excluded.

## SCHEDULE 1
## NOTICE OF SCHEME

The contents of this announcement have not been reviewed by any regulatory authority in Indonesia, Singapore, the United States of America or any other jurisdiction. This announcement does not constitute an offer to sell or the solicitation of an offer to buy any securities. None of the securities referred to in this announcement may be sold, issued or transferred in any jurisdiction in contravention of applicable law. The securities proposed to be issued pursuant to the Scheme (as defined below) will not be registered with the U.S. Securities and Exchange Commission under the U.S. Securities Act of 1933, as amended (the "**U.S. Securities Act**"), or the securities laws of any state or other jurisdiction, and are being transferred and delivered in reliance upon certain exemptions from the registration requirements of the U.S. Securities Act.

## SCHEME OF ARRANGEMENT

## UNDER SECTION 71 OF THE INSOLVENCY, RESTRUCTURING AND DISSOLUTION ACT 2018 (NO. 40 OF 2018)

Between

**PT PAN BROTHERS TBK** (Company Registration No. 8120214123901) (the "**Company**")

And

the Scheme Creditors (as defined in the Scheme)

## <u>NOTICE OF PROPOSED SCHEME OF ARRANGEMENT</u>

We refer to:

(a)     the US$200,000,000 7.625% Guaranteed Senior Notes due 2022 (ISIN: XS1555631925, Common Code: 155563192) issued by PB International B.V. (the "**Issuer**") on 26 January 2017 (the "**Existing Notes**");

(b)     the revolving credit facility of up to US$150,000,000 arranged by PT Bank Anz Indonesia, PT Bank HSBC Indonesia and ING Bank N.V., Singapore Branch for, among others, the Company and as amended on 10 April 2018 and 29 October 2018 (the "**Existing Syndicated Facility**"); and

(c)     certain outstanding bilateral facility claims against the Company (the "**Existing Bilateral Facilities**"),

(the Existing Notes, the Existing Syndicated Facility and the Existing Bilateral Facilities collectively, the "**Existing Debt**").

The Company has circulated terms of an arrangement and compromise which it plans to implement as a scheme of arrangement (the "**Scheme**") pursuant to Section 71 of the Singapore Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018). The Scheme document together with an explanatory statement in relation to the Scheme (the "**Explanatory Statement**") has been circulated through the clearing systems, email, announced on SGXNet and are available to download from the website in respect of the Scheme (https://bonds.morrowsodali.com/PanBrothers) (the "**Scheme Website**"). Printed copies of the Scheme document and Explanatory Statement can also be obtained free of charge by Scheme Creditors (as defined in the Scheme) on request from the Information Agent (contact details below) or the Company.

Information meetings have been arranged by the Company for the purposes of answering Scheme Creditor questions on the Scheme (the "**Information Meetings**"). Due to the current SARS-CoV-2 pandemic, the Information Meetings will take place by way of videoconferences, scheduled for:

Information Meeting for Noteholders

at 7.30 a.m. on 19 November 2021 (London time) / 3.30 p.m. on 19 November 2021 (Singapore time) via videoconference

Information Meeting for Holders of Existing Facilities

at 6.00 a.m. on 19 November 2021 (London time) / 2.00 p.m. on 19 November 2021 (Singapore time) via videoconference

These meetings are strictly for the Scheme Creditors by registration with the Information Agent or the Chairman only. Scheme Creditors who wish to attend the Information Meetings may register to receive access details by contacting the Information Agent or the Chairman (contact details below) at any time following the date of this notice and providing (unless the Scheme Creditor is a Noteholder) its Proof of Debt or (if the Scheme Creditor is a Noteholder) documentary evidence of its debt claim acceptable to the Information Agent dated no more than one month from the date of submission of the same.

## CHAIRMAN

The Company has appointed Geoffrey D Simms of AJCapital to act as Chairman of the Scheme process. The Chairman shall oversee the implementation and conduct of, and compliance with the provisions of, the Scheme.

## VOTING ARRANGEMENTS

Votes attributable to the Existing Debt may be cast by Persons with an economic or beneficial interest as principal in the Existing Debt held through the clearing systems at the Record Time (as defined below) (the "**Holders**") by submitting a blocking and voting instruction in respect of their respective holdings through the clearing systems (through their respective account holders at the relevant clearing systems) in respect of the Existing Notes or by submitting their Voting Instruction Form in respect of the Existing Facilities by the Record Time (as defined below). Detailed voting instructions are included in the Explanatory Statement. Only Scheme Creditors which are Holders at the Record Time are entitled to vote on the Scheme.

The Existing Notes Trustee (as defined in the Scheme), Existing Notes Agents (as defined in the Scheme), the Existing Notes Depositary (as defined in the Scheme) (including any nominee of the Existing Notes Depositary as registered holder of the Existing Notes) and the Existing Syndicated Facility Administrative Parties (as defined in the Scheme) will not be entitled to vote on the Scheme to avoid any double counting of votes.

The "**Record Time**" in respect of the Scheme is 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time).

The Record Time is subject to extension at the discretion of the Company (acting reasonably).

Any Scheme Creditor that fails to submit the blocking and voting instruction (in respect of the Existing Notes) or a Voting Instruction Form (in respect of the Existing Facilities) by the Record Time mentioned above will be excluded from voting on the Scheme.

## SANCTIONING THE SCHEME

The Chairman shall tabulate the results of the voting on the Scheme to be reported to the Singapore Court. In the event that the Scheme receives the requisite support from the Scheme Creditors, a hearing before the High Court of Singapore is necessary in order to sanction the Scheme (the "**Sanction Hearing**"). Scheme Creditors are entitled to attend the Sanction Hearing in person or through their solicitors with rights of audience before the High Court of Singapore to support or oppose the sanctioning of the Scheme.

The Company will notify the Scheme Creditors of the precise date and manner in which the Sanction Hearing shall take place by circulating a notice via the clearing systems, email and the Scheme Website.

If the Scheme is sanctioned by the High Court of Singapore, all Scheme Creditors (whether they have participated in the Scheme or not and even if they have did not vote or voted to oppose the sanctioning of the Scheme) will be bound by the terms of the Scheme.

## FURTHER INFORMATION

Scheme Creditors should direct queries to the Information Agent (details below) in the first instance. Alternatively, Scheme Creditors may also contact the Chairman or the Company's international legal counsel (details below).

Dated this 12 November 2021

*Information Agent:*
**Morrow Sodali Limited**

| **In Hong Kong** | **In London** | **In New York** |
|---|---|---|
| Unit 23-106, | 103 Wigmore Street | 509 Madison Avenue Suite |
| LKF Tower | W1U 1QS | 1206, |
| 33 Wyndham Street, Central | London | New York NY10022 |
| Telephone: +852 2319 4130 | Telephone: +44 20 4513 6933 | Telephone: +1 203 609 4910 |

E-mail: panbrothers@investor.morrowsodali.com
Scheme Website: https://bonds.morrowsodali.com/PanBrothers

*Chairman:*
Geoffrey D Simms
E-mail: panbrothers@ajcapital.co.id

*Company's Solicitors:*
BAKER & MCKENZIE
E-mail: SIN-PanBrothers@bakermckenzie.com

**SCHEDULE 2**
**TERMS OF ARRANGEMENT AND COMPROMISE**

**PT Pan Brothers, Tbk. and subsidiaries**

**USD138.5 Million Syndicated Credit Facility and certain Bilateral Facilities**

**Indicative Non-Binding Restructuring Term Sheet**

**(Subject to Contract)**

The terms set out in this draft term sheet are a summary of the key terms only to facilitate further discussions between the Syndicated Lenders and the Borrowers. These terms do not purport to be a complete description of the terms of the proposed transaction.

This draft term sheet and its contents are intended for the exclusive use of the Borrowers and shall not be disclosed by the Borrowers to any person other than the Borrowers' affiliates and legal and financial advisors for the purposes of the proposed transaction unless the prior written consent of the Syndicated Lenders is obtained.

| PARTIES AND INDEBTEDNESS | | |
|---|---|---|
| Existing Borrowers | : | PT Pan Brothers, Tbk. ("**PBRX**" or the "**Company**") and the following subsidiaries:<br>1. PT Pancaprima Ekabrothers; ("**PPEB**")<br>2. PT Prima Sejati Sejahtera; and<br>3. PT Eco Smart Garment Indonesia. ("**ESGI**")<br><br>PBRX and its subsidiaries listed under (1) to (3) above shall individually be referred to as a "**Borrower**" and collectively referred to as the "**Borrowers**". |
| Group | : | PBRX and all of its (direct and indirect) subsidiaries from time to time. |
| Existing Guarantors | : | All Borrowers and any other subsidiary or subsidiaries of PBRX (excluding CGL (Cosmic Gear), TPG and VPM) that has acceded to the existing Syndicated Facility as a Guarantor (each a "**Guarantor**" and collectively, the "**Guarantors**"). |
| Existing Obligors | : | The Existing Borrowers and the Existing Guarantors. |
| Syndicated Lenders | : | Those lenders under the Syndicated Facility. |
| Syndicated Facility | : | The existing syndicated revolving credit facility dated 27 December 2017 as amended and restated from time to time. |
| Syndicated Facility Amount | : | USD138,400,000. |
| PROPOSED TRANSACTION AND PROCESS | | |
| Transaction | : | This draft term sheet contemplates that the Syndicated Facility shall be amended and restated pursuant to an amended and restated facility agreement (the "**Amended and Restated Facility Agreement**") and the Syndicated Lenders shall all agree to have the existing indebtedness under the Syndicated Facility (the "**Existing Indebtedness**") be governed by the terms of the Amended and Restated Facility Agreement. Each Syndicated Lender's total participation under the Amended and Restated Facility Agreement shall be equal to its aggregate principal amount outstanding of the Existing Indebtedness. For more details, see section regarding "Amended Facility" below.<br><br>The amendment and restatement of the Syndicated Facility is conditional on a successful amendment and restatement of the USD Bonds (as defined below) (with interconditionality), i.e. bond restructuring will be simultaneous with loan restructuring. |
| Process | : | The Company will implement the Transaction by way of a scheme of arrangement.<br><br>The transaction will be implemented as follows:<br>1. Agreement to the terms of this term sheet;<br>2. Signing of key transaction documents, such key transaction documents to include, but are not limited to: |

| | | |
|---|---|---|
| | | a. An amendment and restatement agreement and the Amended and Restated Facility Agreement; <br> b. 'Refreshed' and new security and guarantee documentation; <br> c. A cash account management agreement ("**CAMA**") the principles of which are set out under the "CAMA: Bank Accounts, Minimum Operating Reserve and Cash Sweep Mechanism" section of this term sheet; <br> d. a ringfencing deed (the "**Ringfencing Deed**"), under which certain key shareholders will agree to ringfence an amount of USD50 million ("**Ringfenced Amount**"); and <br> e. Such other documents as the Syndicated Lenders and/or the Company may reasonably require in order to implement the Transaction. <br> 3. As part of the scheme of arrangement, the existing holders of the USD200m 7.625% Senior Notes due 2022 issued by PB International B.V. (ISIN: XS1555631925; Common Code: 155563192) ("**USD Bonds**") shall agree to an amendment and restatement of their notes (by way of a scheme of arrangement) based on the key commercial terms as further set out in the bonds term sheet (the "**USD Bonds Amendment**"): <br> a. Security: None save for security over the interest reserve account. <br> b. Maturity: To seek a tenor extension to 31 December 2025. <br> c. Interest Rate: Flat interest rate not to exceed the existing rate and an all-in cost not exceeding the existing cost. <br> d. Amortisation: Nil, bullet repayment at maturity. <br><br> The Company acknowledges that certain Syndicated Lenders require the Company to execute a side letter (the "**Side Letter**") for the purposes of Syndicated Lenders' respective credit processes. The Side Letter will refer to the scheme of arrangement and this term sheet and will document: (i) the commercial terms of the Amended and Restated Facility Agreement which will be in line with the terms set out in this term sheet; and (ii) the Borrowers' obligation to use their best efforts to finalise and execute the Amended and Restated Facility Agreement in form and substance acceptable to the Syndicated Lenders as soon as reasonably practicable, and in any event by the Long Stop Date (as defined in the scheme of arrangement). The Company agrees to execute the Side Letter on this basis. |
| Conditions | : | It shall be a condition precedent to the Amended and Restated Facility Agreement coming into effect in accordance with the terms of the scheme of arrangement that: <br> 1. The Ringfencing Deed is entered into and is a Finance Document, a breach of which is an Event of Default (subject to a 14 day grace period); <br> 2. The Ringfenced Amount is placed in an unsecured escrow account (and such amount shall only be used for the agreed purposes) with a reputable trustee acceptable to a simple majority (51%) in value of the Syndicated Lenders (e.g. Madison Pacific), with that trustee having co-signing rights (along with a material PBRX shareholder) to facilitate the mechanism described in the 'Ringfenced Amount Application' section set out below. For the avoidance of doubt, both the trustee's and the material PBRX shareholder's signatures will be required for any withdrawals from the escrow account and this shall be documented in an agreement between the account bank, the material PBRX shareholder and the trustee. <br> 3. All outstanding and accrued interest (but not default interest) on the Existing Indebtedness as well as other amounts payable under the Syndicated Facility shall be paid up to the Restructuring Effective Date. All default interest and any other amounts constituting a penalty that has accrued up to the Restructuring Effective Date is irrevocably and unconditionally cancelled by the Syndicated Lenders. <br> 4. All advisors' fees of the Company (being the fees of AJ Capital and Baker & McKenzie) and those of the Syndicated Lenders are paid in accordance with the |

2

| | | |
|---|---|---|
| | | terms and conditions of engagement letters signed by the Company on or prior to the Restructuring Effective Date. |
| | | 5.  An Indonesian top-7 accounting firm shall be appointed as monitoring accountant in relation to the CAMA.  A simple majority (51%) by value of the non-active bilateral lenders, active bilateral lenders and Syndicated Lenders may agree to a later change if necessary. |

## RESTRUCTURING AND RESCHEDULED FACILITY

| | | |
|---|---|---|
| Amended Facility | : | The Amended Facility will consist of: |
| | | a) Facility A - term loan tranche of US$123,400,000 extended by onshore and offshore lenders; and |
| | | b) Facility B- term loan tranche of US$15,000,000 extended by onshore and offshore lenders, |
| | | (together, the "**Facility**"). |
| | | The Syndicated Lenders shall permit active bilateral lenders or other entities to provide standalone active bilateral facilities (including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more members of the Group) (the "**Trade Arrangements**") up to a limit of USD75 million in aggregate (or its equivalent in any other currency or currencies), provided that after the rights issue referred to in this term sheet has taken place, such limit may be increased to USD100 million (or its equivalent in another currency or currencies), subject to the relevant security coverage ratio (as set out in the active bilateral facilities term sheets) being met. If the rights issue referred to in this term sheet has not taken place, such limit may nevertheless be increased to USD100 million (or its equivalent in another currency or currencies) if 51% of the Syndicated Lenders agree. The arrangements set out in this paragraph shall be referred to as the "**New Permitted Financial Indebtedness**". |
| | | Supply chain financing, vendor financing or other trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more members of the Group) (the "**Non-Recourse Trade Arrangements**") shall be permitted. |
| | | Financial indebtedness of the Group which has not been identified and disclosed to the Syndicated Lenders or otherwise permitted prior to the Restructuring Effective Date shall be subordinated to the Amended and Restated Facility Agreement. |
| | | Distributions or payments to shareholders of the Company by way of dividend, repayment of loans and/or transactions with a similar economic effect, as well as related party transactions, will not be permitted, save for any dividends or transactions required by OJK laws and regulations, for example, in connection with the proposed rights issue. |
| | | Upon an event of default occurring under the Amended and Restated Facility Agreement, the amounts outstanding under the Facility shall be capable of being accelerated and enforcement may be triggered upon notice to the Borrowers provided by the Facility Agent where instructed by a majority of 66 and 2/3% of Syndicated Lenders (the "**Majority Lenders**"). |
| | | The key commercial terms of the Amended and Restated Facility Agreement are as below. |
| | | 1.  Lenders: Syndicated Lenders. |
| | | 2.  Amount: Syndicated Facility Amount. |

3

| | | |
|---|---|---|
| | 3. | Security:<br>(i) First Mortgage on land and building (a) owned by PBRX in Tangerang and Sragen; (b) owned by PPEB in Tangerang and Boyolali; and (c) owned by ESGI (Klego and Sambi);<br>(ii) Fiduciary Transfer of Ownership ("**FTO**") over machinery and equipment: (a) FTO over machinery owned by PBRX in Tangerang and Sragen; (b) FTO over machinery owned by PPEB in Tangerang and Boyolali; and (c) FTO over machinery owned by ESGI (Klego and Sambi);<br>(iii) Insurance policies of assets mentioned under (i) and (ii) above (PBRX, PPEB and ESGI); and<br>(iv) Pledges of the amortisation reserve accounts and the interest reserve accounts. |
| | 4. | The Company will also provide a negative pledge to cover all other unsecured assets (with carve-outs to reflect the security already granted or to be granted in connection with the restructuring of the Group in accordance with the terms of the scheme of arrangement). |
| | 5. | Maturity: 1 year + 1 year extension (if extended, maturity will occur at the end of the 2nd year, i.e. two years from 1 January 2022. The extension will automatically occur provided that the Ringfenced Amount has been deposited into the escrow account in accordance with the terms of the Ringfencing Deed, the rights issue has taken place and no event of default is continuing. In the event that the rights issue does not occur for any reason (including, for the avoidance of doubt, because the collectability rating of the Group has not been upgraded to 1), the extension will be subject to approval from a simple majority (51%) in value of the Syndicated Lenders. |
| | 6. | Amortisation: Quarterly amortisation of 3.6% of principal outstanding under the Facility starting from the 5th quarter following 1 January 2022. |
| | 7. | Interest Rate in relation to lenders for the Tranche A Facility: LIBOR + margin of 3.00% (for onshore lenders) and 2.50% (for offshore lenders), payable monthly. |
| | 8. | Interest Rate in relation to lenders for the Tranche B Facility: LIBOR + margin of 3.00% (for onshore lenders) and 2.50% (for offshore lenders), payable monthly. |
| | 9. | Interest and amortisation payments shall be made in accordance with the Schedule to this term sheet. For the avoidance of doubt, the interest and amortisation payments shall be made on the dates specified in the Schedule even if the Amended and Restated Facility Agreement is yet to be executed. In the event that any of the payment dates as specified in the Schedule is not a business day, payment shall be made on the previous business day. |
| CAMA: Bank Accounts, Minimum Operating Reserve and Cash Sweep Mechanism | : | Each Borrower shall be permitted to open and maintain the following types of accounts with any account banks, which shall be freely operated and maintained by each Borrower (the "**Operating Accounts**"):<br><br>a) vendor financing accounts (for receipt of cash advances under vendor financing programmes);<br><br>b) collection accounts (to receive collections from customers, loan proceeds, insurance proceeds and to make payments to suppliers) which shall be pledged in favour of certain active bilateral facility lenders;<br><br>c) payroll accounts (for payment of payroll);<br><br>d) LC accounts (for payments of LC outstandings);<br><br>e) tax accounts (for payments of taxes); and<br><br>f) sundries accounts. |

Amounts in each Borrower's collection accounts are permitted to be transferred to any of such Borrower's payroll accounts, LC accounts, tax accounts or sundries accounts for payment of the required amounts for operations (including payroll amounts, LC outstandings, tax amounts, sundries). Amounts in each Borrower's collection accounts shall also be transferred to relevant third party accounts for payments due to suppliers, active bilateral lenders (for LC outstanding, overdue interest and instalments), and to pay scheduled interest and principal amounts to noteholders, syndicated lenders and non-active bilateral lenders.

In addition to the above accounts, each Borrower shall open and maintain the following accounts with any account bank:

a) a cash proceeds / operating reserve account;

b) an interest reserve account (syndication);

c) an interest reserve account (non-active bilaterals);

d) an amortisation reserve account; and

e) a cash sweep account.

Other than the accounts mentioned above, the Borrowers shall not open or maintain any other bank account.

Cash available after operations and mandatory interest and (where applicable) amortization payments to the noteholders, Syndicated Lenders, active bilateral lenders, and non-active bilateral lenders (in accordance with the terms of the scheme of arrangement) shall be applied in accordance with the following waterfall on a quarterly basis:

a) First, to top up the cash proceeds / operating reserve accounts (as defined below).

Prior to the rights issue, an aggregate operating cash reserve of no more than USD75 million (or its equivalent in any currency or currencies) may be maintained across all the Operating Accounts and cash proceeds / operating reserve accounts of all Borrowers, but excludes any interest reserve account and amortisation reserve account. After the rights issue, such aggregate operating cash reserve limit shall be increased to USD100 million (or its equivalent in any currency or currencies) (the "**Minimum Operating Reserve** ").

b) Second, to top up the interest reserve accounts (syndication) in the amount of interest payments due to Syndicated Lenders for the next quarter and the interest reserve accounts (non-active bilaterals) in the amount of interest payments due to non-active bilateral lenders for the next quarter (on a pro-rata basis based on outstanding amount). The interest reserve accounts (syndication) shall be secured in favour of the Syndicated Lenders.

c) Fourth, to top up the amortization reserve accounts in the amount of principal amortization payments due to Syndicated Lenders for the next quarter (i.e. only one quarter amortisation payment is reserved at any one time). These accounts shall be secured in favour of the Syndicated Lenders.

d) Lastly, any excess cash (after payments in paragraphs (a) to (d) above are made) shall be transferred to the cash sweep accounts every six months and be applied subject to and in accordance with the cash sweep mechanism below. These accounts shall be secured in favour of the Syndicated Lenders and the non-active bilateral lenders.

<table>
<tr><td></td><td></td><td>

Any excess cash above the Minimum Operating Reserve (and after payments in paragraphs (a) to (c) above are made) shall be used to accelerate payments to the Syndicated Lenders and non-active bilateral lenders in the following priority (the "**Cash Sweep Mechanism**"):

a.  payments of principal amounts outstanding under the Amended and Restated Facility Agreement; and

b.  payments of principal amounts outstanding under the non-active bilateral facility agreements, provided no less than USD50 million of outstanding principal amount under the Amended and Restated Facility Agreement has been paid down (after which excess cash is to be pro-rated based on outstanding amounts under the Amended and Restated Facility Agreement and the non-active bilateral facility agreements (excluding outstanding amounts converted by non-active bilateral lenders to the new convertible bond)).

For the avoidance of doubt, excess cash is to be applied pro rata between the Amended and Restated Facility Agreement and the non-active bilateral facility agreements only after the principal amount of the Facility has been paid down by USD50 million.

The Cash Sweep Mechanism shall take effect 1 year after 1 January 2022 and shall be tested semi-annually and verified by the monitoring accountant.

Excess cash shall not be applied towards accelerated payments of any new convertible bond. For the avoidance of doubt, non-active bilateral lenders that exercise the new convertible bond exchange option in accordance with the terms of the non-active bilateral lender term sheet will not receive accelerated payments from excess cash.

The Company shall provide the Syndicated Lenders with summary details of quarter-end bank balances of each of the Borrowers' bank accounts indicating the account type (i.e. with details of bank balances of each bank account and indicating whether it is a vendor financing account, collection account, payroll account, LC account, tax account, sundries account, cash proceeds / operating reserve account, interest reserve account (syndication), interest reserve account (non-active bilaterals), amortisation reserve account or cash sweep account) through to and including 31 December 2022.

</td></tr>
<tr><td>New Money</td><td>:</td><td>

Neither the Company nor any other member of the Group shall, without the consent of the Facility Agent (acting on the instructions of 51% of the Syndicated Lenders), incur any other indebtedness not permitted by this term sheet provided always that (1) the New Permitted Financial Indebtedness and (2) Non-Recourse Trade Arrangements, as set out in this term sheet, shall be permitted without the prior written consent of any Syndicated Lender.

</td></tr>
<tr><td>Ringfenced Amount Application</td><td>:</td><td>

The Ringfenced Amount will be applied towards the an equity injection of not less than the Ringfenced Amount by way of a rights issue by the Company (the "**Rights Issue**") and: (a) prior to the Rights Issue, the Ringfenced Amount shall be held in an escrow account with a reputable trustee acceptable to a simple majority (51%) in value of the Syndicated Lenders (e.g. Madison Pacific) as a co-signatory to that escrow account (along with a material PBRX shareholder) and, for the avoidance of doubt, both the trustee's and the material PBRX shareholder's signatures will be required for any withdrawals from the escrow account and this shall be documented in an agreement between the account bank, the material PBRX shareholder and the trustee, (b) the Ringfencing Deed shall include a clear obligation that a rights issue must be undertaken if the restructuring completes and the Ringfenced Amount is to be used for that purpose and (c) the Ringfencing Deed shall be a Finance Document.

</td></tr>
</table>

|  |  |  |
|---|---|---|
|  | : | Once the Side Letter has been executed, the Group shall request an upgrade of its collectability rating in writing to each of the Syndicated Lenders and the Syndicated Lenders shall begin processing a collectability rating upgrade upon receipt of the request considering the security position, the continued payment of interest, and the support of majority of other creditors in the scheme of arrangement. Each Syndicated Lender shall take all actions it is able and permitted to take in accordance with prevailing regulations to cause the collectability rating of the Group in each respective onshore Syndicated Lender to be upgraded to 1 by 31 March 2022 (or such later date as agreed between the Company and the Syndicated Lenders), it being understood that the Rights Issue may not be undertaken unless and until the collectability rating of the Group in each onshore Syndicated Lender (both syndicated and bilateral) has been upgraded to 1.<br><br>If the Rights Issue is unable to proceed (e.g. due to regulatory restrictions, the collectability rating of the Group not being upgraded to 1 or for any other legal reason and is not in respect of anything the Company or its affiliates have failed to do), this will not constitute an event of default, provided that the Rights Issue occurs by 30 December 2022. |
| Security | : | List of security to be granted in favour of the security agent acting on behalf of the Facility Agent and the Syndicated Lenders to be broadly in accordance with the description in the "Amended Facility" row above. |
| Costs and Expenses | : | The Borrowers shall promptly on demand pay to any finance party (as the case may be) all pre-agreed costs and expenses (including legal fees) reasonably incurred by any of them in connection with the consideration, negotiation, preparation, and execution of the Transaction. For the avoidance of doubt, such pre-agreed costs and expenses include the Syndicated Lenders' legal fees which have been incurred to date and will be incurred in connection with the Transaction. |
| Documentation | : | Unless set out in this term sheet and save for carve-outs required to implement the restructuring or required by the Company to run the business of the Group, undertakings, representations and other terms are to be generally the same as per the existing Syndicated Facility agreement (and will include language to address LIBOR transition). |

The parties shall keep this draft term sheet confidential and shall not disclose the draft term sheet, nor disclose the existence of the draft term sheet, to any other person (other than its key management personnel, legal and financial advisors), save where necessary or desirable to disclose it to any court or otherwise as required by any regulatory authority.

Notwithstanding the foregoing, the Syndicated Lenders may provide a copy of the draft term sheet to potential assignees and/or sub-participants, provided that such potential assignees and/or sub-participants are subject to a duty of confidentiality on substantially the same terms.

This draft term sheet shall be governed by English law and any dispute arising out of or connected with this draft term sheet shall be resolved by arbitration in Singapore conducted in the English language by three arbitrators pursuant to the Arbitration Rules of the Singapore International Arbitration Centre for the time being in force.

## SCHEDULE
## Interest and Amortisation Payments

Each interest payment shall be of an amount equal to a monthly payment of the interest rate per annum of LIBOR and the margin specified in items 7 and 8 of the 'Amended Facility' section of the term sheet (each, an "**Interest Payment**")

Each amortisation payment shall be of an amount equal to 3.6% of the original aggregate principal amount outstanding under the Syndicated Facility as at 1 January 2022, payable quarterly starting from the 5th quarter following 1 January 2022 (each, an "**Amortisation Payment**").

In the event that any of the payment dates as specified below is not a business day, payment shall be made on the previous business day.

Scenario A: Maturity Date of 1 January 2023 (i.e. if the extension is not exercised)

| REPAYMENT DATE | REPAYMENT INSTALMENT |
|---|---|
| 31 January 2022 | Interest Payment |
| 28 February 2022 | Interest Payment |
| 31 March 2022 | Interest Payment |
| 30 April 2022 | Interest Payment |
| 31 May 2022 | Interest Payment |
| 30 June 2022 | Interest Payment |
| 31 July 2022 | Interest Payment |
| 31 August 2022 | Interest Payment |
| 30 September 2022 | Interest Payment |
| 31 October 2022 | Interest Payment |
| 30 November 2022 | Interest Payment |
| 31 December 2022 | Interest Payment + 100% aggregate principal amount outstanding |

Scenario B: Maturity Date of 1 January 2024 (i.e. if the extension is exercised)

| REPAYMENT DATE | REPAYMENT INSTALMENT |
|---|---|
| 31 January 2022 | Interest Payment |
| 28 February 2022 | Interest Payment |
| 31 March 2022 | Interest Payment |
| 30 April 2022 | Interest Payment |
| 31 May 2022 | Interest Payment |
| 30 June 2022 | Interest Payment |
| 31 July 2022 | Interest Payment |
| 31 August 2022 | Interest Payment |
| 30 September 2022 | Interest Payment |
| 31 October 2022 | Interest Payment |
| 30 November 2022 | Interest Payment |
| 31 December 2022 | Interest Payment |
| 31 January 2022 | Interest Payment |

| 28 February 2022 | Interest Payment |
|---|---|
| 31 March 2022 | Interest Payment + Amortisation Payment |
| 30 April 2022 | Interest Payment |
| 31 May 2022 | Interest Payment |
| 30 June 2022 | Interest Payment + Amortisation Payment |
| 31 July 2022 | Interest Payment |
| 31 August 2022 | Interest Payment |
| 30 September 2022 | Interest Payment + Amortisation Payment |
| 31 October 2022 | Interest Payment |
| 30 November 2022 | Interest Payment |
| 31 December 2023 | Interest Payment + 100% aggregate principal amount outstanding |

Restructuring Term Sheet (Existing Notes)

## RESTRUCTURING TERM SHEET
## US$200 MILLION 7.625% SENIOR NOTES DUE ON 26 JANUARY 2022

This term sheet sets out general information in relation to the proposed restructuring of the Existing 2022 Notes (as defined below) under the Singapore Scheme (as defined below).  The transactions contemplated by this term sheet shall be subject to, amongst others, the execution of definitive documentation by the parties.  Defined terms used in this term sheet have the same meaning as in the Existing Indenture (as defined below) unless stated otherwise.

| General Information | |
|---|---|
| **Issuer** | PB International B.V. |
| **Parent Guarantor** | PT Pan Brothers Tbk. |
| **Subsidiary Guarantors** | The following entities shall be Subsidiary Guarantors:<br><br>• PT Pancaprima Ekabrothers ("**PPEB**")<br>• PT Eco Smart Garment Indonesia ("**ESGI**")<br>• PT Prima Sejati Sejahtera<br>• PT Hollit International<br>• PT Ocean Asia Industry<br>• Continent 8 Pte. Ltd.<br>• PT Apparelindo Prima Sentosa<br>• PT Berkah Indo Garment<br>• PB Apparel Pte Ltd<br>• PT Prima Kreasi Gemilang<br>• PT Prima Cosmic Screen Graphics<br>• PT Eco Laundry Hijau Indonesia<br>• PT Mitra Busana Sentosa<br>• PT Apparelindo Mitra Andalan<br><br>As Cosmic Gear Ltd is currently dormant and has transferred operations to Continent 8 Pte. Ltd., Cosmic Gear Ltd will no longer be a Subsidiary Guarantor on and from the Restructuring Effective Date.  Cosmic Gear Ltd will accede as a Subsidiary Guarantor if it subsequently becomes active. PT Teodore Pan Garmindo and PT Victory Pan Multitex will no longer be Subsidiary Guarantors on and from the Restructuring Effective Date on the basis set out in the Section headed "Guarantees" below and the definition of Permitted JV Disposal (set out in the Section headed "Definitions, Covenants and Other Limitations" below). |
| **Guarantors** | The Parent Guarantor and the Subsidiary Guarantors. |
| **Group** | The Parent Guarantor and its subsidiaries. |
| **Existing 2022 Notes** | The US$200 million 7.625% senior notes due on 26 January 2022, which are governed under the bond indenture dated 26 January 2017 (the "**Existing Indenture**"). |
| **Scheme Creditors** | Holders of the economic or beneficial ownership interests as principal in the Existing 2022 Notes and the Existing Facilities (as defined in the explanatory statement in respect of the Scheme (the "**Explanatory Statement**")), and any other person who holds any Scheme Claims (as defined in the Explanatory Statement), as at the Record Time.<br><br>"**Record Time**" means 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time) or such later time or date as may be notified by the Parent Guarantor or the Information Agent (each acting reasonably) to the Scheme Creditors, where such date shall be no later than the date of the Voting Results Announcement (and for this purpose "Information Agent" and Voting Results Announcement" shall be as defined in the Explanatory Statement). |

| | |
|---|---|
| **Scheme** | The scheme of arrangement proposed by the Parent Guarantor under Section 71 of the Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018) (the "**IRDA**"), as subject to modifications, conditions and/or approvals as may be imposed by the High Court of Singapore and as permitted by the terms of the scheme of arrangement. |

| **Restructuring of the Existing 2022 Notes** | |
|---|---|
| **Scheme Conditions** | The Scheme shall only become effective and binding following the satisfaction of all of the following conditions to the Scheme (the "**Scheme Conditions**"):<br><br>• the Requisite Majority (as defined in the Explanatory Statement) of the Scheme Creditors in respect of each class of Scheme Creditors voting to approve the Scheme in accordance with the voting procedures set out in Clauses 5 and 6 of the Scheme;<br><br>• the sanction of the Scheme by the High Court of Singapore (the "**Court**"); and<br><br>• completion of the requisite administrative filings in respect of the sanction of the Scheme by the Court, with the Singapore Registrar of Companies in accordance with the requirements of the IRDA,<br><br>and upon such satisfaction, the Scheme shall become effective and binding on the Parent Guarantor and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme) and all of their respective successors, assigns and transferers (the date on which the Scheme becomes effective and binding being the "**Scheme Effective Date**"). |
| **Restructuring Effective Date** | The Restructuring Effective Date shall occur on the date of satisfaction of all of the following conditions to the Restructuring Effective Date (the "**Restructuring Conditions**") and shall occur in accordance with the terms and conditions of Clauses 3 and 4 of the Scheme:<br><br>• each of the Scheme Conditions has been satisfied and the Scheme Effective Date has occurred;<br><br>• a Chapter 15 Order has been entered by the U.S. Bankruptcy Court and that such Chapter 15 Order is final and no longer subject to rehearing or appeal;<br><br>• any other Application(s) for Cross-Border Recognition (as defined in the Explanatory Statement) have been completed and the applicable recognition order(s) have been obtained and are in full effect;<br><br>• all corporate (including approval by shareholders, board of commissioners and/or board of directors), legal and regulatory approvals deemed necessary by the Parent Guarantor (acting reasonably) to implement the Restructuring Effective Date, including, but not limited to, shareholder, director and/or commissioner approvals (as applicable) from the Parent Guarantor, the Guarantors or any other member of the Group and any approvals required from the OJK, IDX, KSEI or SGX-ST or under the laws of Indonesia or Singapore have been obtained; and |

|  | • all Restructuring Documents (as defined in the Explanatory Statement) are in agreed form and have been executed by or on behalf of the relevant parties to them in accordance with the terms of the Scheme. |
|--|--|
|  | The Restructuring Effective Date is the date when, among others, all Existing 2022 Notes are amended, restated, supplemented or otherwise modified to reflect the terms of this term sheet (the "**Amended Notes**"). In addition, on the Restructuring Effective Date, among other things (as set out in the Explanatory Statement): |
|  | • the Noteholders shall fully release all its Scheme Claims (including any claims under the Existing 2022 Notes arising prior to and after the Restructuring Effective Date against (among others) the Parent Guarantor, the Issuer, the Subsidiary Guarantors, and the officers, directors, advisors and representatives of each of the foregoing under the Existing 2022 Notes) (subject to carve outs for fraud, dishonesty, wilful default and wilful misconduct) and the Parent Guarantor shall, for and on behalf of the Noteholders, execute a deed of release in respect of such release; and |
|  | • the outstanding Existing 2022 Notes and all guarantees and security granted in connection with the Existing 2022 Notes will be amended, restated, supplemented or otherwise modified to reflect the terms of this term sheet and any and all defaults arising prior to the Restructuring Effective Date under the Existing 2022 Notes will be deemed to be waived. |
|  | "**Noteholders**" for this purpose (and as defined in the Explanatory Statement) means all Persons with an economic or beneficial interest as principal in the Existing Notes held through the Clearing Systems and "**Noteholder**" shall mean any one of them (as defined in the Explanatory Statement). |

## Terms of the Amended Notes

*Unless otherwise noted below or as the context otherwise requires, the terms of the Amended Notes shall be the same as those set out in the Existing Indenture governing the Existing 2022 Notes.*

| **Principal Amount of Amended Notes** | US$ 171,078,000. |
|--|--|
| **Tenor of Amended Notes** | 31 December 2025. On maturity, any outstanding principal amount under the Amended Notes shall be repaid, together with any accrued but unpaid interest, subject to the terms of this term sheet. |
| **Coupon of Amended Notes** | 7.625% per annum, payable semi-annually on the 26th of the relevant month, being 26 January and 26 July of each year.<br><br>For the avoidance of doubt default interest (if any) outstanding in respect of the Notes and any documents related thereto as at the Restructuring Effective Date shall not be payable and shall be cancelled on the Restructuring Effective Date. |
| **Optional Redemption of Amended Notes** | At any time and from time to time on or after July 26, 2022, the Company may at its option redeem the Amended Notes, in whole or in part, at a redemption price equal to the percentage of principal amount set forth below, plus accrued and unpaid interest, if any, on the Amended Notes redeemed, to (but not including) the redemption date, if redeemed during the 12-month period commencing on July 26, 2022 of any year set forth below: |

| Period | Redemption Price |
|---|---|
| 2022 | 101.50% |
| 2023 | 100.75% |
| After 2023 | 100.00% |

For the avoidance of doubt, any optional redemption shall be at the Issuer's discretion. The Existing Indenture as amended by the Supplemental Indenture (the "**Amended Indenture**") will reflect the above and remove historic redemption provisions (and related definitions) relating to redemptions that could be made prior to January 26, 2020.

| | |
|---|---|
| **Interest Reserve Account** | To maintain a cash deposit in the Interest Reserve Account in an amount equal to one semi-annual interest payment under the Amended Notes. |
| **Interest Reserve Account Collateral Agent** | The Bank of New York Mellon.<br><br>The Interest Reserve Account Collateral Agent shall continue to be granted a first priority lien over the Interest Reserve Account and all rights, title and interest in and to all amounts deposited in the Interest Reserve Account at any time, for the benefit of the noteholders of the Amended Notes.<br><br>The Issuer and the Interest Reserve Account Collateral Agent shall enter into a Dutch law governed security confirmation deed (such document to be released and become effective on the Restructuring Effective Date) to confirm that the existing first priority lien over the Interest Reserve Account under the Existing 2022 Notes shall continue to secure the Amended Notes. |
| **Security** | No other security shall be granted to secure the Amended Notes aside from the security over the Interest Reserve Account described above. |
| **Guarantees** | As set out in the Section headed "Subsidiary Guarantors" above, Cosmic Gear Ltd, PT Teodore Pan Garmindo and PT Victory Pan Multitex (the "**Released Guarantors**") will no longer be Subsidiary Guarantors after the Restructuring Effective Date.  For this purpose the Amended Indenture will reflect that the Released Guarantors will no longer be Subsidiary Guarantors and in particular: (a) Section 12.09(c) of the Amended Indenture will state that each of Released Guarantor may be designated by the Parent Guarantor as Non-Subsidiary Guarantors provided that the condition set out in paragraph (x) of Section 12.09(c) is satisfied (or will be satisfied on the release of guarantee being effective); (b) Section 12.11(a) of the Existing Indenture shall be amended in the Amended Indenture to permit a release of each Released Guarantor without any consent being required (including for the purposes of Section 9.01(iv)); and (c) the Trustee shall be irrevocably authorised to enter into a release of the guarantees granted by each Released Guarantor upon the Released Guarantors being designated as Non-Subsidiary Guarantors and enter into and carry out all matters incidental thereto.  The Parent Guarantor will, in the supplemental indenture to be entered into to amend and restate the Existing Indenture (the "**Supplemental Indenture**") designate each of Cosmic Gear Ltd, PT Teodore Pan Garmindo and PT Victory Pan Multitex as Non-Subsidiary Guarantors, with such designation being effective upon the Existing Indenture being amended pursuant to the Supplemental Indenture.  For the avoidance of doubt no Released Guarantor shall be required to enter into or execute the Supplemental Agreement or the Amended Indenture or any document related thereto or enter into any new guarantee or guarantee confirmation agreement to confirm its existing guarantee extends to cover the Amended Indenture. |

| Definitions, Covenants and Other Limitations | The covenants of the Amended Notes are to be as set out in the Existing Indenture unless stated otherwise in this term sheet (save for (a) any necessary non-material consequential drafting amendments, (b) inclusion of necessary definitions, (c) any necessary non-material deletions of provisions that are no longer relevant and (d) amendments that are necessary to reflect the terms of this term sheet) and consequential necessary amendments may also be made to the relevant provisions in the forms set out in the exhibits to the Existing Indenture to reflect the terms of this Term Sheet and the relevant changes referred to in paragraphs (a) to (d) above, provided in each case that the relevant amendment referred to in this paragraph does not deviate from the commercial terms set out in this Term Sheet and does not (other than as stated in this Term Sheet or the Scheme) prejudice the rights and interests of the noteholders.<br><br>References to the "Original Issue Date" shall be amended to refer to the date of the Supplemental Indenture where relevant.<br><br>The definition of "**Asset Sale**" shall be amended by the addition of a permission to make Permitted JV Disposals.  "**Permitted JV Disposals**" shall be defined as sale, transfer or other disposition of all or part of the Parent Guarantor's investment, interest, holdings or shares in PT Teodore Pan Garmindo and/or PT Victory Pan Multitex and/or any sale, transfer or other disposition by PT Teodore Pan Garmindo and/or PT Victory Pan Multitex of any of its assets. In addition, Sections 4.11, 4.14, 4.15, 5.01 and 12.11(a)(v) of the Existing Indenture shall be amended to the extent required to include or provide carve outs for (as relevant) Permitted JV Disposals.<br><br>The definition of "**Existing Credit Facilities**" shall be amended to reflect the facilities set out in Appendix 1 to this term sheet and a definition of "**Non-Active Bilateral Facilities**" (as set out in Appendix 1 to this term sheet) shall be included.<br><br>The definition of "**Permitted Business**" shall be amended to mean any business conducted or proposed to be conducted by the Parent Guarantor and its Restricted Subsidiaries on the date of the Supplemental Indenture and any other business reasonably related, ancillary or complementary to any such business.<br><br>A definition of "**Rights Issue**", meaning the US$50.0 million rights issue to be granted by the Parent Guarantor after the date of the Supplemental Indenture in respect of rights to subscribe for or to purchase Capital Stock of the Parent Guarantor, shall be included in the Amended Indenture and a carve out in respect of the Rights Issue shall be included to Section 4.15(b) of the Existing Indenture.<br><br>Section 4.12(a) shall if applicable be amended by the insertion of the words "Except as permitted under Section 4.06," at the beginning of that Section.<br><br>The restructuring of the Existing Facilities in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement shall be carved out of Section 4.15(b) of the Existing Indenture.<br><br>Section 4.03(b) shall be updated if required to reflect changes to the Indonesian laws and regulations referred to therein after the date of the Existing Indenture.<br><br>A new Section 4.26 will be included in the Amended Indenture to reflect the latest sanctions undertakings to be agreed with the Trustee.<br><br>Other definitions and covenants of the Amended Notes shall be amended to reflect Appendix 2 to this term sheet. |

| | |
|---|---|
| **Change of Control** | Not later than 30 days following a Change of Control, the Issuer or the Parent Guarantor will make an offer to repurchase all outstanding Amended Notes at a purchase price equal to 101% of their principal amount plus accrued and unpaid interest, if any.<br><br>The definition of "**Change of Control**" is to be in line with the definition under the Existing 2022 Notes. |
| **Event of Default** | To be in line with the terms under the Existing 2022 Notes unless stated otherwise in Appendix 3 of this term sheet. |
| **Trustee** | The Bank of New York Mellon.<br><br>The rights, duties and responsibilities of the Trustee are to be in line with the terms under the Existing 2022 Notes.  Certain amendments may be made in the Amended Indenture to reflect the Trustee's (as well as the Interest Reserve Account Collateral Agent's) latest transmission of information by electronic means language and certain other amendments as agreed with the Trustee and/or the Interest Reserve Account Collateral Agent. |
| **Form, Denomination and Registration** | The Amended Notes will continue to be issued only in fully registered form, without coupons, in minimum denominations of US$200,000 of principal amount and integral multiples of US$1.00 in excess thereof or integral multiples of US$1,000 in excess thereof, subject to agreement between the Company and the Trustee prior to signing the Supplemental Indenture. Any existing Global Note shall either be deemed to be supplemented, modified and amended in such a manner as is necessary to make the terms of that Global Note consistent with the terms of the Amended Indenture or (if requested by the Trustee and subject to there being no negative tax impact on the Issuer or Guarantors) a new Global Note will be issued. All global notes will be deposited with a common depository and registered in the name of the common depositary or its nominee.  Beneficial interests in the global note will be shown on and transfers thereof will be effected only through the records maintained by Euroclear and Clearstream Luxembourg. |
| **Book-Entry Only** | The Amended Notes will continue to be issued in book-entry form through the facilities of Euroclear and Clearstream Luxembourg for the accounts of its participants. |
| **Listing and Trading** | An announcement will be made on SGXNET in relation to the change in terms of the Existing Notes. For so long as the Amended Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Amended Notes will be traded in a minimum board lot size of US$200,000. |
| **Governing Law and Miscellaneous Matters** | The Amended Notes, Supplemental Indenture and the Amended Indenture will be governed by and will be construed in accordance with the laws of the State of New York.<br><br>The guarantees in connection with the Amended Notes will be governed by and will be construed in accordance with (in the case of any guarantees contained in the Amended Indenture) the laws of the State of New York and (in the case of standalone corporate guarantees and any confirmation letter provided by the Guarantors in connection therewith) the laws of Indonesia.<br><br>The lien over the Interest Reserve Account (and the security confirmation deed to confirm that the existing lien is effective to cover the Amended Notes) will be governed and will be construed in accordance with the laws of the Netherlands. |

| | The Supplemental Indenture shall include a provision equivalent to that contained in Section 13.13 of the Existing Indenture, as amended to refer to the Supplemental Indenture and Amended Indenture and related guarantee and security confirmations. |

**Appendix 1**

"**Existing Credit Facilities**" means each of the credit facilities of the Parent Guarantor or any of its Restricted Subsidiaries outstanding on the date of the Supplemental Indenture, in each case, as such facility may be amended, restated, modified, renewed, refunded, replaced or refinanced, including the following credit facilities made available under the following agreements:

(a)      the up to US$150,000,000 credit facility agreement dated December 27, 2017 in relation to two tranches of revolving credit facilities and made between the Parent Guarantor, the companies listed in Part 1 of Schedule 1 thereof as original borrowers, the persons listed in Part 2 of Schedule 1 thereof as original guarantors, the arrangers listed therein, the financial institution listed in Part 3 of Schedule 1 thereof as original lenders, Madison Pacific Trust Limited as facility agent, The Hongkong and Shanghai Banking Corporation Limited as originally named account bank and PT Bank Permata Tbk as security agent;

(b)      the US$54,000,000 amendment and restatement to facility agreement (No. 281/FA/ANZ/AMD/IV/2019) dated April 24, 2019 and made between the Parent Guarantor and certain Restricted Subsidiaries as borrowers and PT Bank ANZ Indonesia as lender, as amended by the first amendment to facility agreement (No. 428/FA/ANZ/AMD/II/2020) dated February 10, 2020;

(c)      the US$7,500,000 facility letter (No.Ref.SS/DR-045/LA/2015) dated November 30, 2015 and made between the Parent Guarantor and certain Restricted Subsidiaries as borrowers and PT Bank BNP Paribas Indonesia as lender, as amended from time to time, with the most recent amendment as at the date of the Supplemental Indenture being under a sixth amendment to banking facilities letter (Ref. No. LC/DR-424/LA/2019) dated  March 13, 2019 and as extended by the notification letter (Ref. No. LC/DR-511/LA/2020) dated February 27, 2020;

(d)      the corporate facility agreement dated August 9, 2017 (No. JAK/000224/U/170512) relating to a US$50,000,000 corporate facility and a US$1,000,000 treasury facility and made between, among others, the Parent Guarantor and PT Bank HSBC Indonesia as lender, as amended by a first amendment to corporate facility agreement dated  July 23, 2018 (No. JAK/180408/U/180525) and as further amended by a second amendment to corporate facility agreement dated October 21, 2019 (No. JAK/190570/U/190925);

(e)      the Agreement on Bank Transactions dated May 28, 2012, the Agreement on Foreign Exchange Transactions dated September 21, 2012 as amended and restated initially by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated November 24, 2016 and subsequently by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated September 12, 2017 and the Agreement on Forward Foreign Exchange Contracts dated September 12, 2012 as amended and restated by the Amendment and Restatement to Agreement on Forward Foreign Exchange Contracts dated September 12, 2017, each made between MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch as lender and the Parent Guarantor and certain Restricted Subsidiaries listed therein as customers, as confirmed from time to time, most recently pursuant to a confirmation of facilities (Ref. No. 0076/CF/CDU-NJ/RAD/20/20-0137- GC) dated September 12, 2020 and issued by MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch to the Parent Guarantor and certain Restricted Subsidiaries listed therein;

(f)      the credit facility agreement (No. 805/MA/MZH/1018) dated  October 26, 2018 and made between the Parent Guarantor and certain Restricted Subsidiaries as obligors and PT Bank Mizuho Indonesia as lender, as amended from time to time, most recently by an amendment (No. 1430/AMD/MZH/1020) dated  October 26, 2020;

(g)      the  credit agreement No. 10 dated March 12, 2003 as last amended by No.290/Prb/PK/CDU1/2020 dated November 13, 2020 with LC facility of US$15,000,000 between the Parent Guarantor and PT Bank Maybank Indonesia Tbk as lender;

(h)    the credit agreement no. KK/21/0124/AMD/CG1 dated  February 2, 2021 between the Parent Guarantor, among others, and PT Bank Permata Tbk as lender consisting of a LC facility of US$10,000,000 as amended from time to time and the Credit Agreement no. KK/21/0112/AMD/CG1 dated  February 2, 2021 and made between PT Prima Sejati Sejahtera and PT Bank Permata Tbk consisting of an LC Facility of US$15,000,000 as amended from time to time;

(i)    the credit agreement No. 58 dated April 20, 2011 between the Parent Guarantor, among others, and PT Bank UOB Indonesia as original lender as amended from time to time with the most recent amendment as at the date of the Supplemental Indenture being under an amendment (No. 1431/AMD/MZH/1020 dated 4 May 2011 with LC facility of US$8,600,000 and a forex exchange facility of US$10,000,000; and

(j)    each of the Non-Active Bilateral Facilities.

"**Non-Active Bilateral Facilities**" each of the credit facilities of the Parent Guarantor or any of its Restricted Subsidiaries set out below, in each case, as such facility may be amended, restated, modified, renewed, refunded, replaced or refinanced, including the following credit facilities made available under the following agreements:


(i)    the US$7,500,000 facility letter (No.Ref.SS./DR-045/LA/2015) dated 30 November 2015 and made between the Company and certain other entities as borrowers and PT Bank BNP Paribas Indonesia as lender, as amended from time to time, with the most recent amendment as at the date of the Supplemental Indenture being pursuant to a sixth amendment to banking facilities letter (Ref. No. LC/DR-424/LA/2019) dated 13 March 2019 and as extended by the notification letter (Ref. No. LC/DR-511/LA/2020) dated 27 February 2020;

(ii)    the amendment and restatement to facility agreement (No. 281/FA/ANZ/AMD/IV/2019) dated 24 April 2019 and made between the Company and certain other entities as borrowers and PT Bank ANZ Indonesia as lender, as amended by the first amendment to facility agreement (No. 428/FA/ANZ/AMD/II/2020) dated 10 February 2020; and

(iii)    the Agreement on Bank Transactions dated 28 May 2012, the Agreement on Foreign Exchange Transactions dated 21 September 2012 as amended and restated initially by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated 24 November 2016 and subsequently by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated 12 September 2017 and the Agreement on Forward Foreign Exchange Contracts dated 12 September 2012 as amended and restated by the Amendment and Restatement to Agreement on Forward Foreign Exchange Contracts dated 12 September 2017, each made between MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch as bank and the Company and its subsidiaries listed therein as customers, as confirmed from time to time, with the most recent amendment as at the date of the Supplemental Indenture being pursuant to a confirmation of facilities (Ref. No. 0076/CF/CDU-NJ/RAD/20/20-0137- GC) dated 12 September 2020 and issued by MUFG Jakarta to the Company and other customers listed therein.

**Appendix 2**

**(A)      Definition of "Permitted Liens" in Section 1.01 of the Existing Indenture is to be amended as follows.**

(1)      Liens for taxes, assessments, governmental charges or claims that are being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as will be required in conformity with GAAP will have been made;

(2)      statutory and common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, employees or other similar Liens arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as required in conformity with GAAP will have been made and Liens arising solely by virtue of any statutory or common law provisions relating to attorney's Liens;

(3)      Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature or deposits as security for contested taxes or import duties, in each case incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money);

(4)      leases or subleases granted to others that do not materially interfere with the ordinary course of business of the Parent Guarantor or its Restricted Subsidiaries, taken as a whole;

(5)      any interest or title of a lessor in the property subject to any operating lease;

(6)      Liens on property of, or on shares of Capital Stock or Indebtedness of, any Person existing at the time such Person becomes, or becomes a part of, any Restricted Subsidiary; provided that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets acquired; provided further that such Liens were not created in contemplation of or in connection with the transactions or series of transactions pursuant to which such Person became a Restricted Subsidiary;

(7)      Liens in favor of the Parent Guarantor, the Company or any Subsidiary Guarantor;

(8)      Liens arising from attachment or the rendering of a final judgment or order against the Parent Guarantor or any Restricted Subsidiary that does not give rise to an Event of Default;

(9)      Liens existing on the date of the Supplemental Indenture;

(10)     Liens securing Indebtedness which is Incurred to refinance secured Indebtedness which is permitted to be Incurred under Section 4.06(b)(v); provided that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets securing the Indebtedness being refinanced;

(11)     Liens (including extensions and renewals thereof) upon real or personal property, assets, machinery, plant or equipment acquired, developed, installed, improved or expanded after the date of the Supplemental Indenture (including through the acquisition of Capital Stock of any Person that owns such real or personal property, assets, machinery, plant or equipment which will, upon such acquisition, become a Restricted Subsidiary and including any interest or title of a lessor under Capitalized Lease Obligations); provided that (a) such Lien is created solely for the purpose of securing Indebtedness Incurred of the type permitted by Section 4.06(b)(x), (b) such Lien is created prior to, at the time of or within 180 days after the later of the

acquisition or the completion of development, construction, installation, improvement or expansion of such property, (c) the principal amount of Indebtedness secured by such Lien does not exceed 100% of the cost (including adjustment of purchase price or similar obligations) of such property, development, construction, installation, improvement or expansion and (d) such Lien shall not extend to or cover any property or assets other than such item of real or personal property, assets, machinery, plant or equipment and any improvements on such item;

(12)    Liens securing Indebtedness under Hedging Obligations permitted by Section 4.06(b)(vi);

(13)    Liens on deposits made in order to comply with statutory obligations to maintain deposits for workers' compensation claims, unemployment insurance and other purposes specified by statute made in the ordinary course of business and not securing Indebtedness of the Parent Guarantor or any Restricted Subsidiary;

(14)    Liens under the Security Documents securing the Notes (including any Additional Notes) or any Guarantee;

(15)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the products and proceeds thereof;

(16)    Liens securing rights of setoff in favor of a bank imposed by law or customary general terms of banks and incurred in the ordinary course of business on deposit accounts maintained with such bank and cash and Temporary Cash Investments in such accounts;

(17)    (x) Liens on property or assets securing Indebtedness used or to be used to defease or satisfy and discharge the Notes; provided that (a) the Incurrence of such Indebtedness was not prohibited by this Indenture and (b) such defeasance or satisfaction and discharge is not prohibited by this Indenture and (y) Liens on cash and Temporary Cash Investments arising in connection with the defeasance, discharge or redemption of Indebtedness;

(18)    (x) Liens securing Indebtedness permitted to be Incurred under Section 4.06(b)(i) and (y) Liens on current assets securing Indebtedness permitted to be Incurred under the covenant described under Section 4.06, provided the amount of Indebtedness secured pursuant to this clause (y) does not exceed 25% of the amount of consolidated inventory, advance payments and accounts receivable of the Parent Guarantor and its Restricted Subsidiaries measured in accordance with GAAP as of the last day of the most recent fiscal quarter for which consolidated financial statements of the Parent Guarantor and its Restricted Subsidiaries (which may be internal financial statements) are available;

(19)    Liens on (i) Capital Stock of a Finance Subsidiary (other than the Company) and any intercompany loans or advances from such Finance Subsidiary to the Parent Guarantor or any Restricted Subsidiary, (ii) Capital Stock of a Wholly-Owned Subsidiary of a Finance Subsidiary and on any intercompany loans or advances made by such Wholly-Owned Subsidiary to the Parent Guarantor or any Restricted Subsidiary; and (iii) any interest reserve, debt service reserve, debt service accrual or similar account used to service interest payments or debt obligations with respect to such Indebtedness or any escrow account holding all or any part of the proceeds of such Indebtedness, in each case securing Indebtedness of such Finance Subsidiary (and guarantees by the Parent Guarantor or Subsidiary Guarantors of such Indebtedness) permitted to be Incurred under Section 4.06;

(20)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or credited for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(21)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Parent Guarantor or any Restricted Subsidiary in the ordinary course of business;

(22)    Liens Incurred in connection with any cash or treasury management program, or cash pooling, netting or set-off arrangements, in each case established in the ordinary course of business for the benefit of the Parent Guarantor or any Restricted Subsidiary;

(23)    Liens in favor of customs and revenue authorities arising by operation of law to secure payment of customs duties in connection with importation or exportation of goods in the ordinary course of business;

(24)    Liens on the Capital Stock of Unrestricted Subsidiaries or any Person that is not a Subsidiary of the Parent Guarantor solely to secure Indebtedness of such Unrestricted Subsidiaries or such Person, in each case that is non-recourse to the Parent Guarantor or any Restricted Subsidiary, unless the Parent Guarantor or such Restricted Subsidiary could have incurred such Indebtedness under this Indenture on the date of incurrence of such Lien;

(25)    Liens with respect to minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or municipal ordinances, zoning ordinances or other restrictions as to the use of real property, not interfering in any material respect with the conduct of the business of the Parent Guarantor and its Restricted Subsidiaries;

(26)    licenses or leases or subleases as licensor, lessor or sublessor of any of the Parent Guarantor's or the Restricted Subsidiaries' property, including intellectual property, in the ordinary course of business;

(27)    Liens resulting from escrow arrangements entered into in connection with the disposition of assets;

(28)    Liens encumbering property or assets under construction arising from progress or partial payments by a customer of the Parent Guarantor or its Restricted Subsidiaries relating to such property or assets;

(29)    any encumbrance or restriction, including customary rights of first refusal and tag, drag and similar rights with respect to Capital Stock of any joint venture pursuant to joint venture agreements entered into in the ordinary course of business;

(30)    Liens on any interest reserve, debt service reserve, debt service accrual or similar account used to service interest payments or debt obligations with respect to Indebtedness permitted to be Incurred under Section 4.06;

(31)    Liens on inventories and accounts receivable to secure working capital facilities of the Parent Guarantor or any Restricted Subsidiary used for working capital;

(32)    Liens securing Permitted Subsidiary Indebtedness; provided such Liens do not extend to any property or assets of the Company, PB Fashion, the Parent Guarantor or any Subsidiary Guarantor;

(33)    Liens securing the Existing Credit Facilities as permitted and in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement, as disclosed to the holders on or prior to the date of the Supplemental Indenture; and

(34)    Liens with respect to obligations that do not exceed US$10.0 million (or the Dollar Equivalent thereof) at any one time outstanding;

*provided* that, with respect to Liens on the property or assets of PB Fashion, Permitted Liens will include only Liens described in paragraphs (1), (2), (3), (5), (7), (8), (9), (13), (14), (15), (16), (17), (19), (20), (21), (22), (23), (25), (26),

(27), (28), (30) and (34) above, and *provided further* that for purposes of the Interest Reserve Account Collateral, Permitted Liens shall mean Liens described in clauses (1), (14) and (16).

**(B)**     **Definition of "Permitted Indebtedness" in Section 4.06(b) of the Existing Indenture is to be amended as follows.**

(i)      (A) Indebtedness of the Parent Guarantor, the Company or any Subsidiary Guarantor under Credit Facilities not falling within sub-paragraph (B) or (C) of this paragraph (i) in an aggregate principal amount at any time outstanding not to exceed US$400.0 million (or the Dollar Equivalent thereof) less the aggregate principal amount of Notes as of the date of the Supplemental Indenture (or the Dollar Equivalent thereof), which shall include Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary under the Existing Credit Facilities and not falling within sub-paragraphs (B) or (C) of this paragraph (i); (B) Indebtedness of the Parent Guarantor, the Company or any Subsidiary Guarantor under or in respect of letters of credit issued under or pursuant to Credit Facilities and (C) Indebtedness of the Parent Guarantor, the Company or any Subsidiary Guarantor under any supply chain financing or trade arrangements (such as (but not limited to) factoring or retention of title arrangements) (in the case of paragraphs (A), (B) and (C) as may be amended, restated, restructured, modified or varied, in whole or in part, including in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement);

(ii)     Indebtedness under the Notes as of the date of the Supplemental Indenture, after giving pro forma effect to the restructuring of the same in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement as if it occurred on the date of the Supplemental Indenture, the Guarantees thereof and the Intercompany Loans;

(iii)    Indebtedness of the Parent Guarantor, the Company or any other Restricted Subsidiary (other than PB Fashion) outstanding on the date of the Supplemental Indenture, excluding Indebtedness permitted under clause (b)(i), (ii) or (iv) of this Section 4.06;

(iv)     Indebtedness of the Parent Guarantor, the Company or any Restricted Subsidiary owed to the Parent Guarantor, the Company or any Restricted Subsidiary; provided that (x) any event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of such Indebtedness (other than to the Parent Guarantor, the Company or any other Restricted Subsidiary) will be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this clause (b)(iv), (y) if the Company or the Parent Guarantor is the obligor on such Indebtedness, such Indebtedness must be unsecured and expressly be subordinated in right of payment to the Notes, in the case of the Company, or the Parent Guarantee, in the case of the Parent Guarantor and (z) if a Subsidiary Guarantor is the obligor on such Indebtedness and a Restricted Subsidiary that is not the Company or a Subsidiary Guarantor is the obligee, such Indebtedness must be unsecured and expressly subordinated in right of payment to the Subsidiary Guarantee of such Subsidiary Guarantor;

(v)      Indebtedness of the Parent Guarantor, the Company or any other Restricted Subsidiary ("**Permitted Refinancing Indebtedness**") issued in exchange for, or the net proceeds of which are used to refinance or refund, replace, exchange, renew, repay, defease, discharge or extend (collectively, "refinance" and "refinances" and "refinanced" shall have a correlative meaning), then-outstanding Indebtedness (or Indebtedness repaid substantially concurrently with the Incurrence of such Permitted Refinancing Indebtedness) Incurred under Section 4.06(a) or Section 4.06(b)(ii), (iii), (v) or (x) and any refinancings thereof; provided that (A) Indebtedness the proceeds of which are used to refinance or refund the Notes or Indebtedness that is pari passu with, or subordinated in right of payment to, the Notes or a Guarantee will only be permitted under this clause (b)(v) if (x) in case the Notes are refinanced in part or the Indebtedness to be refinanced is pari passu with the Notes or a Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is outstanding, is expressly made pari passu with the remaining Notes or such Guarantee, or (y) in case the Indebtedness to be refinanced is subordinated in right of payment to the Notes or a Guarantee, such new Indebtedness, by its

terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes or such Guarantee at least to the extent that the Indebtedness to be refinanced is subordinated to the Notes or such Guarantee, (B) such new Indebtedness, determined as of the date of Incurrence of such new Indebtedness, does not mature prior to the Stated Maturity of the Indebtedness to be refinanced or refunded, and the Average Life of such new Indebtedness is at least equal to the remaining Average Life of the Indebtedness to be refinanced or refunded, (C) such new Indebtedness has an aggregate principal amount, or if Incurred with original issue discount, an aggregate issue price, that is equal to or less than the aggregate principal amount, or if Incurred with original issue discount, the aggregate accreted value, then outstanding, plus premiums, accrued interest, underwriting discounts, costs (including any defeasance costs), fees and expenses under the Indebtedness being refinanced and (D) in no event may Indebtedness of the Company or any Guarantor be refinanced pursuant to this clause by means of any Indebtedness of any Restricted Subsidiary (other than the Company or any Finance Subsidiary) that is not a Subsidiary Guarantor;

(vi)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary (other than PB Fashion or any FS Subsidiary) pursuant to Hedging Obligations for the purpose of protecting the Parent Guarantor or any Restricted Subsidiary from fluctuations in interest rates, currencies or commodity prices and not for speculation;

(vii)    Indebtedness of the Parent Guarantor, the Company or any other Restricted Subsidiary (other than PB Fashion or any FS Subsidiary) arising from agreements providing for indemnification, adjustment of purchase price, earn out or other similar obligations, or from guarantees or letters of credit, surety bonds or performance bonds securing any obligation of the Parent Guarantor or any Restricted Subsidiary pursuant to such agreements, in any case, Incurred in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Capital Stock of a Restricted Subsidiary for the purpose of financing such acquisition; provided that the maximum aggregate liability in respect of all such Indebtedness incurred in connection with a disposition shall at no time exceed the gross proceeds actually received by the Parent Guarantor or any Restricted Subsidiary from the disposition of such business, assets or Capital Stock of a Restricted Subsidiary;

(viii)   Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, that such Indebtedness is extinguished within five Business Days of Incurrence;

(ix)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary constituting reimbursement obligations with respect to workers' compensation claims or claims arising under similar legislation, or in connection with self-insurance obligations or bid, performance or surety bonds, including guarantees or obligations of the Parent Guarantor or any Restricted Subsidiary thereof with respect to letters of credit supporting such bid, performance or surety bonds, in each case other than for an obligation for borrowed money;

(x)      Indebtedness Incurred by the Parent Guarantor, the Company, any Subsidiary Guarantor or any FS Subsidiary, including Indebtedness represented by Capitalized Lease Obligations, mortgage financings or purchase money obligations, to finance all or any part of the purchase price (including adjustment of purchase price or similar obligations) or cost of construction, development, leasing, installation, improvement or expansion of property (real or personal), assets, machinery, plant or equipment (including through the acquisition of Capital Stock of any Person that owns such property (real or personal), assets, machinery, plant or equipment which will, upon such acquisition, become a Restricted Subsidiary) to be used in the Permitted Business; provided that (i) such Indebtedness shall be Incurred no later than 180 days after the acquisition, construction, development, leasing, installation, improvement or expansion of such property (real or personal), assets, machinery, plant or equipment and (ii) on the date of Incurrence of such

Indebtedness and after giving effect thereto, the aggregate principal amount of Indebtedness Incurred pursuant to this clause (b)(x) at any time outstanding (together with refinancings thereof) shall not exceed the greater of (x) US$30.0 million (or the Dollar Equivalent thereof) and (y) 5.0% of Total Assets;

(xi)     guarantees by any Guarantor of Indebtedness of any other Guarantor, the Company or a Finance Subsidiary that was permitted to be Incurred by another provision of this covenant; provided that if the Indebtedness being guaranteed is subordinated to or pari passu with the Notes or a Guarantee, then the guarantee shall be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed;

(xii)    Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit, trade guarantees or similar instruments issued in the ordinary course of business to the extent that such letters of credit or trade guarantees are not drawn upon or, if drawn upon, to the extent such drawing is reimbursed no later than the 30 days following receipt by the Parent Guarantor or such Restricted Subsidiary of a demand for reimbursement;

(xiii)   Indebtedness of a Finance Subsidiary that is guaranteed by the Parent Guarantor or any Subsidiary Guarantor to the extent the Parent Guarantor or such Subsidiary Guarantor was permitted to incur such Indebtedness under this covenant (other than under Section 4.06(b)(xi);

(xiv)    guarantees by any Non-Guarantor Subsidiary of Indebtedness of any other Non-Guarantor Subsidiary; provided that the Indebtedness guaranteed is permitted to be Incurred under the Indenture;

(xv)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary under active bilateral facilities (including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more of the Parent Guarantor, Company or Restricted Subsidiaries) entered into after the date of the Supplemental Indenture (together with refinancings thereof) provided that the aggregate principal amount of Indebtedness Incurred pursuant to this clause (b)(xv) at any time outstanding  shall not exceed (x) US$75.0 million (or the Dollar Equivalent thereof) prior to the date the Rights Issue has taken place and (y) US$100.0 million (or the Dollar Equivalent thereof) after the date the Rights Issue has taken place and provided that there is no breach of any security coverage ratio test under the terms of the Existing Credit Facilities);

(xvi)    Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary under any supply chain financing or trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more of the Parent Company or any Restricted Subsidiary;

(xvii)   Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary in respect of the issuance of convertible bonds to lenders under the Non-Active Bilateral Facilities after the date falling 6 months from the date of the Supplemental Indenture, provided the market price is higher than the strike price of IDR400 per share; and

(xviii)  Indebtedness of the Parent Guarantor or any Restricted Subsidiary in an aggregate principal amount outstanding at any time (together with any refinancings thereof) not to exceed US$3.0 million (or the Dollar Equivalent thereof).

**Appendix 3**

**Events of Default - Section 6.01 of the Existing Indenture is to be amended as follows:**

Each of the following events is an "**Event of Default**" if such event occurs on and from the date of the Supplemental Indenture:

(a)     default in the payment of principal of (or premium, if any, on) the Notes when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b)     default in the payment of interest on any Note when the same becomes due and payable, and such default continues for a period of 30 consecutive days;

(c)     (x) the Parent Guarantor or any Restricted Subsidiary defaults in the performance or breach of the provisions of Section 5.01, (y) the Parent Guarantor and the Company fail to make or consummate an Offer to Purchase in the manner described under Section 4.13 or Section 4.14 or (z) the Company fails to create a first priority Lien on the Interest Reserve Account Collateral (subject to any Permitted Liens) in accordance with Section 4.25;

(d)     the Parent Guarantor or any Restricted Subsidiary defaults in the performance of or breaches any other covenant or agreement in this Indenture or under the Notes (other than a default specified in clause (a), (b) or (c) above) and such default or breach continues for a period of 14 consecutive Business Days after written notice by the Trustee or the Holders of 25% or more in aggregate principal amount of the Notes then outstanding;

(e)     there occurs with respect to any Indebtedness of the Parent Guarantor or any Restricted Subsidiary having an outstanding principal amount of US$5.0 million (or the Dollar Equivalent thereof) or more in the aggregate for all such Indebtedness of all such Persons, whether such Indebtedness now exists or will hereafter be created, (1) an event of default that has caused the holder thereof to declare such Indebtedness to be due and payable prior to its Stated Maturity and/or (2) a failure to pay principal of, or interest or premium (subject to the applicable grace period in the relevant documents) on, such Indebtedness when the same becomes due;

(f)     one or more final judgments or orders for the payment of money are rendered against the Parent Guarantor or any Restricted Subsidiary and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed US$5.0 million (or the Dollar Equivalent thereof) (in excess of amounts that reputable insurance carriers have agreed in writing to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(g)     an involuntary case or other proceeding is commenced against the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) with respect to it or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) or for any substantial part of the property and assets of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 consecutive days; or an order for relief is entered against the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) under any applicable bankruptcy, insolvency or other similar law as now or hereafter in effect;

(h)      the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) (1) commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (2) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) or for all or substantially all of the property and assets of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) or (3) effects any general assignment for the benefit of creditors;

(i)       any Guarantor denies or disaffirms in writing its obligations under its Guarantee or any Guarantee is finally determined in any judicial proceeding by a court of competent jurisdiction to be unenforceable or invalid or will for any reason cease to be in full force and effect, or the Company or any Guarantor repudiates this Indenture, the Notes or any Guarantee in writing, except as permitted by this Indenture;

(j)       a moratorium is agreed or declared in respect of any Indebtedness of the Company or any Guarantor or any governmental authority shall take any action to condemn, seize, nationalize or appropriate all or a substantial part of the assets of the Company or any Guarantor;

(k)       the capital and/or currency exchange controls in place in the Republic of Indonesia on the date of the Supplemental Indenture shall be modified or amended in a manner that prevents the Company or any Guarantor from performing its payment obligations under this Indenture, the Notes or any Guarantee;

(l)       the entire issued share capital of the Company ceases to be wholly owned, directly or indirectly, by the Parent Guarantor or the entire issued share capital of PB Fashion ceases to be wholly owned, directly or indirectly, by the Company;

(m)      it becomes unlawful for the Company or any Guarantor to perform or comply with any of its obligations under or in respect of this Indenture, the Notes or any Guarantee in any material respect;

(n)      any failure by the Company to maintain the Interest Reserve Account as required in accordance with the provisions described under Section 4.25 other than in accordance with the provisions described under Section 4.22;

(o)       any default by the Company in the performance of any of its obligations under the Security Documents that adversely affects the enforceability, validity, perfection or priority of the applicable Lien on the Interest Reserve Account Collateral or that adversely affects the condition or value of the Interest Reserve Account Collateral, taken as a whole, in any material respect;

(p)       (i) the Company denies or disaffirms in writing its obligations under any Security Document or (ii) other than in accordance with this Indenture and the Security Documents, any Security Document ceases to be or is not in full force and effect or the Interest Reserve Account Collateral Agent ceases to have a first-priority Lien over the Interest Reserve Account Collateral (subject to any Permitted Liens); or

(q)       the Rights Issue does not occur by 30 December 2022 and the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding have by written notice to the Company declared such event to be an Event of Default, provided that no Event of Default will occur if on or before 30 December 2022 at least US$50,000,000 of cash standing to the credit of the ringfence account referred to in Clause 4.4(a) of the Scheme Document (to be defined) has been provided to the Company by way of a subordinated shareholder loan .

For the avoidance of doubt, any event or circumstance that may have triggered or constituted any of the above events of default occurring prior to the date of the Supplemental Indenture shall be deemed to have been waived by

the Holders further to the restructuring of the terms of the Existing Credit Facilities as sanctioned by the High Court of Singapore under the Singapore scheme of arrangement.

Restructuring Term Sheet (HSBC)

| Parties | |
|---|---|
| Borrowers | The following are the borrowers under the Existing Facility Agreement (HSBC) and which will be Borrowers under the Trade Finance Facilities:<br>1. PT Pan Brothers Tbk. ("**PBRX**" or the "Company")<br>2. PT Pancaprima Ekabrothers<br>3. PT Hollit International<br>4. PT Ocean Asia Industry<br>5. PT Prima Sejati Sejahtera ("**PSS**")<br>6. PT Eco Laundry Hijau Indonesia<br>7. PT Apparelindo Prima Sentosa<br>8. PT Eco Smart Garment Indonesia<br>9. PT Berkah Indo Garment |
| Program Sponsor | Buyer(s) of goods from the Vendor Companies with which the Active Bilateral Facility Lender has supply chain financing programs.<br><br>As of the date of this term sheet, the Program Sponsor is Adidas International Trading B.V. |
| Vendor Companies | Vendor Companies means suppliers of goods to the Program Sponsor.  As of the date of this term sheet the Vendor Companies are as follows:<br>1. PBRX<br>2. PSS<br><br>The Vendor Companies may be expanded to include other Borrowers provided they are suppliers to the Program Sponsor. |
| Active Bilateral Facility Lender | PT Bank HSBC Indonesia ("**HSBC**" or "**Lender**") |
| | |
| **HSBC Existing Facility** | |
| Existing Facility Agreement (HSBC) | The US$50,000,000 corporate facility agreement dated 9 August 2017 (No. JAK/000224/U/170512) and made between, among others, PBRX and HSBC as bank, as amended by a first amendment to corporate facility agreement dated 23 July 2018 (No. JAK/180408/U/180525) and as further amended by a second amendment to corporate facility agreement dated 21 October 2019 (No. JAK/190570/U/190925). |
| HSBC Overdue Amount | US$ 12,132,701 (a US$ equivalent of total outstanding of US$ 10,306,965.11 and IDR 26,465,878,603 using IDR/USD exchange rate as of 30 June 2021 of 14,496).<br><br>The HSBC Overdue Amount shall be included as part of the Facility Limit under a new LC/SKBDN facility (described below in the section "**Trade Finance Facilities**") covered by Approved Invoices submitted under the Supply Chain Financing Program (described below in the section "**Supply Chain Financing Program**"). |
| Cancellation of default interest or penalties | All outstanding default interest and/or penalties under the HSBC Existing Facility shall be irrevocably and unconditionally cancelled. |
| | |
| **Trade Finance Facilities** | |

| | |
|---|---|
| Trade Finance Facilities | Letter of Credit/Surat Kredit Berdokumen Dalam Negeri ("**LC/SKBDN**") facilities with a facility limit in the amount of the HSBC Overdue Amount as of the date of the Amended Facility Agreement (HSBC), subject to the applicable Credit Support Coverage Ratio. <br><br> Such limit includes the HSBC Overdue Amount from the HSBC Existing Facility. <br><br> Type of Letter of Credit: Sight LC or Usance LC (no other form of LC is available, such as UPAS, etc). |
| Term | The Trade Finance Facilities shall be committed and made available for a term of a minimum of 24 months from the HSBC Effective Date.  During the Term of the Trade Finance Facilities the Vendor Companies shall remain enrolled in the Supply Chain Financing Program so long as it is offered by HSBC. |
| Currency | USD for LC <br> IDR and/or USD for SKBDN |
| Repayment of HSBC Overdue Amount | The HSBC Overdue Amount shall be repaid in 12 equal monthly instalments. The instalments shall be made on the 15th of each month (or the next business day if 15th is a holiday), with the first payment falling within one month after the signing of this term sheet. <br><br> Upon the first instalment of the HSBC Overdue Amount, HSBC shall reactivate the trade lines for the Borrowers to utilize subject to the Supply Chain Financing Program. |
| Fees applicable to the HSBC Overdue Amount | The HSBC Overdue Amount will incur interest of 5% p.a for USD loan and 8.5% p.a for IDR loan which shall be calculated and paid monthly on the same date as each instalment payment for the HSBC Overdue Amount. <br><br> Any Approved Invoices reserved as credit support for the HSBC Overdue Amount shall not be discounted. |
| Credit Support Coverage Ratio | The Trade Finance Facilities shall be backed by the Approved Invoices under the Supply Chain Financing Program. <br><br> The "**Credit Support Coverage Ratio**" means the Approved Invoices divided by the LC/SKDBN Outstanding Amount.  The Credit Support Coverage Ratio shall be no less than 100% at all times, except during the Grace Period where the Credit Support Coverage Ratio shall be no less than 80% of the LC/SKDBN Outstanding Amount. <br><br> "**LC/SKDBN Outstanding Amount**" means the aggregate of the outstanding Overdue Amount and any additional outstanding amounts under the Trade Finance Facilities. <br><br> The Credit Support Coverage Ratio shall be tested on the date of registration of any new Approved Invoices, with the first testing date to be 17 January 2022 or such later date as agreed between PBRX and HSBC ("**First Coverage Testing Date**"). |
| Grace Period | The "**Grace Period**" means the date starting from the HSBC Effective Date until 30 April 2022. |
| Flow of cash from maturing Approved Invoices | If the Credit Support Coverage Ratio is met, any cash payments made by the Program Sponsor on maturing Approved Invoices during such period shall be paid to the Vendor Companies, with mechanism defined below. <br><br> Mechanism: any funds paid by Program Sponsor shall be remitted to HSBC Supply Chain Financing Account before paid to the Vendor companies' operating accounts. This is to ensure that the total amount of Approved Invoices and cash held with HSBC complies with Credit Support Coverage Ratio. This mechanism is to be monitored and implemented on weekly basis. |

| | If the Credit Support Coverage Ratio is not met, the cash equivalent of the shortfall will be withheld from the payments of maturing Approved Invoices under the Supply Chain Financing Program and held in the HSBC Supply Chain Financing Account until the combination of cash held and Approved Invoices meet the Credit Support Coverage Ratio.<br><br>HSBC may not withhold any of the cashflows from maturing Approved Invoices prior to the First Coverage Testing Date. |
|---|---|
| Conditions of LC/SKBDN issuance | (i)   Issuance of LC or SKBDN must be against a list of beneficiaries pre-approved in writing by the Lender from time to time. The Borrowers must also provide the Lender with any supporting document(s) (including but not limited to purchase and supply contracts with suppliers, and/or purchase orders in respect of such purchase and supply contracts) required by the Lender from time to time for the purpose of any LC or SKBDN issuance, to evidence that the raw material order made by the relevant Borrower(s) from such supplier is genuine.<br>(ii)  The Borrowers agree that an LC and SKBDN may not be issued by the Lender if:<br>    a.  the Lender has not received sufficient supporting documents (such as purchase orders or contracts) in respect of the relevant order;<br>    b.  the LC or SKBDN request is to be subject to Telegraphic Transfer (TT) Claim Reimbursement (i.e enabling claim for payment prior to receipt/presentation of documents); and<br>    c.  destination port(s) is/are outside of Indonesia.<br>Additionally, any issuance of LC and/or SKBDN shall be subject to the following conditions:<br>    a.  tenor shall be at a maximum of 120 days; and<br>    b.  issuance of LC and/or SKBDN for procurement of machinery(ies) will not be allowed. |
| Fees for new issuance of LC/SKBDN under the Trade Finance Facilities | There shall be no double counting of fees via Discounting Fees concerning any Approved Invoices reserved as credit support for new issuance of LC/SKBDN under the Trade Finance Facilities.  The fees applicable for new issuance of LC/SKBDN are as follows:<br><br>- Issuance of 0.1% flat or min USD 30/ IDR 500,000<br>- Acceptance of 0.9% pa or min USD 75/ IDR1,000,000<br>- Amendment (other Fee): USD 30 / IDR 750,000 (amendment of amount / tenor refer to issuance fee)<br>- Telex Charges: USD 25 / IDR 500,000 |
| | |
| **Supply Chain Financing Program** | |
| Supply Chain Financing Program | It is the intent of the parties that the Vendor Companies and/or Borrowers (as necessary) enter into supply chain financing agreement(s) by furnishing the supporting documents for Supply Chain Financing Program Enrolment.<br><br>As of the date of this term sheet, the Vendor Companies will enter into the Supply Chain Financing Program with Adidas. |
| Carve Out of Invoices from Any Security Pledge | Accounts receivable and invoices in respect of purchases by the Program Sponsor are to be excluded from any security pledge to other lenders, bilateral or otherwise. |
| Approved Invoices | Means those invoices that have been issued by the Vendor Companies and accepted by the Program Sponsor for payment at a fixed maturity date. |

| | |
|---|---|
| | The payment destination stated under all Approved Invoices shall be the non-operating accounts of respective Vendor Companies at HSBC Indonesia. |
| HSBC Effective Date | The HSBC Effective Date will be the date on which:<br>1.  the Existing Facility Agreement (HSBC) is amended; and<br>2.  the Vendor Companies are formally enrolled in an agreed Supply Chain Financing Program. |
| Amended Facility Agreement (HSBC) | The Existing Facility Agreement (HSBC) as amended, restated, supplemented, or otherwise modified on the HSBC Effective Date in accordance with the terms of this term sheet. |
| Facility Limit | Shall mean, at any one point in time, the aggregate amount of all Approved Invoices under the Supply Chain Financing Program multiplied by the Credit Support Coverage Ratio, with maximum amount per HSBC Overdue Amount as of the date of this term sheet, for clarification the amount outstanding as of 30 June 2021 amounted to US$ 12,132,701 (a US$ equivalent of total outstanding of US$ 10,306,965.11 and IDR 26,465,878,603 using IDR/USD exchange rate as of 30 June 2021 of 14,496). |
| Program Mechanics | All Approved Invoices shall be entered into the Supply Chain Financing Program. The Approved Invoices in excess of the outstanding HSBC Overdue Amount can be used as backing for the issuance of additional LC/SKBDN (within the Facility Limit) or can be discounted for cash for the Borrowers. The "**Available Facility Limit**" that can be used for issuance of new LC/SKBDN shall be equal to the Facility Limit less the LC/SKBDN Outstanding Amounts.<br><br>Upon acceptance of the Vendor Companies into the Supply Chain Financing Program:<br>1.  The Vendor Companies shall open and maintain a new dedicated bank account under HSBC ("**HSBC Supply Chain Financing Account**").<br>2.  The relevant Program Sponsor shall provide the Lender with a list of Approved Invoices via existent method.<br>3.  Invoices received by HSBC which have 7 days or less before payment of such invoices are due may also be counted towards Approved Invoices. |
| Term | Subject to the agreement between the Vendor Companies, Program Sponsor, and Lender. |
| Discounting Fees | Subject to each specific Supply Chain Financing Program with relevant Program Sponsor.<br><br>The Discounting Fees are applicable against available Approved Invoices (in excess of LC/SKBDN Outstanding Amount) that the Vendor Companies opt to convert to cash advance.<br>Under the Adidas Supply Chain Financing Program, the Discounting Fees are as follows:<br><br>                            Handling Charge       0.015% on Bill amount, max. USD100<br>                            Early Payment charge   LIBOR + 0.9%*<br>                            Remittances Fee       Per Bank's standard remittance fees,<br><br>*The Early Payment Charge pricing may be adjusted aligned with LIBOR transition to SOFR by latest 31 March 2022. HSBC will notify Borrower at least 30 calendar days prior to any adjustments to the interest rates benchmark and/or margin.* |
| Supporting Documents for Supply Chain Financing Program Enrolment | The supporting documents for the Supply Chain Financing Program will include:<br>(1)  Open Account via Bank Agreement (an agreement between HSBC and the Vendor Companies with regards to the Supply Chain Financing Program);<br>(2)  Email Indemnity (a disclaimer letter and letter of indemnity for instructions made from Vendor Companies to HSBC); |

| | |
|---|---|
| | (3) Designated Email Letter (a request letter to approve designated email addresses of the Vendor Companies); and |
| | (4) Payment Instruction Letter (a request letter to ensure that any payments from Supply Chain Finance are credited to HSBC Supply Chain Financing Account from certain account numbers of the Vendor Companies in HSBC). |
| | |

**Account Activities Restrictions**

| | |
|---|---|
| Incoming funds into Borrower's accounts | Source of incoming funds allowed: (1) Program Sponsor; (2) Borrower's own accounts in other Banks. Funds coming from other than Borrower's own name will be rejected. |
| Outgoing transfers out of Borrower's accounts | Beneficiary of outgoing funds allowed: Borrower's own accounts with HSBC (inhouse transfers) or in other Banks. Transfers to beneficiaries other than Borrower's own name will be rejected. |

**Conditions Subsequent**

| | |
|---|---|
| Conditions Subsequent | After the Record Date of the Scheme, the Borrowers, Vendor Companies, and HSBC shall execute the Amended Facility Agreement (HSBC) and conclude the enrolment process of the Supply Chain Financing Program. The documentations shall be executed at the latest by 30 ]s after the Record Date of the Scheme or as otherwise agreed between the Borrowers and HSBC.

PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time. Accordingly, once the Amended Facility Agreement (HSBC) has been executed, HSBC shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (HSBC) shall include wordings on this collectability rating review based on prevailing regulations. |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |

## PT Pan Brothers, Tbk. and subsidiaries

## Active Bilateral Facility - Restructuring Term Sheet (Maybank)

## (Subject to Contract)

The terms set out in this term sheet are a summary of the key terms. These terms do not purport to be a complete description of the terms of the proposed transaction.

This term sheet and its contents are intended for the exclusive use of the parties and shall not be disclosed by any party to any person other than its affiliates and legal and financial advisors for the purposes of the proposed transaction unless the prior written consent of the other party is obtained.

| Parties | |
|---|---|
| Borrowers | The Borrower shall be PT Pan Brothers Tbk ("**PBRX**"). However, the facility shall also be made available to the subsidiary companies that are at least 51% owned by PBRX, as per the Existing Facility Agreement (Maybank). |
| Active Bilateral Facility Lender | PT Bank Maybank Indonesia Tbk ("**Maybank**") |
| **Facility Terms** | |
| Maybank Effective Date | The Maybank Effective Date will be the date on which the Existing Facility Agreement (Maybank) is amended to reflect the terms of this term sheet. |
| Maybank Existing Facility | Active operating bilateral letter of credit and other facilities as per the Existing Facility Agreement (Maybank), with facility limit in the amount of total usage outstanding as of the date of the Amended Facility Agreement (Maybank). |
| Maturity Date | The final maturity date shall be the date falling 24 months from the Maybank Effective Date.<br><br>On the Maturity Date, the Borrowers shall settle any outstanding amounts in full unless Maybank agrees that the Maturity Date may be extended. |
| Existing Facility Agreement (Maybank) | The credit agreement No. 10 made before Maria Andriani Kidarsa, SH., Notary in Jakarta, dated 12 March 2003 as amended by the amendment to credit agreement No. 018/PrbPK/CDU-CORP/2018 dated 11 October 2018 and the amendment to credit agreement No. 173B/PrbPK/CDU-CORP/2019 dated 9 October 2019 and last amended by the amendment to credit agreement No. 290/PrbPK/CDU1/2020 dated 13 November 2020 (including all its amendments, addendums and extensions thereof) made between PBRX and Maybank. |
| Amended Facility Agreement (Maybank) | The Existing Facility Agreement (Maybank) as amended, restated, supplemented, or otherwise modified on the Maybank Effective Date in accordance with the terms of this term sheet. |
| Committed Facility Limit | The committed facility limit shall be in the amount of the total usage outstanding as of the date of the Amended Facility Agreement (Maybank). |
| Maybank Overdue Amount | As of 30 June 2021, US$ 3,777,513 (a US$ equivalent of total outstanding of US$ 3,607,907 and IDR 2,458,616,338 using IDR/US$ exchange rate as of 30 June 2021 of |

|  |  |
|---|---|
|  | 14,496). The numbers are to be updated to be the amount as of the date of the Amended Facility Agreement (Maybank). |
| Repayment of Maybank Overdue Amount | The Maybank Overdue Amount shall be repaid in 12 equal monthly instalments. The instalments shall be made on the 15th of each month (or the next business day if 15th is holiday), with the first instalment falling within one month after the Maybank Effective Date.<br><br>The Maybank Overdue Amount instalments paid will refresh the Available Facility Limit. Upon the first instalment of the Maybank Overdue Amount, Maybank shall reactivate the trade lines for the Borrowers to utilize. |
| Cancellation of default interest or penalties | All outstanding default interest and/or penalties under the Maybank Existing Facility up to the signing date of Amended Facility Agreement (Maybank) shall be irrevocably and unconditionally cancelled. |
| Available Facility Limit | Refers to the amount that the Borrowers can drawdown at any time. The Available Facility Limit is calculated as the Committed Facility Limit less all outstanding facility utilizations ("**Outstanding Utilization**") at that point in time.<br><br>For example, assume that the Committed Facility Limit is US$ 4,000,000. If within the first 30 days after the Maybank Effective Date the Borrowers pay down a maturing usance in the amount of US$ 500,000 and makes an Maybank Overdue Amount instalment of US$ 1,000,000, then the Outstanding Utilization will become USD 2,500,000 (being the Committed Facility Limit as of the Maybank Effective Date of US$ 4,000,000 less the maturating usance payment of US$ 500,000 and less the Maybank Overdue Amount instalment of US$ 1,000,000). The Available Facility Limit will be refreshed and at that point in time be available to the Borrowers up to US$ 1,500,000 (the limit of US$ 4,000,000 less the Outstanding Utilization of US$ 2,500,000). |
| Security | Maybank will be entitled to security in the form of a first rank *hak tanggungan* amounting 125% of the latest appraisal report market value over land and building of PBRX's ex-factory in Sukabumi, the land and building located in Tenjoayu, Cicurug district, Sukabumi, West Java with a total land size of 31,090 square meters and total building size of 5,518 square meters. |
| Interest, Fees and Other Charges | 4.25% p.a. for USD facilities and 9.25% p.a. for IDR facilities.<br><br>For interest over the Maybank Overdue Amount, the interest applicable shall be 4.25% p.a. The interest shall be paid monthly at the same date as the instalment payment date.<br><br>Other interest, fees, and charges are as per the Existing Facility Agreement (Maybank). |
| Financial Covenant | The following financial covenants shall apply to Pan Brothers and its subsidiaries as a group ("**Group**") and shall supersede those in the Existing Facility Agreement (Maybank), based on the annual audited consolidated financial statements of the Group:<br>1.      Minimum current ratio of 1.1x;<br>2.      Maximum Net Debt to Equity of 2.0x;<br>3.      Maximum Net Debt to EBITDA of 5.5x; and<br>4.      Minimum EBITDA to Interest of 2.25x. |

|  | "**Current Assets**" means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including any cash and cash equivalent investments.<br><br>"**Current Liabilities**" means the aggregate (on a consolidated basis) of all borrowings (including trade creditors, accruals and provisions) of each member of the Group.<br><br>"**Current Ratio**" means the ratio of Current Assets to Current Liabilities.<br><br>"**EBITDA**" means, EBIT for that measurement period after adding back any amount attributable to the amortization and depreciation of assets of the Group.<br><br>"**Equity**" means, at any time, the aggregate total assets of the Group less the aggregate total liabilities of the Group at that time.<br><br>"**Net Debt**" means, at any time, the aggregate of all obligations of the Group for or in respect of interest-bearing borrowings (including outstanding letters of credit) but deducting the aggregate amount of cash and cash equivalents held by the Group at that time. For the avoidance of doubt, any supply chain financing or other trade arrangements which do not involve recourse to one or more members of the Group shall not be included towards the calculation of Net Debt.<br><br>For the avoidance of doubt, the financial covenants shall be tested on 31 December every year starting from 31 December 2022 until the maturity of the facility based on the annual audited consolidated financial statements of the Group. |
|---|---|
| Representation, warranties, undertakings, and other terms. | To be in-line with the Existing Facility Agreement (Maybank) unless stated otherwise in this term sheet or if reasonably required by the Pan Brothers Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility. In the event of any inconsistency, the terms in this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail.<br><br>Maybank irrevocably and unconditionally agrees not to (prior to the Maybank Effective Date) rely on any cross-default or comparable clause in the Existing Facility Agreement (Maybank) or any other agreement to accelerate the payment of any amount owing under the Existing Facility Agreement (Maybank) or any agreement (howsoever described) mentioned therein, enforce any security securing the amended Existing Facility Agreement (Maybank) (including the *Hak Tanggungan*) or take any other enforcement steps due to any default (howsoever described) in any document to which a relevant creditor is a party.<br><br>There will be routing of cash collection from certain buyers as per section Other Condition below, however there shall not be any requirement to maintain a certain amount of direct income from customers in any of the Borrowers' account(s) with Maybank. |
| Event of Default | To be in-line with the Existing Facility Agreement (Maybank) unless otherwise amended or overridden by this term sheet or if reasonably required by the Pan Brothers Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility. In particular, as this is now a committed facility, the facilities may only be frozen and acceleration or |

|  |  |
|---|---|
|  | enforcement action taken by Maybank only upon the occurrence of an event of default which is continuing.<br><br>Events of default (other than a payment event of default) are each subject to a 14 Business Day grace period if that event of default is capable of remedy and in the case of a payment event of default that is caused by a Disruption Event, a 3 business day grace period will be applicable.<br><br>"Disruption Event" means:<br>(a)  a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Amended Facility Agreement (Maybank), which is not caused by, and is beyond the control of, any of the parties; or<br>(b)  the occurrence of any other event which results in a disruption (of a technical or systems- related nature) to the treasury or payments operations of a party preventing it, or any other party from:<br>(i)  performing its payment obligations under Amended Facility Agreement (Maybank); or<br>(ii)  communicating with other parties under the Amended Facility Agreement (Maybank),<br>and which is not caused by, and is beyond the control of, the party whose operations are disrupted.<br><br>In the event of any inconsistency, the terms of this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
| Condition Precedent to the Amended Facility Agreement (Maybank) | 1.  The Borrower shall submit corporate approval according to the Borrower's article of association to (i) approve the terms of, and the transactions contemplated by, the Facility agreement; (ii) to authorised a specified person or persons to execute the Facility agreement and security document.<br>2.  The respective Borrowers shall submit the documents on the Security (i.e original land and building certificate, proof of land & building tax payments) to a notary agreed between Maybank and the Borrowers at the latest 7 days following the signing of the term sheet.<br>3.  Prior to the Record Date of the Scheme, proof of the clean check (*cek bersih*) over the land certificate (security documents) mentioned in No. 2 must be obtained from the respective Notary. The failure to submit the said document shall impact the Bank's decision on the Record Date and the execution of this Amended Facility Agreement;<br>4.  After the Record Date of the Scheme, the Borrowers and Maybank shall execute the Amended Facility Agreement (Maybank). The agreement shall be executed at the latest by 30 days after the Record Date of the Scheme or as otherwise agreed between the Borrowers and Maybank. |
| Conditions Subsequent to the Amended Facility Agreement (Maybank) | 1.  Perfection of the Security shall be done at the latest within 60 days or such later date as agreed after the signing of the Amended Facility Agreement (Maybank).<br>2.  PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time.  Accordingly, once the |

| | |
|---|---|
| | Amended Facility Agreement (Maybank) has been executed, Maybank shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (Maybank) shall include wordings on this collectability rating review based on prevailing regulations.<br><br>"**Record Date**" means 7 December 2021 (voting date).<br><br>"**Rights Issue**" means a rights issue of an amount of US$50 million to be carried out by the Company as per the Scheme which is underwritten by key shareholders who have agreed to ringfence such amount under the terms of a ringfencing deed to be entered into prior to the Restructuring Effective Date (as such term is defined in the Scheme documents). |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |
| Other Condition | To route cash collection from the following key buyers or other companies agreed by the key buyers to Borrowers' accounts in Maybank from the Routing Date (as defined below) and confirmation from the buyers on the change of accounts:<br><br>• Burton<br>• Betabrand<br><br>The above list of key buyers which collections are to be routed through Maybank may be changed from time to time if agreed between the Borrowers and Maybank.<br><br>The cash routing shall happen within 60 business days after the signing of the term sheet or such later date as agreed between Maybank and the Borrowers (the "**Routing Date**"). |
| Governing Law | Indonesian Law |
| Jurisdiction | Indonesian courts |

**PT Pan Brothers, Tbk. and subsidiaries**

**Non-Active Bilateral Facilities - Restructuring Term Sheet**

**(Subject to Contract)**

The terms set out in this draft term sheet are a summary of the key terms only to facilitate further discussions between the Non-Active Bilateral Lenders and the Borrowers. These terms do not purport to be a complete description of the terms of the proposed transaction.

This draft term sheet and its contents are intended for the exclusive use of the Borrowers and shall not be disclosed by the Borrowers to any person other than the Borrowers' affiliates and legal and financial advisors for the purposes of the proposed transaction unless the prior written consent of the Non-Active Bilateral Lenders is obtained.

| PARTIES AND INDEBTEDNESS | | |
|---|---|---|
| Existing Borrowers | : | PT Pan Brothers, Tbk. ("**PBRX**" or the "**Company**") and its relevant subsidiaries as set out in the table in Schedule 1. PBRX and its subsidiaries referred to above shall individually be referred to as a "**Borrower**" and collectively referred to as the "**Borrowers**". |
| Group | : | PBRX and all of its (direct and indirect) subsidiaries from time to time. |
| Non-Active Bilateral Lenders | : | The bilateral lenders as set out in the table in Schedule 1 who have opted not to provide any further committed active facilities post restructuring of the Group. |
| Non-Active Bilateral Facilities Amount / Existing Indebtedness | : | The aggregate of the principal amounts outstanding under the Non-Active Bilateral Facilities (being approximately USD 31,228,613). All outstanding default interest or penalties shall be unconditionally and irrevocably cancelled. |
| Non-Active Bilateral Facilities | | Bilateral facilities granted by Non-Active Bilateral Lenders as set out in Schedule 1. |
| PROPOSED TRANSACTION AND PROCESS | | |
| Transaction | : | This draft term sheet contemplates that the Existing Borrowers and the Non-Active Bilateral Lenders shall enter into a common framework agreement (the "**Common Framework Agreement**") which will override the terms in the existing underlying Non-Active Bilateral Facilities agreements in accordance with the terms of this term sheet and reflect consequential amendments to reflect the terms of the restructuring of the indebtedness of the Group as sanctioned by the Singapore court under the scheme of arrangement. Each Non-Active Bilateral Lender's total participation shall be equal to its respective aggregate principal amount outstanding of the Existing Indebtedness. |
| Process | : | While ideally the Company would like the Transaction to be completed by way of unanimous consent of all its creditors, the Company will implement the Transaction by way of a scheme of arrangement. The transaction will be implemented as follows: 1. Agreement and signing of this draft term sheet; 2. Signing of key transaction documents (to be held in escrow and coming into effect in accordance with the terms of the scheme of arrangement), such key transaction documents to include, but not be limited to: a. The Common Framework Agreement. b. A cash account management agreement ("**CAMA**") which will describe how the Group will manage its cash/cash pooling arrangements going forward; and c. Such other documents as the Non-Active Bilateral Lenders and/or the Company may reasonably require in order to implement the Transaction. |

| Conditions | : | It shall be a condition precedent to the Common Framework Agreement coming into effect that: <br><br> 1. The Group shall procure that all Non-Active Bilateral Lenders agree to sign up to the Common Framework Agreement. <br> 2. All outstanding and accrued interest (but not default interest) on the Existing Indebtedness as well as other amounts payable under the existing Non-Active Bilateral Facilities agreements shall be paid up to such date. <br> 3. [●], being an Indonesian top-7 accounting firm, are to be appointed as monitoring accountant in relation to the CAMA. A simple majority (51%) by value of the Non-Active Bilateral Lenders, the active bilateral lenders and the syndicated lenders may agree to a later change if necessary. |

**RESTRUCTURING AND RESCHEDULED NON-ACTIVE BILATERAL FACILITIES**

| Amended Non-Active Bilateral Facilities | : | The key commercial terms of the Amended Non-Active Bilateral Facilities are as below. <br><br> 1. Lenders: Non-Active Bilateral Lenders. <br> 2. Amount: The Existing Indebtedness / aggregate of the principal amounts outstanding under the Non-Active Bilateral Facilities, being USD 31,228,613 as of the date of this term sheet. <br> 3. Cancellation of default interest or penalties: All outstanding default interest and/or penalties under the Non-Active Bilateral Facilities shall be irrevocably and unconditionally cancelled. <br> 4. The Non-Active Bilateral Lenders may elect one of the three options below: <br>    a. a three-year term out starting from 31 March 2022 with monthly amortisation starting from the third year (i.e. 12-monthly equal amortization in year three) and interest rate of LIBOR + margin of 3.00%, with no security; <br>    b. option to exchange into a new convertible bond with terms as set out in Schedule 2. Non-Active Bilateral Lenders to elect if they wish to exercise this option on or before 31 March 2022; or <br>    c. a payment of 15% of the principal amount of a Non-Active Bilateral Lender's debt (as a one-time payment in full settlement) at the time of the rights issue. Non-Active Bilateral Lenders to elect if they wish to exercise this option on or before 31 March 2022. |
| CAMA: Bank Accounts, Minimum Operating Reserve and Cash Sweep Mechanism | : | The Company, PPEB, PSS, and ESGI shall be permitted to open and maintain the following types of accounts with any account banks, which shall be freely operated and maintained by each Borrower (the "**Operating Accounts**"): <br><br> a) vendor financing accounts (for receipt of cash advances under vendor financing programmes); <br><br> b) collection accounts (to receive collections from customers, loan proceeds, insurance proceeds and to make payments to suppliers) which shall be pledged in favour of certain active bilateral facility lenders; <br><br> c) payroll accounts (for payment of payroll); <br><br> d) LC accounts (for payments of LC outstandings); <br><br> e) tax accounts (for payments of taxes); and <br><br> f) sundries accounts. |

Amounts in the Company, PPEB, PSS, and ESGI's collection accounts are permitted to be transferred to any of such Borrower's payroll accounts, LC accounts, tax accounts or sundries accounts for payment of the required amounts for operations (including payroll amounts, LC outstandings, tax amounts, sundries). Amounts in the Company, PPEB, PSS, and ESGI's collection accounts shall also be transferred to relevant third party accounts for payments due to suppliers, active bilateral lenders (for LC outstanding, overdue interest and instalments), and to pay scheduled interest and principal amounts to noteholders, syndicated lenders and non-active bilateral lenders.

In addition to the above accounts, the Company, PPEB, PSS, and ESGI may open and maintain the following accounts with any account bank:

a) a cash proceeds / operating accounts;

b) an interest reserve account (syndication);

c) an interest reserve account (non-active bilaterals);

d) an amortisation reserve account; and

e) a cash sweep account.

Other than the accounts mentioned above, the Company, PPEB, PSS, and ESGI shall not open or maintain any other bank account.

Cash available after operations and mandatory interest and (where applicable) amortization payments to the noteholders, syndicated lenders, active bilateral lenders, and non-active bilateral lenders (in accordance with the terms of the scheme of arrangement) shall be applied in accordance with the following waterfall on a quarterly basis:

a.    First, to top up the cash proceeds / operating reserve accounts.

Prior to the rights issue, an aggregate operating cash reserve of no more than USD75 million (or its equivalent in any currency or currencies) may be maintained across all the Operating Accounts and cash proceeds / operating reserve accounts of the Company, PPEB, PSS, and ESGI, but excludes any interest reserve account and amortisation reserve account.  After the rights issue, such aggregate operating cash reserve limit shall be increased to USD100 million (or its equivalent in any currency or currencies) (the "**Minimum Operating Reserve** ").

b)  Second, to top up the interest reserve accounts (syndication) in the amount of interest payments due to syndicated lenders for the next quarter and the interest reserve accounts (non-active bilaterals) in the amount of interest payments due to non-active bilateral lenders for the next quarter (on a pro-rata basis based on outstanding amount). The interest reserve accounts (syndication) shall be secured in favour of the syndicated lenders.

c) Third, to top up the amortization reserve accounts in the amount of principal amortization payments due to syndicated lenders for the next quarter (i.e. only one quarter amortisation payment is reserved at any one time).  These accounts shall be secured in favour of the syndicated lenders.

d) Lastly, any excess cash (after payments in paragraphs (a) to (d) above are made) shall be transferred to the cash sweep accounts every six months and be applied subject to and

|  |  |  |
|--|--|--|
|  |  | in accordance with the cash sweep mechanism below. These accounts shall be secured in favour of the syndicated lenders and the non-active bilateral lenders.

Any excess cash above the Minimum Operating Reserve (and after payments in paragraphs (a) to (d) above are made) shall be used to accelerate payments to the syndicated lenders and Non-Active Bilateral Lenders in the following priority (the "**Cash Sweep Mechanism**"):

a.  payments of principal amounts outstanding under the amended and restated syndicated facility agreement; and
b.  payments of principal amounts outstanding under the Amended Non-Active Bilateral Facilities, provided no less than USD50 million of outstanding indebtedness under the amended and restated syndicated facility agreement has been paid down (after which excess cash is to be pro-rated based on outstanding amounts under the amended and restated syndicated facility agreement and the Amended Non-Active Bilateral Facilities (excluding outstanding amounts converted by Non-Active Bilateral Lenders to the new convertible bond, if any Non-Active Bilateral Lenders choose this option)).

For the avoidance of doubt, excess cash is to be applied pro rata between the amended and restated syndicated facility agreement and the Non-Active Bilateral Facilities only after the facilities under the amended and restated syndicated facility agreement have been paid down by USD50 million.

The Cash Sweep Mechanism shall take effect 1 year after 1 January 2022  and shall be tested semi-annually and verified by the monitoring accountant.

Excess cash shall not be applied towards accelerated payments of any new convertible bond.  For the avoidance of doubt, Non-Active Bilateral Lenders that exercise the new convertible bond exchange option in accordance with the terms of Schedule 2 will not receive accelerated payments from excess cash. |
| Costs and Expenses | : | The Borrowers shall promptly on demand pay to any Non-Active Bilateral Lender (as the case may be) all pre-agreed costs and expenses (including legal fees) reasonably incurred by any of them in connection with the consideration, negotiation, preparation, and execution of the Transaction. |
| Documentation | : | Unless set out in this term sheet and save for carve-outs required to implement the restructuring or required by the Company to run the business of the Group as will be set out in the Common Framework Agreement, undertakings, representations and other terms are to be generally the same as per the existing Non-Active Bilateral Facilities agreements. |

The parties shall keep this draft term sheet confidential and shall not disclose the draft term sheet, nor disclose the existence of the draft term sheet, to any other person (other than its key management personnel, legal and financial advisors), save where necessary or desirable to disclose it to any court or otherwise as required by any regulatory authority.

Notwithstanding the foregoing, the Non-Active Bilateral Lenders may provide a copy of the draft term sheet to potential assignees and/or sub-participants, provided that such potential assignees and/or sub-participants are subject to a duty of confidentiality on substantially the same terms.

This draft term sheet shall be governed by Indonesian law and the parties submit to the Commercial Court of Jakarta in respect of any dispute arising out of or in connection with this draft term sheet.

SCHEDULE 1

**Non-Active Bilateral Facilities**

## 1.1    NON-ACTIVE BILATERALS

| Borrower | Debt | Guarantors | Governing Law | outstanding principal amount as of 30 June 2021 |
|---|---|---|---|---|
| • PT Pan Brothers Tbk., PSS, PPEB, ESGI, BIG | • Sight/Usance Documentary and Letter of credit up to USD7,500,000 provided by PT Bank BNP Paribas Indonesia | N.A. | Indonesia | USD 2,401,084 |
| • PT Pan Brothers Tbk., PPEB, Hollit, PSS, TPG, VPM, ESGI, BIG, OAI | • Uncommitted letter of credit up to USD 54,000,000 provided by ANZ Indonesia (now Strait Merchant Capital) | N.A. | Indonesia | USD 7,455,273 |
| • PT Pan Brothers Tbk., ESGI, PSS, TPG | • LC Import/Local (Sight, Usance) up to USD35,000,000 and Forex (Forward) up to USD1,000,000 provided by MUFG Indonesia (now **SC Lowy**) | N.A. | Indonesia | USD 21,372,256 |
| • PT Pan Brothers Tbk., PPEB, ESGI, TPG, PSS | • Letter of Credit Facility up to USD3,000,000 and Bank Guarantee Facility up to USD3,000,000 provided by PT Bank Mizuho Indonesia (now **SC Lowy**) | N.A. | Indonesia | |

**SCHEDULE 2**

**Mandatory Convertible Bond ("MCB")**

| | |
|---|---|
| MCB Creditors | Non-Active Bilateral Lenders who opted for the option to convert their outstanding facilities into MCB.<br><br>"**MCB Holders**" shall mean the creditors who are issued with the MCBs and any person that acquires an interest in the MCBs after the MCB Effective Date. |
| Issuer | PBRX |
| Converted Debt Amount | The sum of the outstanding principal amount plus any accrued interest (but not default interest) of such Non-Active Bilateral Lender under its Non-Active Bilateral Facilities:<br><br><table><tr><th>Existing Creditor</th><th>Amount of Converted Debt (principal)</th></tr><tr><td>[ ]</td><td>[USD xx]</td></tr><tr><td>[ ]</td><td>[USD xx]</td></tr></table> |
| MCB Effective Date | The date that the MCBs are issued which shall be on or as soon as reasonably practicable after and in any event by no later than [30 June 2022]. |
| MCB Maturity Date | 3 years from the MCB Effective Date. |
| Coupon Rate | The MCBs will receive an interest of LIBOR + margin of 1.5%, with LIBOR floor of 0.25%. |
| Security | Unsecured. |
| Conversion Mechanics | The MCB Holders may elect to convert, in whole or in part, the MCBs into ordinary shares in the Company after 6 months following the MCB Effective Date at the MCB Strike Price, provided that the average Market Share Price for the last [60] days is equal to or higher than the MCB Strike Price.<br><br>If such election is made, unless previously redeemed, repurchased or converted and cancelled, 100% of the Converted Debt Amount shall be mandatorily converted into ordinary shares in the Company at the MCB Strike Price on the MCB Maturity Date.<br><br>"**Market Share Price**" means the daily closing price of the Company's shares listed in Indonesian Stock Exchange under ticker "PBRX". |
| MCB Strike Price | IDR 400 |
| Transfer Restrictions | The MCB Holders shall provide no less than [14] days prior written notice to the Company of any intention to assign and/or transfer the MCBs save that any transfer restrictions shall not apply to the extent they prevent the MCBs from being cleared in the relevant clearing systems. |
| Other Conditions | The MCB Holders are not entitled to acceleration of principal payment under Cash Sweep Mechanism. |

| Governing Law | Indonesian Law |
|---|---|
| Jurisdiction | Indonesian courts |

**Term Sheet - Permata**

| Parties | |
|---|---|
| Borrowers | 1.  PT Pan Brothers Tbk ("**PBRX**" or the "**Company**")<br>2.  PT Pancaprima Ekabrothers ("**PPEB**")<br>3.  PT Prima Sejati Sejahtera ("**PSS**") |
| Original Relevant Active Bilateral Facility Lender | PT Bank Permata Tbk ("**Permata**") |
| Group | Group means the Company and its subsidiaries from time to time. |
| **Facility Terms** | |
| Original Active Bilateral Effective Date | The Original Active Bilateral Effective Date will be the date on which:<br>1.  the Existing Facility Agreement (Permata) is amended and restated; and<br>2.  the security sharing agreement is entered into by, among others, the Borrowers and the Original Relevant Active Bilateral Facilities Lenders (as defined below) as of the date of this term sheet (the "**Security Sharing Agreement**"). |
| Facility | Active operating bilateral letter of credit and other facilities as per the Existing Facility Agreement (Permata), with committed facility limit of US$ 14,041,340. |

| Company | Limit |
|---|---|
| PBRX | 2,053,157 |
| PPEB | 2,661,180 |
| PSS | 9,327,003 |
| **Total** | **14,041,340** |

| | |
|---|---|
| Term | The Facility shall be committed and made available for a term of a minimum of 24 months from the date of the Original Active Bilateral Effective Date. |
| Existing Facility Agreement (Permata) | The credit agreement No. 41 dated 26 August 2014 and No. 103 dated 24 July 2014 made between PBRX and certain other entities as obligors and Permata, as amended from time to time, most recently by two amendments: (i) No. KK/20/0372/AMD/CG1 dated 24 October 2020 among PBRX, PPEB, and Permata; and (ii) No. KK/20/0370/AMD/CG1 dated 24 October 2020 between PSS and Permata. |
| Amended Facility Agreement (Permata) | The Existing Facility Agreement (Permata) as amended, restated, supplemented, or otherwise modified on the Original Active Bilateral Effective Date in accordance with the terms of this term sheet. |
| Interest, Fees and Other Charges | As per the Existing Facility Agreement (Permata). |
| Financial Covenant | The following financial covenants shall apply to the Group and shall supersede those in the Existing Facility Agreement (Permata), based on the annual audited consolidated financial statements of the Group:<br><br>1.      Minimum Current Ratio of 1.1x;<br>2.      Maximum Net Debt to Equity of 2.0x;<br>3.      Maximum Net Debt to EBITDA of 5.5x; and<br>4.      Minimum EBITDA to Interest of 2.25x. |

| | |
|---|---|
| | "**Current Assets**" means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including any cash and cash equivalent investments.<br><br>"**Current Liabilities**" means the aggregate (on a consolidated basis) of all borrowings (including trade creditors, accruals and provisions) of each member of the Group.<br><br>"**Current Ratio**" means the ratio of Current Assets to Current Liabilities.<br><br>"**EBITDA**" means, EBIT for that measurement period after adding back any amount attributable to the amortization and depreciation of assets of the Group.<br><br>"**Equity**" means, at any time, the aggregate total assets of the Group less the aggregate total liabilities of the Group at that time.<br><br>"**Net Debt**" means, at any time, the aggregate of all obligations of the Group for or in respect of interest-bearing borrowings (including outstanding letters of credit) but deducting the aggregate amount of cash and cash equivalents held by the Group at that time.  For the avoidance of doubt, any supply chain financing or other trade arrangements which do not involve recourse to one or more members of the Group shall not be included towards the calculation of Net Debt.<br><br>For the avoidance of doubt, the financial covenants shall be tested on 31 December every year starting from 31 December 2022 until the maturity of the Term based on the annual audited consolidated financial statements of the Group. |
| Representation, warranties, undertakings | To be in-line with the Existing Facility Agreement (Permata) unless stated otherwise in this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In the event of any inconsistency, the terms in this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
| Events of Default | To be in-line with the Existing Facility Agreement (Permata) unless otherwise amended or overridden by this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In particular, as this is now a committed facility, the facilities may only be frozen and acceleration or enforcement action taken by Permata only upon the occurrence of an event of default which is continuing.<br><br>Events of default (other than a payment event of default) are each subject to a 14 Business Day grace period if that event of default is capable of remedy and in the case of a payment event of default that is caused by a Disruption Event, a 3 Business Day grace period will be applicable.<br><br>"Disruption Event" means:<br>(a)  a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Amended |

<table>
<tr><td></td><td colspan="2">Facility Agreement (Permata), which is not caused by, and is beyond the control of, any of the parties; or</td></tr>
</table>

|  |  |  |
|--|--|--|
|  | (b) | the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a party preventing it, or any other party from: |
|  | (i) | performing its payment obligations under the Amended Facility Agreement (Permata); or |
|  | (ii) | communicating with other parties under the Amended Facility Agreement (Permata), |

and which is not caused by, and is beyond the control of, the party whose operations are disrupted.

In the event of any inconsistency, the terms of this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail.

### Details of all Active Bilateral Facilities

| Active Bilateral Facilities | The existing Active Bilateral Facilities made available to the Company and its subsidiaries as at the date of this term sheet are provided by the banks listed below (together, the "**Original Active Bilateral Facilities Lenders**"):<br><br>1. UOB<br>2. Permata<br>3. Maybank<br>4. HSBC<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities shall also be Active Bilateral Facilities lenders.<br><br>"**Active Bilateral Facilities**" means active committed letter of credit facilities provided to the Company and/or each of its subsidiaries. |
|--|--|
| Relevant Active Bilateral Facilities | The existing Relevant Active Bilateral Facilities made available to the Company and its subsidiaries on the date of this term sheet are provided by the banks listed below (together, the "**Original Relevant Active Bilateral Facilities Lenders**"):<br><br>1. UOB<br>2. Permata<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities which is provided with shared security in the form of a first ranking fiducia over the Pledged Receivables shall also become Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities**" means Active Bilateral Facilities provided by Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities Lenders**" means Active Bilateral Facilities lenders who are entitled to shared security in the form of a first ranking fiducia over the Pledged Receivables pursuant to the terms of the Security Sharing Agreement (being, as of the date of this term sheet, the Original Relevant Active Bilateral Facilities Lenders). Any new Relevant Active Bilateral Facilities Lenders will have the same security rights as the Original Relevant Active Bilateral Facilities Lenders. |

| | |
|---|---|
| Committed Facility Limits from the Active Bilateral Facilities Lenders | As of the date of this term sheet the Committed Facility Limits from the Original Active Bilateral Facilities Lenders are as follows:<br><br>1.  UOB:  Committed Facility Limit of US$ 8,423,511<br>2.  Permata:  Committed Facility Limit of US$ 14,041,340<br>3.  HSBC: Committed Facility Limit of maximum US$ 12,132,701<br>4.  Maybank: Committed Facility Limit of US$ 4,249,797<br><br>Notwithstanding the above, the cumulative limits of all Active Bilateral Facilities lenders (provided by the Original Relevant Active Bilateral Facilities Lenders or new Active Bilateral Facilities lenders, including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more members of the Group), shall not at any time exceed US$75 million in aggregate (or its equivalent in any other currency or currencies), provided that after the Rights Issue (as defined below) has taken place, such limit may be increased to US$100 million (or its equivalent in another currency or currencies), subject to the following security coverage conditions being met:<br><br>a)  During the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.5x of the cumulative facility limit of the Relevant Active Bilateral Facilities; and<br>b)  After the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.25x of the cumulative facility limit of the Relevant Active Bilateral Facilities.<br><br>For the avoidance of doubt, supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more members of the Group shall be permitted, subject to the Other Conditions below.<br><br>"**Receivables Security Coverage Ratio**" is calculated as the aggregate amount of the Pledged Receivables divided by the aggregate committed facility limits of the Relevant Active Bilateral Facilities provided by the Relevant Active Bilateral Facilities Lenders.<br><br>"**Rights Issue**" means a rights issue of an amount of US$50 million to be carried out by the Company as per the Scheme which is underwritten by key shareholders who have agreed to ringfence such amount under the terms of a ringfencing deed to be entered into prior to the Restructuring Effective Date (as such term is defined in the Scheme documents). |
| Notification on issuance of new Relevant Active Bilateral Facilities | The Borrowers shall notify the Common Security Agent of the issuance of any additional committed facility limit for letter of credit facilities by Original Relevant Active Bilateral Facilities Lenders or new Relevant Active Bilateral Facilities Lenders. |
| | |
| **Shared Security for the Relevant Active Bilateral Facilities Lenders** | |
| Security | All Relevant Active Bilateral Facilities Lenders will be entitled to share security in the form of a first ranking fiducia over receivables (excluding receivables the subject of supply chain financing arrangements which do not involve recourse to one or more members of the Group) and a pledge over the collection accounts in respect of those receivables of the entities below (the **"Pledged Receivables"**): |

|  | |
|---|---|
|  | 1.  Key Obligors:<br>    a.  PBRX<br>    b.  PPEB<br>    c.  ESGI<br>    d.  PSS<br>2.  Secondary Obligors:<br>    a.  Hollit<br>    b.  OAI<br>    c.  APS<br><br>The registration and updating of the fiducia over receivables will be undertaken by the Common Security Agent appointed under the Security Sharing Agreement as follows:<br><br>1.  Quarterly: All trade receivables from the Key Obligors are to be registered quarterly with the fiducia office; and<br>2.  Six-monthly: All trade receivables from the Secondary Obligors are to be registered six-monthly with the fiducia office. |
| Security Sharing Agreement | The Security Sharing Agreement will be entered into by the Relevant Active Bilateral Facilities Lenders and the Common Security Agent and will govern, among others, the sharing of the Security over the receivables indicated in this term sheet and their associated collection accounts by all Relevant Active Bilateral Facilities Lenders *pro rata*. |
| Conditions Subsequent | After the Record Date of the Scheme, the Borrowers and Permata shall execute the Amended Facility Agreement (Permata). The agreement shall be executed at the latest by 30 days after the Record Date of the Scheme or as otherwise agreed between the Borrowers and Permata.<br><br>Perfection of the Security shall be done at the latest within 90 days or such later date as agreed (between the Company and the Relevant Active Bilateral Facilities Lenders) after the Original Active Bilateral Effective Date.<br><br>PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time.  Accordingly, once the Amended Facility Agreement (Permata) has been executed, Permata shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (Permata) shall include wordings on this collectability rating review based on prevailing regulations. |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |
| Other Conditions | To route cash collection from the following key buyers or other companies agreed by the key buyers to Borrowers' accounts in Permata from the Routing Date (as defined below) and confirmation from the buyers on the change of accounts: |

| | |
|---|---|
| | <ul><li>The North Face</li><li>Kathmandu</li><li>Indygena</li></ul> The above list of key buyers which collections are to be routed through Permata may be changed from time to time if agreed between the Borrowers and Permata.<br><br>Supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of the title arrangements) to one or more members of the Group in respect of the buyers above can only be executed with prior approval from Permata.<br><br>The cash routing shall happen within 60 business days after the signing of the term sheet or such later date as agreed between the Borrowers and Permata (the "**Routing Date**"). |
| Common Security Agent | Permata |
| Governing Law | Indonesian Law |
| Jurisdiction | Indonesian courts |

Term Sheet - UOB

| Parties | |
|---|---|
| Borrowers | 1.   PT Pan Brothers Tbk ("**PBRX**" or the "**Company**") <br> 2.   PT Pancaprima Ekabrothers ("**PPEB**") <br> 3.   PT Eco Smart Garment Indonesia ("**ESGI**") <br> 4.   PT Prima Sejati Sejahtera ("**PSS**") <br> 5.   PT Hollit International ("**Hollit**") <br> 6.   PT Ocean Asia Industry ("**OAI**") <br> 7.   PT Apparelindo Prima Sentosa ("**APS**") |
| Original Relevant Active Bilateral Facilities Lender | PT Bank UOB Indonesia ("**UOB**") |
| Group | Group means the Company and its subsidiaries from time to time. |
| **Facility Terms** | |
| Original Active Bilateral Effective Date | The Original Active Bilateral Effective Date will be the date on which: <br> 1.   the Existing Facility Agreement (UOB) is amended and restated; and <br> 2.   the security sharing agreement is entered into by, among others, the Borrowers and the Original Relevant Active Bilateral Facilities Lenders (as defined below) as of the date of this term sheet (the "**Security Sharing Agreement**"). |
| Facility | Active operating bilateral letter of credit and other facilities as per the Existing Facility Agreement (UOB), with committed facility limit of US$8,423,511. |
| Term | The Facility shall be committed and made available for a term of a minimum of 24 months from the date of the Original Active Bilateral Effective Date. |
| Existing Facility Agreement (UOB) | The credit agreement No. 58 dated 20 April 2011 made between PBRX and certain other entities as obligors and UOB, as amended from time to time, most recently by an amendment No. 920/09/2020 dated 9 September 2020, supplemented with an additional amendment on facility limit and pricing based on an email sent by UOB on 10 December 2020 (subject: UOB – Trade Limit). |
| Amended Facility Agreement (UOB) | The Existing Facility Agreement (UOB) as amended, restated, supplemented, or otherwise modified on the Original Active Bilateral Effective Date in accordance with the terms of this term sheet. |
| Interest, Fees and Other Charges | As per the Existing Facility Agreement (UOB). |
| Financial Covenant | The following financial covenants shall apply to the Group and shall supersede those in the Existing Facility Agreement (UOB), based on the annual audited consolidated financial statements of the Group: <br><br> 1.   Minimum Current Ratio of 1.1x; <br> 2.   Maximum Net Debt to Equity of 2.0x; <br> 3.   Maximum Net Debt to EBITDA of 5.5x; and <br> 4.   Minimum EBITDA to Interest of 2.25x. <br><br> "**Current Assets**" means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including any cash and cash equivalent investments. |

|  | |
|---|---|
|  | "**Current Liabilities**" means the aggregate (on a consolidated basis) of all borrowings (including trade creditors, accruals and provisions) of each member of the Group.<br><br>"**Current Ratio**" means the ratio of Current Assets to Current Liabilities.<br><br>"**EBITDA**" means, EBIT for that measurement period after adding back any amount attributable to the amortization and depreciation of assets of the Group.<br><br>"**Equity**" means, at any time, the aggregate total assets of the Group less the aggregate total liabilities of the Group at that time.<br><br>"**Net Debt**" means, at any time, the aggregate of all obligations of the Group for or in respect of interest-bearing borrowings (including outstanding letters of credit) but deducting the aggregate amount of cash and cash equivalents held by the Group at that time.   For the avoidance of doubt, any supply chain financing or other trade arrangements which do not involve recourse to one or more members of the Group shall not be included towards the calculation of Net Debt.<br><br>For the avoidance of doubt, the financial covenants shall be tested on 31 December every year starting from 31 December 2022 until the maturity of the Term based on the annual audited consolidated financial statements of the Group. |
| Representation, warranties, undertakings | To be in-line with the Existing Facility Agreement (UOB) unless stated otherwise in this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In the event of any inconsistency, the terms in this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
| Events of Default | To be in-line with the Existing Facility Agreement (UOB) unless otherwise amended or overridden by this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In particular, as this is now a committed facility, the facilities may only be frozen and acceleration or enforcement action taken by UOB only upon the occurrence of an event of default which is continuing.<br><br>Events of default (other than a payment event of default) are each subject to a 14 Business Day grace period if that event of default is capable of remedy and in the case of a payment event of default that is caused by a Disruption Event, a 3 Business Day grace period will be applicable.<br><br>"Disruption Event" means:<br>(a)  a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Amended Facility Agreement (UOB), which is not caused by, and is beyond the control of, any of the parties; or<br>(b)  the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a party preventing it, or any other party from: |

|  | |
|---|---|
|  | (i)  performing its payment obligations under Amended Facility Agreement (UOB); or<br><br>(ii)  communicating with other parties under the Amended Facility Agreement (UOB),<br><br>and which is not caused by, and is beyond the control of, the party whose operations are disrupted.<br><br>In the event of any inconsistency, the terms of this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
| **Details of all Active Bilateral Facilities** | |
| Active Bilateral Facilities | The existing Active Bilateral Facilities made available to the Company and its subsidiaries as at the date of this term sheet are provided by the banks listed below (together, the "**Original Active Bilateral Facilities Lenders**"):<br><br>1.  UOB<br>2.  Permata<br>3.  Maybank<br>4.  HSBC<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities shall also be Active Bilateral Facilities lenders.<br><br>"**Active Bilateral Facilities**" means active committed letter of credit facilities provided to the Company and/or each of its subsidiaries. |
| Relevant Active Bilateral Facilities | The existing Relevant Active Bilateral Facilities made available to the Company and its subsidiaries on the date of this term sheet are provided by the banks listed below (together, the "**Original Relevant Active Bilateral Facilities Lenders**"):<br><br>1.  UOB<br>2.  Permata<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities which is provided with shared security in the form of a first ranking fiducia over the Pledged Receivables shall also become Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities**" means Active Bilateral Facilities provided by Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities Lenders**" means Active Bilateral Facilities lenders who are entitled to shared security in the form of a first ranking fiducia over the Pledged Receivables pursuant to the terms of the Security Sharing Agreement (being, as of the date of this term sheet, the Original Relevant Active Bilateral Facilities Lenders).  Any new Relevant Active Bilateral Facilities Lenders will have the same security rights as the Original Relevant Active Bilateral Facilities Lenders. |
| Committed Facility Limits from the Original Relevant | As of the date of this term sheet the Committed Facility Limits from the Original Active Bilateral Facilities Lenders are as follows:<br><br>1.  UOB: Committed Facility Limit of US$8,423,511 |

| Active Bilateral Facilities Lenders | 2.  Permata:  Committed Facility Limit of US\$14,041,340<br>3.  HSBC: Committed Facility Limit of maximum US\$ 12,132,701<br>4.  Maybank: Committed Facility Limit of US\$ 4,249,797<br><br>Notwithstanding the above, the cumulative limits of all Active Bilateral Facilities lenders (provided by the Original Relevant Active Bilateral Facilities Lenders or new Active Bilateral Facilities lenders, including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more members of the Group), shall not at any time exceed US\$75 million in aggregate (or its equivalent in any other currency or currencies), provided that after the Rights Issue (as defined below) has taken place, such limit may be increased to US\$100 million (or its equivalent in another currency or currencies), subject to the following security coverage conditions being met:<br><br>a)  During the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.5x of the cumulative facility limit of the Relevant Active Bilateral Facilities; and<br>b)  After the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.25x of the cumulative facility limit of the Relevant Active Bilateral Facilities.<br><br>For the avoidance of doubt, supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more members of the Group shall be permitted, subject to the Other Conditions below.<br><br>"**Receivables Security Coverage Ratio**" is calculated as the aggregate amount of the Pledged Receivables divided by the aggregate committed facility limits of the Relevant Active Bilateral Facilities provided by the Relevant Active Bilateral Facilities Lenders.<br><br>"**Rights Issue**" means a rights issue of an amount of US\$50 million to be carried out by the Company as per the Scheme which is underwritten by key shareholders who have agreed to ringfence such amount under the terms of a ringfencing deed to be entered into prior to the Restructuring Effective Date (as such term is defined in the Scheme documents). |
| Notification on issuance of new Relevant Active Bilateral Facilities | The Borrowers shall notify the Common Security Agent of the issuance of any additional committed facility limit for letter of credit facilities by Original Relevant Active Bilateral Facilities Lenders or new Relevant Active Bilateral Facilities Lenders. |
|  |  |
| **Shared Security for the Relevant Active Bilateral Facilities Lenders** | |
| Security | All Relevant Active Bilateral Facilities Lenders will be entitled to share security in the form of a first ranking fiducia over receivables (excluding receivables the subject of supply chain financing arrangements which do not involve recourse to one or more members of the Group) and a pledge over the collection accounts in respect of those receivables of the entities below (the "**Pledged Receivables**"):<br><br>1.  Key Obligors:<br>    a.  PBRX<br>    b.  PPEB<br>    c.  ESGI |

|  |  |
|---|---|
|  | d.   PSS<br>2.   Secondary Obligors:<br>   a.   Hollit<br>   b.   OAI<br>   c.   APS<br><br>The registration and updating of the fiducia over receivables will be undertaken by the Common Security Agent appointed under the Security Sharing Agreement as follows:<br><br>1.   Quarterly: All trade receivables from the Key Obligors are to be registered quarterly with the fiducia office; and<br>2.   Six-monthly: All trade receivables from the Secondary Obligors are to be registered six-monthly with the fiducia office. |
| Security Sharing Agreement | The Security Sharing Agreement will be entered into by the Relevant Active Bilateral Facilities Lenders and the Common Security Agent and will govern, among others, the sharing of the Security over the receivables indicated in this term sheet and their associated collection accounts by all Relevant Active Bilateral Facilities Lenders *pro rata*. |
| Conditions Subsequent | After the Record Date of the Scheme, the Borrowers and UOB shall execute the Amended Facility Agreement (UOB). The agreement shall be executed at the latest by 30 days after the Record Date of the Scheme or as otherwise agreed between the Borrowers and UOB.<br><br>Perfection of the Security shall be done at the latest within 90 days or such later date as agreed (between the Company and the Relevant Active Bilateral Facilities Lenders) after the Original Active Bilateral Effective Date.<br><br>PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time.  Accordingly, once the Amended Facility Agreement (UOB) has been executed, UOB shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (UOB) shall include wordings on this collectability rating review based on prevailing regulations. |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |
| Other Conditions | To route cash collection from the following key buyers or other companies agreed by the key buyers to Borrowers' accounts in UOB from the Routing Date (as defined below) and confirmation from the buyers on the change of accounts:<br><br>• Uniqlo<br>• Columbia<br>• Hunter |

| | |
|---|---|
| | The above list of key buyers which collections are to be routed through UOB may be changed from time to time if agreed between the Borrowers and UOB.<br><br>Supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of the title arrangements) to one or more members of the Group in respect of the buyers above can only be executed with prior approval from UOB.<br><br>The cash routing shall happen within 60 business days after the signing of the term sheet or such later date as agreed (the "**Routing Date**"). |
| Common Security Agent | Permata |
| Governing Law | Indonesian Law |
| Jurisdiction | Indonesian courts |

**SCHEDULE 3**

**FORM OF PROOF OF DEBT**

**PT PAN BROTHERS TBK**

**(the "Company")**

**SCHEME CREDITORS' PROOF OF DEBT**

***(please see note (e) below)***

***Note****: Noteholders do not need to complete this Proof of Debt Form provided they comply with Clause 5.3 of the Scheme proposed by the Company.*

**Name of Company:** PT Pan Brothers Tbk

**Particulars Of Scheme Creditor Claiming Debt**

**Name of Scheme Creditor:**
**IC/Passport No/Company/Business Registration No.:**
**Postal Address** *(please see note (a) below)***:**

**Contact Nos. (Tel/HP):**
**Fax No.:**
**E-mail Address:**

**Particulars of Claim as at the Record Date**

| Date Debt Incurred | Details of Debt *(Please see note (b) below)* | Currency | Amount ($) of Principal | Amount ($) of Interest and any other amount (please break down and provide a description of each amount) |
|---|---|---|---|---|
|  |  |  |  |  |

| Total Amount Of Debt Claimed (in Figures): |
| --- |
| **Total Amount Of Debt Claimed (in Words):** |

**Security Held (*Please see note (c) below*)**
**Brief Description of Security as at the Record Date:**
**Particulars Of Person Authorised To Complete This Proof Of Debt Form**
*(If same as Particulars of Scheme Creditor Claiming Debt above, please indicate "See Particulars of Scheme Creditor Claiming Debt above")*

**Name:**
**NRIC No./Passport No.:**
**Relationship to Scheme Creditor:**
*(State whether director  / employee / solicitors  / accountant, etc.)*
**Name of Company/Firm:**
*(Where applicable)*
**Contact Nos. (Tel/HP):**
**Fax No.:**

**E-mail address:**

**Signature of Scheme Creditor/Person Authorised To Complete This Proof Of Debt Form**
I do solemnly and sincerely declare that:

1. to the best of my knowledge and belief, the Company or other member of the Group owes the Scheme Creditor the amount claimed above;

2. neither the Scheme Creditor, nor any person by the order and for the use of the Scheme Creditor, has to my knowledge and belief received any manner of satisfaction or security for the amount or any part of the amount referred to above, save and except as set out under "Security Held" in this Proof of Debt;

3. the Scheme Creditor that submits this Proof of Debt represents, warrants and undertakes to the Company, the Chairman and the Information Agent that any personal data of any individual provided has been obtained with such individual's consent and hereby consents on behalf of such individual to the collection, use and disclosure of his/her personal data by the Company, the Chairman and the Information Agent (or their agents), in each case, in accordance with the provisions of the Singapore Personal Data Protection Act 2012 (No. 26 of 2012). Any consent given hereunder in relation to personal data shall survive death, incapacity, bankruptcy or insolvency of any such individual and the termination or expiration of the Scheme. For the purposes hereunder, "personal data" has the meaning ascribed to it in the Singapore Personal Data Protection Act 2012 (No. 26 of 2012);

4. I am duly authorised by the Scheme Creditor to make this statutory declaration, that it is within my own knowledge that the debt declared in this statutory declaration was incurred for the consideration stated, and that the debt, to the best of my knowledge and belief, still remains unpaid and unsatisfied *(Please see note (d) below);* and

5. I conscientiously make and believe the statements contained in this declaration to be true in every particular.

Signature: _____

101

Date: _____

**<u>Notes:</u>**

(a) Please inform the Company in the event of any change in address.

(b) Please attach copies of documents substantiating the debt dated no more than one month from the date of submission of this Proof of Debt. The onus is upon the Scheme Creditor to prove the debt.

(c) This section is intended to apply to the Holders of the Existing Syndicated Facility. Scheme Creditors who are not such Holders may indicate "Nil" under this section if that Scheme Creditor does not hold any security (including any third party security) in respect of its Claim.

(d) If this proof is made by a Scheme Creditor in his/her individual capacity, delete paragraph 4 under "Signature of Scheme Creditor/Person Authorised To Complete This Proof Of Debt Form" above.

(e) Unless expressly stated otherwise, all capitalised terms used herein shall bear the same meanings as ascribed under the Scheme proposed by the Company.

**APPENDIX 4**

**(VOTING INSTRUCTION FORM)**

The Voting Instruction Form is appended on the next following pages.

**VOTING INSTRUCTION FORM**

**SCHEME OF ARRANGEMENT**

under Section 71 of the Companies Act (Cap 50, 2006 Rev Ed Sing)

Between

**PT PAN BROTHERS TBK**

(Company Registration No. 8120214123901)

And

**SCHEME CREDITORS**

**VOTING INSTRUCTION FORM FOR HOLDERS OF THE EXISTING FACILITIES**

To be used by the Scheme Creditors of an Existing Facility Agreement to consider the proposed Scheme between the Company and its Scheme Creditors. Capitalised terms in this form have the same meaning as in the Scheme Document, unless the context otherwise requires.

I / We ....................................................................................................................................

(name of the Scheme Creditor, including former names)

of ..........................................................................................................................................

([registration / business] address of the Scheme Creditor)

as a holder of the following Existing Facility Agreement: ..............................................................

with aggregate Claim amount of existing debt of US$..................................................................,

hereby cast my / our vote on the proposed Scheme.

| FOR the proposed Scheme[1] | AGAINST the proposed Scheme[1] |
|---|---|
| (Signature) | (Signature) |

Dated: _____

Signature of [Duly Appointed Attorney / or Authorised Representative] of Scheme Creditor

_____

**NOTES:**

[1] If you wish to vote FOR the Scheme, sign in the box marked "FOR the said Scheme". If you wish to vote AGAINST the Scheme, sign in the box marked "AGAINST the said Scheme". Otherwise, this form will not operate as a valid vote for the proposed Scheme.

**OTHER INSTRUCTIONS:**

1.  You are requested to lodge this voting form by way of email to the Information Agent at panbrothers@investor.morrowsodali.com prior to the Record Time.
2.  This voting form must be executed under the hand of a duly authorised signatory, officer or attorney (in which case, evidence of such authority must accompany this proxy form). The signature need not be witnessed.

## APPENDIX 5

### (EXISTING NON-ACTIVE BILATERAL FACILITY AGREEMENTS)

The list of Existing Non-Active Bilateral Facility Agreements is set out on the next following pages.

**LIST OF EXISTING NON-ACTIVE BILATERAL FACILITY AGREEMENTS**

1.   The US$7,500,000 facility letter (No.Ref.SS./DR-045/LA/2015) dated 30 November 2015 and made between the Company and certain other entities as borrowers and PT Bank BNP Paribas Indonesia as lender, as amended from time to time, most recently pursuant to a sixth amendment to banking facilities letter (Ref. No. LC/DR-424/LA/2019) dated 13 March 2019 and as extended by the notification letter (Ref. No. LC/DR-511/LA/2020) dated 27 February 2020.

2.   The amendment and restatement to facility agreement (No. 281/FA/ANZ/AMD/IV/2019) dated 24 April 2019 and made between the Company and certain other entities as borrowers and PT Bank ANZ Indonesia as lender, as amended by the first amendment to facility agreement (No. 428/FA/ANZ/AMD/II/2020) dated 10 February 2020.

3.   The Agreement on Bank Transactions dated 28 May 2012, the Agreement on Foreign Exchange Transactions dated 21 September 2012 as amended and restated initially by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated 24 November 2016 and subsequently by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated 12 September 2017 and the Agreement on Forward Foreign Exchange Contracts dated 12 September 2012 as amended and restated by the Amendment and Restatement to Agreement on Forward Foreign Exchange Contracts dated 12 September 2017, each made between MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch as bank and the Company and its subsidiaries listed therein as customers, as confirmed from time to time, most recently pursuant to a confirmation of facilities (Ref. No. 0076/CF/CDU-NJ/RAD/20/20-0137- GC) dated 12 September 2020 and issued by MUFG Jakarta to the Company and other customers listed therein.

## APPENDIX 6

### (RESTRUCTURING TERM SHEET (EXISTING NOTES))

The Restructuring Term Sheet (Existing Notes) is set out on the next following pages.

## RESTRUCTURING TERM SHEET
## US$200 MILLION 7.625% SENIOR NOTES DUE ON 26 JANUARY 2022

This term sheet sets out general information in relation to the proposed restructuring of the Existing 2022 Notes (as defined below) under the Singapore Scheme (as defined below).  The transactions contemplated by this term sheet shall be subject to, amongst others, the execution of definitive documentation by the parties.  Defined terms used in this term sheet have the same meaning as in the Existing Indenture (as defined below) unless stated otherwise.

| General Information | |
|---|---|
| **Issuer** | PB International B.V. |
| **Parent Guarantor** | PT Pan Brothers Tbk. |
| **Subsidiary Guarantors** | The following entities shall be Subsidiary Guarantors:<br><br>• PT Pancaprima Ekabrothers ("**PPEB**")<br>• PT Eco Smart Garment Indonesia ("**ESGI**")<br>• PT Prima Sejati Sejahtera<br>• PT Hollit International<br>• PT Ocean Asia Industry<br>• Continent 8 Pte. Ltd.<br>• PT Apparelindo Prima Sentosa<br>• PT Berkah Indo Garment<br>• PB Apparel Pte Ltd<br>• PT Prima Kreasi Gemilang<br>• PT Prima Cosmic Screen Graphics<br>• PT Eco Laundry Hijau Indonesia<br>• PT Mitra Busana Sentosa<br>• PT Apparelindo Mitra Andalan<br><br>As Cosmic Gear Ltd is currently dormant and has transferred operations to Continent 8 Pte. Ltd., Cosmic Gear Ltd will no longer be a Subsidiary Guarantor on and from the Restructuring Effective Date.  Cosmic Gear Ltd will accede as a Subsidiary Guarantor if it subsequently becomes active. PT Teodore Pan Garmindo and PT Victory Pan Multitex will no longer be Subsidiary Guarantors on and from the Restructuring Effective Date on the basis set out in the Section headed "Guarantees" below and the definition of Permitted JV Disposal (set out in the Section headed "Definitions, Covenants and Other Limitations" below). |
| **Guarantors** | The Parent Guarantor and the Subsidiary Guarantors. |
| **Group** | The Parent Guarantor and its subsidiaries. |
| **Existing 2022 Notes** | The US$200 million 7.625% senior notes due on 26 January 2022, which are governed under the bond indenture dated 26 January 2017 (the "**Existing Indenture**"). |
| **Scheme Creditors** | Holders of the economic or beneficial ownership interests as principal in the Existing 2022 Notes and the Existing Facilities (as defined in the explanatory statement in respect of the Scheme (the "**Explanatory Statement**")), and any other person who holds any Scheme Claims (as defined in the Explanatory Statement), as at the Record Time.<br><br>"**Record Time**" means 2.00 p.m. on 7 December 2021 (London time) / 10.00 p.m. on 7 December 2021 (Singapore time) or such later time or date as may be notified by the Parent Guarantor or the Information Agent (each acting reasonably) to the Scheme Creditors, where such date shall be no later than the date of the Voting Results Announcement (and for this purpose "Information Agent" and Voting Results Announcement" shall be as defined in the Explanatory Statement). |

| Scheme | The scheme of arrangement proposed by the Parent Guarantor under Section 71 of the Insolvency, Restructuring and Dissolution Act 2018 (No. 40 of 2018) (the "**IRDA**"), as subject to modifications, conditions and/or approvals as may be imposed by the High Court of Singapore and as permitted by the terms of the scheme of arrangement. |
|---|---|

## Restructuring of the Existing 2022 Notes

| Scheme Conditions | The Scheme shall only become effective and binding following the satisfaction of all of the following conditions to the Scheme (the "**Scheme Conditions**"):<br><br>• the Requisite Majority (as defined in the Explanatory Statement) of the Scheme Creditors in respect of each class of Scheme Creditors voting to approve the Scheme in accordance with the voting procedures set out in Clauses 5 and 6 of the Scheme;<br><br>• the sanction of the Scheme by the High Court of Singapore (the "**Court**"); and<br><br>• completion of the requisite administrative filings in respect of the sanction of the Scheme by the Court, with the Singapore Registrar of Companies in accordance with the requirements of the IRDA,<br><br>and upon such satisfaction, the Scheme shall become effective and binding on the Parent Guarantor and all of the Scheme Creditors (regardless of whether a Scheme Creditor participated in the Scheme or not and even if such Scheme Creditor did not vote or voted against the Scheme) and all of their respective successors, assigns and transferers (the date on which the Scheme becomes effective and binding being the "**Scheme Effective Date**"). |
|---|---|
| Restructuring Effective Date | The Restructuring Effective Date shall occur on the date of satisfaction of all of the following conditions to the Restructuring Effective Date (the "**Restructuring Conditions**") and shall occur in accordance with the terms and conditions of Clauses 3 and 4 of the Scheme:<br><br>• each of the Scheme Conditions has been satisfied and the Scheme Effective Date has occurred;<br><br>• a Chapter 15 Order has been entered by the U.S. Bankruptcy Court and that such Chapter 15 Order is final and no longer subject to rehearing or appeal;<br><br>• any other Application(s) for Cross-Border Recognition (as defined in the Explanatory Statement) have been completed and the applicable recognition order(s) have been obtained and are in full effect;<br><br>• all corporate (including approval by shareholders, board of commissioners and/or board of directors), legal and regulatory approvals deemed necessary by the Parent Guarantor (acting reasonably) to implement the Restructuring Effective Date, including, but not limited to, shareholder, director and/or commissioner approvals (as applicable) from the Parent Guarantor, the Guarantors or any other member of the Group and any approvals required from the OJK, IDX, KSEI or SGX-ST or under the laws of Indonesia or Singapore have been obtained; and |

|  | • all Restructuring Documents (as defined in the Explanatory Statement) are in agreed form and have been executed by or on behalf of the relevant parties to them in accordance with the terms of the Scheme. |
|---|---|
|  | The Restructuring Effective Date is the date when, among others, all Existing 2022 Notes are amended, restated, supplemented or otherwise modified to reflect the terms of this term sheet (the **"Amended Notes"**). In addition, on the Restructuring Effective Date, among other things (as set out in the Explanatory Statement): |
|  | • the Noteholders shall fully release all its Scheme Claims (including any claims under the Existing 2022 Notes arising prior to and after the Restructuring Effective Date against (among others) the Parent Guarantor, the Issuer, the Subsidiary Guarantors, and the officers, directors, advisors and representatives of each of the foregoing under the Existing 2022 Notes) (subject to carve outs for fraud, dishonesty, wilful default and wilful misconduct) and the Parent Guarantor shall, for and on behalf of the Noteholders, execute a deed of release in respect of such release; and |
|  | • the outstanding Existing 2022 Notes and all guarantees and security granted in connection with the Existing 2022 Notes will be amended, restated, supplemented or otherwise modified to reflect the terms of this term sheet and any and all defaults arising prior to the Restructuring Effective Date under the Existing 2022 Notes will be deemed to be waived. |
|  | **"Noteholders"** for this purpose (and as defined in the Explanatory Statement) means all Persons with an economic or beneficial interest as principal in the Existing Notes held through the Clearing Systems and **"Noteholder"** shall mean any one of them (as defined in the Explanatory Statement). |

## Terms of the Amended Notes

*Unless otherwise noted below or as the context otherwise requires, the terms of the Amended Notes shall be the same as those set out in the Existing Indenture governing the Existing 2022 Notes.*

| **Principal Amount of Amended Notes** | US$ 171,078,000. |
|---|---|
| **Tenor of Amended Notes** | 31 December 2025. On maturity, any outstanding principal amount under the Amended Notes shall be repaid, together with any accrued but unpaid interest, subject to the terms of this term sheet. |
| **Coupon of Amended Notes** | 7.625% per annum, payable semi-annually on the 26th of the relevant month, being 26 January and 26 July of each year.<br><br>For the avoidance of doubt default interest (if any) outstanding in respect of the Notes and any documents related thereto as at the Restructuring Effective Date shall not be payable and shall be cancelled on the Restructuring Effective Date. |
| **Optional Redemption of Amended Notes** | At any time and from time to time on or after July 26, 2022, the Company may at its option redeem the Amended Notes, in whole or in part, at a redemption price equal to the percentage of principal amount set forth below, plus accrued and unpaid interest, if any, on the Amended Notes redeemed, to (but not including) the redemption date, if redeemed during the 12-month period commencing on July 26, 2022 of any year set forth below: |

|  | Period | Redemption Price |
| --- | --- | --- |
|  | 2022 | 101.50% |
|  | 2023 | 100.75% |
|  | After 2023 | 100.00% |
|  | For the avoidance of doubt, any optional redemption shall be at the Issuer's discretion. The Existing Indenture as amended by the Supplemental Indenture (the "**Amended Indenture**") will reflect the above and remove historic redemption provisions (and related definitions) relating to redemptions that could be made prior to January 26, 2020. | |
| **Interest Reserve Account** | To maintain a cash deposit in the Interest Reserve Account in an amount equal to one semi-annual interest payment under the Amended Notes. | |
| **Interest Reserve Account Collateral Agent** | The Bank of New York Mellon. | |
|  | The Interest Reserve Account Collateral Agent shall continue to be granted a first priority lien over the Interest Reserve Account and all rights, title and interest in and to all amounts deposited in the Interest Reserve Account at any time, for the benefit of the noteholders of the Amended Notes. | |
|  | The Issuer and the Interest Reserve Account Collateral Agent shall enter into a Dutch law governed security confirmation deed (such document to be released and become effective on the Restructuring Effective Date) to confirm that the existing first priority lien over the Interest Reserve Account under the Existing 2022 Notes shall continue to secure the Amended Notes. | |
| **Security** | No other security shall be granted to secure the Amended Notes aside from the security over the Interest Reserve Account described above. | |
| **Guarantees** | As set out in the Section headed "Subsidiary Guarantors" above, Cosmic Gear Ltd, PT Teodore Pan Garmindo and PT Victory Pan Multitex (the "**Released Guarantors**") will no longer be Subsidiary Guarantors after the Restructuring Effective Date.  For this purpose the Amended Indenture will reflect that the Released Guarantors will no longer be Subsidiary Guarantors and in particular: (a) Section 12.09(c) of the Amended Indenture will state that each of Released Guarantor may be designated by the Parent Guarantor as Non-Subsidiary Guarantors provided that the condition set out in paragraph (x) of Section 12.09(c) is satisfied (or will be satisfied on the release of guarantee being effective); (b) Section 12.11(a) of the Existing Indenture shall be amended in the Amended Indenture to permit a release of each Released Guarantor without any consent being required (including for the purposes of Section 9.01(iv)); and (c) the Trustee shall be irrevocably authorised to enter into a release of the guarantees granted by each Released Guarantor upon the Released Guarantors being designated as Non-Subsidiary Guarantors and enter into and carry out all matters incidental thereto.  The Parent Guarantor will, in the supplemental indenture to be entered into to amend and restate the Existing Indenture (the "**Supplemental Indenture**") designate each of Cosmic Gear Ltd, PT Teodore Pan Garmindo and PT Victory Pan Multitex as Non-Subsidiary Guarantors, with such designation being effective upon the Existing Indenture being amended pursuant to the Supplemental Indenture.  For the avoidance of doubt no Released Guarantor shall be required to enter into or execute the Supplemental Agreement or the Amended Indenture or any document related thereto or enter into any new guarantee or guarantee confirmation agreement to confirm its existing guarantee extends to cover the Amended Indenture. | |

| Definitions, Covenants and Other Limitations | The covenants of the Amended Notes are to be as set out in the Existing Indenture unless stated otherwise in this term sheet (save for (a) any necessary non-material consequential drafting amendments, (b) inclusion of necessary definitions, (c) any necessary non-material deletions of provisions that are no longer relevant and (d) amendments that are necessary to reflect the terms of this term sheet) and consequential necessary amendments may also be made to the relevant provisions in the forms set out in the exhibits to the Existing Indenture to reflect the terms of this Term Sheet and the relevant changes referred to in paragraphs (a) to (d) above, provided in each case that the relevant amendment referred to in this paragraph does not deviate from the commercial terms set out in this Term Sheet and does not (other than as stated in this Term Sheet or the Scheme) prejudice the rights and interests of the noteholders. |
|---|---|
| | References to the "Original Issue Date" shall be amended to refer to the date of the Supplemental Indenture where relevant. |
| | The definition of "**Asset Sale**" shall be amended by the addition of a permission to make Permitted JV Disposals.  "**Permitted JV Disposals**" shall be defined as sale, transfer or other disposition of all or part of the Parent Guarantor's investment, interest, holdings or shares in PT Teodore Pan Garmindo and/or PT Victory Pan Multitex and/or any sale, transfer or other disposition by PT Teodore Pan Garmindo and/or PT Victory Pan Multitex of any of its assets. In addition, Sections 4.11, 4.14, 4.15, 5.01 and 12.11(a)(v) of the Existing Indenture shall be amended to the extent required to include or provide carve outs for (as relevant) Permitted JV Disposals. |
| | The definition of "**Existing Credit Facilities**" shall be amended to reflect the facilities set out in Appendix 1 to this term sheet and a definition of "**Non-Active Bilateral Facilities**" (as set out in Appendix 1 to this term sheet) shall be included. |
| | The definition of "**Permitted Business**" shall be amended to mean any business conducted or proposed to be conducted by the Parent Guarantor and its Restricted Subsidiaries on the date of the Supplemental Indenture and any other business reasonably related, ancillary or complementary to any such business. |
| | A definition of "**Rights Issue**", meaning the US$50.0 million rights issue to be granted by the Parent Guarantor after the date of the Supplemental Indenture in respect of rights to subscribe for or to purchase Capital Stock of the Parent Guarantor, shall be included in the Amended Indenture and a carve out in respect of the Rights Issue shall be included to Section 4.15(b) of the Existing Indenture. |
| | Section 4.12(a) shall if applicable be amended by the insertion of the words "Except as permitted under Section 4.06," at the beginning of that Section. |
| | The restructuring of the Existing Facilities in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement shall be carved out of Section 4.15(b) of the Existing Indenture. |
| | Section 4.03(b) shall be updated if required to reflect changes to the Indonesian laws and regulations referred to therein after the date of the Existing Indenture. |
| | A new Section 4.26 will be included in the Amended Indenture to reflect the latest sanctions undertakings to be agreed with the Trustee. |
| | Other definitions and covenants of the Amended Notes shall be amended to reflect Appendix 2 to this term sheet. |

| Change of Control | Not later than 30 days following a Change of Control, the Issuer or the Parent Guarantor will make an offer to repurchase all outstanding Amended Notes at a purchase price equal to 101% of their principal amount plus accrued and unpaid interest, if any.<br><br>The definition of "**Change of Control**" is to be in line with the definition under the Existing 2022 Notes. |
|---|---|
| Event of Default | To be in line with the terms under the Existing 2022 Notes unless stated otherwise in Appendix 3 of this term sheet. |
| Trustee | The Bank of New York Mellon.<br><br>The rights, duties and responsibilities of the Trustee are to be in line with the terms under the Existing 2022 Notes.  Certain amendments may be made in the Amended Indenture to reflect the Trustee's (as well as the Interest Reserve Account Collateral Agent's) latest transmission of information by electronic means language and certain other amendments as agreed with the Trustee and/or the Interest Reserve Account Collateral Agent. |
| Form, Denomination and Registration | The Amended Notes will continue to be issued only in fully registered form, without coupons, in minimum denominations of US$200,000 of principal amount and integral multiples of US$1.00 in excess thereof or integral multiples of US$1,000 in excess thereof, subject to agreement between the Company and the Trustee prior to signing the Supplemental Indenture. Any existing Global Note shall either be deemed to be supplemented, modified and amended in such a manner as is necessary to make the terms of that Global Note consistent with the terms of the Amended Indenture or (if requested by the Trustee and subject to there being no negative tax impact on the Issuer or Guarantors) a new Global Note will be issued. All global notes will be deposited with a common depository and registered in the name of the common depositary or its nominee.  Beneficial interests in the global note will be shown on and transfers thereof will be effected only through the records maintained by Euroclear and Clearstream Luxembourg. |
| Book-Entry Only | The Amended Notes will continue to be issued in book-entry form through the facilities of Euroclear and Clearstream Luxembourg for the accounts of its participants. |
| Listing and Trading | An announcement will be made on SGXNET in relation to the change in terms of the Existing Notes. For so long as the Amended Notes are listed on the SGX-ST and the rules of the SGX-ST so require, the Amended Notes will be traded in a minimum board lot size of US$200,000. |
| Governing Law and Miscellaneous Matters | The Amended Notes, Supplemental Indenture and the Amended Indenture will be governed by and will be construed in accordance with the laws of the State of New York.<br><br>The guarantees in connection with the Amended Notes will be governed by and will be construed in accordance with (in the case of any guarantees contained in the Amended Indenture) the laws of the State of New York and (in the case of standalone corporate guarantees and any confirmation letter provided by the Guarantors in connection therewith) the laws of Indonesia.<br><br>The lien over the Interest Reserve Account (and the security confirmation deed to confirm that the existing lien is effective to cover the Amended Notes) will be governed and will be construed in accordance with the laws of the Netherlands. |

| | The Supplemental Indenture shall include a provision equivalent to that contained in Section 13.13 of the Existing Indenture, as amended to refer to the Supplemental Indenture and Amended Indenture and related guarantee and security confirmations. |
|---|---|

**Appendix 1**

"**Existing Credit Facilities**" means each of the credit facilities of the Parent Guarantor or any of its Restricted Subsidiaries outstanding on the date of the Supplemental Indenture, in each case, as such facility may be amended, restated, modified, renewed, refunded, replaced or refinanced, including the following credit facilities made available under the following agreements:

(a)       the up to US$150,000,000 credit facility agreement dated December 27, 2017 in relation to two tranches of revolving credit facilities and made between the Parent Guarantor, the companies listed in Part 1 of Schedule 1 thereof as original borrowers, the persons listed in Part 2 of Schedule 1 thereof as original guarantors, the arrangers listed therein, the financial institution listed in Part 3 of Schedule 1 thereof as original lenders, Madison Pacific Trust Limited as facility agent, The Hongkong and Shanghai Banking Corporation Limited as originally named account bank and PT Bank Permata Tbk as security agent;

(b)       the US$54,000,000 amendment and restatement to facility agreement (No. 281/FA/ANZ/AMD/IV/2019) dated April 24, 2019 and made between the Parent Guarantor and certain Restricted Subsidiaries as borrowers and PT Bank ANZ Indonesia as lender, as amended by the first amendment to facility agreement (No. 428/FA/ANZ/AMD/II/2020) dated February 10, 2020;

(c)       the US$7,500,000 facility letter (No.Ref.SS/DR-045/LA/2015) dated November 30, 2015 and made between the Parent Guarantor and certain Restricted Subsidiaries as borrowers and PT Bank BNP Paribas Indonesia as lender, as amended from time to time, with the most recent amendment as at the date of the Supplemental Indenture being under a sixth amendment to banking facilities letter (Ref. No. LC/DR-424/LA/2019) dated  March 13, 2019 and as extended by the notification letter (Ref. No. LC/DR-511/LA/2020) dated February 27, 2020;

(d)       the corporate facility agreement dated August 9, 2017 (No. JAK/000224/U/170512) relating to a US$50,000,000 corporate facility and a US$1,000,000 treasury facility and made between, among others, the Parent Guarantor and PT Bank HSBC Indonesia as lender, as amended by a first amendment to corporate facility agreement dated  July 23, 2018 (No. JAK/180408/U/180525) and as further amended by a second amendment to corporate facility agreement dated October 21, 2019 (No. JAK/190570/U/190925);

(e)       the Agreement on Bank Transactions dated May 28, 2012, the Agreement on Foreign Exchange Transactions dated September 21, 2012 as amended and restated initially by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated November 24, 2016 and subsequently by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated September 12, 2017 and the Agreement on Forward Foreign Exchange Contracts dated September 12, 2012 as amended and restated by the Amendment and Restatement to Agreement on Forward Foreign Exchange Contracts dated September 12, 2017, each made between MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch as lender and the Parent Guarantor and certain Restricted Subsidiaries listed therein as customers, as confirmed from time to time, most recently pursuant to a confirmation of facilities (Ref. No. 0076/CF/CDU-NJ/RAD/20/20-0137- GC) dated September 12, 2020 and issued by MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch to the Parent Guarantor and certain Restricted Subsidiaries listed therein;

(f)       the credit facility agreement (No. 805/MA/MZH/1018) dated  October 26, 2018 and made between the Parent Guarantor and certain Restricted Subsidiaries as obligors and PT Bank Mizuho Indonesia as lender, as amended from time to time, most recently by an amendment (No. 1430/AMD/MZH/1020) dated  October 26, 2020;

(g)       the  credit agreement No. 10 dated March 12, 2003 as last amended by No.290/Prb/PK/CDU1/2020 dated November 13, 2020 with LC facility of US$15,000,000 between the Parent Guarantor and PT Bank Maybank Indonesia Tbk as lender;

(h)      the credit agreement no. KK/21/0124/AMD/CG1 dated  February 2, 2021 between the Parent Guarantor, among others, and PT Bank Permata Tbk as lender consisting of a LC facility of US$10,000,000 as amended from time to time and the Credit Agreement no. KK/21/0112/AMD/CG1 dated  February 2, 2021 and made between PT Prima Sejati Sejahtera and PT Bank Permata Tbk consisting of an LC Facility of US$15,000,000 as amended from time to time;

(i)      the credit agreement No. 58 dated April 20, 2011 between the Parent Guarantor, among others, and PT Bank UOB Indonesia as original lender as amended from time to time with the most recent amendment as at the date of the Supplemental Indenture being under an amendment (No. 1431/AMD/MZH/1020 dated 4 May 2011 with LC facility of US$8,600,000 and a forex exchange facility of US$10,000,000; and

(j)      each of the Non-Active Bilateral Facilities.

"**Non-Active Bilateral Facilities**" each of the credit facilities of the Parent Guarantor or any of its Restricted Subsidiaries set out below, in each case, as such facility may be amended, restated, modified, renewed, refunded, replaced or refinanced, including the following credit facilities made available under the following agreements:


(i)      the US$7,500,000 facility letter (No.Ref.SS./DR-045/LA/2015) dated 30 November 2015 and made between the Company and certain other entities as borrowers and PT Bank BNP Paribas Indonesia as lender, as amended from time to time, with the most recent amendment as at the date of the Supplemental Indenture being pursuant to a sixth amendment to banking facilities letter (Ref. No. LC/DR-424/LA/2019) dated 13 March 2019 and as extended by the notification letter (Ref. No. LC/DR-511/LA/2020) dated 27 February 2020;

(ii)      the amendment and restatement to facility agreement (No. 281/FA/ANZ/AMD/IV/2019) dated 24 April 2019 and made between the Company and certain other entities as borrowers and PT Bank ANZ Indonesia as lender, as amended by the first amendment to facility agreement (No. 428/FA/ANZ/AMD/II/2020) dated 10 February 2020; and

(iii)      the Agreement on Bank Transactions dated 28 May 2012, the Agreement on Foreign Exchange Transactions dated 21 September 2012 as amended and restated initially by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated 24 November 2016 and subsequently by the Amendment and Restatement to Agreement on Foreign Exchange Transactions dated 12 September 2017 and the Agreement on Forward Foreign Exchange Contracts dated 12 September 2012 as amended and restated by the Amendment and Restatement to Agreement on Forward Foreign Exchange Contracts dated 12 September 2017, each made between MUFG Bank, Ltd. (previously known as The Bank of Tokyo-Mitsubishi UFJ, Ltd.), Jakarta Branch as bank and the Company and its subsidiaries listed therein as customers, as confirmed from time to time, with the most recent amendment as at the date of the Supplemental Indenture being pursuant to a confirmation of facilities (Ref. No. 0076/CF/CDU-NJ/RAD/20/20-0137- GC) dated 12 September 2020 and issued by MUFG Jakarta to the Company and other customers listed therein.

**Appendix 2**

**(A)**    **Definition of "Permitted Liens" in Section 1.01 of the Existing Indenture is to be amended as follows.**

(1)    Liens for taxes, assessments, governmental charges or claims that are being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as will be required in conformity with GAAP will have been made;

(2)    statutory and common law Liens of landlords and carriers, warehousemen, mechanics, suppliers, materialmen, repairmen, employees or other similar Liens arising in the ordinary course of business and with respect to amounts not yet delinquent or being contested in good faith by appropriate legal or administrative proceedings promptly instituted and diligently conducted and for which a reserve or other appropriate provision, if any, as required in conformity with GAAP will have been made and Liens arising solely by virtue of any statutory or common law provisions relating to attorney's Liens;

(3)    Liens incurred or deposits made to secure the performance of tenders, bids, leases, statutory or regulatory obligations, bankers' acceptances, surety and appeal bonds, government contracts, performance and return-of-money bonds and other obligations of a similar nature or deposits as security for contested taxes or import duties, in each case incurred in the ordinary course of business (exclusive of obligations for the payment of borrowed money);

(4)    leases or subleases granted to others that do not materially interfere with the ordinary course of business of the Parent Guarantor or its Restricted Subsidiaries, taken as a whole;

(5)    any interest or title of a lessor in the property subject to any operating lease;

(6)    Liens on property of, or on shares of Capital Stock or Indebtedness of, any Person existing at the time such Person becomes, or becomes a part of, any Restricted Subsidiary; provided that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets acquired; provided further that such Liens were not created in contemplation of or in connection with the transactions or series of transactions pursuant to which such Person became a Restricted Subsidiary;

(7)    Liens in favor of the Parent Guarantor, the Company or any Subsidiary Guarantor;

(8)    Liens arising from attachment or the rendering of a final judgment or order against the Parent Guarantor or any Restricted Subsidiary that does not give rise to an Event of Default;

(9)    Liens existing on the date of the Supplemental Indenture;

(10)    Liens securing Indebtedness which is Incurred to refinance secured Indebtedness which is permitted to be Incurred under Section 4.06(b)(v); provided that such Liens do not extend to or cover any property or assets of the Parent Guarantor or any Restricted Subsidiary other than the property or assets securing the Indebtedness being refinanced;

(11)    Liens (including extensions and renewals thereof) upon real or personal property, assets, machinery, plant or equipment acquired, developed, installed, improved or expanded after the date of the Supplemental Indenture (including through the acquisition of Capital Stock of any Person that owns such real or personal property, assets, machinery, plant or equipment which will, upon such acquisition, become a Restricted Subsidiary and including any interest or title of a lessor under Capitalized Lease Obligations); provided that (a) such Lien is created solely for the purpose of securing Indebtedness Incurred of the type permitted by Section 4.06(b)(x), (b) such Lien is created prior to, at the time of or within 180 days after the later of the

acquisition or the completion of development, construction, installation, improvement or expansion of such property, (c) the principal amount of Indebtedness secured by such Lien does not exceed 100% of the cost (including adjustment of purchase price or similar obligations) of such property, development, construction, installation, improvement or expansion and (d) such Lien shall not extend to or cover any property or assets other than such item of real or personal property, assets, machinery, plant or equipment and any improvements on such item;

(12)    Liens securing Indebtedness under Hedging Obligations permitted by Section 4.06(b)(vi);

(13)    Liens on deposits made in order to comply with statutory obligations to maintain deposits for workers' compensation claims, unemployment insurance and other purposes specified by statute made in the ordinary course of business and not securing Indebtedness of the Parent Guarantor or any Restricted Subsidiary;

(14)    Liens under the Security Documents securing the Notes (including any Additional Notes) or any Guarantee;

(15)    Liens securing reimbursement obligations with respect to letters of credit that encumber documents and other property relating to such letters of credit and the products and proceeds thereof;

(16)    Liens securing rights of setoff in favor of a bank imposed by law or customary general terms of banks and incurred in the ordinary course of business on deposit accounts maintained with such bank and cash and Temporary Cash Investments in such accounts;

(17)    (x) Liens on property or assets securing Indebtedness used or to be used to defease or satisfy and discharge the Notes; provided that (a) the Incurrence of such Indebtedness was not prohibited by this Indenture and (b) such defeasance or satisfaction and discharge is not prohibited by this Indenture and (y) Liens on cash and Temporary Cash Investments arising in connection with the defeasance, discharge or redemption of Indebtedness;

(18)    (x) Liens securing Indebtedness permitted to be Incurred under Section 4.06(b)(i) and (y) Liens on current assets securing Indebtedness permitted to be Incurred under the covenant described under Section 4.06, provided the amount of Indebtedness secured pursuant to this clause (y) does not exceed 25% of the amount of consolidated inventory, advance payments and accounts receivable of the Parent Guarantor and its Restricted Subsidiaries measured in accordance with GAAP as of the last day of the most recent fiscal quarter for which consolidated financial statements of the Parent Guarantor and its Restricted Subsidiaries (which may be internal financial statements) are available;

(19)    Liens on (i) Capital Stock of a Finance Subsidiary (other than the Company) and any intercompany loans or advances from such Finance Subsidiary to the Parent Guarantor or any Restricted Subsidiary, (ii) Capital Stock of a Wholly-Owned Subsidiary of a Finance Subsidiary and on any intercompany loans or advances made by such Wholly-Owned Subsidiary to the Parent Guarantor or any Restricted Subsidiary; and (iii) any interest reserve, debt service reserve, debt service accrual or similar account used to service interest payments or debt obligations with respect to such Indebtedness or any escrow account holding all or any part of the proceeds of such Indebtedness, in each case securing Indebtedness of such Finance Subsidiary (and guarantees by the Parent Guarantor or Subsidiary Guarantors of such Indebtedness) permitted to be Incurred under Section 4.06;

(20)    Liens upon specific items of inventory or other goods and proceeds of any Person securing such Person's obligations in respect of bankers' acceptances issued or credited for the account of such Person to facilitate the purchase, shipment or storage of such inventory or other goods;

(21)    Liens arising out of conditional sale, title retention, consignment or similar arrangements for the sale of goods entered into by the Parent Guarantor or any Restricted Subsidiary in the ordinary course of business;

(22)    Liens Incurred in connection with any cash or treasury management program, or cash pooling, netting or set-off arrangements, in each case established in the ordinary course of business for the benefit of the Parent Guarantor or any Restricted Subsidiary;

(23)    Liens in favor of customs and revenue authorities arising by operation of law to secure payment of customs duties in connection with importation or exportation of goods in the ordinary course of business;

(24)    Liens on the Capital Stock of Unrestricted Subsidiaries or any Person that is not a Subsidiary of the Parent Guarantor solely to secure Indebtedness of such Unrestricted Subsidiaries or such Person, in each case that is non-recourse to the Parent Guarantor or any Restricted Subsidiary, unless the Parent Guarantor or such Restricted Subsidiary could have incurred such Indebtedness under this Indenture on the date of incurrence of such Lien;

(25)    Liens with respect to minor survey exceptions, minor encumbrances, easements or reservations of, or rights of others for, licenses, rights of way, sewers, electric lines, telegraph and telephone lines and other similar purposes, or municipal ordinances, zoning ordinances or other restrictions as to the use of real property, not interfering in any material respect with the conduct of the business of the Parent Guarantor and its Restricted Subsidiaries;

(26)    licenses or leases or subleases as licensor, lessor or sublessor of any of the Parent Guarantor's or the Restricted Subsidiaries' property, including intellectual property, in the ordinary course of business;

(27)    Liens resulting from escrow arrangements entered into in connection with the disposition of assets;

(28)    Liens encumbering property or assets under construction arising from progress or partial payments by a customer of the Parent Guarantor or its Restricted Subsidiaries relating to such property or assets;

(29)    any encumbrance or restriction, including customary rights of first refusal and tag, drag and similar rights with respect to Capital Stock of any joint venture pursuant to joint venture agreements entered into in the ordinary course of business;

(30)    Liens on any interest reserve, debt service reserve, debt service accrual or similar account used to service interest payments or debt obligations with respect to Indebtedness permitted to be Incurred under Section 4.06;

(31)    Liens on inventories and accounts receivable to secure working capital facilities of the Parent Guarantor or any Restricted Subsidiary used for working capital;

(32)    Liens securing Permitted Subsidiary Indebtedness; provided such Liens do not extend to any property or assets of the Company, PB Fashion, the Parent Guarantor or any Subsidiary Guarantor;

(33)    Liens securing the Existing Credit Facilities as permitted and in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement, as disclosed to the holders on or prior to the date of the Supplemental Indenture; and

(34)    Liens with respect to obligations that do not exceed US$10.0 million (or the Dollar Equivalent thereof) at any one time outstanding;

*provided* that, with respect to Liens on the property or assets of PB Fashion, Permitted Liens will include only Liens described in paragraphs (1), (2), (3), (5), (7), (8), (9), (13), (14), (15), (16), (17), (19), (20), (21), (22), (23), (25), (26),

(27), (28), (30) and (34) above, and *provided further* that for purposes of the Interest Reserve Account Collateral, Permitted Liens shall mean Liens described in clauses (1), (14) and (16).

**(B)** **Definition of "Permitted Indebtedness" in Section 4.06(b) of the Existing Indenture is to be amended as follows.**

(i)      (A) Indebtedness of the Parent Guarantor, the Company or any Subsidiary Guarantor under Credit Facilities not falling within sub-paragraph (B) or (C) of this paragraph (i) in an aggregate principal amount at any time outstanding not to exceed US$400.0 million (or the Dollar Equivalent thereof) less the aggregate principal amount of Notes as of the date of the Supplemental Indenture (or the Dollar Equivalent thereof), which shall include Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary under the Existing Credit Facilities and not falling within sub-paragraphs (B) or (C) of this paragraph (i); (B) Indebtedness of the Parent Guarantor, the Company or any Subsidiary Guarantor under or in respect of letters of credit issued under or pursuant to Credit Facilities and (C) Indebtedness of the Parent Guarantor, the Company or any Subsidiary Guarantor under any supply chain financing or trade arrangements (such as (but not limited to) factoring or retention of title arrangements) (in the case of paragraphs (A), (B) and (C) as may be amended, restated, restructured, modified or varied, in whole or in part, including in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement);

(ii)     Indebtedness under the Notes as of the date of the Supplemental Indenture, after giving pro forma effect to the restructuring of the same in accordance with the terms sanctioned by the High Court of Singapore under the Singapore scheme of arrangement as if it occurred on the date of the Supplemental Indenture, the Guarantees thereof and the Intercompany Loans;

(iii)    Indebtedness of the Parent Guarantor, the Company or any other Restricted Subsidiary (other than PB Fashion) outstanding on the date of the Supplemental Indenture, excluding Indebtedness permitted under clause (b)(i), (ii) or (iv) of this Section 4.06;

(iv)     Indebtedness of the Parent Guarantor, the Company or any Restricted Subsidiary owed to the Parent Guarantor, the Company or any Restricted Subsidiary; provided that (x) any event which results in any such Restricted Subsidiary ceasing to be a Restricted Subsidiary or any subsequent transfer of such Indebtedness (other than to the Parent Guarantor, the Company or any other Restricted Subsidiary) will be deemed, in each case, to constitute an Incurrence of such Indebtedness not permitted by this clause (b)(iv), (y) if the Company or the Parent Guarantor is the obligor on such Indebtedness, such Indebtedness must be unsecured and expressly be subordinated in right of payment to the Notes, in the case of the Company, or the Parent Guarantee, in the case of the Parent Guarantor and (z) if a Subsidiary Guarantor is the obligor on such Indebtedness and a Restricted Subsidiary that is not the Company or a Subsidiary Guarantor is the obligee, such Indebtedness must be unsecured and expressly subordinated in right of payment to the Subsidiary Guarantee of such Subsidiary Guarantor;

(v)      Indebtedness of the Parent Guarantor, the Company or any other Restricted Subsidiary ("**Permitted Refinancing Indebtedness**") issued in exchange for, or the net proceeds of which are used to refinance or refund, replace, exchange, renew, repay, defease, discharge or extend (collectively, "refinance" and "refinances" and "refinanced" shall have a correlative meaning), then-outstanding Indebtedness (or Indebtedness repaid substantially concurrently with the Incurrence of such Permitted Refinancing Indebtedness) Incurred under Section 4.06(a) or Section 4.06(b)(ii), (iii), (v) or (x) and any refinancings thereof; provided that (A) Indebtedness the proceeds of which are used to refinance or refund the Notes or Indebtedness that is pari passu with, or subordinated in right of payment to, the Notes or a Guarantee will only be permitted under this clause (b)(v) if (x) in case the Notes are refinanced in part or the Indebtedness to be refinanced is pari passu with the Notes or a Guarantee, such new Indebtedness, by its terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is outstanding, is expressly made pari passu with the remaining Notes or such Guarantee, or (y) in case the Indebtedness to be refinanced is subordinated in right of payment to the Notes or a Guarantee, such new Indebtedness, by its

terms or by the terms of any agreement or instrument pursuant to which such new Indebtedness is issued or remains outstanding, is expressly made subordinate in right of payment to the Notes or such Guarantee at least to the extent that the Indebtedness to be refinanced is subordinated to the Notes or such Guarantee, (B) such new Indebtedness, determined as of the date of Incurrence of such new Indebtedness, does not mature prior to the Stated Maturity of the Indebtedness to be refinanced or refunded, and the Average Life of such new Indebtedness is at least equal to the remaining Average Life of the Indebtedness to be refinanced or refunded, (C) such new Indebtedness has an aggregate principal amount, or if Incurred with original issue discount, an aggregate issue price, that is equal to or less than the aggregate principal amount, or if Incurred with original issue discount, the aggregate accreted value, then outstanding, plus premiums, accrued interest, underwriting discounts, costs (including any defeasance costs), fees and expenses under the Indebtedness being refinanced and (D) in no event may Indebtedness of the Company or any Guarantor be refinanced pursuant to this clause by means of any Indebtedness of any Restricted Subsidiary (other than the Company or any Finance Subsidiary) that is not a Subsidiary Guarantor;

(vi)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary (other than PB Fashion or any FS Subsidiary) pursuant to Hedging Obligations for the purpose of protecting the Parent Guarantor or any Restricted Subsidiary from fluctuations in interest rates, currencies or commodity prices and not for speculation;

(vii)    Indebtedness of the Parent Guarantor, the Company or any other Restricted Subsidiary (other than PB Fashion or any FS Subsidiary) arising from agreements providing for indemnification, adjustment of purchase price, earn out or other similar obligations, or from guarantees or letters of credit, surety bonds or performance bonds securing any obligation of the Parent Guarantor or any Restricted Subsidiary pursuant to such agreements, in any case, Incurred in connection with the acquisition or disposition of any business, assets or Capital Stock of a Restricted Subsidiary, other than guarantees of Indebtedness Incurred by any Person acquiring all or any portion of such business, assets or Capital Stock of a Restricted Subsidiary for the purpose of financing such acquisition; provided that the maximum aggregate liability in respect of all such Indebtedness incurred in connection with a disposition shall at no time exceed the gross proceeds actually received by the Parent Guarantor or any Restricted Subsidiary from the disposition of such business, assets or Capital Stock of a Restricted Subsidiary;

(viii)   Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary arising from the honoring by a bank or other financial institution of a check, draft or similar instrument drawn against insufficient funds in the ordinary course of business; provided, that such Indebtedness is extinguished within five Business Days of Incurrence;

(ix)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary constituting reimbursement obligations with respect to workers' compensation claims or claims arising under similar legislation, or in connection with self-insurance obligations or bid, performance or surety bonds, including guarantees or obligations of the Parent Guarantor or any Restricted Subsidiary thereof with respect to letters of credit supporting such bid, performance or surety bonds, in each case other than for an obligation for borrowed money;

(x)      Indebtedness Incurred by the Parent Guarantor, the Company, any Subsidiary Guarantor or any FS Subsidiary, including Indebtedness represented by Capitalized Lease Obligations, mortgage financings or purchase money obligations, to finance all or any part of the purchase price (including adjustment of purchase price or similar obligations) or cost of construction, development, leasing, installation, improvement or expansion of property (real or personal), assets, machinery, plant or equipment (including through the acquisition of Capital Stock of any Person that owns such property (real or personal), assets, machinery, plant or equipment which will, upon such acquisition, become a Restricted Subsidiary) to be used in the Permitted Business; provided that (i) such Indebtedness shall be Incurred no later than 180 days after the acquisition, construction, development, leasing, installation, improvement or expansion of such property (real or personal), assets, machinery, plant or equipment and (ii) on the date of Incurrence of such

Indebtedness and after giving effect thereto, the aggregate principal amount of Indebtedness Incurred pursuant to this clause (b)(x) at any time outstanding (together with refinancings thereof) shall not exceed the greater of (x) US$30.0 million (or the Dollar Equivalent thereof) and (y) 5.0% of Total Assets;

(xi)      guarantees by any Guarantor of Indebtedness of any other Guarantor, the Company or a Finance Subsidiary that was permitted to be Incurred by another provision of this covenant; provided that if the Indebtedness being guaranteed is subordinated to or pari passu with the Notes or a Guarantee, then the guarantee shall be subordinated or pari passu, as applicable, to the same extent as the Indebtedness guaranteed;

(xii)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary constituting reimbursement obligations with respect to letters of credit, trade guarantees or similar instruments issued in the ordinary course of business to the extent that such letters of credit or trade guarantees are not drawn upon or, if drawn upon, to the extent such drawing is reimbursed no later than the 30 days following receipt by the Parent Guarantor or such Restricted Subsidiary of a demand for reimbursement;

(xiii)    Indebtedness of a Finance Subsidiary that is guaranteed by the Parent Guarantor or any Subsidiary Guarantor to the extent the Parent Guarantor or such Subsidiary Guarantor was permitted to incur such Indebtedness under this covenant (other than under Section 4.06(b)(xi);

(xiv)     guarantees by any Non-Guarantor Subsidiary of Indebtedness of any other Non-Guarantor Subsidiary; provided that the Indebtedness guaranteed is permitted to be Incurred under the Indenture;

(xv)      Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary under active bilateral facilities (including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more of the Parent Guarantor, Company or Restricted Subsidiaries) entered into after the date of the Supplemental Indenture (together with refinancings thereof) provided that the aggregate principal amount of Indebtedness Incurred pursuant to this clause (b)(xv) at any time outstanding  shall not exceed (x) US$75.0 million (or the Dollar Equivalent thereof) prior to the date the Rights Issue has taken place and (y) US$100.0 million (or the Dollar Equivalent thereof) after the date the Rights Issue has taken place and provided that there is no breach of any security coverage ratio test under the terms of the Existing Credit Facilities);

(xvi)     Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary under any supply chain financing or trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more of the Parent Company or any Restricted Subsidiary;

(xvii)    Indebtedness Incurred by the Parent Guarantor, the Company or any other Restricted Subsidiary in respect of the issuance of convertible bonds to lenders under the Non-Active Bilateral Facilities after the date falling 6 months from the date of the Supplemental Indenture, provided the market price is higher than the strike price of IDR400 per share; and

(xviii)   Indebtedness of the Parent Guarantor or any Restricted Subsidiary in an aggregate principal amount outstanding at any time (together with any refinancings thereof) not to exceed US$3.0 million (or the Dollar Equivalent thereof).

**Appendix 3**

**Events of Default - Section 6.01 of the Existing Indenture is to be amended as follows:**

Each of the following events is an "**Event of Default**" if such event occurs on and from the date of the Supplemental Indenture:

(a)      default in the payment of principal of (or premium, if any, on) the Notes when the same becomes due and payable at maturity, upon acceleration, redemption or otherwise;

(b)      default in the payment of interest on any Note when the same becomes due and payable, and such default continues for a period of 30 consecutive days;

(c)      (x) the Parent Guarantor or any Restricted Subsidiary defaults in the performance or breach of the provisions of Section 5.01, (y) the Parent Guarantor and the Company fail to make or consummate an Offer to Purchase in the manner described under Section 4.13 or Section 4.14 or (z) the Company fails to create a first priority Lien on the Interest Reserve Account Collateral (subject to any Permitted Liens) in accordance with Section 4.25;

(d)      the Parent Guarantor or any Restricted Subsidiary defaults in the performance of or breaches any other covenant or agreement in this Indenture or under the Notes (other than a default specified in clause (a), (b) or (c) above) and such default or breach continues for a period of 14 consecutive Business Days after written notice by the Trustee or the Holders of 25% or more in aggregate principal amount of the Notes then outstanding;

(e)      there occurs with respect to any Indebtedness of the Parent Guarantor or any Restricted Subsidiary having an outstanding principal amount of US$5.0 million (or the Dollar Equivalent thereof) or more in the aggregate for all such Indebtedness of all such Persons, whether such Indebtedness now exists or will hereafter be created, (1) an event of default that has caused the holder thereof to declare such Indebtedness to be due and payable prior to its Stated Maturity and/or (2) a failure to pay principal of, or interest or premium (subject to the applicable grace period in the relevant documents) on, such Indebtedness when the same becomes due;

(f)      one or more final judgments or orders for the payment of money are rendered against the Parent Guarantor or any Restricted Subsidiary and are not paid or discharged, and there is a period of 60 consecutive days following entry of the final judgment or order that causes the aggregate amount for all such final judgments or orders outstanding and not paid or discharged against all such Persons to exceed US$5.0 million (or the Dollar Equivalent thereof) (in excess of amounts that reputable insurance carriers have agreed in writing to pay under applicable policies) during which a stay of enforcement, by reason of a pending appeal or otherwise, is not in effect;

(g)      an involuntary case or other proceeding is commenced against the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) with respect to it or its debts under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect seeking the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) or for any substantial part of the property and assets of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) and such involuntary case or other proceeding remains undismissed and unstayed for a period of 60 consecutive days; or an order for relief is entered against the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) under any applicable bankruptcy, insolvency or other similar law as now or hereafter in effect;

(h)    the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) (1) commences a voluntary case under any applicable bankruptcy, insolvency or other similar law now or hereafter in effect, or consents to the entry of an order for relief in an involuntary case under any such law, (2) consents to the appointment of or taking possession by a receiver, liquidator, assignee, custodian, trustee, sequestrator or similar official of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) or for all or substantially all of the property and assets of the Parent Guarantor or any Significant Subsidiary (or any group of Restricted Subsidiaries that, taken together, would constitute a Significant Subsidiary) or (3) effects any general assignment for the benefit of creditors;

(i)    any Guarantor denies or disaffirms in writing its obligations under its Guarantee or any Guarantee is finally determined in any judicial proceeding by a court of competent jurisdiction to be unenforceable or invalid or will for any reason cease to be in full force and effect, or the Company or any Guarantor repudiates this Indenture, the Notes or any Guarantee in writing, except as permitted by this Indenture;

(j)    a moratorium is agreed or declared in respect of any Indebtedness of the Company or any Guarantor or any governmental authority shall take any action to condemn, seize, nationalize or appropriate all or a substantial part of the assets of the Company or any Guarantor;

(k)    the capital and/or currency exchange controls in place in the Republic of Indonesia on the date of the Supplemental Indenture shall be modified or amended in a manner that prevents the Company or any Guarantor from performing its payment obligations under this Indenture, the Notes or any Guarantee;

(l)    the entire issued share capital of the Company ceases to be wholly owned, directly or indirectly, by the Parent Guarantor or the entire issued share capital of PB Fashion ceases to be wholly owned, directly or indirectly, by the Company;

(m)    it becomes unlawful for the Company or any Guarantor to perform or comply with any of its obligations under or in respect of this Indenture, the Notes or any Guarantee in any material respect;

(n)    any failure by the Company to maintain the Interest Reserve Account as required in accordance with the provisions described under Section 4.25 other than in accordance with the provisions described under Section 4.22;

(o)    any default by the Company in the performance of any of its obligations under the Security Documents that adversely affects the enforceability, validity, perfection or priority of the applicable Lien on the Interest Reserve Account Collateral or that adversely affects the condition or value of the Interest Reserve Account Collateral, taken as a whole, in any material respect;

(p)    (i) the Company denies or disaffirms in writing its obligations under any Security Document or (ii) other than in accordance with this Indenture and the Security Documents, any Security Document ceases to be or is not in full force and effect or the Interest Reserve Account Collateral Agent ceases to have a first-priority Lien over the Interest Reserve Account Collateral (subject to any Permitted Liens); or

(q)    the Rights Issue does not occur by 30 December 2022 and the Trustee or the Holders of at least 25% in aggregate principal amount of the Notes then outstanding have by written notice to the Company declared such event to be an Event of Default, provided that no Event of Default will occur if on or before 30 December 2022 at least US$50,000,000 of cash standing to the credit of the ringfence account referred to in Clause 4.4(a) of the Scheme Document (to be defined) has been provided to the Company by way of a subordinated shareholder loan .

For the avoidance of doubt, any event or circumstance that may have triggered or constituted any of the above events of default occurring prior to the date of the Supplemental Indenture shall be deemed to have been waived by

the Holders further to the restructuring of the terms of the Existing Credit Facilities as sanctioned by the High Court of Singapore under the Singapore scheme of arrangement.

## APPENDIX 7

## RESTRUCTURING TERM SHEET (SYNDICATED FACILITY))

The Restructuring Term Sheet (Syndicated Facility) is set out on the next following pages.

**PT Pan Brothers, Tbk. and subsidiaries**

**USD138.5 Million Syndicated Credit Facility and certain Bilateral Facilities**

**Indicative Non-Binding Restructuring Term Sheet**

**(Subject to Contract)**

The terms set out in this draft term sheet are a summary of the key terms only to facilitate further discussions between the Syndicated Lenders and the Borrowers. These terms do not purport to be a complete description of the terms of the proposed transaction.

This draft term sheet and its contents are intended for the exclusive use of the Borrowers and shall not be disclosed by the Borrowers to any person other than the Borrowers' affiliates and legal and financial advisors for the purposes of the proposed transaction unless the prior written consent of the Syndicated Lenders is obtained.

| PARTIES AND INDEBTEDNESS | | |
|---|---|---|
| Existing Borrowers | : | PT Pan Brothers, Tbk. ("**PBRX**" or the "**Company**") and the following subsidiaries:<br>1. PT Pancaprima Ekabrothers; ("**PPEB**")<br>2. PT Prima Sejati Sejahtera; and<br>3. PT Eco Smart Garment Indonesia. ("**ESGI**")<br><br>PBRX and its subsidiaries listed under (1) to (3) above shall individually be referred to as a "**Borrower**" and collectively referred to as the "**Borrowers**". |
| Group | : | PBRX and all of its (direct and indirect) subsidiaries from time to time. |
| Existing Guarantors | : | All Borrowers and any other subsidiary or subsidiaries of PBRX (excluding CGL (Cosmic Gear), TPG and VPM) that has acceded to the existing Syndicated Facility as a Guarantor (each a "**Guarantor**" and collectively, the "**Guarantors**"). |
| Existing Obligors | : | The Existing Borrowers and the Existing Guarantors. |
| Syndicated Lenders | : | Those lenders under the Syndicated Facility. |
| Syndicated Facility | : | The existing syndicated revolving credit facility dated 27 December 2017 as amended and restated from time to time. |
| Syndicated Facility Amount | : | USD138,400,000. |
| PROPOSED TRANSACTION AND PROCESS | | |
| Transaction | : | This draft term sheet contemplates that the Syndicated Facility shall be amended and restated pursuant to an amended and restated facility agreement (the "**Amended and Restated Facility Agreement**") and the Syndicated Lenders shall all agree to have the existing indebtedness under the Syndicated Facility (the "**Existing Indebtedness**") be governed by the terms of the Amended and Restated Facility Agreement. Each Syndicated Lender's total participation under the Amended and Restated Facility Agreement shall be equal to its aggregate principal amount outstanding of the Existing Indebtedness. For more details, see section regarding "Amended Facility" below.<br><br>The amendment and restatement of the Syndicated Facility is conditional on a successful amendment and restatement of the USD Bonds (as defined below) (with interconditionality), i.e. bond restructuring will be simultaneous with loan restructuring |
| Process | : | The Company will implement the Transaction by way of a scheme of arrangement.<br><br>The transaction will be implemented as follows:<br>1. Agreement to the terms of this term sheet;<br>2. Signing of key transaction documents, such key transaction documents to include, but are not limited to: |

| | | |
|---|---|---|
| | | a. An amendment and restatement agreement and the Amended and Restated Facility Agreement; |
| | | b. 'Refreshed' and new security and guarantee documentation; |
| | | c. A cash account management agreement ("**CAMA**") the principles of which are set out under the "CAMA: Bank Accounts, Minimum Operating Reserve and Cash Sweep Mechanism" section of this term sheet; |
| | | d. a ringfencing deed (the "**Ringfencing Deed**"), under which certain key shareholders will agree to ringfence an amount of USD50 million ("**Ringfenced Amount**"); and |
| | | e. Such other documents as the Syndicated Lenders and/or the Company may reasonably require in order to implement the Transaction. |
| | | 3. As part of the scheme of arrangement, the existing holders of the USD200m 7.625% Senior Notes due 2022 issued by PB International B.V. (ISIN: XS1555631925; Common Code: 155563192) ("**USD Bonds**") shall agree to an amendment and restatement of their notes (by way of a scheme of arrangement) based on the key commercial terms as further set out in the bonds term sheet (the "**USD Bonds Amendment**"): |
| | | a. Security: None save for security over the interest reserve account. |
| | | b. Maturity: To seek a tenor extension to 31 December 2025. |
| | | c. Interest Rate: Flat interest rate not to exceed the existing rate and an all-in cost not exceeding the existing cost. |
| | | d. Amortisation: Nil, bullet repayment at maturity. |
| | | The Company acknowledges that certain Syndicated Lenders require the Company to execute a side letter (the "**Side Letter**") for the purposes of Syndicated Lenders' respective credit processes. The Side Letter will refer to the scheme of arrangement and this term sheet and will document: (i) the commercial terms of the Amended and Restated Facility Agreement which will be in line with the terms set out in this term sheet; and (ii) the Borrowers' obligation to use their best efforts to finalise and execute the Amended and Restated Facility Agreement in form and substance acceptable to the Syndicated Lenders as soon as reasonably practicable, and in any event by the Long Stop Date (as defined in the scheme of arrangement). The Company agrees to execute the Side Letter on this basis. |
| Conditions | : | It shall be a condition precedent to the Amended and Restated Facility Agreement coming into effect in accordance with the terms of the scheme of arrangement that: |
| | | 1. The Ringfencing Deed is entered into and is a Finance Document, a breach of which is an Event of Default (subject to a 14 day grace period); |
| | | 2. The Ringfenced Amount is placed in an unsecured escrow account (and such amount shall only be used for the agreed purposes) with a reputable trustee acceptable to a simple majority (51%) in value of the Syndicated Lenders (e.g. Madison Pacific), with that trustee having co-signing rights (along with a material PBRX shareholder) to facilitate the mechanism described in the 'Ringfenced Amount Application' section set out below. For the avoidance of doubt, both the trustee's and the material PBRX shareholder's signatures will be required for any withdrawals from the escrow account and this shall be documented in an agreement between the account bank, the material PBRX shareholder and the trustee. |
| | | 3. All outstanding and accrued interest (but not default interest) on the Existing Indebtedness as well as other amounts payable under the Syndicated Facility shall be paid up to the Restructuring Effective Date. All default interest and any other amounts constituting a penalty that has accrued up to the Restructuring Effective Date is irrevocably and unconditionally cancelled by the Syndicated Lenders. |
| | | 4. All advisors' fees of the Company (being the fees of AJ Capital and Baker & McKenzie) and those of the Syndicated Lenders are paid in accordance with the |

2

|  |  | terms and conditions of engagement letters signed by the Company on or prior to the Restructuring Effective Date.<br>5. An Indonesian top-7 accounting firm shall be appointed as monitoring accountant in relation to the CAMA. A simple majority (51%) by value of the non-active bilateral lenders, active bilateral lenders and Syndicated Lenders may agree to a later change if necessary. |
|---|---|---|
| **RESTRUCTURING AND RESCHEDULED FACILITY** | | |
| Amended Facility | : | The Amended Facility will consist of:<br><br>a) Facility A - term loan tranche of US$123,400,000 extended by onshore and offshore lenders; and<br>b) Facility B- term loan tranche of US$15,000,000 extended by onshore and offshore lenders,<br><br>(together, the "**Facility**").<br><br>The Syndicated Lenders shall permit active bilateral lenders or other entities to provide standalone active bilateral facilities (including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more members of the Group) (the "**Trade Arrangements**") up to a limit of USD75 million in aggregate (or its equivalent in any other currency or currencies), provided that after the rights issue referred to in this term sheet has taken place, such limit may be increased to USD100 million (or its equivalent in another currency or currencies), subject to the relevant security coverage ratio (as set out in the active bilateral facilities term sheets) being met. If the rights issue referred to in this term sheet has not taken place, such limit may nevertheless be increased to USD100 million (or its equivalent in another currency or currencies) if 51% of the Syndicated Lenders agree. The arrangements set out in this paragraph shall be referred to as the "**New Permitted Financial Indebtedness**".<br><br>Supply chain financing, vendor financing or other trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more members of the Group) (the "**Non-Recourse Trade Arrangements**") shall be permitted.<br><br>Financial indebtedness of the Group which has not been identified and disclosed to the Syndicated Lenders or otherwise permitted prior to the Restructuring Effective Date shall be subordinated to the Amended and Restated Facility Agreement.<br><br>Distributions or payments to shareholders of the Company by way of dividend, repayment of loans and/or transactions with a similar economic effect, as well as related party transactions, will not be permitted, save for any dividends or transactions required by OJK laws and regulations, for example, in connection with the proposed rights issue.<br><br>Upon an event of default occurring under the Amended and Restated Facility Agreement, the amounts outstanding under the Facility shall be capable of being accelerated and enforcement may be triggered upon notice to the Borrowers provided by the Facility Agent where instructed by a majority of 66 and 2/3% of Syndicated Lenders (the "**Majority Lenders**").<br><br>The key commercial terms of the Amended and Restated Facility Agreement are as below.<br><br>1. Lenders: Syndicated Lenders.<br>2. Amount: Syndicated Facility Amount. |

3

| | | |
|---|---|---|
| | | 3.   Security:<br>(i) First Mortgage on land and building (a) owned by PBRX in Tangerang and Sragen; (b) owned by PPEB in Tangerang and Boyolali; and (c) owned by ESGI (Klego and Sambi);<br>(ii) Fiduciary Transfer of Ownership ("**FTO**") over machinery and equipment: (a) FTO over machinery owned by PBRX in Tangerang and Sragen; (b) FTO over machinery owned by PPEB in Tangerang and Boyolali; and (c) FTO over machinery owned by ESGI (Klego and Sambi);<br>(iii) Insurance policies of assets mentioned under (i) and (ii) above (PBRX, PPEB and ESGI); and<br>(iv) Pledges of the amortisation reserve accounts and the interest reserve accounts.<br>4.   The Company will also provide a negative pledge to cover all other unsecured assets (with carve-outs to reflect the security already granted or to be granted in connection with the restructuring of the Group in accordance with the terms of the scheme of arrangement).<br>5.   Maturity: 1 year + 1 year extension (if extended, maturity will occur at the end of the 2nd year, i.e. two years from 1 January 2022. The extension will automatically occur provided that the Ringfenced Amount has been deposited into the escrow account in accordance with the terms of the Ringfencing Deed, the rights issue has taken place and no event of default is continuing. In the event that the rights issue does not occur for any reason (including, for the avoidance of doubt, because the collectability rating of the Group has not been upgraded to 1), the extension will be subject to approval from a simple majority (51%) in value of the Syndicated Lenders.<br>6.   Amortisation: Quarterly amortisation of 3.6% of principal outstanding under the Facility starting from the 5th quarter following 1 January 2022.<br>7.   Interest Rate in relation to lenders for the Tranche A Facility: LIBOR + margin of 3.00% (for onshore lenders) and 2.50% (for offshore lenders), payable monthly.<br>8.   Interest Rate in relation to lenders for the Tranche B Facility: LIBOR + margin of 3.00% (for onshore lenders) and 2.50% (for offshore lenders), payable monthly.<br>9.   Interest and amortisation payments shall be made in accordance with the Schedule to this term sheet. For the avoidance of doubt, the interest and amortisation payments shall be made on the dates specified in the Schedule even if the Amended and Restated Facility Agreement is yet to be executed. In the event that any of the payment dates as specified in the Schedule is not a business day, payment shall be made on the previous business day. |
| CAMA: Bank Accounts, Minimum Operating Reserve and Cash Sweep Mechanism | : | Each Borrower shall be permitted to open and maintain the following types of accounts with any account banks, which shall be freely operated and maintained by each Borrower (the "**Operating Accounts**"):<br><br>a) vendor financing accounts (for receipt of cash advances under vendor financing programmes);<br><br>b) collection accounts (to receive collections from customers, loan proceeds, insurance proceeds and to make payments to suppliers) which shall be pledged in favour of certain active bilateral facility lenders;<br><br>c) payroll accounts (for payment of payroll);<br><br>d) LC accounts (for payments of LC outstandings);<br><br>e) tax accounts (for payments of taxes); and<br><br>f) sundries accounts. |

Amounts in each Borrower's collection accounts are permitted to be transferred to any of such Borrower's payroll accounts, LC accounts, tax accounts or sundries accounts for payment of the required amounts for operations (including payroll amounts, LC outstandings, tax amounts, sundries).  Amounts in each Borrower's collection accounts shall also be transferred to relevant third party accounts for payments due to suppliers, active bilateral lenders (for LC outstanding, overdue interest and instalments), and to pay scheduled interest and principal amounts to noteholders, syndicated lenders and non-active bilateral lenders.

In addition to the above accounts, each Borrower shall open and maintain the following accounts with any account bank:

a) a cash proceeds / operating reserve account;

b) an interest reserve account (syndication);

c) an interest reserve account (non-active bilaterals);

d) an amortisation reserve account; and

e) a cash sweep account.

Other than the accounts mentioned above, the Borrowers shall not open or maintain any other bank account.

Cash available after operations and mandatory interest and (where applicable) amortization payments to the noteholders, Syndicated Lenders, active bilateral lenders, and non-active bilateral lenders (in accordance with the terms of the scheme of arrangement) shall be applied in accordance with the following waterfall on a quarterly basis:

a)  First, to top up the cash proceeds / operating reserve accounts (as defined below).

Prior to the rights issue, an aggregate operating cash reserve of no more than USD75 million (or its equivalent in any currency or currencies) may be maintained across all the Operating Accounts and cash proceeds / operating reserve accounts of all Borrowers, but excludes any interest reserve account and amortisation reserve account.  After the rights issue, such aggregate operating cash reserve limit shall be increased to USD100 million (or its equivalent in any currency or currencies) (the "**Minimum Operating Reserve** ").

b)  Second, to top up the interest reserve accounts (syndication) in the amount of interest payments due to Syndicated Lenders for the next quarter and the interest reserve accounts (non-active bilaterals) in the amount of interest payments due to non-active bilateral lenders for the next quarter (on a pro-rata basis based on outstanding amount). The interest reserve accounts (syndication) shall be secured in favour of the Syndicated Lenders.

c)  Fourth, to top up the amortization reserve accounts in the amount of principal amortization payments due to Syndicated Lenders for the next quarter (i.e. only one quarter amortisation payment is reserved at any one time).  These accounts shall be secured in favour of the Syndicated Lenders.

d)  Lastly, any excess cash (after payments in paragraphs (a) to (d) above are made) shall be transferred to the cash sweep accounts every six months and be applied subject to and in accordance with the cash sweep mechanism below. These accounts shall be secured in favour of the Syndicated Lenders and the non-active bilateral lenders.

|  |  |  |
|---|---|---|
|  |  | Any excess cash above the Minimum Operating Reserve (and after payments in paragraphs (a) to (c) above are made) shall be used to accelerate payments to the Syndicated Lenders and non-active bilateral lenders in the following priority (the "**Cash Sweep Mechanism**"):<br><br>a.   payments of principal amounts outstanding under the Amended and Restated Facility Agreement; and<br><br>b.   payments of principal amounts outstanding under the non-active bilateral facility agreements, provided no less than USD50 million of outstanding principal amount under the Amended and Restated Facility Agreement has been paid down (after which excess cash is to be pro-rated based on outstanding amounts under the Amended and Restated Facility Agreement and the non-active bilateral facility agreements (excluding outstanding amounts converted by non-active bilateral lenders to the new convertible bond)).<br><br>For the avoidance of doubt, excess cash is to be applied pro rata between the Amended and Restated Facility Agreement and the non-active bilateral facility agreements only after the principal amount of the Facility has been paid down by USD50 million.<br><br>The Cash Sweep Mechanism shall take effect 1 year after 1 January 2022 and shall be tested semi-annually and verified by the monitoring accountant.<br><br>Excess cash shall not be applied towards accelerated payments of any new convertible bond. For the avoidance of doubt, non-active bilateral lenders that exercise the new convertible bond exchange option in accordance with the terms of the non-active bilateral lender term sheet will not receive accelerated payments from excess cash.<br><br>The Company shall provide the Syndicated Lenders with summary details of quarter-end bank balances of each of the Borrowers' bank accounts indicating the account type (i.e. with details of bank balances of each bank account and indicating whether it is a vendor financing account, collection account, payroll account, LC account, tax account, sundries account, cash proceeds / operating reserve account, interest reserve account (syndication), interest reserve account (non-active bilaterals), amortisation reserve account or cash sweep account) through to and including 31 December 2022. |
| New Money | : | Neither the Company nor any other member of the Group shall, without the consent of the Facility Agent (acting on the instructions of 51% of the Syndicated Lenders), incur any other indebtedness not permitted by this term sheet provided always that (1) the New Permitted Financial Indebtedness and (2) Non-Recourse Trade Arrangements, as set out in this term sheet, shall be permitted without the prior written consent of any Syndicated Lender. |
| Ringfenced Amount Application | : | The Ringfenced Amount will be applied towards the an equity injection of not less than the Ringfenced Amount by way of a rights issue by the Company (the "**Rights Issue**") and: (a) prior to the Rights Issue, the Ringfenced Amount shall be held in an escrow account with a reputable trustee acceptable to a simple majority (51%) in value of the Syndicated Lenders (e.g. Madison Pacific) as a co-signatory to that escrow account (along with a material PBRX shareholder) and, for the avoidance of doubt, both the trustee's and the material PBRX shareholder's signatures will be required for any withdrawals from the escrow account and this shall be documented in an agreement between the account bank, the material PBRX shareholder and the trustee, (b) the Ringfencing Deed shall include a clear obligation that a rights issue must be undertaken if the restructuring completes and the Ringfenced Amount is to be used for that purpose and (c) the Ringfencing Deed shall be a Finance Document. |

| | | |
|---|---|---|
| | | Once the Side Letter has been executed, the Group shall request an upgrade of its collectability rating in writing to each of the Syndicated Lenders and the Syndicated Lenders shall begin processing a collectability rating upgrade upon receipt of the request considering the security position, the continued payment of interest, and the support of majority of other creditors in the scheme of arrangement. Each Syndicated Lender shall take all actions it is able and permitted to take in accordance with prevailing regulations to cause the collectability rating of the Group in each respective onshore Syndicated Lender to be upgraded to 1 by 31 March 2022 (or such later date as agreed between the Company and the Syndicated Lenders), it being understood that the Rights Issue may not be undertaken unless and until the collectability rating of the Group in each onshore Syndicated Lender (both syndicated and bilateral) has been upgraded to 1.<br><br>If the Rights Issue is unable to proceed (e.g. due to regulatory restrictions, the collectability rating of the Group not being upgraded to 1 or for any other legal reason and is not in respect of anything the Company or its affiliates have failed to do), this will not constitute an event of default, provided that the Rights Issue occurs by 30 December 2022. |
| Security | : | List of security to be granted in favour of the security agent acting on behalf of the Facility Agent and the Syndicated Lenders to be broadly in accordance with the description in the "Amended Facility" row above. |
| Costs and Expenses | : | The Borrowers shall promptly on demand pay to any finance party (as the case may be) all pre-agreed costs and expenses (including legal fees) reasonably incurred by any of them in connection with the consideration, negotiation, preparation, and execution of the Transaction. For the avoidance of doubt, such pre-agreed costs and expenses include the Syndicated Lenders' legal fees which have been incurred to date and will be incurred in connection with the Transaction. |
| Documentation | : | Unless set out in this term sheet and save for carve-outs required to implement the restructuring or required by the Company to run the business of the Group, undertakings, representations and other terms are to be generally the same as per the existing Syndicated Facility agreement (and will include language to address LIBOR transition). |

The parties shall keep this draft term sheet confidential and shall not disclose the draft term sheet, nor disclose the existence of the draft term sheet, to any other person (other than its key management personnel, legal and financial advisors), save where necessary or desirable to disclose it to any court or otherwise as required by any regulatory authority.

Notwithstanding the foregoing, the Syndicated Lenders may provide a copy of the draft term sheet to potential assignees and/or sub-participants, provided that such potential assignees and/or sub-participants are subject to a duty of confidentiality on substantially the same terms.

This draft term sheet shall be governed by English law and any dispute arising out of or connected with this draft term sheet shall be resolved by arbitration in Singapore conducted in the English language by three arbitrators pursuant to the Arbitration Rules of the Singapore International Arbitration Centre for the time being in force.

**SCHEDULE**
**Interest and Amortisation Payments**

Each interest payment shall be of an amount equal to a monthly payment of the interest rate per annum of LIBOR and the margin specified in items 7 and 8 of the 'Amended Facility' section of the term sheet (each, an "**Interest Payment**")

Each amortisation payment shall be of an amount equal to 3.6% of the original aggregate principal amount outstanding under the Syndicated Facility as at 1 January 2022, payable quarterly starting from the 5th quarter following 1 January 2022 (each, an "**Amortisation Payment**").

In the event that any of the payment dates as specified below is not a business day, payment shall be made on the previous business day.

Scenario A: Maturity Date of 1 January 2023 (i.e. if the extension is not exercised)

| REPAYMENT DATE | REPAYMENT INSTALMENT |
|---|---|
| 31 January 2022 | Interest Payment |
| 28 February 2022 | Interest Payment |
| 31 March 2022 | Interest Payment |
| 30 April 2022 | Interest Payment |
| 31 May 2022 | Interest Payment |
| 30 June 2022 | Interest Payment |
| 31 July 2022 | Interest Payment |
| 31 August 2022 | Interest Payment |
| 30 September 2022 | Interest Payment |
| 31 October 2022 | Interest Payment |
| 30 November 2022 | Interest Payment |
| 31 December 2022 | Interest Payment + 100% aggregate principal amount outstanding |

Scenario B: Maturity Date of 1 January 2024 (i.e. if the extension is exercised)

| REPAYMENT DATE | REPAYMENT INSTALMENT |
|---|---|
| 31 January 2022 | Interest Payment |
| 28 February 2022 | Interest Payment |
| 31 March 2022 | Interest Payment |
| 30 April 2022 | Interest Payment |
| 31 May 2022 | Interest Payment |
| 30 June 2022 | Interest Payment |
| 31 July 2022 | Interest Payment |
| 31 August 2022 | Interest Payment |
| 30 September 2022 | Interest Payment |
| 31 October 2022 | Interest Payment |
| 30 November 2022 | Interest Payment |
| 31 December 2022 | Interest Payment |
| 31 January 2022 | Interest Payment |

8

| | |
|---|---|
| 28 February 2022 | Interest Payment |
| 31 March 2022 | Interest Payment + Amortisation Payment |
| 30 April 2022 | Interest Payment |
| 31 May 2022 | Interest Payment |
| 30 June 2022 | Interest Payment + Amortisation Payment |
| 31 July 2022 | Interest Payment |
| 31 August 2022 | Interest Payment |
| 30 September 2022 | Interest Payment + Amortisation Payment |
| 31 October 2022 | Interest Payment |
| 30 November 2022 | Interest Payment |
| 31 December 2023 | Interest Payment + 100% aggregate principal amount outstanding |

## APPENDIX 8

## (RESTRUCTURING TERM SHEET (AMENDED BILATERAL FACILITIES))

The Restructuring Term Sheet (Amended Bilateral Facilities) are set out on the next following pages.

Restructuring Term Sheet (HSBC)

| Parties | |
|---|---|
| Borrowers | The following are the borrowers under the Existing Facility Agreement (HSBC) and which will be Borrowers under the Trade Finance Facilities:<br>1. PT Pan Brothers Tbk. ("**PBRX**" or the "Company")<br>2. PT Pancaprima Ekabrothers<br>3. PT Hollit International<br>4. PT Ocean Asia Industry<br>5. PT Prima Sejati Sejahtera ("**PSS**")<br>6. PT Eco Laundry Hijau Indonesia<br>7. PT Apparelindo Prima Sentosa<br>8. PT Eco Smart Garment Indonesia<br>9. PT Berkah Indo Garment |
| Program Sponsor | Buyer(s) of goods from the Vendor Companies with which the Active Bilateral Facility Lender has supply chain financing programs.<br><br>As of the date of this term sheet, the Program Sponsor is Adidas International Trading B.V. |
| Vendor Companies | Vendor Companies means suppliers of goods to the Program Sponsor.  As of the date of this term sheet the Vendor Companies are as follows:<br>1. PBRX<br>2. PSS<br><br>The Vendor Companies may be expanded to include other Borrowers provided they are suppliers to the Program Sponsor. |
| Active Bilateral Facility Lender | PT Bank HSBC Indonesia ("**HSBC**" or "**Lender**") |
| | |
| **HSBC Existing Facility** | |
| Existing Facility Agreement (HSBC) | The US$50,000,000 corporate facility agreement dated 9 August 2017 (No. JAK/000224/U/170512) and made between, among others, PBRX and HSBC as bank, as amended by a first amendment to corporate facility agreement dated 23 July 2018 (No. JAK/180408/U/180525) and as further amended by a second amendment to corporate facility agreement dated 21 October 2019 (No. JAK/190570/U/190925). |
| HSBC Overdue Amount | US$ 12,132,701 (a US$ equivalent of total outstanding of US$ 10,306,965.11 and IDR 26,465,878,603 using IDR/USD exchange rate as of 30 June 2021 of 14,496).<br><br>The HSBC Overdue Amount shall be included as part of the Facility Limit under a new LC/SKBDN facility (described below in the section "**Trade Finance Facilities**") covered by Approved Invoices submitted under the Supply Chain Financing Program (described below in the section "**Supply Chain Financing Program**"). |
| Cancellation of default interest or penalties | All outstanding default interest and/or penalties under the HSBC Existing Facility shall be irrevocably and unconditionally cancelled. |
| | |
| **Trade Finance Facilities** | |

| | |
|---|---|
| Trade Finance Facilities | Letter of Credit/Surat Kredit Berdokumen Dalam Negeri ("**LC/SKBDN**") facilities with a facility limit in the amount of the HSBC Overdue Amount as of the date of the Amended Facility Agreement (HSBC), subject to the applicable Credit Support Coverage Ratio.<br><br>Such limit includes the HSBC Overdue Amount from the HSBC Existing Facility.<br><br>Type of Letter of Credit: Sight LC or Usance LC (no other form of LC is available, such as UPAS, etc). |
| Term | The Trade Finance Facilities shall be committed and made available for a term of a minimum of 24 months from the HSBC Effective Date.  During the Term of the Trade Finance Facilities the Vendor Companies shall remain enrolled in the Supply Chain Financing Program so long as it is offered by HSBC. |
| Currency | USD for LC<br>IDR and/or USD for SKBDN |
| Repayment of HSBC Overdue Amount | The HSBC Overdue Amount shall be repaid in 12 equal monthly instalments. The instalments shall be made on the 15th of each month (or the next business day if 15th is a holiday), with the first payment falling within one month after the signing of this term sheet.<br><br>Upon the first instalment of the HSBC Overdue Amount, HSBC shall reactivate the trade lines for the Borrowers to utilize subject to the Supply Chain Financing Program. |
| Fees applicable to the HSBC Overdue Amount | The HSBC Overdue Amount will incur interest of 5% p.a for USD loan and 8.5% p.a for IDR loan which shall be calculated and paid monthly on the same date as each instalment payment for the HSBC Overdue Amount.<br><br>Any Approved Invoices reserved as credit support for the HSBC Overdue Amount shall not be discounted. |
| Credit Support Coverage Ratio | The Trade Finance Facilities shall be backed by the Approved Invoices under the Supply Chain Financing Program.<br><br>The "**Credit Support Coverage Ratio**" means the Approved Invoices divided by the LC/SKDBN Outstanding Amount.  The Credit Support Coverage Ratio shall be no less than 100% at all times, except during the Grace Period where the Credit Support Coverage Ratio shall be no less than 80% of the LC/SKDBN Outstanding Amount.<br><br>"**LC/SKDBN Outstanding Amount**" means the aggregate of the outstanding Overdue Amount and any additional outstanding amounts under the Trade Finance Facilities.<br><br>The Credit Support Coverage Ratio shall be tested on the date of registration of any new Approved Invoices, with the first testing date to be 17 January 2022 or such later date as agreed between PBRX and HSBC ("**First Coverage Testing Date**"). |
| Grace Period | The "**Grace Period**" means the date starting from the HSBC Effective Date until 30 April 2022. |
| Flow of cash from maturing Approved Invoices | If the Credit Support Coverage Ratio is met, any cash payments made by the Program Sponsor on maturing Approved Invoices during such period shall be paid to the Vendor Companies, with mechanism defined below.<br><br>Mechanism: any funds paid by Program Sponsor shall be remitted to HSBC Supply Chain Financing Account before paid to the Vendor companies' operating accounts. This is to ensure that the total amount of Approved Invoices and cash held with HSBC complies with Credit Support Coverage Ratio. This mechanism is to be monitored and implemented on weekly basis. |

|  | If the Credit Support Coverage Ratio is not met, the cash equivalent of the shortfall will be withheld from the payments of maturing Approved Invoices under the Supply Chain Financing Program and held in the HSBC Supply Chain Financing Account until the combination of cash held and Approved Invoices meet the Credit Support Coverage Ratio.<br><br>HSBC may not withhold any of the cashflows from maturing Approved Invoices prior to the First Coverage Testing Date. |
|---|---|
| Conditions of LC/SKBDN issuance | (i)   Issuance of LC or SKBDN must be against a list of beneficiaries pre-approved in writing by the Lender from time to time. The Borrowers must also provide the Lender with any supporting document(s) (including but not limited to purchase and supply contracts with suppliers, and/or purchase orders in respect of such purchase and supply contracts) required by the Lender from time to time for the purpose of any LC or SKBDN issuance, to evidence that the raw material order made by the relevant Borrower(s) from such supplier is genuine.<br>(ii)  The Borrowers agree that an LC and SKBDN may not be issued by the Lender if:<br>    a.   the Lender has not received sufficient supporting documents (such as purchase orders or contracts) in respect of the relevant order;<br>    b.   the LC or SKBDN request is to be subject to Telegraphic Transfer (TT) Claim Reimbursement (i.e enabling claim for payment prior to receipt/presentation of documents); and<br>    c.   destination port(s) is/are outside of Indonesia.<br>Additionally, any issuance of LC and/or SKBDN shall be subject to the following conditions:<br>    a.   tenor shall be at a maximum of 120 days; and<br>    b.   issuance of LC and/or SKBDN for procurement of machinery(ies) will not be allowed. |
| Fees for new issuance of LC/ SKBDN under the Trade Finance Facilities | There shall be no double counting of fees via Discounting Fees concerning any Approved Invoices reserved as credit support for new issuance of LC/SKBDN under the Trade Finance Facilities.  The fees applicable for new issuance of LC/SKBDN are as follows:<br><br>-  Issuance of 0.1% flat or min USD 30/ IDR 500,000<br>-  Acceptance of 0.9% pa or min USD 75/ IDR1,000,000<br>-  Amendment (other Fee): USD 30 / IDR 750,000 (amendment of amount / tenor refer to issuance fee)<br>-  Telex Charges: USD 25 / IDR 500,000 |
|  |  |
| **Supply Chain Financing Program** | |
| Supply Chain Financing Program | It is the intent of the parties that the Vendor Companies and/or Borrowers (as necessary) enter into supply chain financing agreement(s) by furnishing the supporting documents for Supply Chain Financing Program Enrolment.<br><br>As of the date of this term sheet, the Vendor Companies will enter into the Supply Chain Financing Program with Adidas. |
| Carve Out of Invoices from Any Security Pledge | Accounts receivable and invoices in respect of purchases by the Program Sponsor are to be excluded from any security pledge to other lenders, bilateral or otherwise. |
| Approved Invoices | Means those invoices that have been issued by the Vendor Companies and accepted by the Program Sponsor for payment at a fixed maturity date. |

|  | The payment destination stated under all Approved Invoices shall be the non-operating accounts of respective Vendor Companies at HSBC Indonesia. |
|---|---|
| HSBC Effective Date | The HSBC Effective Date will be the date on which: <br> 1. the Existing Facility Agreement (HSBC) is amended; and <br> 2. the Vendor Companies are formally enrolled in an agreed Supply Chain Financing Program. |
| Amended Facility Agreement (HSBC) | The Existing Facility Agreement (HSBC) as amended, restated, supplemented, or otherwise modified on the HSBC Effective Date in accordance with the terms of this term sheet. |
| Facility Limit | Shall mean, at any one point in time, the aggregate amount of all Approved Invoices under the Supply Chain Financing Program multiplied by the Credit Support Coverage Ratio, with maximum amount per HSBC Overdue Amount as of the date of this term sheet, for clarification the amount outstanding as of 30 June 2021 amounted to US$ 12,132,701 (a US$ equivalent of total outstanding of US$ 10,306,965.11 and IDR 26,465,878,603 using IDR/USD exchange rate as of 30 June 2021 of 14,496). |
| Program Mechanics | All Approved Invoices shall be entered into the Supply Chain Financing Program. The Approved Invoices in excess of the outstanding HSBC Overdue Amount can be used as backing for the issuance of additional LC/SKBDN (within the Facility Limit) or can be discounted for cash for the Borrowers. The "**Available Facility Limit**" that can be used for issuance of new LC/SKBDN shall be equal to the Facility Limit less the LC/SKBDN Outstanding Amounts. <br><br> Upon acceptance of the Vendor Companies into the Supply Chain Financing Program: <br> 1. The Vendor Companies shall open and maintain a new dedicated bank account under HSBC ("**HSBC Supply Chain Financing Account**"). <br> 2. The relevant Program Sponsor shall provide the Lender with a list of Approved Invoices via existent method. <br> 3. Invoices received by HSBC which have 7 days or less before payment of such invoices are due may also be counted towards Approved Invoices. |
| Term | Subject to the agreement between the Vendor Companies, Program Sponsor, and Lender. |
| Discounting Fees | Subject to each specific Supply Chain Financing Program with relevant Program Sponsor. <br><br> The Discounting Fees are applicable against available Approved Invoices (in excess of LC/SKBDN Outstanding Amount) that the Vendor Companies opt to convert to cash advance. <br> Under the Adidas Supply Chain Financing Program, the Discounting Fees are as follows: |

| Handling Charge | 0.015% on Bill amount, max. USD100 |
|---|---|
| Early Payment charge | LIBOR + 0.9%* |
| Remittances Fee | Per Bank's standard remittance fees, |

| | *\* The Early Payment Charge pricing may be adjusted aligned with LIBOR transition to SOFR by latest 31 March 2022. HSBC will notify Borrower at least 30 calendar days prior to any adjustments to the interest rates benchmark and/or margin.* |
|---|---|
| Supporting Documents for Supply Chain Financing Program Enrolment | The supporting documents for the Supply Chain Financing Program will include: <br> (1) Open Account via Bank Agreement (an agreement between HSBC and the Vendor Companies with regards to the Supply Chain Financing Program); <br> (2) Email Indemnity (a disclaimer letter and letter of indemnity for instructions made from Vendor Companies to HSBC); |

|  | (3) Designated Email Letter (a request letter to approve designated email addresses of the Vendor Companies); and |
|  | (4) Payment Instruction Letter (a request letter to ensure that any payments from Supply Chain Finance are credited to HSBC Supply Chain Financing Account from certain account numbers of the Vendor Companies in HSBC). |
|  |  |
| **Account Activities Restrictions** | |
| Incoming funds into Borrower's accounts | Source of incoming funds allowed: (1) Program Sponsor; (2) Borrower's own accounts in other Banks. Funds coming from other than Borrower's own name will be rejected. |
| Outgoing transfers out of Borrower's accounts | Beneficiary of outgoing funds allowed: Borrower's own accounts with HSBC (inhouse transfers) or in other Banks. Transfers to beneficiaries other than Borrower's own name will be rejected. |
| **Conditions Subsequent** | |
| Conditions Subsequent | After the Record Date of the Scheme, the Borrowers, Vendor Companies, and HSBC shall execute the Amended Facility Agreement (HSBC) and conclude the enrolment process of the Supply Chain Financing Program. The documentations shall be executed at the latest by 30 ]s after the Record Date of the Scheme or as otherwise agreed between the Borrowers and HSBC.<br><br>PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time. Accordingly, once the Amended Facility Agreement (HSBC) has been executed, HSBC shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (HSBC) shall include wordings on this collectability rating review based on prevailing regulations. |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |

Restructuring Term Sheet (Maybank)

**PT Pan Brothers, Tbk. and subsidiaries**

**Active Bilateral Facility - Restructuring Term Sheet (Maybank)**

**(Subject to Contract)**

The terms set out in this term sheet are a summary of the key terms. These terms do not purport to be a complete description of the terms of the proposed transaction.

This term sheet and its contents are intended for the exclusive use of the parties and shall not be disclosed by any party to any person other than its affiliates and legal and financial advisors for the purposes of the proposed transaction unless the prior written consent of the other party is obtained.

| Parties | |
|---|---|
| Borrowers | The Borrower shall be PT Pan Brothers Tbk ("**PBRX**"). However, the facility shall also be made available to the subsidiary companies that are at least 51% owned by PBRX, as per the Existing Facility Agreement (Maybank). |
| Active Bilateral Facility Lender | PT Bank Maybank Indonesia Tbk ("**Maybank**") |
| **Facility Terms** | |
| Maybank Effective Date | The Maybank Effective Date will be the date on which the Existing Facility Agreement (Maybank) is amended to reflect the terms of this term sheet. |
| Maybank Existing Facility | Active operating bilateral letter of credit and other facilities as per the Existing Facility Agreement (Maybank), with facility limit in the amount of total usage outstanding as of the date of the Amended Facility Agreement (Maybank). |
| Maturity Date | The final maturity date shall be the date falling 24 months from the Maybank Effective Date.

On the Maturity Date, the Borrowers shall settle any outstanding amounts in full unless Maybank agrees that the Maturity Date may be extended. |
| Existing Facility Agreement (Maybank) | The credit agreement No. 10 made before Maria Andriani Kidarsa, SH., Notary in Jakarta, dated 12 March 2003 as amended by the amendment to credit agreement No. 018/PrbPK/CDU-CORP/2018 dated 11 October 2018 and the amendment to credit agreement No. 173B/PrbPK/CDU-CORP/2019 dated 9 October 2019 and last amended by the amendment to credit agreement No. 290/PrbPK/CDU1/2020 dated 13 November 2020 (including all its amendments, addendums and extensions thereof) made between PBRX and Maybank. |
| Amended Facility Agreement (Maybank) | The Existing Facility Agreement (Maybank) as amended, restated, supplemented, or otherwise modified on the Maybank Effective Date in accordance with the terms of this term sheet. |
| Committed Facility Limit | The committed facility limit shall be in the amount of the total usage outstanding as of the date of the Amended Facility Agreement (Maybank). |
| Maybank Overdue Amount | As of 30 June 2021, US$ 3,777,513 (a US$ equivalent of total outstanding of US$ 3,607,907 and IDR 2,458,616,338 using IDR/US$ exchange rate as of 30 June 2021 of |

| | |
|---|---|
| | 14,496). The numbers are to be updated to be the amount as of the date of the Amended Facility Agreement (Maybank). |
| Repayment of Maybank Overdue Amount | The Maybank Overdue Amount shall be repaid in 12 equal monthly instalments. The instalments shall be made on the 15th of each month (or the next business day if 15th is holiday), with the first instalment falling within one month after the Maybank Effective Date.<br><br>The Maybank Overdue Amount instalments paid will refresh the Available Facility Limit. Upon the first instalment of the Maybank Overdue Amount, Maybank shall reactivate the trade lines for the Borrowers to utilize. |
| Cancellation of default interest or penalties | All outstanding default interest and/or penalties under the Maybank Existing Facility up to the signing date of Amended Facility Agreement (Maybank) shall be irrevocably and unconditionally cancelled. |
| Available Facility Limit | Refers to the amount that the Borrowers can drawdown at any time. The Available Facility Limit is calculated as the Committed Facility Limit less all outstanding facility utilizations ("**Outstanding Utilization**") at that point in time.<br><br>For example, assume that the Committed Facility Limit is US\$ 4,000,000. If within the first 30 days after the Maybank Effective Date the Borrowers pay down a maturing usance in the amount of US\$ 500,000 and makes an Maybank Overdue Amount instalment of US\$ 1,000,000, then the Outstanding Utilization will become USD 2,500,000 (being the Committed Facility Limit as of the Maybank Effective Date of US\$ 4,000,000 less the maturing usance payment of US\$ 500,000 and less the Maybank Overdue Amount instalment of US\$ 1,000,000). The Available Facility Limit will be refreshed and at that point in time be available to the Borrowers up to US\$ 1,500,000 (the limit of US\$ 4,000,000 less the Outstanding Utilization of US\$ 2,500,000). |
| Security | Maybank will be entitled to security in the form of a first rank *hak tanggungan* amounting 125% of the latest appraisal report market value over land and building of PBRX's ex-factory in Sukabumi, the land and building located in Tenjoayu, Cicurug district, Sukabumi, West Java with a total land size of 31,090 square meters and total building size of 5,518 square meters. |
| Interest, Fees and Other Charges | 4.25% p.a. for USD facilities and 9.25% p.a. for IDR facilities.<br><br>For interest over the Maybank Overdue Amount, the interest applicable shall be 4.25% p.a. The interest shall be paid monthly at the same date as the instalment payment date.<br><br>Other interest, fees, and charges are as per the Existing Facility Agreement (Maybank). |
| Financial Covenant | The following financial covenants shall apply to Pan Brothers and its subsidiaries as a group ("**Group**") and shall supersede those in the Existing Facility Agreement (Maybank), based on the annual audited consolidated financial statements of the Group:<br>1.      Minimum current ratio of 1.1x;<br>2.      Maximum Net Debt to Equity of 2.0x;<br>3.      Maximum Net Debt to EBITDA of 5.5x; and<br>4.      Minimum EBITDA to Interest of 2.25x. |

| | |
|---|---|
| | "**Current Assets**" means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including any cash and cash equivalent investments.<br><br>"**Current Liabilities**" means the aggregate (on a consolidated basis) of all borrowings (including trade creditors, accruals and provisions) of each member of the Group.<br><br>"**Current Ratio**" means the ratio of Current Assets to Current Liabilities.<br><br>"**EBITDA**" means, EBIT for that measurement period after adding back any amount attributable to the amortization and depreciation of assets of the Group.<br><br>"**Equity**" means, at any time, the aggregate total assets of the Group less the aggregate total liabilities of the Group at that time.<br><br>"**Net Debt**" means, at any time, the aggregate of all obligations of the Group for or in respect of interest-bearing borrowings (including outstanding letters of credit) but deducting the aggregate amount of cash and cash equivalents held by the Group at that time. For the avoidance of doubt, any supply chain financing or other trade arrangements which do not involve recourse to one or more members of the Group shall not be included towards the calculation of Net Debt.<br><br>For the avoidance of doubt, the financial covenants shall be tested on 31 December every year starting from 31 December 2022 until the maturity of the facility based on the annual audited consolidated financial statements of the Group. |
| Representation, warranties, undertakings, and other terms. | To be in-line with the Existing Facility Agreement (Maybank) unless stated otherwise in this term sheet or if reasonably required by the Pan Brothers Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility. In the event of any inconsistency, the terms in this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail.<br><br>Maybank irrevocably and unconditionally agrees not to (prior to the Maybank Effective Date) rely on any cross-default or comparable clause in the Existing Facility Agreement (Maybank) or any other agreement to accelerate the payment of any amount owing under the Existing Facility Agreement (Maybank) or any agreement (howsoever described) mentioned therein, enforce any security securing the amended Existing Facility Agreement (Maybank) (including the *Hak Tanggungan*) or take any other enforcement steps due to any default (howsoever described) in any document to which a relevant creditor is a party.<br><br>There will be routing of cash collection from certain buyers as per section Other Condition below, however there shall not be any requirement to maintain a certain amount of direct income from customers in any of the Borrowers' account(s) with Maybank. |
| Event of Default | To be in-line with the Existing Facility Agreement (Maybank) unless otherwise amended or overridden by this term sheet or if reasonably required by the Pan Brothers Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility. In particular, as this is now a committed facility, the facilities may only be frozen and acceleration or |

|  | enforcement action taken by Maybank only upon the occurrence of an event of default which is continuing.<br><br>Events of default (other than a payment event of default) are each subject to a 14 Business Day grace period if that event of default is capable of remedy and in the case of a payment event of default that is caused by a Disruption Event, a 3 business day grace period will be applicable.<br><br>"Disruption Event" means:<br>(a)    a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Amended Facility Agreement (Maybank), which is not caused by, and is beyond the control of, any of the parties; or<br>(b)    the occurrence of any other event which results in a disruption (of a technical or systems- related nature) to the treasury or payments operations of a party preventing it, or any other party from:<br>(i)    performing its payment obligations under Amended Facility Agreement (Maybank); or<br>(ii)    communicating with other parties under the Amended Facility Agreement (Maybank),<br><br>and which is not caused by, and is beyond the control of, the party whose operations are disrupted.<br><br>In the event of any inconsistency, the terms of this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
|---|---|
| Condition Precedent to the Amended Facility Agreement (Maybank) | 1.    The Borrower shall submit corporate approval according to the Borrower's article of association to (i) approve the terms of, and the transactions contemplated by, the Facility agreement; (ii) to authorised a specified person or persons to execute the Facility agreement and security document.<br>2.    The respective Borrowers shall submit the documents on the Security (i.e original land and building certificate, proof of land & building tax payments) to a notary agreed between Maybank and the Borrowers at the latest 7 days following the signing of the term sheet.<br>3.    Prior to the Record Date of the Scheme, proof of the clean check (*cek bersih*) over the land certificate (security documents) mentioned in No. 2 must be obtained from the respective Notary. The failure to submit the said document shall impact the Bank's decision on the Record Date and the execution of this Amended Facility Agreement;<br>4.    After the Record Date of the Scheme, the Borrowers and Maybank shall execute the Amended Facility Agreement (Maybank). The agreement shall be executed at the latest by 30 days after the Record Date of the Scheme or as otherwise agreed between the Borrowers and Maybank. |
| Conditions Subsequent to the Amended Facility Agreement (Maybank) | 1.    Perfection of the Security shall be done at the latest within 60 days or such later date as agreed after the signing of the Amended Facility Agreement (Maybank).<br>2.    PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time.  Accordingly, once the |

|  | Amended Facility Agreement (Maybank) has been executed, Maybank shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (Maybank) shall include wordings on this collectability rating review based on prevailing regulations.<br><br>"**Record Date**" means 7 December 2021 (voting date).<br><br>"**Rights Issue**" means a rights issue of an amount of US$50 million to be carried out by the Company as per the Scheme which is underwritten by key shareholders who have agreed to ringfence such amount under the terms of a ringfencing deed to be entered into prior to the Restructuring Effective Date (as such term is defined in the Scheme documents). |
|---|---|
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |
| Other Condition | To route cash collection from the following key buyers or other companies agreed by the key buyers to Borrowers' accounts in Maybank from the Routing Date (as defined below) and confirmation from the buyers on the change of accounts:<br><br>• Burton<br>• Betabrand<br><br>The above list of key buyers which collections are to be routed through Maybank may be changed from time to time if agreed between the Borrowers and Maybank.<br><br>The cash routing shall happen within 60 business days after the signing of the term sheet or such later date as agreed between Maybank and the Borrowers (the "**Routing Date**"). |
| Governing Law | Indonesian Law |
| Jurisdiction | Indonesian courts |

**Term Sheet - Permata**

| Parties | |
|---|---|
| Borrowers | 1.  PT Pan Brothers Tbk ("**PBRX**" or the "**Company**")<br>2.  PT Pancaprima Ekabrothers ("**PPEB**")<br>3.  PT Prima Sejati Sejahtera ("**PSS**") |
| Original Relevant Active Bilateral Facility Lender | PT Bank Permata Tbk ("**Permata**") |
| Group | Group means the Company and its subsidiaries from time to time. |
| **Facility Terms** | |
| Original Active Bilateral Effective Date | The Original Active Bilateral Effective Date will be the date on which:<br>1.  the Existing Facility Agreement (Permata) is amended and restated; and<br>2.  the security sharing agreement is entered into by, among others, the Borrowers and the Original Relevant Active Bilateral Facilities Lenders (as defined below) as of the date of this term sheet (the "**Security Sharing Agreement**"). |
| Facility | Active operating bilateral letter of credit and other facilities as per the Existing Facility Agreement (Permata), with committed facility limit of US$ 14,041,340.<br><br>| Company | Limit |<br>|---|---|<br>| PBRX | 2,053,157 |<br>| PPEB | 2,661,180 |<br>| PSS | 9,327,003 |<br>| **Total** | **14,041,340** | |
| Term | The Facility shall be committed and made available for a term of a minimum of 24 months from the date of the Original Active Bilateral Effective Date. |
| Existing Facility Agreement (Permata) | The credit agreement No. 41 dated 26 August 2014 and No. 103 dated 24 July 2014 made between PBRX and certain other entities as obligors and Permata, as amended from time to time, most recently by two amendments: (i) No. KK/20/0372/AMD/CG1 dated 24 October 2020 among PBRX, PPEB, and Permata; and (ii) No. KK/20/0370/AMD/CG1 dated 24 October 2020 between PSS and Permata. |
| Amended Facility Agreement (Permata) | The Existing Facility Agreement (Permata) as amended, restated, supplemented, or otherwise modified on the Original Active Bilateral Effective Date in accordance with the terms of this term sheet. |
| Interest, Fees and Other Charges | As per the Existing Facility Agreement (Permata). |
| Financial Covenant | The following financial covenants shall apply to the Group and shall supersede those in the Existing Facility Agreement (Permata), based on the annual audited consolidated financial statements of the Group:<br><br>1.    Minimum Current Ratio of 1.1x;<br>2.    Maximum Net Debt to Equity of 2.0x;<br>3.    Maximum Net Debt to EBITDA of 5.5x; and<br>4.    Minimum EBITDA to Interest of 2.25x. |

|  | |
|---|---|
|  | "**Current Assets**" means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including any cash and cash equivalent investments.<br><br>"**Current Liabilities**" means the aggregate (on a consolidated basis) of all borrowings (including trade creditors, accruals and provisions) of each member of the Group.<br><br>"**Current Ratio**" means the ratio of Current Assets to Current Liabilities.<br><br>"**EBITDA**" means, EBIT for that measurement period after adding back any amount attributable to the amortization and depreciation of assets of the Group.<br><br>"**Equity**" means, at any time, the aggregate total assets of the Group less the aggregate total liabilities of the Group at that time.<br><br>"**Net Debt**" means, at any time, the aggregate of all obligations of the Group for or in respect of interest-bearing borrowings (including outstanding letters of credit) but deducting the aggregate amount of cash and cash equivalents held by the Group at that time.   For the avoidance of doubt, any supply chain financing or other trade arrangements which do not involve recourse to one or more members of the Group shall not be included towards the calculation of Net Debt.<br><br>For the avoidance of doubt, the financial covenants shall be tested on 31 December every year starting from 31 December 2022 until the maturity of the Term based on the annual audited consolidated financial statements of the Group. |
| Representation, warranties, undertakings | To be in-line with the Existing Facility Agreement (Permata) unless stated otherwise in this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In the event of any inconsistency, the terms in this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
| Events of Default | To be in-line with the Existing Facility Agreement (Permata) unless otherwise amended or overridden by this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In particular, as this is now a committed facility, the facilities may only be frozen and acceleration or enforcement action taken by Permata only upon the occurrence of an event of default which is continuing.<br><br>Events of default (other than a payment event of default) are each subject to a 14 Business Day grace period if that event of default is capable of remedy and in the case of a payment event of default that is caused by a Disruption Event, a 3 Business Day grace period will be applicable.<br><br>"Disruption Event" means:<br>(a)      a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Amended |

|  | |
|---|---|
|  | Facility Agreement (Permata), which is not caused by, and is beyond the control of, any of the parties; or<br><br>(b)  the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a party preventing it, or any other party from:<br><br>(i)  performing its payment obligations under the Amended Facility Agreement (Permata); or<br><br>(ii)  communicating with other parties under the Amended Facility Agreement (Permata),<br><br>and which is not caused by, and is beyond the control of, the party whose operations are disrupted.<br><br>In the event of any inconsistency, the terms of this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |

**Details of all Active Bilateral Facilities**

| Active Bilateral Facilities | The existing Active Bilateral Facilities made available to the Company and its subsidiaries as at the date of this term sheet are provided by the banks listed below (together, the "**Original Active Bilateral Facilities Lenders**"):<br><br>1.  UOB<br>2.  Permata<br>3.  Maybank<br>4.  HSBC<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities shall also be Active Bilateral Facilities lenders.<br><br>"**Active Bilateral Facilities**" means active committed letter of credit facilities provided to the Company and/or each of its subsidiaries. |
|---|---|
| Relevant Active Bilateral Facilities | The existing Relevant Active Bilateral Facilities made available to the Company and its subsidiaries on the date of this term sheet are provided by the banks listed below (together, the "**Original Relevant Active Bilateral Facilities Lenders**"):<br><br>1.  UOB<br>2.  Permata<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities which is provided with shared security in the form of a first ranking fiducia over the Pledged Receivables shall also become Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities**" means Active Bilateral Facilities provided by Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities Lenders**" means Active Bilateral Facilities lenders who are entitled to shared security in the form of a first ranking fiducia over the Pledged Receivables pursuant to the terms of the Security Sharing Agreement (being, as of the date of this term sheet, the Original Relevant Active Bilateral Facilities Lenders).  Any new Relevant Active Bilateral Facilities Lenders will have the same security rights as the Original Relevant Active Bilateral Facilities Lenders. |

| | |
|---|---|
| Committed Facility Limits from the Active Bilateral Facilities Lenders | As of the date of this term sheet the Committed Facility Limits from the Original Active Bilateral Facilities Lenders are as follows:<br><br>1. UOB: Committed Facility Limit of US$ 8,423,511<br>2. Permata: Committed Facility Limit of US$ 14,041,340<br>3. HSBC: Committed Facility Limit of maximum US$ 12,132,701<br>4. Maybank: Committed Facility Limit of US$ 4,249,797<br><br>Notwithstanding the above, the cumulative limits of all Active Bilateral Facilities lenders (provided by the Original Relevant Active Bilateral Facilities Lenders or new Active Bilateral Facilities lenders, including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more members of the Group), shall not at any time exceed US$75 million in aggregate (or its equivalent in any other currency or currencies), provided that after the Rights Issue (as defined below) has taken place, such limit may be increased to US$100 million (or its equivalent in another currency or currencies), subject to the following security coverage conditions being met:<br><br>a) During the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.5x of the cumulative facility limit of the Relevant Active Bilateral Facilities; and<br>b) After the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.25x of the cumulative facility limit of the Relevant Active Bilateral Facilities.<br><br>For the avoidance of doubt, supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more members of the Group shall be permitted, subject to the Other Conditions below.<br><br>"**Receivables Security Coverage Ratio**" is calculated as the aggregate amount of the Pledged Receivables divided by the aggregate committed facility limits of the Relevant Active Bilateral Facilities provided by the Relevant Active Bilateral Facilities Lenders.<br><br>"**Rights Issue**" means a rights issue of an amount of US$50 million to be carried out by the Company as per the Scheme which is underwritten by key shareholders who have agreed to ringfence such amount under the terms of a ringfencing deed to be entered into prior to the Restructuring Effective Date (as such term is defined in the Scheme documents). |
| Notification on issuance of new Relevant Active Bilateral Facilities | The Borrowers shall notify the Common Security Agent of the issuance of any additional committed facility limit for letter of credit facilities by Original Relevant Active Bilateral Facilities Lenders or new Relevant Active Bilateral Facilities Lenders. |
| | |
| **Shared Security for the Relevant Active Bilateral Facilities Lenders** | |
| Security | All Relevant Active Bilateral Facilities Lenders will be entitled to share security in the form of a first ranking fiducia over receivables (excluding receivables the subject of supply chain financing arrangements which do not involve recourse to one or more members of the Group) and a pledge over the collection accounts in respect of those receivables of the entities below (the **"Pledged Receivables"**): |

|  |  |
|---|---|
|  | 1. Key Obligors:<br>    a. PBRX<br>    b. PPEB<br>    c. ESGI<br>    d. PSS<br>2. Secondary Obligors:<br>    a. Hollit<br>    b. OAI<br>    c. APS<br><br>The registration and updating of the fiducia over receivables will be undertaken by the Common Security Agent appointed under the Security Sharing Agreement as follows:<br><br>1. Quarterly: All trade receivables from the Key Obligors are to be registered quarterly with the fiducia office; and<br>2. Six-monthly: All trade receivables from the Secondary Obligors are to be registered six-monthly with the fiducia office. |
| Security Sharing Agreement | The Security Sharing Agreement will be entered into by the Relevant Active Bilateral Facilities Lenders and the Common Security Agent and will govern, among others, the sharing of the Security over the receivables indicated in this term sheet and their associated collection accounts by all Relevant Active Bilateral Facilities Lenders *pro rata*. |
| Conditions Subsequent | After the Record Date of the Scheme, the Borrowers and Permata shall execute the Amended Facility Agreement (Permata). The agreement shall be executed at the latest by 30 days after the Record Date of the Scheme or as otherwise agreed between the Borrowers and Permata.<br><br>Perfection of the Security shall be done at the latest within 90 days or such later date as agreed (between the Company and the Relevant Active Bilateral Facilities Lenders) after the Original Active Bilateral Effective Date.<br><br>PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time.  Accordingly, once the Amended Facility Agreement (Permata) has been executed, Permata shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (Permata) shall include wordings on this collectability rating review based on prevailing regulations. |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |
| Other Conditions | To route cash collection from the following key buyers or other companies agreed by the key buyers to Borrowers' accounts in Permata from the Routing Date (as defined below) and confirmation from the buyers on the change of accounts: |

|  | <ul><li>The North Face</li><li>Kathmandu</li><li>Indygena</li></ul><br>The above list of key buyers which collections are to be routed through Permata may be changed from time to time if agreed between the Borrowers and Permata.<br><br>Supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of the title arrangements) to one or more members of the Group in respect of the buyers above can only be executed with prior approval from Permata.<br><br>The cash routing shall happen within 60 business days after the signing of the term sheet or such later date as agreed between the Borrowers and Permata (the "**Routing Date**"). |
|---|---|
| Common Security Agent | Permata |
| Governing Law | Indonesian Law |
| Jurisdiction | Indonesian courts |

Term Sheet - UOB

| Parties | |
|---|---|
| Borrowers | 1.  PT Pan Brothers Tbk ("**PBRX**" or the "**Company**")<br>2.  PT Pancaprima Ekabrothers ("**PPEB**")<br>3.  PT Eco Smart Garment Indonesia ("**ESGI**")<br>4.  PT Prima Sejati Sejahtera ("**PSS**")<br>5.  PT Hollit International ("**Hollit**")<br>6.  PT Ocean Asia Industry ("**OAI**")<br>7.  PT Apparelindo Prima Sentosa ("**APS**") |
| Original Relevant Active Bilateral Facilities Lender | PT Bank UOB Indonesia ("**UOB**") |
| Group | Group means the Company and its subsidiaries from time to time. |
| **Facility Terms** | |
| Original Active Bilateral Effective Date | The Original Active Bilateral Effective Date will be the date on which:<br>1.  the Existing Facility Agreement (UOB) is amended and restated; and<br>2.  the security sharing agreement is entered into by, among others, the Borrowers and the Original Relevant Active Bilateral Facilities Lenders (as defined below) as of the date of this term sheet (the "**Security Sharing Agreement**"). |
| Facility | Active operating bilateral letter of credit and other facilities as per the Existing Facility Agreement (UOB), with committed facility limit of US$8,423,511. |
| Term | The Facility shall be committed and made available for a term of a minimum of 24 months from the date of the Original Active Bilateral Effective Date. |
| Existing Facility Agreement (UOB) | The credit agreement No. 58 dated 20 April 2011 made between PBRX and certain other entities as obligors and UOB, as amended from time to time, most recently by an amendment No. 920/09/2020 dated 9 September 2020, supplemented with an additional amendment on facility limit and pricing based on an email sent by UOB on 10 December 2020 (subject: UOB – Trade Limit). |
| Amended Facility Agreement (UOB) | The Existing Facility Agreement (UOB) as amended, restated, supplemented, or otherwise modified on the Original Active Bilateral Effective Date in accordance with the terms of this term sheet. |
| Interest, Fees and Other Charges | As per the Existing Facility Agreement (UOB). |
| Financial Covenant | The following financial covenants shall apply to the Group and shall supersede those in the Existing Facility Agreement (UOB), based on the annual audited consolidated financial statements of the Group:<br><br>1.     Minimum Current Ratio of 1.1x;<br>2.     Maximum Net Debt to Equity of 2.0x;<br>3.     Maximum Net Debt to EBITDA of 5.5x; and<br>4.     Minimum EBITDA to Interest of 2.25x.<br><br>"**Current Assets**" means the aggregate (on a consolidated basis) of all inventory, work in progress, trade and other receivables of each member of the Group including any cash and cash equivalent investments. |

| | |
|---|---|
| | "**Current Liabilities**" means the aggregate (on a consolidated basis) of all borrowings (including trade creditors, accruals and provisions) of each member of the Group. |
| | "**Current Ratio**" means the ratio of Current Assets to Current Liabilities. |
| | "**EBITDA**" means, EBIT for that measurement period after adding back any amount attributable to the amortization and depreciation of assets of the Group. |
| | "**Equity**" means, at any time, the aggregate total assets of the Group less the aggregate total liabilities of the Group at that time. |
| | "**Net Debt**" means, at any time, the aggregate of all obligations of the Group for or in respect of interest-bearing borrowings (including outstanding letters of credit) but deducting the aggregate amount of cash and cash equivalents held by the Group at that time.   For the avoidance of doubt, any supply chain financing or other trade arrangements which do not involve recourse to one or more members of the Group shall not be included towards the calculation of Net Debt. |
| | For the avoidance of doubt, the financial covenants shall be tested on 31 December every year starting from 31 December 2022 until the maturity of the Term based on the annual audited consolidated financial statements of the Group. |
| Representation, warranties, undertakings | To be in-line with the Existing Facility Agreement (UOB) unless stated otherwise in this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In the event of any inconsistency, the terms in this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
| Events of Default | To be in-line with the Existing Facility Agreement (UOB) unless otherwise amended or overridden by this term sheet or if reasonably required by the Group to be revised to enable it to run the business of the Group and/or to implement the restructuring and to reflect the fact that this is now a committed facility.  In particular, as this is now a committed facility, the facilities may only be frozen and acceleration or enforcement action taken by UOB only upon the occurrence of an event of default which is continuing. |
| | Events of default (other than a payment event of default) are each subject to a 14 Business Day grace period if that event of default is capable of remedy and in the case of a payment event of default that is caused by a Disruption Event, a 3 Business Day grace period will be applicable. |
| | "Disruption Event" means: |
| | (a)    a material disruption to the payment or communications systems or to the financial markets which are required to operate in order for payments to be made (or other transactions to be carried out) in connection with the transactions contemplated by the Amended Facility Agreement (UOB), which is not caused by, and is beyond the control of, any of the parties; or |
| | (b)    the occurrence of any other event which results in a disruption (of a technical or systems-related nature) to the treasury or payments operations of a party preventing it, or any other party from: |

|  | (i)    performing its payment obligations under Amended Facility Agreement (UOB); or<br><br>(ii)    communicating with other parties under the Amended Facility Agreement (UOB),<br><br>and which is not caused by, and is beyond the control of, the party whose operations are disrupted.<br><br>In the event of any inconsistency, the terms of this term sheet (or the relevant document documenting the terms of this term sheet) shall prevail. |
|---|---|

| **Details of all Active Bilateral Facilities** | |
|---|---|
| Active Bilateral Facilities | The existing Active Bilateral Facilities made available to the Company and its subsidiaries as at the date of this term sheet are provided by the banks listed below (together, the "**Original Active Bilateral Facilities Lenders**"):<br><br>1.   UOB<br>2.   Permata<br>3.   Maybank<br>4.   HSBC<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities shall also be Active Bilateral Facilities lenders.<br><br>"**Active Bilateral Facilities**" means active committed letter of credit facilities provided to the Company and/or each of its subsidiaries. |
| Relevant Active Bilateral Facilities | The existing Relevant Active Bilateral Facilities made available to the Company and its subsidiaries on the date of this term sheet are provided by the banks listed below (together, the "**Original Relevant Active Bilateral Facilities Lenders**"):<br><br>1.   UOB<br>2.   Permata<br><br>In addition to the above, any new bilateral lenders that provide the Company and its subsidiaries with active committed letter of credit facilities which is provided with shared security in the form of a first ranking fiducia over the Pledged Receivables shall also become Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities**" means Active Bilateral Facilities provided by Relevant Active Bilateral Facilities Lenders.<br><br>"**Relevant Active Bilateral Facilities Lenders**" means Active Bilateral Facilities lenders who are entitled to shared security in the form of a first ranking fiducia over the Pledged Receivables pursuant to the terms of the Security Sharing Agreement (being, as of the date of this term sheet, the Original Relevant Active Bilateral Facilities Lenders). Any new Relevant Active Bilateral Facilities Lenders will have the same security rights as the Original Relevant Active Bilateral Facilities Lenders. |
| Committed Facility Limits from the Original Relevant | As of the date of this term sheet the Committed Facility Limits from the Original Active Bilateral Facilities Lenders are as follows:<br><br>1.   UOB: Committed Facility Limit of US$8,423,511 |

| Active Bilateral Facilities Lenders | 2.   Permata:  Committed Facility Limit of US$14,041,340<br>3.   HSBC: Committed Facility Limit of maximum US$ 12,132,701<br>4.   Maybank: Committed Facility Limit of US$ 4,249,797<br><br>Notwithstanding the above, the cumulative limits of all Active Bilateral Facilities lenders (provided by the Original Relevant Active Bilateral Facilities Lenders or new Active Bilateral Facilities lenders, including unsecured financing or trade arrangements such as factoring (under which there is direct recourse to one or more members of the Group), shall not at any time exceed US$75 million in aggregate (or its equivalent in any other currency or currencies), provided that after the Rights Issue (as defined below) has taken place, such limit may be increased to US$100 million (or its equivalent in another currency or currencies), subject to the following security coverage conditions being met:<br><br>a)   During the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.5x of the cumulative facility limit of the Relevant Active Bilateral Facilities; and<br>b)   After the first 12 months post the Original Active Bilateral Effective Date, the Receivables Security Coverage Ratio should be no less than 1.25x of the cumulative facility limit of the Relevant Active Bilateral Facilities.<br><br>For the avoidance of doubt, supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of title arrangements) which do not involve recourse to one or more members of the Group shall be permitted, subject to the Other Conditions below.<br><br>"**Receivables Security Coverage Ratio**" is calculated as the aggregate amount of the Pledged Receivables divided by the aggregate committed facility limits of the Relevant Active Bilateral Facilities provided by the Relevant Active Bilateral Facilities Lenders.<br><br>"**Rights Issue**" means a rights issue of an amount of US$50 million to be carried out by the Company as per the Scheme which is underwritten by key shareholders who have agreed to ringfence such amount under the terms of a ringfencing deed to be entered into prior to the Restructuring Effective Date (as such term is defined in the Scheme documents). |
| Notification on issuance of new Relevant Active Bilateral Facilities | The Borrowers shall notify the Common Security Agent of the issuance of any additional committed facility limit for letter of credit facilities by Original Relevant Active Bilateral Facilities Lenders or new Relevant Active Bilateral Facilities Lenders. |
| | |
| **Shared Security for the Relevant Active Bilateral Facilities Lenders** | |
| Security | All Relevant Active Bilateral Facilities Lenders will be entitled to share security in the form of a first ranking fiducia over receivables (excluding receivables the subject of supply chain financing arrangements which do not involve recourse to one or more members of the Group) and a pledge over the collection accounts in respect of those receivables of the entities below (the "**Pledged Receivables**"):<br><br>1.   Key Obligors:<br>    a.   PBRX<br>    b.   PPEB<br>    c.   ESGI |

|  |  |
|---|---|
|  | d.   PSS<br>2.   Secondary Obligors:<br>   a.   Hollit<br>   b.   OAI<br>   c.   APS<br><br>The registration and updating of the fiducia over receivables will be undertaken by the Common Security Agent appointed under the Security Sharing Agreement as follows:<br><br>1.   Quarterly: All trade receivables from the Key Obligors are to be registered quarterly with the fiducia office; and<br>2.   Six-monthly: All trade receivables from the Secondary Obligors are to be registered six-monthly with the fiducia office. |
| Security Sharing Agreement | The Security Sharing Agreement will be entered into by the Relevant Active Bilateral Facilities Lenders and the Common Security Agent and will govern, among others, the sharing of the Security over the receivables indicated in this term sheet and their associated collection accounts by all Relevant Active Bilateral Facilities Lenders *pro rata*. |
| Conditions Subsequent | After the Record Date of the Scheme, the Borrowers and UOB shall execute the Amended Facility Agreement (UOB). The agreement shall be executed at the latest by 30 days after the Record Date of the Scheme or as otherwise agreed between the Borrowers and UOB.<br><br>Perfection of the Security shall be done at the latest within 90 days or such later date as agreed (between the Company and the Relevant Active Bilateral Facilities Lenders) after the Original Active Bilateral Effective Date.<br><br>PBRX and the Group consider the need for new letter of credit lines to be of critical importance to the operations of the Group, and are targeting to obtain new lines by 31 March 2022. However, to do so, the onshore banks would need to have upgraded the Group's collectability rating to 1 by such time. Accordingly, once the Amended Facility Agreement (UOB) has been executed, UOB shall review the collectability rating in accordance with prevailing regulations. It being understood that any delay in the upgrade to collectability rating 1 may adversely impact the operations of the Group. The Amended Facility Agreement (UOB) shall include wordings on this collectability rating review based on prevailing regulations. |
| Scheme | Means the scheme of arrangement proposed by the Company under Section 71 of the Insolvency, Restructuring and Dissolution Act, in its present form subject to modifications, conditions and/or approvals as the Court may impose or approve and as permitted by the terms of the Scheme. |
| Other Conditions | To route cash collection from the following key buyers or other companies agreed by the key buyers to Borrowers' accounts in UOB from the Routing Date (as defined below) and confirmation from the buyers on the change of accounts:<br><br>• Uniqlo<br>• Columbia<br>• Hunter |

| | The above list of key buyers which collections are to be routed through UOB may be changed from time to time if agreed between the Borrowers and UOB.<br><br>Supply chain financing or other trade arrangements (such as (but not limited to) factoring or retention of the title arrangements) to one or more members of the Group in respect of the buyers above can only be executed with prior approval from UOB.<br><br>The cash routing shall happen within 60 business days after the signing of the term sheet or such later date as agreed (the "**Routing Date**"). |
|---|---|
| Common Security Agent | Permata |
| Governing Law | Indonesian Law |
| Jurisdiction | Indonesian courts |

## PT Pan Brothers, Tbk. and subsidiaries

## Non-Active Bilateral Facilities - Restructuring Term Sheet

## (Subject to Contract)

The terms set out in this draft term sheet are a summary of the key terms only to facilitate further discussions between the Non-Active Bilateral Lenders and the Borrowers. These terms do not purport to be a complete description of the terms of the proposed transaction.

This draft term sheet and its contents are intended for the exclusive use of the Borrowers and shall not be disclosed by the Borrowers to any person other than the Borrowers' affiliates and legal and financial advisors for the purposes of the proposed transaction unless the prior written consent of the Non-Active Bilateral Lenders is obtained.

| PARTIES AND INDEBTEDNESS | | |
|---|---|---|
| Existing Borrowers | : | PT Pan Brothers, Tbk. ("**PBRX**" or the "**Company**") and its relevant subsidiaries as set out in the table in Schedule 1.<br>PBRX and its subsidiaries referred to above shall individually be referred to as a "**Borrower**" and collectively referred to as the "**Borrowers**". |
| Group | : | PBRX and all of its (direct and indirect) subsidiaries from time to time. |
| Non-Active Bilateral Lenders | : | The bilateral lenders as set out in the table in Schedule 1 who have opted not to provide any further committed active facilities post restructuring of the Group. |
| Non-Active Bilateral Facilities Amount / Existing Indebtedness | : | The aggregate of the principal amounts outstanding under the Non-Active Bilateral Facilities (being approximately USD 31,228,613).<br><br>All outstanding default interest or penalties shall be unconditionally and irrevocably cancelled. |
| Non-Active Bilateral Facilities | | Bilateral facilities granted by Non-Active Bilateral Lenders as set out in Schedule 1. |
| PROPOSED TRANSACTION AND PROCESS | | |
| Transaction | : | This draft term sheet contemplates that the Existing Borrowers and the Non-Active Bilateral Lenders shall enter into a common framework agreement (the "**Common Framework Agreement**") which will override the terms in the existing underlying Non-Active Bilateral Facilities agreements in accordance with the terms of this term sheet and reflect consequential amendments to reflect the terms of the restructuring of the indebtedness of the Group as sanctioned by the Singapore court under the scheme of arrangement. Each Non-Active Bilateral Lender's total participation shall be equal to its respective aggregate principal amount outstanding of the Existing Indebtedness. |
| Process | : | While ideally the Company would like the Transaction to be completed by way of unanimous consent of all its creditors, the Company will implement the Transaction by way of a scheme of arrangement.<br><br>The transaction will be implemented as follows:<br>1.  Agreement and signing of this draft term sheet;<br>2.  Signing of key transaction documents (to be held in escrow and coming into effect in accordance with the terms of the scheme of arrangement), such key transaction documents to include, but not be limited to:<br>　　a.  The Common Framework Agreement.<br>　　b.  A cash account management agreement ("**CAMA**") which will describe how the Group will manage its cash/cash pooling arrangements going forward; and<br>　　c.  Such other documents as the Non-Active Bilateral Lenders and/or the Company may reasonably require in order to implement the Transaction. |

| Conditions | : | It shall be a condition precedent to the Common Framework Agreement coming into effect that: |
|---|---|---|
| | | 1.  The Group shall procure that all Non-Active Bilateral Lenders agree to sign up to the Common Framework Agreement. |
| | | 2.  All outstanding and accrued interest (but not default interest) on the Existing Indebtedness as well as other amounts payable under the existing Non-Active Bilateral Facilities agreements shall be paid up to such date. |
| | | 3.  [●], being an Indonesian top-7 accounting firm, are to be appointed as monitoring accountant in relation to the CAMA. A simple majority (51%) by value of the Non-Active Bilateral Lenders, the active bilateral lenders and the syndicated lenders may agree to a later change if necessary. |

**RESTRUCTURING AND RESCHEDULED NON-ACTIVE BILATERAL FACILITIES**

| Amended Non-Active Bilateral Facilities | : | The key commercial terms of the Amended Non-Active Bilateral Facilities are as below. |
|---|---|---|
| | | 1.  Lenders: Non-Active Bilateral Lenders. |
| | | 2.  Amount: The Existing Indebtedness / aggregate of the principal amounts outstanding under the Non-Active Bilateral Facilities, being USD 31,228,613 as of the date of this term sheet. |
| | | 3.  Cancellation of default interest or penalties: All outstanding default interest and/or penalties under the Non-Active Bilateral Facilities shall be irrevocably and unconditionally cancelled. |
| | | 4.  The Non-Active Bilateral Lenders may elect one of the three options below: |
| | |    a.  a three-year term out starting from 31 March 2022 with monthly amortisation starting from the third year (i.e. 12-monthly equal amortization in year three) and interest rate of LIBOR + margin of 3.00%, with no security; |
| | |    b.  option to exchange into a new convertible bond with terms as set out in Schedule 2. Non-Active Bilateral Lenders to elect if they wish to exercise this option on or before 31 March 2022; or |
| | |    c.  a payment of 15% of the principal amount of a Non-Active Bilateral Lender's debt (as a one-time payment in full settlement) at the time of the rights issue. Non-Active Bilateral Lenders to elect if they wish to exercise this option on or before 31 March 2022. |

| CAMA: Bank Accounts, Minimum Operating Reserve and Cash Sweep Mechanism | : | The Company, PPEB, PSS, and ESGI shall be permitted to open and maintain the following types of accounts with any account banks, which shall be freely operated and maintained by each Borrower (the "**Operating Accounts**"): |
|---|---|---|
| | | a) vendor financing accounts (for receipt of cash advances under vendor financing programmes); |
| | | b) collection accounts (to receive collections from customers, loan proceeds, insurance proceeds and to make payments to suppliers) which shall be pledged in favour of certain active bilateral facility lenders; |
| | | c) payroll accounts (for payment of payroll); |
| | | d) LC accounts (for payments of LC outstandings); |
| | | e) tax accounts (for payments of taxes); and |
| | | f) sundries accounts. |

Amounts in the Company, PPEB, PSS, and ESGI's collection accounts are permitted to be transferred to any of such Borrower's payroll accounts, LC accounts, tax accounts or sundries accounts for payment of the required amounts for operations (including payroll amounts, LC outstandings, tax amounts, sundries). Amounts in the Company, PPEB, PSS, and ESGI's collection accounts shall also be transferred to relevant third party accounts for payments due to suppliers, active bilateral lenders (for LC outstanding, overdue interest and instalments), and to pay scheduled interest and principal amounts to noteholders, syndicated lenders and non-active bilateral lenders.

In addition to the above accounts, the Company, PPEB, PSS, and ESGI may open and maintain the following accounts with any account bank:

a) a cash proceeds / operating accounts;

b) an interest reserve account (syndication);

c) an interest reserve account (non-active bilaterals);

d) an amortisation reserve account; and

e) a cash sweep account.

Other than the accounts mentioned above, the Company, PPEB, PSS, and ESGI shall not open or maintain any other bank account.

Cash available after operations and mandatory interest and (where applicable) amortization payments to the noteholders, syndicated lenders, active bilateral lenders, and non-active bilateral lenders (in accordance with the terms of the scheme of arrangement) shall be applied in accordance with the following waterfall on a quarterly basis:

a.    First, to top up the cash proceeds / operating reserve accounts.

Prior to the rights issue, an aggregate operating cash reserve of no more than USD75 million (or its equivalent in any currency or currencies) may be maintained across all the Operating Accounts and cash proceeds / operating reserve accounts of the Company, PPEB, PSS, and ESGI, but excludes any interest reserve account and amortisation reserve account.  After the rights issue, such aggregate operating cash reserve limit shall be increased to USD100 million (or its equivalent in any currency or currencies) (the "**Minimum Operating Reserve** ").

b)  Second, to top up the interest reserve accounts (syndication) in the amount of interest payments due to syndicated lenders for the next quarter and the interest reserve accounts (non-active bilaterals) in the amount of interest payments due to non-active bilateral lenders for the next quarter (on a pro-rata basis based on outstanding amount). The interest reserve accounts (syndication) shall be secured in favour of the syndicated lenders.

c) Third, to top up the amortization reserve accounts in the amount of principal amortization payments due to syndicated lenders for the next quarter (i.e. only one quarter amortisation payment is reserved at any one time).  These accounts shall be secured in favour of the syndicated lenders.

d) Lastly, any excess cash (after payments in paragraphs (a) to (d) above are made) shall be transferred to the cash sweep accounts every six months and be applied subject to and

|  |  |  |
|---|---|---|
|  |  | in accordance with the cash sweep mechanism below. These accounts shall be secured in favour of the syndicated lenders and the non-active bilateral lenders.<br><br>Any excess cash above the Minimum Operating Reserve (and after payments in paragraphs (a) to (d) above are made) shall be used to accelerate payments to the syndicated lenders and Non-Active Bilateral Lenders in the following priority (the "**Cash Sweep Mechanism**"):<br><br>a.  payments of principal amounts outstanding under the amended and restated syndicated facility agreement; and<br>b.  payments of principal amounts outstanding under the Amended Non-Active Bilateral Facilities, provided no less than USD50 million of outstanding indebtedness under the amended and restated syndicated facility agreement has been paid down (after which excess cash is to be pro-rated based on outstanding amounts under the amended and restated syndicated facility agreement and the Amended Non-Active Bilateral Facilities (excluding outstanding amounts converted by Non-Active Bilateral Lenders to the new convertible bond, if any Non-Active Bilateral Lenders choose this option)).<br><br>For the avoidance of doubt, excess cash is to be applied pro rata between the amended and restated syndicated facility agreement and the Non-Active Bilateral Facilities only after the facilities under the amended and restated syndicated facility agreement have been paid down by USD50 million.<br><br>The Cash Sweep Mechanism shall take effect 1 year after 1 January 2022  and shall be tested semi-annually and verified by the monitoring accountant.<br><br>Excess cash shall not be applied towards accelerated payments of any new convertible bond.  For the avoidance of doubt, Non-Active Bilateral Lenders that exercise the new convertible bond exchange option in accordance with the terms of Schedule 2 will not receive accelerated payments from excess cash. |
| Costs and Expenses | : | The Borrowers shall promptly on demand pay to any Non-Active Bilateral Lender (as the case may be) all pre-agreed costs and expenses (including legal fees) reasonably incurred by any of them in connection with the consideration, negotiation, preparation, and execution of the Transaction. |
| Documentation | : | Unless set out in this term sheet and save for carve-outs required to implement the restructuring or required by the Company to run the business of the Group as will be set out in the Common Framework Agreement, undertakings, representations and other terms are to be generally the same as per the existing Non-Active Bilateral Facilities agreements. |

The parties shall keep this draft term sheet confidential and shall not disclose the draft term sheet, nor disclose the existence of the draft term sheet, to any other person (other than its key management personnel, legal and financial advisors), save where necessary or desirable to disclose it to any court or otherwise as required by any regulatory authority.

Notwithstanding the foregoing, the Non-Active Bilateral Lenders may provide a copy of the draft term sheet to potential assignees and/or sub-participants, provided that such potential assignees and/or sub-participants are subject to a duty of confidentiality on substantially the same terms.

This draft term sheet shall be governed by Indonesian law and the parties submit to the Commercial Court of Jakarta in respect of any dispute arising out of or in connection with this draft term sheet.

**SCHEDULE 1**

**Non-Active Bilateral Facilities**

## 1.1 NON-ACTIVE BILATERALS

| Borrower | Debt | Guarantors | Governing Law | outstanding principal amount as of 30 June 2021 |
|---|---|---|---|---|
| • PT Pan Brothers Tbk., PSS, PPEB, ESGI, BIG | • Sight/Usance Documentary and Letter of credit up to USD7,500,000 provided by PT Bank BNP Paribas Indonesia | N.A. | Indonesia | USD 2,401,084 |
| • PT Pan Brothers Tbk., PPEB, Hollit, PSS, TPG, VPM, ESGI, BIG, OAI | • Uncommitted letter of credit up to USD 54,000,000 provided by ANZ Indonesia (now Strait Merchant Capital) | N.A. | Indonesia | USD 7,455,273 |
| • PT Pan Brothers Tbk., ESGI, PSS, TPG | • LC Import/Local (Sight, Usance) up to USD35,000,000 and Forex (Forward) up to USD1,000,000 provided by MUFG Indonesia (now **SC Lowy**) | N.A. | Indonesia | USD 21,372,256 |
| • PT Pan Brothers Tbk., PPEB, ESGI, TPG, PSS | • Letter of Credit Facility up to USD3,000,000 and Bank Guarantee Facility up to USD3,000,000 provided by PT Bank Mizuho Indonesia (now **SC Lowy**) | N.A. | Indonesia | |

**SCHEDULE 2**

**Mandatory Convertible Bond ("MCB")**

| | |
|---|---|
| MCB Creditors | Non-Active Bilateral Lenders who opted for the option to convert their outstanding facilities into MCB.<br><br>"**MCB Holders**" shall mean the creditors who are issued with the MCBs and any person that acquires an interest in the MCBs after the MCB Effective Date. |
| Issuer | PBRX |
| Converted Debt Amount | The sum of the outstanding principal amount plus any accrued interest (but not default interest) of such Non-Active Bilateral Lender under its Non-Active Bilateral Facilities:<br><br><table><tr><th>Existing Creditor</th><th>Amount of Converted Debt (principal)</th></tr><tr><td>[ ]</td><td>[USD xx]</td></tr><tr><td>[ ]</td><td>[USD xx]</td></tr></table> |
| MCB Effective Date | The date that the MCBs are issued which shall be on or as soon as reasonably practicable after and in any event by no later than [30 June 2022]. |
| MCB Maturity Date | 3 years from the MCB Effective Date. |
| Coupon Rate | The MCBs will receive an interest of LIBOR + margin of 1.5%, with LIBOR floor of 0.25%. |
| Security | Unsecured. |
| Conversion Mechanics | The MCB Holders may elect to convert, in whole or in part, the MCBs into ordinary shares in the Company after 6 months following the MCB Effective Date at the MCB Strike Price, provided that the average Market Share Price for the last [60] days is equal to or higher than the MCB Strike Price.<br><br>If such election is made, unless previously redeemed, repurchased or converted and cancelled, 100% of the Converted Debt Amount shall be mandatorily converted into ordinary shares in the Company at the MCB Strike Price on the MCB Maturity Date.<br><br>"**Market Share Price**" means the daily closing price of the Company's shares listed in Indonesian Stock Exchange under ticker "PBRX". |
| MCB Strike Price | IDR 400 |
| Transfer Restrictions | The MCB Holders shall provide no less than [14] days prior written notice to the Company of any intention to assign and/or transfer the MCBs save that any transfer restrictions shall not apply to the extent they prevent the MCBs from being cleared in the relevant clearing systems. |
| Other Conditions | The MCB Holders are not entitled to acceleration of principal payment under Cash Sweep Mechanism. |

| Governing Law | Indonesian Law |
|---|---|
| Jurisdiction | Indonesian courts |